**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

## [PROPOSED] ORDER

Upon reading the Government's motion for summary judgment, Plaintiff's

opposition thereto, and any reply; and upon consideration of other papers and

proceedings had herein, it is hereby

**ORDERED** that the Government's motion be, and hereby is denied, and it

is further

**ORDERED** that Plaintiff is awarded fees and costs; and it is further;

**ORDERED** that Plaintiff is awarded the following additional relief

_____.


_____
STEPHEN A. VADEN, JUDGE

Dated: _____, 2024
        New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

<u>**PLAINTIFF'S OPPOSITION TO THE**</u>
<u>**GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**</u>

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, Plaintiff, Cozy Comfort Company, LLC, respectfully moves this Court for an Order denying the Government's motion for summary judgment. As set forth in the accompanying memorandum of law, there are numerous material facts in genuine dispute so summary judgment is inappropriate at this time. The facts and reasoning for Plaintiff's opposition are set forth in the attached memorandum, the exhibits submitted with the Government's motion for summary judgment, and the exhibits submitted with Plaintiff's opposition.

//

//

//

WHEREFORE, Plaintiff requests that this Court enter an order denying the Government's motion for summary judgment and granting such other and further relief as may be just and appropriate.

Dated December 8, 2023, Los Angeles, California.

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA
Attorneys for Plaintiff
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

By:   /s/*Christopher J. Duncan*
      Christopher J. Duncan

      /s/*Elon A. Pollack*
      Elon A. Pollack

## **TABLE OF CONTENTS**

**PAGE**

**TABLE OF AUTHORITIES**................................................................ ii

**I.      INTRODUCTION** ...............................................................3

**II.     QUESTION PRESENTED**...................................................4

**III.    LEGAL STANDARD** ..........................................................5

**IV.    FACTUAL OVERVIEW** .......................................................6

**V.     SUMMARY OF ARGUMENT** ...............................................12

**VI.    ARGUMENT** ....................................................................14

  **A. Legal Meaning of the HTSUS 6110 Term "Pullover"** .................14

  **B. Legal Meaning of the HTSUS 6110 Term "Similar Article"**........17

  **C. Properties of The Comfy® are in Genuine Dispute** ....................19

    **1. Length**.................................................................19

    **2. Weight and Thickness**.............................................22

    **3. Width** ...................................................................24

  **D. Characteristics of The Comfy® are in Genuine Dispute**...............24

    **1. Micro-Fleece/Sherpa Combination** ..............................24

    **2. Reversible/One-Size-Fits-All Sizing** ............................27

  **E. Use of The Comfy® is in Genuine Dispute**...........................28

## <u>TABLE OF CONTENTS (Cont'd.)</u>

<u>**PAGE**</u>

    **1. Design** .................................................................................28

    **2. Marketing** ...........................................................................32

    **3. Sales** ...................................................................................33

    **4. Primary Use** .....................................................................36

  **F. <u>Proper Classification of the Comfy®</u>** ...........................39

**VII.**   <u>**CONCLUSION**</u> .........................................................40

**CERTIFICATE OF COMPLIANCE** .................................................42

# TABLE OF AUTHORITIES

**CASES**             **PAGE**

Aectra Ref. & Mktg. v. United States,
   533 F. Supp. 2d 1318
   C.I.T 2086 (Ct. Int'l Trade 2007) ........................................................................17

Allstar Mktg. Grp., LLC v. United States,
   211 F. Supp. 3d 1319, (Ct. Int'l Trade 2017) ................................... 4, 24, 34, 39

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242, S.Ct. 2505
   91 L.Ed.2d 202 (1986) ................................................................................5, 14

Ashflash Corp. v. United States,
   412 F. Supp. 585 (Ct. Int'l Trade 1976) ........................................................23, 37

Bausch & Lomb, Inc. v. United States,
   148 F.3d 1363 (Fed. Cir. 1998) ..............................................................................5

CamelBak Prods. LLC v. United States,
   649 F.3d 1361 (Fed. Cir. 2011) ...........................................................................23

Casio, Inc. v. United States,
   73 F.3d 1095 (Fed. Cir. 1996) .............................................................................23

Faus Grp., Inc. v. United States,
   28 C.I.T. 1879 (2004) ...........................................................................................6

Intercontinental Marble Corp. v. United States,
   27 C.I.T. 654, judgement entered 27 C.I.T. 819 (2003)
   Aff'd. 381 F.3d 1169 (Fed. Cir. 2004.............................................................26

**TABLE OF AUTHORITIES (Continued)**

**PAGE**

Lemans Corp. v. United States,
675 F. Supp. 2d 1374 (Ct. Int'l. Trade 2010)...................................................14

Lemans Corp. v. United States,
660 F. 3d 1311 (Fed. Cir. 2011) ......................................................................15

Phone-Mate, Inc. v. United States,
690 F.Supp. 1048, CIT 575 (1988)
Aff'd. 867 F.2d 1404 (Fed. Cir. 1989).............................................................5

Pitsker v. Office of Pers. Mgmt.,
234 F.3d 1378 (Fed. Cir. 2000)  ....................................................................19

Rocknel Fastener, Inc. v. United States,
267 F.3d 1354 (Fed. Cir. 2001) ......................................................................26

Rubies Costume Co. v. United States,
922 F. 3d 1337 (Fed. Cir. 2019) .....................................................................18

Schlumberger Tech Corp. v. United States,
845 F.3d 1158 (Fed. Cir. 2017) ......................................................................15

Scott v. Harris,
550 U.S. 372 (2007).........................................................................................5

Yamaha Int'l. Corp. v. United States,
3 CIT 108 (1982) .............................................................................................5

Yates v. United States,
574 U.S. 528 (2015)........................................................................................18

iv

**TABLE OF AUTHORITIES (Continued)**

**PAGE**

**U.S. COURT OF INTERNATIONAL TRADE RULES**

U.S.C.I.T Rule 56 ........................................................................5, 39, 40

**FEDERAL REGULATIONS**

19 C.F.R. § 152....................................................................................9

**U.S. CUSTOMS AND BORDER PROTECTION**

Customs Ruling HQ 076819 (November 22, 1985)................................16

Customs Ruling HQ 078919 (January 30, 1987)..................................16

Customs Ruling HQ H334342 (November 14, 2023)  ...........................16

Customs Ruling HQ 817245 (November 18, 1986)...............................16

Customs Ruling NY 824585 (September 17, 1987) ..............................16

Customs Ruling NY 828111 (March 25, 1988)....................................16

**TABLE OF AUTHORITIES (Continued)**

**HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES      PAGE**

Chapter   61, Heading 6101 ...................................................................26

Chapter   61, Heading 6102 ...................................................................26

Chapter   61, Heading 6110 ................................................................*passim*

Chapter   61, Heading 6111 ...................................................................26

Chapter   61, Heading 6114 ................................................................*passim*
Chapter   63, Heading 6301 ................................................................*passim*

Chapter   63, Heading 6307 ................................................................*passim*

Chapter   69, Heading 6909 ...................................................................15

Chapter   69, Heading 6914 ...................................................................15

**OTHER**

Federal Rule of Civil Procedure Rule 30....................................17, 22, 25

11 Webster's Third New International Dictionary(2002) ......................................14

Informed Compliance Publication
"What Every Member of the Trade Community Should Know About: Classification of Marble ("Classification of Marble")   .............................................27

https://www.cdc.gov/nchs/fastats/body-measurements.htm
(Last visited December 6, 2023) ..........................................................11

https://www.merriam-webster.com/dictionary/oblong
(Last visited December 6, 2023) ..........................................................24

**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S OPPOSITION**
**TO THE GOVERNMENT'S FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This case involves the classification of a novel wearable blanket called The Comfy®. Although the parties have engaged in extensive discovery, numerous material facts remain in genuine dispute concerning the use, characteristics, and properties of The Comfy®. Plaintiff produces substantial evidence that: (1) The Comfy® extends to or below the knees of the average user; (2) The Comfy® is heavy and bulky; (3) The Comfy® is and has always been designed, marketed, and sold as a wearable blanket; and (4) The Comfy® is primarily used as a wearable blanket. Plaintiff's position is that based on the use, characteristics, and properties of The Comfy®, it is classified under HTSUS Heading 6301 (blankets), 6307 (other made-up textile articles), or 6114 (other garments), not Heading 6110, as the Government

advances. Plaintiff's legal position is strongly supported by <u>Allstar Mktg. Group, LLC, v. United States,</u> a case in which this Court classified a similar sleeved blanket called the Snuggie® under Heading 6301 (blankets).[1] See <u>Allstar Mktg. Group, LLC, v. United States</u> 211 F. Supp. 3d 1319 (Ct. Int'l Trade 2017).

The Government, on the other hand, disputes these facts and insists that The Comfy® must be classified as a pullover or similar article under Heading 6110, even though it has blanket-like properties and characteristics that distinguish it from a pullover, it has never been sold as a pullover, and a pullover is not its primary use. Despite the parties' numerous disputes concerning material facts, and the many undisputed material facts in Plaintiff's favor, the Government moves for summary judgment. Given there are many genuine issues as to material facts, summary judgment is inappropriate, and the Government's motion for summary judgment should be denied.

## II.    **QUESTION PRESENTED**

Whether The Comfy® is properly classified as a "pullover" or "similar article" under Heading 6110, HTSUS.

---

[1] A blanket is a large (possibly oblong) piece of fabric that is used as a covering for warmth (often but not always on a bed). <u>Allstar Mktg. Group, LLC v. United States</u>, 211 F. Supp. 3d 1319, 1336 (Ct. Int'l Trade 2017).

## III.  <u>LEGAL STANDARD</u>

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is **no genuine issue as to any material fact** and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(c) (emphasis added). Material issues only arise concerning "facts that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the Court is not empowered to weigh the competing evidence of a factual issue. <u>Anderson</u>, 477 U.S. at 249, 106 S.Ct. 2505; <u>Phone–Mate, Inc. v. United States</u>, 690 F.Supp. 1048, 1050, 12 CIT 575, 577 (1988), aff'd 867 F.2d 1404 (Fed.Cir.1989) (citing <u>Yamaha Int'l Corp. v. United States</u>, 3 CIT 108, 109 (1982). Rather, if there is competing evidence as to a material fact, the motion must be denied. <u>Id</u>. At the summary judgment phase, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (internal quotations and parentheticals omitted).

Where tariff classification is at issue, "summary judgment is appropriate when there is no genuine dispute as to the underlying factual issue of **exactly what the merchandise is**." <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1365

(Fed.Cir.1998) (emphasis added). More specifically, in classification cases, genuine issues of material fact arise when there is a dispute over the **use, characteristics, or properties** of the merchandise being classified, or where **commercial meaning** is in question. Faus Grp., Inc. v. United States, 28 C.I.T. 1879 (2004) (internal citations omitted) (emphasis added). A genuine issue exists if there is a dispute as to material facts in any of these categories. Id. Here, there are genuine issues as to material facts in each of the categories.

## IV.   FACTUAL OVERVIEW

In February 2017, Michael Speciale had an idea that would change his life and introduce a brand new concept, the wearable blanket, into the blanket market. Living with his brother Brian during a personal crisis, one chilly morning, Michael saw his seven-year-old nephew curled up on the couch with his knees pulled to his chest inside his dad's adult extra-large sweatshirt. See Pl. Ex. 12, Speciale Dec. ¶ 5. Michael commented to his brother Brian that they should make one of those for adults. Id. His gaze then fell on a fleece blanket draped over the back of the couch and the idea for The Comfy®, a blanket you can wear, was born. Id.

Michael took his idea and a micro-fleece sherpa wearable blanket to a textile producer and instructed the producer to construct a wearable blanket comprised of the blanket fabric with a hood, sleeves, and a marsupial pocket. Id. ¶ 8. The producer constructed a prototype wearable blanket with a thick micro-fleece fabric on the

exterior and an equally thick sherpa fabric side on the interior. Id. ¶ 9. This prototype was shorter than what Michael imagined from observing his nephew (it would only extend down to just below the waist of the average user), so Michael instructed the producer to construct a longer prototype that would cover more of the lower body like a typical blanket, in the same manner his nephew was completely covered that chilly morning. Id. ¶ 10. Michael also had the producer add a longer rear panel to ensure the blanket would cover the lower body even for taller users like himself or his brother Brian, or a user bending forward to pick up a remote control or conduct other household activities. Id. ¶ 11. He had the prototype made so that it would be simple for the user to pull the user's arms in the blanket, as his nephew had done. Id. ¶ 12. He also had it made with a wide circumference at the bottom and no ribbing so that the user, like his nephew, could easily pull the legs completely inside as well. Id. ¶ 13.

Michael and his brother Brian formed Plaintiff as a limited liability company. One of the first things they did was to file a provisional patent application and design patent application in September 2017. Def. Ex. 17, U.S. Patent No. 10,420,431 (provisional patent); Def. Ex. 18, U.S. Patent No. D859,788. The provisional patent application describes the field of invention as relating to **"generally to blankets, and more particularly to large, wearable blankets."** Def. Ex. 17, U.S. Patent No.

10,420,431, at 20 (emphasis added). The application describes the background of

the invention as follows:

> Throw blankets are great at keeping a person warm and comfortable on the couch. Light blankets keep one comfortable on cool nights, and heavy blankets are wonderful for warming oneself on especially cold nights. But sadly, eventually, one must get up from the couch, whether to grab a hot chocolate, adjust the fire, or go to bed. When one gets up, they must leave the warm blanket behind and venture through their home a little colder.
>
> Layering is often the answer when the question is how to stay warm inside a cool building. Layering is the process of wearing many layers of clothing on top of each other. One might wear a thin pair of polyester socks and a thick pair of wool socks, or an undershirt, a t-shirt, and a sweater, or even long underwear and jeans. But, layering is not always the most comfortable. Layering clothes can be constrictive in feeling and restrictive in movement. Children especially dislike layering, their response being to just "turn up the heat!"
>
> However, turning up the heat is not always the answer. Sometimes, it feels good to be warmed by a blanket when the house is a little cold. But blankets simply are not practically portable when worn on the body. An improved, cozy, comfortable blanket is needed.

Id.

In December 2017, Michael and Brian appeared on the television show "The

Shark Tank." See Pl. Ex. 12, Speciale Dec. ¶ 20. Business boomed after that with

net sales reaching [████████] in 2018 and [████████] in 2019. Def. Ex. 20 at

439-44. It was clear consumers had been looking for a novel wearable blanket like

The Comfy® that had thus far been missing from the marketplace.

Between May 2018 and February 2020, Plaintiff filed nearly three hundred entries containing The Comfy® with Customs. See Pl. Ex. 12, Speciale Dec. ¶ 21. Each time, Plaintiff classified The Comfy® as a blanket under HTSUS Heading 6301 and Plaintiff's manufacturers appropriately described The Comfy® on entry records as a "utility blanket." See, e.g., Pl. Ex. 11, Entry No. 9HX-5586673-2. Customs liquidated each of the entries under this classification without question. See Pl. Ex. 12, Speciale Dec. ¶ 21.

In March 2020, pursuant to 19 C.F.R. § 152.2, Customs issued a notice asserting for the first time that The Comfy® is pullover and should be classified under Heading 6110, not Heading 6301. Def. Ex. 1 at 305. Plaintiff immediately complied with Customs' instructions, began listing The Comfy® as a pullover on entry paperwork, and entered The Comfy® under Heading 6110 as Customs directed on all subsequent entries. See Pl. Ex. 12, Speciale Dec. ¶ 22. Plaintiff did not relinquish its legal rights, however, and actively took steps to protest Customs' erroneous liquidations. Id.

The instant case relates to an entry of The Comfy® wearable blankets that was made in a factory operated by the Xiamen Jinshi Export and Import Trade Company, (see Pl. Ex. 12, Speciale Dec., ¶ 17), and imported into the United States about three years ago on or about January 1, 2021, under Entry No. 442-9233932-0. Pacer Doc. #1 at 1. In compliance with Customs' instructions, Plaintiff classified the

merchandise in the entry as pullovers under HTSUS 6110.30.3059/32%. Pacer Doc. #1 at 2. Customs liquidated the entry on December 3, 2021. Id.

Plaintiff filed a timely protest on May 20, 2022, and Customs denied the protest on May 31, 2022. Id. On June 9, 2022, Plaintiff initiated this action with the filing of a summons with the Clerk of Court. Id. On June 29, 2022, Plaintiff filed a three-count complaint alleging that Customs made an incorrect classification decision when it reclassified and liquidated the Comfy® as a pullover under HTSUS 6110.30.3059 and that Customs should have classified the Comfy under Heading 6301 (blankets), 6307 (other made-up textile articles), or 6114 (other garments). Pacer Doc. #6.

The Comfy® is made from two heavy blanket fabrics, microfleece on the exterior and sherpa on the interior. See Pl. Resp. Gov't SOF ¶ 7. The Comfy® features an opening for the head, a hood, long-sleeves with ribbed cuffs, a frontal marsupial pouch pocket open at both ends, and a very large opening at the bottom, which is near the knees for the average user. Id. ¶ 8. The Comfy® does not have a ribbed waistband. Id.

Like any other blanket, The Comfy® is reversible and is available in only one size. Id. ¶ 9, 14. The front panel of The Comfy® measures approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel.

Id. ¶ 10. The back panel measures approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel. Id. ¶ 10.

To wear The Comfy®, users pull it over their heads, extend their arms through the sleeves and have the option of placing the hood over their heads. Id. ¶ 11. The Comfy® extends to or below the knees of the average user. Id. ¶¶ 10, 13, 15. Most users of The Comfy® are women and the average woman is 64 inches (5'4") tall.[2] Id.

The Comfy®'s sherpa lining is designed to provide extra warmth, and The Comfy® is primarily intended to provide users with comfort and soft coziness like a traditional blanket with the added advantage that a user can more easily conduct activities that are more difficult to conduct with a traditional blanket. Id. ¶¶ 19 22.

The Comfy® is sold nearly exclusively in the home or bedding, not apparel, departments of online and retail stores. Id. ¶ 25. Plaintiff's marketing materials focus primarily on The Comfy®'s blanket-like features and routinely use the terms "blanket," "giant blanket," and "wearable blanket." Id. ¶ 28.

Plaintiff, in its domestic and international intellectual property portfolio, "has consistently characterized the products as blankets, and more specifically, as wearable or whole-body blankets." Def. Ex. 5 at 24 et seq. (Letter from Plaintiff's

---

[2] https://www.cdc.gov/nchs/fastats/body-measurements.htm (last visited December 6, 2023).

Intellectual Property Lawyer to U.S. Customs and Border Protection, dated July 24, 2020).

## V.    **SUMMARY OF ARGUMENT**

The Government moves for summary judgment predicated on the singular theory that The Comfy® is a pullover or similar article classified under Heading 6110, and not classified under any other heading. Summary judgment is only appropriate, however, when there are no genuine fact issues as to properties, characteristics, or use. Here, there are genuine issues as to several material facts in each of these three categories.

As a threshold legal matter, the parties fundamentally disagree over the meaning of the terms "pullover" and "similar articles" as used in HTSUS Heading 6110. Plaintiff contends that these terms are limited to upper body garments, in other words, garments that go from the neck to the vicinity of the waist. The Government, however, contends that these terms do not include a length limitation and could even extend all the way down to the feet. Given the relevant case law, Customs trade guidance, previous Customs rulings, and dictionary definitions, the Court should conclude that the terms "pullover" and "similar article" commonly mean upper body garments and not those that extend well below the waist, as The Comfy® does.

Factually, the parties disagree and have offered competing evidence establishing a genuine and material fact issue as to the length, weight, and thickness

of The Comfy®, the construction and other characteristics of The Comfy®, and the use of The Comfy®. Plaintiff contends The Comfy® is too heavy and thick to be a pullover under Heading 6110 while the Government contends it is not. Plaintiff, relying in part on Customs' own guidance to importers, contends The Comfy®'s characteristic micro-fleece exterior/sherpa interior construction, reversibility, and one-size-fits all sizing exclude it from classification as a pullover under Heading 6110 while the Government contends they do not. Finally, Plaintiff contends The Comfy® is designed, marketed, sold, and primarily used as a wearable blanket while the Government contends it is designed, marketed, sold, and primarily used as a garment.

All these facts are material because they go directly to whether The Comfy® is a pullover or similar article as the Government advances in its motion. As the Court observed during the parties' recent conference on mediation, these material facts are still very much in genuine dispute. Consequently, summary judgment is inappropriate at this time and the Court must resolve these genuine factual disputes at trial before ultimately rendering a legal conclusion as to classification.

The following is a chart summarizing the numerous material facts in genuine dispute and the parties' respective competing factual contentions:

| Category | Material Fact | Plaintiff | Government |
|---|---|---|---|
| Properties | Length of The Comfy on the average user | Extends to knees or below | Extends to just below the waist |
|  | Weight/Thickness | Heavy/thick | Not heavy/not thick |
|  | Width | Oblong | Not oblong |
| Characteristics | Micro-fleece/sherpa combination | Used with blankets | Used with pullovers |
|  | Reversible/One-Size-Fits-All | Atypical of pullovers | Typical for pullovers |
| Use | Design | Wearable blanket | Hooded sweatshirt |
|  | Marketing | Wearable blanket | Sweatshirt |
|  | Sales | Wearable blanket | Garment |
|  | Actual Use | Wearable blanket | Clothing |

## VI.  ARGUMENT

### A. Legal Meaning of the HTSUS 6110 Term "Pullover"

As an initial matter, the parties dispute the meaning of the term "pullover" as used in HTSUS Heading 6110 ("sweater, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted"). Given the substantive law will identify which facts are material, the Court will need to resolve this dispute as a matter of law to adjudicate the Government's motion. See Anderson, 477 U.S. at 248).

This Court previously defined a "pullover" as "a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usually made without a placket or similar opening." Lemans Corp. v. United States, 675 F. Supp. 2d 1374, 1381 (2010) (quoting 11 Webster's Third New International Dictionary 1840, 2308

(2002)), affirmed by <u>Lemans Corp. v. United States</u>, 660 F.3d 1311 (Fed. Cir. 2011). Customs, for its part, has issued official guidance to the trade community, consistent with dictionary definitions, that a pullover is "an **upper body** knit garment without a full length opening." Def. Ex. 5 at 1013 (emphasis added).

Consistent with these definitions, Plaintiff proposes that the common meaning of the term "pullover" is limited to an upper body garment, or, in other words, it is a garment that goes from the neck only to the vicinity of the waist and not the lower half or lower parts of the body as well. Plaintiff's position is consistent with the *noscitur a sociism* canon of statutory interpretation, which posits that the meaning of a term is known by the company it keeps. <u>See</u>, e.g., <u>Schlumberger Tech. Corp. v. United States</u>, 845 F.3d 1158, 1165–66 (Fed. Cir. 2017) (interpreting meaning of terms in headings 6909 and 6914 in light of surrounding terms used in headings and explanatory notes). In HTSUS Heading 6110, the term "pullovers" is surrounded by the terms "sweaters…sweatshirts, waistcoats (vests), and similar articles." A guiding thread in the meaning of each of the surroundings terms is that each describes a covering for the upper body, or the region from the neck to the vicinity of the waist, and not a garment that extends well below the waist, such as a dress or a trench coat.

Plaintiff's proposed interpretation is consistent with a series of Customs rulings showing a pullover, like other sweater-like articles, typically has a ribbed waistband, emphasizing that a pullover's length extends only to the waist or slightly

below. <u>See</u> NY 828111 (March 25, 1988); NY 824585 (September 17,1987); HQ 078919 (January 30, 1987); HQ 817245 (November 18, 1986); HQ 076819 (November 22, 1985). Just a few days ago, on November 14, 2023, Customs issued a Customs Headquarters ruling reiterating its position that items in Heading 6110 typically have a ribbed waistband. <u>See</u> HQ H334342 (November 14, 2023) (classifying sweater-like items with a ribbed waistband in Heading 6110 and classifying similar sweater-like articles without a ribbed waistband in other headings).

In contrast, here, the Government takes the remarkably overbroad position that a garment can extend to any length on the body and still be a pullover, sweater, shirt, waistcoat, vest or similar articles under the tariff.[3] <u>See</u> Gov't MSJ p. 34, 38. Theoretically, the Government's broad definition would encompass judicial robes, liturgical vestments, and scholastic gowns. However, such garments are separately classified in Heading 6114, not Heading 6110. <u>See</u> HTSUS Heading 6114, EN (2) and (3). The Government's proposed interpretation thus violates the whole act rule of statutory interpretation, which posits that "each part or section of a statute should

---

[3] Amongst other problems, the Government's definition of pullover is contrary to the canon of construction *ejusdem generis*, which holds that when a general term follows a list of particular terms, the general term only applies to things similar to the particular items in the list. The terms sweater, shirt, waistcoat, and vest listed in Heading 6110 are all specific articles that extend to waist or just below. Yet, the Government would interpret the term pullover expansively to cover any item pulled over the head regardless of length.

be construed in connection with every other part or section so as to produce a harmonious whole." <u>Aectra Ref. & Mktg v. United States</u>, 533 F. Supp. 2d 1318, 31 C.I.T. 2086, 2093 (Ct. Int'l Trade 2007).

The absurdity of the Government's position became crystal clear during the deposition of the Government's Rule 30(b)(6) witness, who testified that even if the garment went down to a person's feet the Government would still consider it an "upper body garment" that meets the Government proposed definition of a pullover. <u>See</u> Pl. Ex. 5, Matherne Depo. Tr. at 37:4-41:15.

Considering the relevant case law, CBP trade guidance, Customs rulings, and dictionary definitions, the term pullover commonly means an upper body garment and not one that extends well past the vicinity of the waist. The Court should therefore adopt and apply the following definition of "pullover": an upper-body garment (such as a sweater, shirt, vest, or blouse) that is put on by being pulled over the head and is usually made without a placket or similar opening.

### B. <u>Legal Meaning of the HTSUS 6110 Term "Similar Article"</u>

The parties also dispute the meaning of the term "similar article" as used in HTSUS Heading 6110 ("sweater, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted"). The parties can agree that the Federal Circuit describes the essential characteristics of a "similar article" as an article that (1) covers the upper body, (2) provides warmth to the wearer, (3) is suitable for wear

over either undergarment or other clothing, and (4) does not protect against wind, rain, or extreme cold. Rubies Costume Co. v. United States, 922 F.3d 1337, 1345-46 (Fed. Cir 2019). The parties can also agree that the statutory canon of *ejusdem generis* is helpful in analyzing the meaning of the term "similar article." This canon provides that "where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Yates v. United States, 574 U.S. 528, 545 (2015). But the parties fundamentally disagree regarding whether the term "similar articles" is inherently limited to articles of a certain length and the way that *ejusdem generis* provides insight into this issue.

As noted above, Plaintiff's position is that each of the specific articles listed in HTSUS Heading 6110 are "upper body garments," or in other words, garments that cover the body from the neck to the vicinity of the waist. Plaintiff therefore posits that under the canon of *ejusdem generis* the term "similar articles" should also be interpreted as including only upper-body garments. The Government argues instead that the term "similar articles" does not contain a length limitation. But as noted above, this interpretation would lead to the absurd result that garments that extend to a user's feet would be considered similar to a waistcoat (vest), sweater, or pullover, as the Government's witness awkwardly testified. See Pl. Ex. 5, Matherne Depo. Tr. at 37:4-41:15.

Another fundamental canon of statutory interpretation is that a statute should be construed in a sensible way that avoids absurd consequences. See Pitsker v. Office of Pers. Mgmt., 234 F.3d 1378, 1383 (Fed. Cir. 2000). A statutory interpretation that results in a full-body garment to be considered a sweater, pullover, waistcoat, or similar article is the epitome of an absurd result. The Court should thus reject the Government's proposed interpretation and instead adopt a sensible interpretation that limits the term "similar articles" to upper-body garments, or those that go from the neck to the vicinity of the waist.

### C. Properties of The Comfy® are in Genuine Dispute

With the appropriate definitions of "pullover" and "similar article" as an upper-body garment pulled over the head in mind, it is apparent that there are numerous material fact issues to be tried, including genuine disputes over physical properties, such as length, weight and thickness, characteristics, and use of The Comfy®.

### 1. Length

The Comfy®'s back panel extends a full 41 inches (nearly 3.5 feet) down from the shoulders. See Gov't SOF ¶ 10. Although the parties agree on this fact, they very much disagree and offer competing evidence about the length of The Comfy® on the body of the average user. Plaintiff contends The Comfy® extends to or below the knees of the average user, which Plaintiff asserts is a 5-foot 4-inch woman. To the

contrary, the Government contends The Comfy® "typically" extends to below the waist of a user. See Gov't MSJ p. 13. Thus, there remains a genuine factual dispute as to the length of The Comfy® on the average user.

Plaintiff proffers evidence that most users of The Comfy® are women, the average woman is 5 feet 4 inches, or 64 inches tall, the average knee height is about 24 inches, and the length from and average woman's head to her knees is about 40 inches. See Pl. Ex. 1, Pl. Roggs Resp., ¶ 6; Pl. Ex. 2, The Comfy® Psychographic Segmentation Study, p. 6. Hence, The Comfy® extends to or below the average woman's knees. In support, Plaintiff produces numerous photographs submitted to Plaintiff by users, overwhelmingly women, showing The Comfy® extends to or below their knees. See Pl. Ex. 3, User Photographs. Therefore, Plaintiff contends that, unlike a pullover or similar article, The Comfy® extends to or below the knees of the average user.

The Government does not proffer any reliable or admissible evidence about the length of The Comfy® on the average user. Instead, the Government's statement of material facts unhelpfully states that The Comfy® "typically extends below the waist." Gov't SOF ¶ 15. This assertion is a drastic understatement insofar as The Comfy® **essentially always** extends well below the waist of any user. The Government then vaguely states that "for some" users The Comfy® will fall mid-thigh and that "[f]or others" it will fall below the knees. Id. The Government also

points to a few cherry-picked photographs of men in The Comfy® (not the average user) and men and women in The Comfy® with their arms conveniently **raised** upward such that the length of the Comfy® is also **raised** upward. See Gov't SOF ¶¶ 13, 15.

The Government's witness was similarly unhelpful and offered confusing testimony on the issue. She initially testified that "based on the information provided to us, it's about the mid-thigh on an average-sized adult." Pl. Ex. 5, Matherne Depo. Tr. at 52:13-15. When pressed for details, she vaguely testified that the average user is "just somewhere in the range" above five feet and below six feet and guessed that the average was five feet five inches. Id. at 52:17-53:2. She then went on to testify that The Comfy® "could perhaps [go] to maybe the knee on a five-foot-five adult." Id. at 53:11-12.

The length of The Comfy® on the average user is material because the Government advances The Comfy® is a pullover or similar article, which, by definition, is an upper-body garment, in other words one that covers the area between the neck and the vicinity of the waist. If Plaintiff is correct that The Comfy® extends to or below the knees of the average user, then The Comfy® is not a pullover or similar article. Given there is a genuine issue as to the material fact of The Comfy®'s length on the average user, summary judgment is inappropriate and this fact can only be determined at trial.

### 2.  **Weight and Thickness**

Plaintiff contends and proffers evidence from Michael Speciale, the person who created The Comfy®, that The Comfy® weighs approximately three pounds and is heavy, bulky, and thick. <u>See</u> Pl. Ex. 1, Pl. Roggs Resp., ¶ 7; Pl. Ex. 4, Speciale Depo. 79:9-80:17. To the contrary, the Government apparently contends that The Comfy® does not have these properties. However, the Government is unable to produce any reliable or admissible evidence on the weight, bulkiness, or thickness because the Government failed to measure these properties. Rather, the Government's Rule 30(b)(6) witness, who drafted Customs' classification decision in this matter, confessed that she **did not physically examine** The Comfy® and has **never observed, touched, held, or worn** The Comfy®, calling into serious question her competence to make the critical classification decision central to this case, especially given the many material facts in genuine dispute. <u>See</u> Pl. Ex. 5, Matherne Depo. Tr. at 73:8-9; 133:1-17. Despite never physically examining or weighing the Comfy, the Government's witness opined that "it's my understanding that it's not so heavy that it would be…like it's a struggle to wear it." <u>Id</u>. at 134:13-15. Given the Government witness's confusing and unreliable testimony on this point, the Court should give her testimony little if any probative value.

The weight and thickness of The Comfy® is material because it goes to whether, assuming *arguendo* it was otherwise once a garment, it is improved or amplified through a thicker and weightier lining – so much so that it has become something else (e.g., a blanket or other type of textile).

In assessing whether an improved or amplified article is excluded from an *eo nomine* statutory designation, a court must determine whether its "essential characteristic" has been preserved or only incidentally altered. Casio, Inc. v. United States, 73 F.3d 1095, 1098 (Fed. Cir. 1996). If the article's "essential characteristic" is preserved or only incidentally altered, it is not excluded from the statutory designation. Id. In deciding whether an article's "essential characteristic" has been preserved, a court may consider the article's primary design, use, and function. CamelBak Prods. LLC v. United States, 649 F.3d 1361, 1368 (Fed. Cir. 2011); Ashflash Corp. v. United States, 412 F. Supp. 585, 587 (Ct. Int'l Trade 1976) ("[I]t is well settled that where merchandise has a single primary function and an incidental, subordinate or secondary function, it is classifiable on the basis of its primary design, construction and function.").

The weight and thickness of The Comfy® is relevant and material to the article's primary design, use, and function. In other words, it goes to what the article was designed to do, how it is marketed and sold, and how it is used. Some articles are light weight and designed, sold, and used with this in mind (e.g., a windbreaker

designed for, sold to, and used by runners or hikers). Other articles are designed to be heavier and provide greater warmth for other circumstances (e.g., blankets used to lounge around the house). Given there are genuine issues pertaining to The Comfy®'s weight and thickness, summary judgment is inappropriate and these facts can only be determined at trial.

### 3. Width

Plaintiff contends and proffers evidence from that The Comfy® is oblong.[4] See Pl. Ex. 3, Pl. Ex. 4, Speciale Depo. 38:5-6 ("It's oblong."). The Government contends, however, that The Comfy® is not oblong. See Def. SOF ¶ 6. Whether The Comfy® is oblong is material because it goes to the use, function, and design of The Comfy®. Plaintiff contends that The Comfy® is primarily used, functions, and was designed as a blanket or wearable blanket. A blanket is a large (possibly oblong) piece of fabric that is used as a covering for warmth (often but not always on a bed). Allstar, 211 F. Supp. 3d at 1336. Given there are genuine issues whether The Comfy®' is oblong, summary judgment is inappropriate and this fact can only be determined at trial.

### D. **Characteristics of The Comfy® are in Genuine Dispute**

#### 1. **Micro-Fleece/Sherpa Combination**

---

[4] Merriam-Webster defines "oblong" as "deviating from a square, circular, or spherical form by elongation in one dimension." https://www.merriam-webster.com/dictionary/oblong (last visited December 6, 2023).

The Comfy® is comprised of a microfleece exterior with a sherpa interior lining. See Gov't SOF ¶ 7. Plaintiff contends and proffers evidence that this combination is unique to blankets and is not used with pullovers or similar articles. See Pl. Ex. 4, Speciale Depo. Tr. at 33:17-39:19, 78:5-79:1, 118:14-119:13. To the contrary, the Government apparently contends that the micro-fleece/sherpa combination is used with apparel, although this contention is belied by the Government's Rule 30(b)(6) witness' testimony that she is unaware of any garments with a sherpa lining. See Pl. Ex. 5, Matherne Depo. Tr. at 135:20-136:3.

Plaintiff proffers evidence that The Comfy® was contrived of and produced by combining two blanket fabrics, micro-fleece and sherpa. See Pl. Ex. 12, Speciale Dec. ¶ 9; Pl. Ex. 4, Speciale Depo. Tr. at 33:17-39:19, 78:5-79:1, 118:14-119:13. Plaintiff further proffers evidence that it is unable to identify any garment with this combination of fabrics. Id. Given The Comfy® is comprised of a combination of blanket, not garment, fabrics, Plaintiff contends it is a blanket, not a pullover or similar article.

The Government does not offer evidence whether micro-fleece is found in garments; however, the Government's own Rule 30(b)(6) witness testified micro-fleece is found in throws, which are a type of blanket. See Pl. Ex. 5, Matherne Depo. Tr. at 51:6-8. As for the sherpa lining, Plaintiff points out that in Customs' Informed Compliance Publication (ICP) to importers on the classification of textiles, Customs

instructs that sweater-like articles such as The Comfy® with a sherpa lining that provide warmth to the user are **excluded** from classification under Heading 6110:

> This term [███████████████] **excludes** garments that have a **sherpa lining** or a heavyweight fiberfill lining (including quilted lining), which are used to provide extra warmth to the wearer. Such garments, whether or not they have a sweater stitch-count, **are classified in heading 6101 or 6102**.

Pl. Ex. 6, *What Every Member of the Trade Community Should Know About: Classification: Apparel Terminology under the HTSUS*, an Informed Compliance Publication, U.S. Customs and Border Protection (June 2008) (ICP), p. 22. Customs' official guidance to textile importers like Plaintiff on classification of items in Heading 6110 is entitled to deference. *See* Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1357–58 (Fed.Cir.2001) (according deference to Customs' interpretation of tariff provision as set forth in agency's "informed compliance" publication). Under the canon of *ejusdem generis*, it makes sense that the other terms in Heading 6110 would likewise exclude sherpa-lined articles.

It is ironic that the Government now minimizes the importance of its official informed compliance guidance to the trade community on the classification of textile articles, fails to include the ICP in its exhibits, and pointedly asks this court **not to grant deference to its own official guidance to importers** (see Gov't MSJ p. 25) simply to try to gain an advantage in this case. Troublingly, the Government previously has taken the opposite position before this Court. *See* Intercontinental

Marble Corp. v. United States, 27 C.I.T. 654, 658, judgment entered, 27 C.I.T. 819 (2003), and aff'd, 381 F.3d 1169 (Fed. Cir. 2004) (considering the Government's argument that the Court should afford deference to Customs' interpretation of the term "marble" as contained in a Customs' "Informed Compliance Publication," *What Every Member of the Trade Community Should Know About: Classification of Marble* (*"Classification of Marble"*), because of this publication's "power to persuade.").

The Comfy®'s characteristic micro-fleece exterior and sherpa interior lining are material because, like the product's thickness and weight, this characteristic goes to the article's primary design, use, and function. Given there are genuine issues as to the material facts of The Comfy®'s characteristic micro-fleece/sherpa construction, summary judgment is inappropriate and these facts can only be determined at trial.

### 2.  **Reversible/One-Size-Fits-All Sizing**

Plaintiff contends that The Comfy®'s characteristic reversibility and one-size-fits-all sizing are characteristic of blankets or other textiles, not pullovers or similar articles. See Pl. Ex. 12, Speciale Dec. ¶ 14. Pullover garments typically come in small, medium, large, and extra-large sizes. See id. To the contrary, the Government apparently contends these characteristics are not atypical for pullovers or similar articles. See Gov't SOF ¶¶ 9, 14.

The Comfy®'s characteristic reversibility and one-size-fits-all sizing are material because these features also go to the article's primary design, use, and function. Given there are genuine issues as to the material facts whether The Comfy®'s reversibility and sizing are atypical for pullovers or similar articles, summary judgment is inappropriate and these facts can only be determined at trial.

**E.  Use of The Comfy® is in Genuine Dispute**

**1.  Design**

Plaintiff contends that The Comfy® was inspired both by a seven-year-old child with his arms and knees tucked into an adult sweatshirt for warmth and a nearby thick fleece blanket. See Pl. Ex. 12, Speciale Dec. ¶ 6. Plaintiff proffers evidence that Michael Speciale, one of Plaintiff's founders, brought a micro-fleece and sherpa blanket to a producer and requested the producer construct a wearable blanket with a hood, sleeves, and a marsupial pocket using this blanket fabric. See Pl. Ex. 12, Speciale Dec. ¶ 8. Specifically, Michael saw his seven-year-old nephew curled up on a couch in an old hoodie. Id. His attention then turned to a plush throw blanket draped over the back of the couch.[5] Id.; Def. Ex. 8. And then the idea for the The Comfy® was born. Id. This evidence emphasizes that The Comfy® was designed to provide the warmth and comfort of a blanket, albeit one that can be worn on the

---

[5] It is noteworthy that the Government omits this extremely important detail in its factual presentation.

body so it will not fall off during certain activities. <u>See</u> Pl. Ex. 4, Speciale Depo. Tr. at 39:6-19; Pl. Ex. 2, The Comfy® Psychographic Segmentation Study.

Plaintiff has also offered evidence that it has consistently characterized The Comfy® as blankets and wearable blankets and focused on the market for blankets in its intellectual property portfolio. For example, the very first words in Plaintiff's very first patent application in 2017 state that "[t]he present invention relates generally to blankets, and more particularly to large wearable blankets." Def. Ex. 5 at 34. The application then describes a problem in the blanket market that the invention seeks to solve, namely that blankets must be left behind when getting up from the couch to grab a hot chocolate, adjust the fire, or go to bed. <u>Id</u>. The application then continues to describe how the invention is useful both as an over-garment like a jacket and also as a blanket "under which the body can be curled up for warmth and coziness." <u>Id</u>. at 38. Other areas address the common features of a blanket, for example the fact that it can be "worn, placed, or draped over one's whole body for full-body comfort and coziness."[6] <u>Id</u>. Plaintiff's other IP filings (both patent and trademark) similarly characterize the products and address the blanket market, as Plaintiff's intellectual property counsel pointed out to CBP in a 2020 letter. <u>See</u> Def. Ex. 5 at 25 <u>et</u> <u>seq</u>.

---

[6] The Government's material statement of facts also omits these extremely important details of the Plaintiff's initial IP filing.

In contrast, the Government contends that The Comfy® is inspired only by a "men's XL hooded sweatshirt" and utterly disregards The Comfy®'s creators' emphasis on a blanket and blanket fabrics, microfleece and sherpa. See Gov't SOF ¶ 16. From the Government's perspective, given The Comfy® has some features sometimes found on a sweatshirt, such as a hood, Plaintiff's reliance on blankets during The Comfy®'s creation, and The Comfy®'s prominent blanket-like design features like its sherpa lining, simply do not matter. The court should reject the Government's myopic perspective.

Further, the Government ignores the substance of the Plaintiff's IP filings and instead tries to deflect the Court's attention to Plaintiff's use of the terms "garment" and "over-garment" in the patent application process. See Gov't SOF ¶¶ 37, 39, 40, and 41. But, Plaintiff has explained that this reference resulted from the absence of the commercial term "wearable blanket" at the time the original patent application was filed, and that Plaintiff has since surrendered this outdated patent and obtained a new patent more accurately covering a "whole body blanket."[7] See Pl. Ex. 4, Speciale Depo. Tr. at 58:6-13, 61:22-62:2; Pl. Ex. 7, Patent No. US D969,458. The

---

[7] The Government's presumption that the patent application somehow influences the Court's classification determination regarding The Comfy® is a classic *post hoc* fallacy. *Post hoc* (a shortened form of *post hoc, ergo propter hoc*) is a logical fallacy in which one event is said to be the cause of a later event simply because it occurred earlier. *Post hoc* is a fallacy because correlation does not equal causation. Plaintiff's patent application has no bearing on the Court's classification determination because a patent application is an entirely different process than importation.

Government also notes the use of the term "sweatshirt" during the trademark application process. See Gov't SOF ¶ 34. But, Plaintiff counters that the trademark was obtained for International Class 024 applicable to "Blanket throws, namely, whole body blankets" category, not the apparel category, and that the U.S. Patent and Trademark Officer (USPTO) has since canceled this mark. See Pl. Ex. 8, Trademark Reg. No. 5678126.[8]

Finally, the Government questionably contends that The Comfy® is manufactured in factories with the term "garment" in the name, even though the subject merchandise was manufactured in a factory that does **not** have garment in its name. See Pl. Resp. Gov't SOF ¶ 49. This misleads this Court as to the manufacturer of the subject merchandise, which is Xiamen Jinshi Export and Import Trade Company, Ltd. Id.

These competing facts regarding The Comfy®'s design are material whether The Comfy® retains the "essential characteristics" of a pullover or similar article or whether it possesses features substantially in excess of these statutory designations such that it must be classified under a different provision. Given there are genuine issues as to the material facts as to whether The Comfy® was designed to be a

---

[8] Plaintiff also holds numerous trademarks for The Comfy® in IC 025, the category for wearable blankets. See, e.g., Trademark Reg. Nos. 6896826, 6540042, and 90780531.

wearable blanket or garment, summary judgment is inappropriate and these facts can only be determined at trial.

### 2. __Marketing__

Plaintiff contends The Comfy® is marketed as a wearable blanket. Pl. Ex. 4, Speciale Depo. 98:1-21, 86:15-21. Plaintiff submits that its marketing materials focus primarily on The Comfy®'s blanket-like features. Plaintiff's marketing materials routinely use the terms "blanket," "giant blanket," and "wearable blanket." Def. Ex. 1 at 266, 639-40; Def. Ex. 5 at 346; Def. Ex. 7-10; Def. Ex. 12. Plaintiff's marketing materials also routinely emphasize that the product is used for lounging, cuddling, and making yourself comfortable. For example, one advertisement states:

> It's the world's first truly wearable blanket. Flip the hood up, pull your legs in, and #FeelTheHappy!

Def. Ex. 1 at 267. Another sells "Extreme Comfort & Luxury Material:"

> Pull your legs into the plush fluffy sherpa to cover yourself completely on the couch, roll the sleeves up to make yourself a snack, & move around freely while taking your warmth wherever you go.

Def. Ex. 5 at 346. Plaintiff's advertisements also routinely incorporate pictures of individuals lounging and relaxing around the house. See Pl. Ex. 3, User Photos. Simply put, when fairly read, it's clear that Plaintiff's marketing campaigns primarily focus on the fact that it is a blanket or wearable blanket, so much so that

Amazon had to create an entirely new category for the product (wearable blankets). Pl. Ex. 4, Speciale Depo. Tr. at 97:1-3.

The Government completely disregards the primary focus of Plaintiff's marketing campaigns and instead myopically focuses on a few random comparisons to oversized or giant sweatshirts. See Gov't SOF ¶ 16. But in its overzealousness, the Government overlooks that The Comfy® is never marketed as a garment alone. Every reference first mentions the term blanket, such as "The blanket…that's a sweatshirt!" and "a giant blanket that's really a giant sweatshirt," and "blanket/sweatshirt." See Gov't SOF ¶¶ 26-33.

It is unclear why the Government believes the secondary marketing term "sweatshirt" should trump the primary descriptive term "blanket" in The Comfy®'s marketing materials or why this combination does not conclusively prove The Comfy® is a combination of these articles such that it should be classified as a generic textile, rather than as a blanket or garment, which Plaintiff has proposed as an alternate classification.

These competing facts regarding The Comfy®'s marketing are material to the primary design, use, and function of The Comfy®, the relevant factors that the Court must consider in deciding whether the product retained the "essential characteristics" of a pullover or similar article or whether it must be classified as something else.

Because these facts are in genuine dispute, summary judgment is inappropriate and these facts can only be determined at trial.

### 3. **Sales**

Plaintiff contends The Comfy® is sold as a blanket primarily to non-apparel retailers who display and advertise The Comfy® nearly exclusively in the blankets, bedding, or home departments of retail or online stores. In contrast, the Government contends The Comfy® is sold at apparel stores.

Plaintiff proffers ample evidence The Comfy® is sold to licensees and customers as a "wearable blanket," not as apparel. See Pl. Ex. 9, Licensee Records [confidential]. Plaintiff further proffers evidence that virtually all of it's The Comfy® sales are to companies that do not specialize in apparel. See Gov't Ex. 20 [confidential]; Pl. Resp. Gov't SOF ¶ 50. Plaintiff's evidence also demonstrates The Comfy® is sold **exclusively** in the bedding or home departments of retail stores like Costco and online stores like Amazon, and that The Comfy® is **never** sold in the wearing apparel sections of any of these stores. See Pl. Ex. 4, Speciale Depo. Tr. 36:20-37:9, 90:5-13, 97:12-16. This Court has held that this operative fact demonstrates that a textile is classified as a blanket. See Allstar, 211 F. Supp. 3d at 1326 (The Snuggie® is sold in the "bedding, housewares, general merchandise, 'impulse buy,' or 'as-seen-on-TV' departments of retail stores," never in the wearing apparel department.").

The Government, in turn, through a questionable series of misleading statements and omissions, argues that The Comfy® is sold as apparel. The Government starts its Statement of Facts by disingenuously stating that The Comfy®'s manufacturer calls The Comfy® a "Knit PullOver" in the commercial invoice for the subject merchandise. See Gov't SOF ¶ 2. Yet, this statement is very deceiving because the language in the factory's commercial invoice came not from Plaintiff, but expressly at the direction of Customs, when it instructed Plaintiff to classify The Comfy® as a pullover in March 2020, nearly one year before the January 2021 entry (not after the entry in May 2021, as the Government incorrectly states in its Statement of Facts). See Pl. Resp. Gov't SOF ¶ 2; Pl. Ex. 10, March 2020 CBPF 29. Prior to Customs' March 2020 instruction, The Comfy®'s manufacturer listed The Comfy® as a "utility blanket" on its commercial invoices. See Pl. Ex. 11, Entry No. 9HX-5586673-2.

The Government also omits any reference to the numerous license agreements produced by Plaintiff in discovery showing that well-known third-party licensees such as [█████████████████████████████] exclusively place The Comfy® in the "Home Furnishings" product category and refer to The Comfy® as a "wearable blanket/throw," not as apparel. See PL. Ex. 9, License Records [confidential]; Plaintiff Ex. 4, Speciale Depo. Tr. at 110:5-115:7.

The Government also misleadingly claims that Plaintiff's products are sold at apparel stores. They do this by referencing three out of the hundreds of Plaintiff's customers that have the term "apparel" in their company names (along with other products). <u>See</u> Gov't SOF ¶ 50. But the Government omits the essential facts that there are <u>hundreds of other customers</u> that do not have the word "apparel" in their names and nearly all of them sell The Comfy® in their bedding or home departments and not their wearing apparel sections. <u>See</u> Pl. Resp. to Gov't SOF ¶ 50; Gov't Ex. 20; Def. Ex. 1 at 241 (sporting goods), 242-43, 245-60 (bedding), 244, 261-62 (As Seen on TV).

Finally, the Government misleads the Court by claiming that one customer, [        ], processed The Comfy® through safety testing for garment protocols, omitting the fact that the testing covers all protocols for softline textile products, including those used for blankets. <u>See</u> Pl. Resp. Gov't SOF ¶ 48; Gov't Exhibit 20 [confidential].

These competing facts regarding The Comfy®'s sales are material because they go to the primary design, function, and use of The Comfy®, which can be considered in determining the classification of an *eo nomine* provision. Given there are genuine issues as to the material facts as to whether The Comfy® is sold as a wearable blanket or apparel, summary judgment is inappropriate and these facts can only be determined at trial.

### 4. **Primary Use**

Plaintiff contends The Comfy® is primarily used to keep warm around the house or outside in the same manner a blanket would be used, albeit better and easier to use because the blanket covers the whole body and does not fall off. In support, Plaintiff produced numerous customer photos showing actual customers using The Comfy® as a blanket in this manner, as well as a psychographic segmentation study concluding this is how users actually use The Comfy®. See Pl. Ex. 3, User Photos; Pl. Ex. 2, The Comfy® Psychographic Segmentation Study. Michael Speciale, the product's inventor and Plaintiff's CEO further testified that this is how most purchasers would use the product. Pl. Ex. 4, Speciale Depo. Tr. at 92:4-6. In contrast, the Government apparently contends The Comfy® is primarily used like a hooded sweatshirt for all sorts of physical activities, while failing to cite to any evidence to support this purported actual primary use.

While it is true that someone can ostensibly use the The Comfy® while taking a walk, raking leaves, or ice skating, just as they could a traditional blanket, there is zero evidence in the record that this is the product's primary use, which is the pertinent inquiry before the Court. See Ashflash Corp., 412 F. Supp. at 587.

Plaintiff posits that The Comfy® is too long, heavy, and bulky to be used primarily as an article of clothing. Rather, Plaintiff proffers evidence from real customers that, while users can conduct certain activities with The Comfy® in the

same manner a user could with a blanket, albeit easier, it is impractical (and frankly embarrassing) for users to try to use The Comfy® as an article of clothing. See Pl. Ex. 3, User Photos; Pl. Ex. 2, The Comfy® Psychographic Segmentation Study. This evidence and common sense suggest, for example, that people frequently wear hooded sweatshirts to the gym, on a jog, or even to work, but no reasonable person would use the long, heavy, bulky, oblong, and thick The Comfy® for these activities, and there is no evidence The Comfy® users do. Id.

The Government imagines The Comfy® as something is it is not, an oversized hoodie, and attempts to hoist this fiction on the Court by force of will alone and nothing else. This is likely because the Government cannot proffer any evidence that The Comfy®'s primary use is as a pullover or hooded sweatshirt. Instead, the Government merely proffers photographs of users standing in The Comfy® often with their arms raised. These pictures provide little insight into how The Comfy® is primarily used. The evidence and common sense suggest that The Comfy® is primarily used "an improved cozy, comfortable blanket" that provides warmth on the couch "when the house is a little cold" and that doesn't have to be left behind when "grab[bing] a hot chocolate, adjust[ing] the fire, or go[ing] to bed." Def. Ex. 5 at 34. In the face of this overwhelming evidence and reason, the Government's desperate speculation to the contrary is not compelling.

The parties' competing facts regarding The Comfy®'s primary use are material as to whether the The Comfy® retains the "essential characteristics" of a pullover or similar article or whether it possesses features substantially in excess of these statutory designations such that it must be classified under a different provision. Because there are genuine issues of material fact on this issue, summary judgment is inappropriate and these facts can only be determined at trial.

**F. Proper Classification of The Comfy®**

As noted above, Plaintiff believes there are genuine issues of material fact such that the case must be tried. With that said, assuming *arguendo* that the Court concludes that there are no genuine issues of material fact in dispute and decides to grant summary judgment in Plaintiff's favor pursuant to Rule 56(f), the Court should classify The Comfy® under Heading 6301 (blankets), 6307 (other made-up textile articles), or 6114 (other garments).

Regarding Heading 6301 (blankets), The Comfy® meets the definition of a blanket, which is a large (possibly oblong) piece of fabric that is used as a covering for warmth (often but not always on a bed). See Allstar, 211 F. Supp. 3d at 1336. In Allstar, the court held that a sleeved blanket called the Snuggie® was classified under Heading 6301 (blankets). Id. In doing so, this Court rejected the Government's position that adding sleeves to a blanket made it something that is not a blanket. Id. at 1335-37. This Court noted that the Snuggie® had been marketed and trademarked as

a blanket and that retail packaging showed people using the product as a blanket. Id. Ultimately, this Court concluded that the addition of the sleeves was incidental and did not transform the Snuggie® from a blanket into something else. Id.

In a similar way, the addition of a few features such as a hood, marsupial pouch, and ribbed cuffs does not transform The Comfy® from a blanket into something else. As noted in detail above, The Comfy® was designed as a wearable blanket, it has always been marketed that way, and that is its primary use. As a result, if the Court determines that there are no genuine issues of fact in dispute, the Court should classify The Comfy® under Heading 6301 (blankets). If the court ultimately concludes that The Comfy® cannot be classified under Heading 6301 (blankets), if the Court concludes it is a garment, the Court should classify The Comfy® under Heading 6114 (other garments), and if not, then the Court should classify it under Heading 6307 (other made-up textile articles).

## VII.  <u>CONCLUSION</u>

Summary judgment should be reserved for those cases in which there are no genuine issues pertaining to material facts. Here, there are numerous genuine issues as to material facts, such as The Comfy®'s properties, characteristics, and use. While the current factual record weighs decidedly in Plaintiff's favor, Plaintiff reasonably posits that the remaining disputes concerning material facts can only be resolved with a trial and thus does not file a cross-motion for summary judgment.

Plaintiff therefore respectfully requests the Court interpret the terms "pullover" and "similar articles" under HTSUS 6110 to mean "upper body garment" (meaning one that ends at or near the waist), find that there are numerous genuine issues of material facts, and deny the Government's motion accordingly. If the Court denies the Government's motion, Plaintiff respectfully requests that the Court either enter judgment for Plaintiff under Rule 56(f) or schedule a post-assignment conference to again explore whether court-annexed mediation may expedite resolution of the case and facilitate potential settlement. Plaintiff continues to believe that the best way for the parties to resolve this matter involving the novel The Comfy® is amicably through the assistance of an unbiased third party.

Dated December 8, 2023, Los Angeles, California.

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA
Attorneys for Plaintiff
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

By    *Christopher J. Duncan*
Christopher J. Duncan

*Elon A. Pollack*
Elon A. Pollack

**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

## <u>CERTIFICATE OF COMPLIANCE</u>

Plaintiff Cozy Comfort®'s Memorandum of Points and Authorities in support of its Opposition to Government's Motion for Summary Judgment, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 9,040 words.

Dated December 8, 2023, Los Angeles, California.

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA
Attorneys for Plaintiff
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

By    *Christopher J. Duncan*
      Christopher J. Duncan