# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| COZY COMFORT COMPANY, LLC, : | |
| : | |
| Plaintiff, : | |
| : | Court No. 22-00173 |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |

## ORDER

Upon consideration of plaintiff's motion *in limine* to exclude the testimony and reports of defendant's expert witness Patricia Concannon; and upon consideration of defendant's response in opposition thereto and other papers and proceedings had herein, it is hereby

**ORDERED** that plaintiff's motion be, and hereby is, denied; and it is further

**ORDERED** that Ms. Patricia Concannon shall be permitted to present expert witness testimony on behalf of defendant at trial.

_____
JUDGE

Dated: _____

New York, New York

1

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| COZY COMFORT COMPANY, LLC, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> UNITED STATES, : <br> : <br> Defendant. : | Court No. 22-00173 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY AND
REPORTS OF DEFENDANT'S EXPERT WITNESS PATRICIA CONCANNON**

This memorandum is respectfully submitted in opposition to plaintiff Cozy Comfort Company, LLC (Cozy Comfort's) motion *in limine* to exclude the testimony and expert and rebuttal reports of defendant's expert witness Patricia Concannon. For the reasons that follow, we show that Ms. Concannon is extremely qualified to testify as an expert in apparel sales, marketing, and merchandising, and her testimony will help the Court determine that The Comfy® is a pullover, it is designed, used, and marketed as such, and it is not designed, used, nor marketed to protect from extreme cold. Accordingly, plaintiff's motion should be denied.

**ARGUMENT**

**I. THE COURT SHOULD DENY PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS PATRICIA CONCANNON**

Plaintiff argues that the Court should exclude Ms. Concannon's expert witness testimony because plaintiff claims that she lacks the expertise to be qualified as an expert, and that she fails to articulate any recognizable or reproducible methodologies. Plaintiff is wrong on both claims.

We address each of these arguments below and show that neither of them warrants the exclusion of Ms. Concannon's expert testimony.

### A. Ms. Concannon's Expertise And Experience Shows That She Is An Expert In Apparel Sales, Marketing, And Merchandising

In *United States v. Univar USA Inc.*, 294 F.Supp.3d 1314, 1328 (Ct. Int'l Trade 2018), this Court addressed the factors that it may consider in determining whether expert testimony is reliable. The *Univar* Court explained as follows:

> The Supreme Court in *Daubert* identified several factors that the court may consider in determining whether testimony is reliable: (1) whether a theory or scientific technique can or has been tested; (2) whether it "has been subjected to peer review and publication"; (3) whether the specific scientific technique has a "known or potential rate of error"; and (4) whether the theory or technique is generally accepted in the "relevant scientific community." 509 U.S. at 593–94, 113 S.Ct. 2786; *see also Kumho Tire*, 526 U.S. at 149–150, 119 S.Ct. 1167. This list of factors, however, "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167. Indeed, "[t]he inquiry envisioned by Rule 702 is ... a flexible one," *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786, and the trial judge has broad latitude when deciding how to determine reliability, *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. "Because it is usually impossible to subject nonscientific theories to experimentation," the court "should concentrate on the expert's experience, rather than methodology." *Amco Ukrservice & Prompriladamco v. Am. Meter Co*, No. CIV.A.00-2638, 2005 WL 1541029, at *2 (E.D. Pa. June 29, 2005) (citing *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167).

294 F.Supp.3d at 1328 (citing to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-594 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In *Univar*, the Court explained that plaintiff's witness, Dr. Henry B. McFarland, testified, in sum and substance, that he had expertise in economics, had dealt with transportation issues and transshipment, and also worked on matters involving the chemical industry. 294 F.Supp.3d at 1328. Given this

testimony, the Court found that Dr. McFarland was "qualified to give the opinions mentioned above." *Id.*

In addition, the *Univar* Court explained that "[e]xperts may rely on opinions of other experts on areas outside their expertise[,]" citing to *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015), and further added that "[i]t is not necessary that the basis for their opinions be obtained from personal perception[,]" citing to *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008). 294 F.Supp.3d at 1329.

In its motion, plaintiff argues that Ms. Concannon should not be qualified as an expert in this case because she "is not an expert in the construction of outerwear." Pl. Mot. In Lim. (Pl. Mot.), 4. But plaintiff's argument is a red herring. We do not offer Ms. Concannon as an expert in the construction of outerwear; instead, we offer her as an expert in apparel sales, marketing, and merchandising. Proposed Pretrial Order (ECF No. 52), 61. As described in our Schedule G-2, and as reflected in her expert report and CV, Ms. Concannon has a B.S. from California State Polytechnic University, Pomona, from 2011, with a major in Apparel Merchandising and Management. Proposed Pretrial Order (ECF No. 52), 61; *see also* Pl. Mot., Ex. A, Concannon Expert Report (ECF No. 54-2). She has worked with distributors of clothing manufacturers, where she has worked in sales, marketing, and merchandising of apparel. *Id.* She has knowledge of garment fabrics as reflected by her experience performing testing on various fabrics for heat transfer. *Id.* She has provided business development assistance and resources to start-up fashion companies. *Id.* She has served as Regional Director of the Los Angeles chapter of Fashion Group International. *Id.* Between 2017 and 2020, she worked with DG Expo, a regional business-to-business fabric and trim trade show, as Director of Communications. *Id.* From December 2020 to February 2024, she worked as Buyer Relations Specialist for Informa

Markets Fashion, specifically for the Sourcing at MAGIC trade Show, where she worked with fashion brands to connect them to a variety of global suppliers and production facilities. *Id.* She has also taught a class at California State Polytechnic University, Pomona called International Apparel Management, and she serves on the Advisory Board for their Apparel Merchandising and Management Department, as well as on the Advisory Board for the Santa Monica College Fashion Department. *Id.* Plaintiff cannot reasonably dispute that she has extensive expertise and experience in the fashion world, particularly in sales, marketing, and merchandising. Moreover, as Ms. Concannon's report and testimony reflect, in order to be able to sell and market apparel, one needs to be knowledgeable to a certain extent about the physical features and designs of apparel. Given that the Court has expressed interest in hearing about the physical characteristics, design, intended use, and marketing of The Comfy® (see ECF No. 48 at 6), Ms. Concannon's extensive expertise in apparel sales, marketing, and merchandising is directly relevant to this case and demonstrates that she is qualified to opine on topics such as apparel sales, marketing, trends, and how garments are sold and marketed based on their design and physical features. *See Univar*, 294 F.Supp.3d at 1328-1329.

In addition, in its motion, plaintiff puts forward several alleged quotes from Ms. Concannon's deposition, but many of these excerpts are incomplete, misleading, and/or without context. *See* Pl. Mot., at 4-5. For example, Ms. Concannon testified as follows:

```
 9·  ·THE WITNESS:· So I will answer I'm not an expert
10·  ·in the construction of outerwear.· However, I know that
11·  ·there are companies that produce extreme cold garments and
12·  ·parkas that do list these numbers on their sales and
13·  ·marketing on their website.· An example would be, let's
14·  ·say, a Canada Goose jacket will say this will protect you
15·  ·in weather under -- you know, below zero.· You know,
16·  ·freezing -- around freezing, below -- whatever the certain
17·  ·temperature would be, that is something that would be
18·  ·indicated, but that is not my area of expertise.
```

5

Pl. Mot., Ex. B, Concannon Depo. Tr. (ECF No. 54-3), at 52.  Here, Ms. Concannon acknowledges that she is not an expert in the construction of outerwear, but her testimony reflects that she *is* knowledgeable about the marketing of outerwear such as Canada Goose jackets, and is familiar with the features of Canada Goose jackets, as also reflected in her expert report.  *See also* Pl. Mot., Ex. A, at 8-11.  In her testimony above, as well in her report, she acknowledges that she is not an expert in determining the specific temperature ranges that a garment like a Canada Goose jacket may provide protection in, but she also explains that she has knowledge of how apparel and outerwear are marketed according to their design, physical features, and technical specifications, and further explains that companies that design and sell products for protection from extreme cold, like Canada Goose, typically market them that way and include temperature ranges showing their products' protection from extreme cold.  *See also* Pl. Mot., Ex. A, at 8-11.

Moreover, Ms. Concannon testified that, although she is not an expert in garment design, she has been involved in the design process, has studied it, has worked with designers, and has expertise regarding tech packs, which are parts of garment design:

```
12· · · · Q.· And how about more specifically garment design?
13· · · · A.· I have -- I have been involved in the process. I
14· ·have studied it.· I have worked with designers on, you
15· ·know, who were designing, but I have not personally
16· ·designed a garment.· My -- the woman I worked with at
17· ·Fashion Business, Inc., who was the founder and president,
18· ·was a designer.· And I sat in a lot of the consultations
19· ·with her and all the sample reviews for members who would
20· ·bring their products in as well as I have been educated on
21· ·how to put together a tech pack.
22· · · · Q.· Okay.· What is a tech pack?
23· · · · A.· Tech pack is basically -- it serves as a legal
24· ·document.· It's also the way -- it's the communication of a
25· ·brand to a factory that they are contracting to produce
·1· ·their garments, whether it's a cut and sew -- it basically
·2· ·will list every component that goes into that garment.
```

>  ·3· · · · · The reason I say it acts as a legal document, if
>  ·4· ·there are errors that come back and if it's stated in the
>  ·5· ·tech pack that protect the brand who hired the factory to
>  ·6· ·produce it.· So when I say every component, I mean the
>  ·7· ·fabric, the stitch, the type of thread, placement of a
>  ·8· ·pocket, a zipper, the -- you know, where a button goes.
>  ·9· ·Basically anything you can think of that goes into
>  10· ·producing your product would go into that tech pack.

*Id.* at 93-94.

Ms. Concannon also testified that she has experience working with all the components of the outdoor apparel industry supply chain, including functional fabrics, trims, components, as well as knowledge of production facilities across the globe:

>  24· · Q. . . . What is your -- what are your job responsibilities
>  25· ·as a show director at Emerald?
>  ·1· · · · A.· I manage all aspects of organizing this particular
>  ·2· ·trade show.· We sell exhibit space to suppliers within the
>  ·3· ·industry -- outdoor industry.· So a large portion of it is
>  ·4· ·functional fabrics, trims, components, also production
>  ·5· ·facilities across the globe.· So we have groups from China,
>  ·6· ·Korea, Vietnam, Central and South America.· Basically,
>  ·7· ·anything that you can think of in the supply chain.
>  ·8· ·People -- the brands would come to our show to source all
>  ·9· ·the components of their supply chain.
>  10· · · · · So I manage the entire show.· So we have someone
>  11· ·who handles buyer relations, which is the outreach to the
>  12· ·brands and the buyers that would attend this trade show,
>  13· ·and then we have sales teams, both domestic and
>  14· ·international, who bring in the exhibitors for the show who
>  15· ·are the basic -- all the components of that supply chain.
>  16· · · · Q.· Can you give me a few examples of the exhibitors?
>  17· · · · A.· Sure.· One is a textile company out of Vancouver,
>  18· ·British Columbia, called KenDor Textiles.

*Id.* at 55-56.

Ms. Concannon further testified that she has experience working with textile companies and outdoor retail brands that sell to other outdoor apparel companies, including outerwear companies like Patagonia, The North Face, and Fjällräven:

>      10      Q.· Okay.· You said that you were a show director for
>      11· ·outdoor --
>      12· · · A.· The show was called Outdoor Design and Innovation.
>      13· · · Q.· Okay.
>      14· · · A.· It is a colocated show with Outdoor Retailer,
>      15· ·which is the sister show to mine.· Outdoor Design and
>      16· ·Innovation, we just launched.· We just had it in June.· So
>      17· ·I was hired in February to direct that show.· So I worked
>      18· ·closely with -- we are, like, two shows in one.· So the
>      19· ·outdoor retailer side is where brands are selling to retail
>      20· ·stores all within the outdoor industry world.· So it might
>      21· ·be like a Patagonia or a North Face or a Fjallraven or any
>      22· ·of those brands.· They would be exhibitors.· The buyers
>      23· ·would be retail stores.
>      24· · · · · So it could be a Dick's Sporting Goods, Academy
>      25· ·Sports, small specialty stores.· Those are the buyers that
> ·1· ·come to that side.· So essentially that side of the store,
> ·2· ·the brands are exhibitors.· My side of the show, the brands
> ·3· ·are the buyers but in a different role.· So you have the
> ·4· ·salespeople here manning a booth, and then they send their
> ·5· ·product development teams to come and source the components
> ·6· ·of the supply chain.

*Id.* at 56-57.

Ms. Concannon also testified that she has expertise in and experience with consumer trends:

>      10· · · Q.· What is consumer trends?
>      11· · · A.· Consumer trends are what -- how people are buying
>      12· ·and -- fashion has involved through the years.· An example
>      13· ·would be during the pandemic there was an uptick in
>      14· ·loungewear and comfort -- comfort apparel.· Work-from-home
>      15· ·clothing, that type of thing.
>      16· · · Q.· I recall.· Fondly.
>      17· · · A.· You know, there are -- in certain demographics
>      18· ·you're going to see different tends.· For example, what
>      19· ·someone might be wearing on the streets of Los Angeles
>      20· ·would be different from Miami, which there's more -- you
>      21· ·know, there's more street wear, urban kind of inspiration.
>      22· ·Certain areas you have more bright colors and blings, so to
>      23· ·speak.· Basically talking about knowing your customer when
>      24· ·you're selling into a wide marketplace; right?· Who are you
>      25· ·selling to?· Are you -- where are you selling your product
> ·1· ·into and knowing how to communicate and market it to those

8

```
·2· ·different demographics is basically what that covers.
·3· · · Q.· Is part of analyzing consumer trends determining
·4· ·how people use a textile?
·5· · · · · MR. KENNEDY:· Objection.· Confusing.· Vague.
·6· · · · · THE WITNESS:· I would say it could fall under
·7· ·that.· If, for example, the work-from-home comfort trend,
·8· ·people would be purchasing a product based on more of the
·9· ·comfort than the aesthetic maybe.· It could be a little bit
10· ·of both, but I think that was a determining factor.
```

*Id.* at 62-63.  As noted above, plaintiff's counsel confirmed Ms. Concannon's knowledge of apparel consumer trends when she described the uptick in loungewear and comfort apparel during the pandemic.

Ms. Concannon further testified that she is knowledgeable about market research:

```
16· · · · · What is market research?
17· · · A.· Market research is knowing who your customer is.
18· ·Identifying -- if you're producing a product, who is your
19· ·target market.· What are their demographics?· What is their
20· ·age range?· What is their kind of lifestyle?· You know,
21· ·there's many components involved in market research.
```

*Id.* at 65.

Finally, Ms. Concannon testified that, although she has not been qualified as an expert in a court before (she has never had the opportunity to), she considers herself to have been qualified as an expert by her peers and institutions in the fields of textiles and fashion:

```
·8· · · Q.· Have you ever been qualified as an expert?
·9· · · A.· Yes.
10· · · Q.· Where was that?
11· · · A.· Various places.· I was invited to a textile show
12· ·in Toronto, Canada, to do a series of seminars on sourcing.
13· ·They hired me as a -- well, they didn't hire me.· I wasn't
14· ·paid, but it was like a barter.· So I was brought in to
15· ·speak.· Say with SOURCING at MAGIC, prior to my employment
16· ·with the company, I was brought into moderate seminars as
17· ·an industry expert.· I was also asked to speak on panels,
18· ·and I was invited to the board of Fashion Group
19· ·International, the Los Angeles Chapter.· Everyone on that
20· ·board was an industry expert, and I served as the regional
```

```
21· ·director for a few years on that board as well.
22· · · · Q.· Okay.· And I'll clarify.
23· · · · · Have you ever been qualified as an expert in a
24· ·court?
25· · · · A.· Not in a court, no.
```

*Id.* at 97; *see also id.* at 86:14-16 ("I have been brought into various different situations as an expert in the apparel industry.").

As reflected by Ms. Concannon's detailed expertise and experience, she is qualified to give the opinions on the topics mentioned above, namely apparel sales, marketing, and merchandising, all of which involve knowledge and experience with garment components, garment design, and the technical specifications of garments, particularly concerning outerwear, as illustrated by her testimony and her expert report.  *See Univar*, 294 F.Supp.3d at 1328-1329; Pl. Mot., Exs. A and B.

### B. Ms. Concannon's Expert Opinion Regarding The Comfy® Is Based On Reliable Methodologies And Experience

Ms. Concannon's testimony mostly involves her experience in the fields of textiles and garments and their sales and marketing.  As the *Univar* Court explained, citing to *Kumho Tire*, 526 U.S. at 152, "'[b]ecause it is usually impossible to subject nonscientific theories to experimentation,' the court 'should concentrate on the expert's experience, rather than methodology.'" 294 F.Supp.3d at 1328.  Ms. Concannon's experience, alone, qualifies her expertise.

Nevertheless, even if we look beyond Ms. Concannon's experience, she also described her methodologies, including that she took a college course on consumer studies which centered on research methodology:

```
·8· · · · Q.· Did you take any college classes that centered on
·9· ·research methodology?
10· · · · A.· Yes.
```

> 11· · · · Q.· What class?
> 12· · · · A.· Basically consumer studies.
> 13· · · · Q.· Okay.· What is consumer studies?
> 14· · · · A.· The behavior of consumers, especially when it
> 15· ·pertains to a certain product, kind of tied into sales.

Pl. Mot., Ex. B, at 45.

Plaintiff argues that she is unqualified for allegedly "failing to articulate *any* recognizable or reproducible methodologies." Pl. Mot., 5-7 (emphasis added). Not so. Ms. Concannon testified about both the methodologies she employed as well as her experience in the textile and apparel industry, including consulting definitions of specific terms from dictionaries, which is reproducible and reliable:

> ·6· · · · · You stated in your report that a blanket does not
> ·7· ·have ribbed cuffs, did you not?
> ·8· · · · A.· I did.
> ·9· · · · Q.· What is your basis for the opinion that blankets
> 10· ·do not have ribbed cuffs?
> 11· · · · A.· The definition of a blanket, as I believe I stated
> 12· ·in here from either Britannica or Merriam-Webster, it's a
> 13· ·cloth -- it's a piece of fabric made of cloth, typically an
> 14· ·odd oblong shape that is traditionally used to cover a
> 15· ·person, to provide warmth on a bed, could be on a sofa.
> 16· ·It's (indicating).
> 17· · · · Q.· Okay.· But I think you stated before you've never
> 18· ·been involved in blanket design?
> 19· · · · A.· No.
> 20· · · · Q.· And have you ever been involved in blanket sales?
> 21· · · · A.· I have been involved with a company that sells
> 22· ·blankets.· I haven't personally been the seller, but I know
> 23· ·what a blanket is.
> 24· · · · Q.· Okay.· Did you conduct a study to determine
> 25· ·whether they are blankets with ribbed cuffs?
> ·1· · · · A.· I did not.
> ·2· · · · Q.· What was your methodology used to come to that
> ·3· ·conclusion?
> ·4· · · · · MR. KENNEDY:· Objection.· Asked and answered.
> ·5· · · · · THE WITNESS:· Any blankets I've ever seen in a
> ·6· ·home goods department.· Any -- I don't know how I would
> ·7· ·find a blanket with ribbed cuffs.· I -- it's an odd
> ·8· ·question because I don't believe it exists.· Have I done

·9· ·research?· Have I gone out to every retail store, no,
10· ·because I don't know how I would find a blanket that has
11· ·ribbed cuffs.
12· ·BY MR. DUNCAN:
13· · · ·Q.· So your conclusion was based on your personal
14· ·experience?
15· · · ·A.· And definitions --
16· · · · · ·(Unreportable simultaneous talking.)
17· · · · · ·MR. KENNEDY:· Objection.
18· · · · · ·THE WITNESS:· Sorry.
19· · · · · ·MR. KENNEDY:· Objection.· Asked and answered.
20· ·Mischaracterizes her prior testimony.· You may answer now.
21· · · · · ·THE WITNESS:· Based on my personal knowledge and
22· ·actual definitions that I looked at.

*Id.* at 130-131.  Ms. Concannon also testified that her opinion was based on working with companies that produce blankets and her experience observing products in the market:

16· · · ·Q.· What is the basis for your conclusion that a
17· ·blanket cannot be pulled over the head?
18· · · ·A.· Because a blanket is something that is thrown over
19· ·the body.
20· · · ·Q.· What do you base that on?
21· · · · · ·MR. KENNEDY:· Objection.· Asked and answered.
22· · · · · ·THE WITNESS:· Personal experience.· Working with
23· ·companies that produce blankets.
24· ·BY MR. DUNCAN:
25· · · ·Q.· Was that opinion based on a study?
·1· · · ·A.· No.
·2· · · ·Q.· What was the methodology that you used to come to
·3· ·that opinion?
·4· · · ·A.· I didn't see a methodology required besides just
·5· ·looking up the definition to support my opinion based on my
·6· ·observation of products out there in the market.

*Id.* at 133-134.

Ms. Concannon further testified that she conducted research, including extensive product research online—which is reproducible—to support her opinions, and she indicated that she cited every reference in her report:

6· · · · · ·Are all scientific bases for your opinion in the
·7· ·report, if there are any?

12

```
·8· · · A.· Every reference was cited in here, so any
·9· ·conclusion I came to which was based on my research, based
10· ·on the documents provided to me to review, has been cited
11· ·in here.
```

*Id.* at 106; *see also* Pl. Mot., Ex. A; Pl. Mot., Ex. B, at 119:13-14 ("I based my opinions on extensive research on all of the documents."), 151:6-9 ("Q.· Did you conduct any studies to come to the conclusion that The Comfy could not protect from extreme cold?· A.· I did research, yes."), and 151:21-23:

```
21· · · Q.· What, again, is your methodology for coming to the
22· ·conclusion that The Comfy cannot protect from extreme cold?
23· · · A.· I did extensive product research.
24· · · Q.· And that research is contained in your expert
25· ·report?
·1· · · A.· It is.
·2· · · Q.· Did you do any research not contained in your
·3· ·expert report?
·4· · · A.· No.
·5· · · Q.· Okay.· Did you produce all of the sources for that
·6· ·research you conducted?
·7· · · A.· I did.
·8· · · Q.· And is that all in your report?
·9· · · A.· It is.
```

Ms. Concannon also testified as to specific examples of the type of research she conducted and how she cited the results and sources in her report:

```
·9· · · Q.· Okay.· Right about at that area in your report,
10· ·you give a price range of -- I guess it's jackets.· You
11· ·say, "Approximately $350 at the low end to approximately
12· ·$1,500 at the high end."
13· · · · · Do you remember saying that?
14· · · A.· I do.
15· · · Q.· Where did you get those figures from?
16· · · A.· Researching brands that produce extreme cold
17· ·parkas and jackets.
18· · · Q.· When was that research conducted?
19· · · A.· About two weeks ago.
20· · · Q.· And how did you conduct the research?
21· · · A.· Online.
22· · · Q.· And are those results listed in your report?
```

> 23· · · A.· Yes, they are.· They are all cited.· The various
> 24· ·products with the price and the brand and also the websites
> 25· ·are cited in my report.
> ·1· · · Q.· And how did you determine what product protect
> ·2· ·from extreme cold?
> ·3· · · A.· As someone who works with brands in the outdoor
> ·4· ·industry, I'm very aware of a lot of -- many of them.· So I
> ·5· ·just did -- I picked a range, knowing some are higher end,
> ·6· ·some are mid tier, and some are lower end.· And I just
> ·7· ·got -- that was just an overall range just based on me
> ·8· ·looking up their websites, finding a particular jacket that
> ·9· ·states it protects from extreme cold that lists the actual
> 10· ·temperatures it would protect from, list all of the
> 11· ·components that go into the garment, and I just pulled that
> 12· ·information with the pricing to give a range of the price
> 13· ·points.

*Id.* at 193-194.

Ms. Concannon further testified, and her report reflects, that she relied on this Court's physical description of the Snuggie® in *Allstar Mktg. Grp., LLC v. United States*, 211 F.Supp.3d 1319 (Ct. Int'l Trade 2017), as well as on her previous observations of the Snuggie®. *See* Pl. Mot. Ex. B, at 113:17-115:2; Pl. Mot. Ex. A, at 18-20. Similarly, Ms. Concannon also testified that although she did not physically inspect the Santa Suit jacket at issue in *Rubies Costume Co. v. United States*, 922 F.3d 1337, 1345-1346 (Fed. Cir. 2019), she reviewed that case and relied on the facts and physical descriptions of the jacket provided by the court in that case. *See* Pl. Mot. Ex. B, at 215:18-24; Pl. Mot. Ex. A, at 20-21.

Ms. Concannon also testified that she relied on the National Weather Service's definitions of extreme cold, as well as her expertise in the apparel and outerwear industries, and her review of the documents produced in discovery, to reach her conclusion that The Comfy® is a pullover and that it cannot protect from extreme cold. *See* Pl. Mot. Ex. B, at 165:24-166:24; Pl. Mot. Ex. A, at 7-8. The Court should take judicial notice that the National Weather Service is a federal agency, part of the National Oceanic and Atmospheric Administration within the U.S.

14

Department of Commerice, that is tasked with providing weather forecasts, warnings of hazardous weather, and other weather-related products to organizations and the public for the purposes of protection, safety, and general information, thereby making it a reliable source of weather-related information. *See* National Weather Service, accessible at www.weather.gov. As such, Ms. Concannon's reliance on the National Weather Service's website as well as her own experience and expertise show that her testimony is both trustworthy and reliable for the Court.

Finally, Ms. Concannon described in detail the documents that she reviewed and upon which she based her expert opinion, including the complaint, the answer, the Court's decision dated June 18, 2024, all the documents produced by the parties in discovery, The Comfy®'s website, and the *Allstar* and *Rubies* cases. *See, e.g.*, Pl. Mot. Ex. B, at 220:2-24; Pl. Mot. Ex. A, at 21-23.

In short, Ms. Concannon has described her methodology, in both her expert report and testimony, and most importantly, she has demonstrated that she possesses the requisite knowledge and experience to be qualified as an expert witness in this proceeding. Significantly, she is considered an expert on fashion and apparel by her peers and in her community, inlcuding fashion and apparel organizations, and in her expert reports and deposition, she has demonstrated that she has the expertise to provide testimony regarding the features, design, use, and marketing of The Comfy®, which will be both reliable and probative to the Court. *See Univar*, 294 F.Supp.3d at 1328.

## **CONCLUSION**

For all the foregoing reasons, Ms. Concannon's expert report and deposition testimony demonstrate that she is qualified to testify as an expert witness, and plaintiff's motion *in limine* to exclude her expert testimony and expert and rebuttal reports should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By: /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Beverly A. Farrell
BEVERLY A. FARRELL
Senior Trial Attorney

/s/ Brandon A. Kennedy
BRANDON A. KENNEDY
Trial Attorney
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel.: (212) 264-9230

Dated: October 1, 2024  *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I, Brandon A. Kennedy, a trial attorney in the Department of Justice, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing Defendant's Response in Opposition to Plaintiff's Motion *In Limine* to Exclude the Testimony and Reports of Defendant's Expert Witness Patricia Concannon, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 4,934 words.

/s/ Brandon A. Kennedy
BRANDON A. KENNEDY