**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

## <u>COZY COMFORT'S PRETRIAL MEMORANDUM</u>

# TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES** ................................................................. iii

**INTRODUCTION** ............................................................................... 2

**STATEMENT OF MATERIAL FACTS TO BE ESTABLISHED
AT TRIAL** ........................................................................................... 5

**DESCRIPTION OF EVIDENCE TO BE INTRODUCED AT TRIAL** ............. 9

**LEGAL STANDARD** ........................................................................ 12

**ANALYSIS** ....................................................................................... 14

I.     **THE COMFY® IS NOT PROPERLY CLASSIFIED
IN HEADING 6110** ......................................................................... 14

     A.    **The Comfy® Does Not Share the Essential Characteristics of
Sweaters, Pullovers, and Similar Articles.** ...................................... 14

          1.    **The Comfy® protects against extreme cold through
its sherpa lining, weight, thickness, length, and
cocooning functionality** ............................................................ 15

          2.    **The Comfy® covers more than the upper body** .................... 23

     B.    **The Comfy® Has a Primary Use or Purpose That Differs from
Sweaters, Pullovers, and Similar Articles—
It is Used as a Blanket.** ...................................................................... 26

          1.    **The Comfy® is heavier, thicker, wider, and longer,
has a long back panel, and cocoons the entire body.** ........... 28

          2.    **The Comfy® is primarily used as a blanket.** ......................... 30

i

# TABLE OF CONTENTS (CONT'D)

PAGE

      **3.**     **The Comfy® is designed and intended for use as a blanket**......................................................32

      **4.**     **The Comfy® is sold and marketed as a blanket.** ..................34

**II.**     **THE COMFY® IS PROPERLY CLASSIFIED UNDER HEADING 6301 (BLANKETS) OR, ALTERNATIVELY, HEADINGS 6307 (MADE UP ARTICLE OF TEXTILE FABRIC), 6108 (ROBES), OR 6114 (OTHER KNITTED GARMENTS).**................................................37

    **A.**     **Heading 6301 (Blankets)**....................................................37

    **B.**     **Heading 6307 (Made Up Article of Textile Fabric).** ......................39

    **C.**     **HTS 6108 (Bathrobes and Similar Articles) or 6114 (Other Knitted Garments).**................................39

**III.**    **CONCLUSION** ..........................................................40

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

Allstar Mktg. Grp., LLC v. United States,
    211 F. Supp. 3d 1319, (Ct. Int'l Trade 2017) ............................................. *Passim*

Anhydrides & Chems  v. United States,
    130 F.3d 1481 (Fed. Cir. 1997) ................................................................13, 25

Apple Inc. v. United States,
    964 F.3d 1087 (Fed. Cir. 2020) ...........................................................12

Best Key Textiles Co. v. United States,
    No. 13-00367, Int'l Trade Rep. (BNA)
    1590 Slip. Op. 2015-63, 2015 Ct. Int'. Trade
    Lexis 65, at *5 (Ct. Int'l Trade June 18, 2015).................................................24

CamelBak Prods. LLC v. United States,
    649 F.3d 1361 (Fed. Cir. 2011) .......................................................26, 30 ,31, 32

Casio, Inc. v. United States,
    73 F.3d 1095 (Fed. Cir. 1996) ....................................................................26, 38

Chevron U.S.A., Inc. v. Natural Resources Defense Counsil, Inc.,
    467 U.S. 837,
    104 S.Ct. 2778, 81 L. Ed.2d 694 (1984)...........................................................12

EOS of N. Am., Inc. v. United States,
    911 F. Supp. 2d 1311 (2013) ...............................................................21

Estee Lauder, Inc. v. United States,
    815 F. Supp. 2d 1287 (2012) ...............................................................21

**TABLE OF AUTHORITIES (Continued)**

**PAGE**

GRK Canada, Ltd. v. United States,
    761 F.3d 1354 (Fed. Cir. 2014) ...................................................25, 26

Int'l Home Textile v. United States,
    153 F.3d 1378 (Fed. Cir. 1998) ...................................................39, 40

Jarvis Clark Co. v. United States,
    733 F.2d 873 (Fed. Cir. 1984).....................................................14, 37

Jennings v. Rodriguez,
    583 U.S. 281 (2018).........................................................................23

Jing Mei Auto (USA) v. United States,
    682 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ...................................20

King v. Burwell,
    576 U.S. 473 (2015).........................................................................15

Legal Services Corporation v. Valazquez,
    531 U.S. 533 (2001).........................................................................24

Lemans Corp. v. United States,
    660 F.3d 1311 (Fed. Cir. 2011)........................................................29

Loper Bright Enterprises v. Raimondo,
    603 U.S. __, 144 S. Ct. 2244 (2024)...........................................12, 14

Magid Glove & Safety Mfg. Co. LLC v. United States,
    87 F.4th 1352 (Fed. Cir. 2023).........................................................12

Otter Prods., LLC v. United States,
    834 F.3d 1369 (Fed. Cir. 2016) ........................................................27

iv

Quaker Pet Grp., LLC v. United States,
   287 F. Supp. 3d 1348 (Ct. Int'l Trade 2018) .........................................14, 28, 29

Pompeo v. United States,
   40 Cust. Ct. 362 (1958)...........................................................................................39

Riddell, Inc. v. United States,
   754 F.3d 1375 (Fed. Cir. 2014)..............................................................................29

Rubies Costume Co. v. United States,
   337 F.3d 1350 (Fed. Cir. 2003)............................................................19, 20, 26

Rubies Costume Co. v. United States,
   922 F. 3d 1337 (Fed. Cir. 2019) .............................................................. Passim

Skidmore v. Swift & Co.,
   323 U.S. 134 (1944)......................................................................................13, 14

United States v. Mead Corp.,
   533 U.S. 218 (2001)................................................................................................13

United States v. Quon Quon.,
   46 C.C.P.A. 70 (1959) ..........................................................................................31

Warner-Lambert Co. v. United States,
   407 F.3d 1207 (Fed. Cir. 2005) .........................................................................14

Wilton Indus., Inc. v. United States,
   741 F.3d 1263 (Fed. Cir. 2013) ...................................................................14, 37

**PAGE**

**FEDERAL STATUTES**

19 U.S.C. § 2411 ........................................................................................4

25 U.S.C. § 103 ..........................................................................................2

25 U.S.C. § 171 ..........................................................................................2

**HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES**

Chapter   42, Heading 4202 ..............................................................27, 28

Chapter   61, Heading 6101 ..............................................................21, 28

Chapter   61, Heading 6102 ..............................................................21, 22

Chapter   61, Heading 6108 ............................................................. Passim

Chapter   61, Heading 6110 ............................................................. Passim

Chapter   61, Heading 6112 ....................................................................21

Chapter   61, Heading 6113 ....................................................................22

Chapter   61, Heading 6114 ...............................................................passim

Chapter   62, Heading 6201 ....................................................................22

Chapter   62, Heading 6202 ....................................................................22

Chapter   62, Heading 6210 ....................................................................22

Chapter   63, Heading 6301 ...............................................................passim

**TABLE OF AUTHORITIES (Continued)**

**PAGE**

**HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES**

Chapter   63, Heading 6307 ............................................................................passim


**TABLE OF AUTHORITIES (Continued)**

**PAGE**

**OTHER**

Federal Rule of Civil Procedure Rule 30....................................................................

https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/ICP-Apparel-Terminology-2008-Final.pdf (Apparel Terminology ICP)
U.S. Customs & Border Prot., Classification:
Apparel Terminology Under the HTSUS (June 2008)..............................................

Oxford English Dictionary (June 2024) ...................................................................

## **INTRODUCTION**

Michael Speciale, together with his brother Brian Speciale (collectively, the "Speciale Brothers"), are the inventors of The Comfy® a new type of blanket that they refer to as a "wearable blanket", a term they coined and a product category that they created. The Speciale Brothers first conceived of the idea in early 2017 after Michael saw a sherpa/microfleece throw blanket draped over a couch juxtaposed with Brian's young son fully engulfed in an enormous adult sweatshirt. The Speciale Brothers realized that no product existed on the market which provided the warmth and insulation of a cold weather blanket in a form that could engulf, or cocoon, an adult's entire body.

Believing that this was something new, novel, and unlike anything else on the market, the Speciale Brothers created Cozy Comfort Company LLC ("Cozy Comfort"), the Plaintiff in this case. They hired a patent attorney to file United States patent applications protecting their design, and the Speciale Brothers went on the NBC show "Shark Tank," to see if they could attract investors. The Government, after a thorough vetting and review, found that the design was indeed "novel" and "nonobvious."[1] Likewise, New York mogul and Shark Tank personality Barbara Corcoran was so impressed by the new product she immediately purchased 30% of

---

[1] *See* 25 U.S.C. §§ 103, 171.

Cozy Comfort.[2] Ms. Corcoran's and the Government's opinion—that the Speciale Brothers had created a brand-new and exciting product—was shared by an eager public.

The Comfy® achieved rapid and widespread commercial success by bringing convenience and portability to the blanket market through its novel product, The Comfy® Original. The Comfy® is used as an outer layer. The Comfy® provides the traditional features of a blanket—its plush, warm materials drape over the user, its sherpa lining provides extra warmth, and its extended length and massive circumference were designed from the beginning to enfold or cocoon the entire body. The Comfy® also has a key, novel feature that sets it apart in the blanket marketplace—it does not fall off when the user moves around. The market understood the novelty of a wearable blanket and people bought The Comfy® in droves. As it filled a previously unsatisfied public need for a heavy, extra warm, thick sherpa/microfleece blanket that moves with the user, Cozy Comfort's revenue took off and the company imported tens of thousands of The Comfy®'s. Because the product was made of blanket material and designed to cover the entire body as an outer layer, the company classified The Comfy® from the very start as

---

[2] This level of investment from an experienced textile businessperson like Ms. Corcoran would be unthinkable if The Comfy® were merely a standard hooded sweatshirt as the Government now appears to contend.

sherpa/microfleece blankets are classified—as a blanket under Harmonized Tariff Code of the United States (HTSUS) Heading 6301.

But in March 2020, well after the company had imported tens of thousands of wearable blankets that Customs readily liquidated under Heading 6301 without question, Customs decided to change course and demand that The Comfy® be reclassified as a "pullover" under Heading 6110. Customs' sudden and drastic action after years of liquidating The Comfy® as a blanket without question resulted in a 364% increase in the applicable duty (from 8.5% under HTS 6301 to 39.5% under Heading 6110, accounting for Section 301 tariffs). Customs took this harsh enforcement action against a newly launched and remarkably successful American small business despite that: (1) The Comfy® bares zero similarity to the common meaning of the term "pullover;" (2) no one refers to The Comfy® as a pullover; and (3) The Comfy® is not designed, used, or marketed as a pullover.

Backed into a corner by Customs' draconian reclassification action, Cozy Comfort timely filed protests. After Customs took the rare action of denying all Cozy Comfort's protests in a single day resulting in massive assessments in the millions of dollars, Cozy Comfort eventually filed the instant suit. Cozy Comfort should prevail because The Comfy® protects against extreme cold, which Heading 6110 garments, such as sweaters and pullovers, do not, and because the Comfy® is an outer

layer designed for a different primary use than a pullover or similar article—it serves as a wearable blanket, not a garment to wear out in public as clothing.

Recognizing that this litigation is potentially existential for the company, Cozy Comfort engaged the Government on numerous occasions to resolve the case out of court. At every turn, the Government has spurned Cozy Comfort's good faith entreaties, and, as this Court is aware, refuses to make a counteroffer or even engage in court-annexed mediation. Consequently, the matter will be tried before this Court.

Ultimately, the Court can right Customs' wrong by classifying The Comfy® correctly. The Comfy® is a wearable blanket. It is designed that way. It is used that way. And it is marketed that way. Cozy Comfort respectfully requests that after hearing the evidence the Court find that the Government's classification  is wrong, The Comfy® is not properly classified under Heading 6110 (sweaters, pullovers, and similar articles), and The Comfy® is instead properly classified in Heading 6301 (blankets), or, alternatively, Heading 6307 (made up articles of textile fabric), Heading 6108 (robes), or Heading 6114 (other knitted garments).

## STATEMENT OF MATERIAL FACTS
## TO BE ESTABLISHED AT TRIAL

A statement of stipulated facts, upon which the parties agree there is no issue, is submitted to the Court as Schedule C of the proposed pretrial order. A full statement of the material facts that Cozy Comfort intends to establish at trial is

submitted to the Court as Schedule C-1 of the proposed pretrial order. In summary, however, Cozy Comfort intends to establish the following at trial:

1.     The Comfy® is a novel product in the blanket market. Everyone who has considered The Comfy® has agreed that nothing like it was previously for sale before its invention. Like a traditional thick sherpa/microfleece blanket, which was a major part of its inspiration, it was designed to provide extra warmth during very cold temperatures. Unlike a traditional blanket, however, it: (1) does not fall off when a user moves; and (2) is able to provide even more warmth since its cocoons a user's entire body. In simple terms, The Comfy® is a thick, extra warm whole-body blanket that engulfs and easily moves with its user. After inventing The Comfy®, the Speciale brothers recognized they needed novel words to describe their novel product…and so they coined the phrase "wearable blanket."

2.     The Speciale Brothers engaged a local textile designer to create a prototype of The Comfy® from thick sherpa and micro-fleece blankets, not garment fabric. In April 2017, after filing patent applications asking the Government to confirm the novelty of their new product, the Speciale Brothers took a prototype of their novel wearable blanket on the national television show "Shark Tank." In December 2017, before the Speciale Brothers had even received their first shipment of wearable blankets from their manufacturers, Cozy Comfort had already sold over half-a-million dollars' worth of their new wearable blankets. In a few short years,

this number would balloon to more than ten million units sold in just a few years. Over this time, Cozy Comfort would ultimately be granted by the Government no fewer than five patents and trademarks in the whole-body blanket category for The Comfy®.

3.      In time, major international brands, including Marvel, Disney, and the National Hockey League got on board and agreed Cozy Comfort could put their trademarks on "blankets," but not garments or any other type of product other than blankets. National retailers, including Target, Walmart, and Costco, began selling The Comfy® wearable blankets, which were packaged in boxes and sold in the home furnishings sections of their brick-and-mortar stores (*not* in the apparel sections or with sweatshirts or pullovers). Amazon.com, for its part, eventually agreed to create an entirely new category for on its online marketplace—"wearable blankets"— which is entirely separate and apart from, and unrelated to, the pullover, sweater, or sweatshirt apparel category.

4.      From the start, Cozy Comfort imported The Comfy® under the proper tariff provision for blankets—Heading 6301. Then suddenly, in March 2020, almost three years after Cozy Comfort filed for patents for its new "wearable blankets" and two years after Cozy Comfort started importing tens of thousands of units of The Comfy® as blankets under Heading 6301, Customs abruptly notified Cozy Comfort that it would reclassify imports of The Comfy® from Heading 6301 (the

classification for blankets) to Heading 6110 (the classification for sweaters, sweatshirts, pullovers, and similar articles), resulting in a 364% increase in the applicable duty rate.

5.      Cozy Comfort was forced to comply, but took immediate steps to challenge Customs' actions, including filing protests. Customs issued a headquarters ruling reaffirming its position that The Comfy® is a pullover and denied dozens of Cozy Comfort's protests *en masse*, costing Cozy Comfort millions of dollars in assessments and putting the company on the brink of going out of business. The instant lawsuit followed.

6.      At trial, Cozy Comfort will establish by a preponderance of the evidence that Customs improperly classified The Comfy® under Heading 6110 (sweaters, pullovers, and similar articles) on two primary bases. First, The Comfy® is excluded from Heading 6110 because The Comfy® does not possess the essential characteristics of sweaters, pullovers, and similar articles. The Comfy® is an outer layer that protects against extreme cold and covers far more of the user's body than just the user's upper body; sweaters and similar articles in Heading 6110 do not protect against extreme cold and cover only the upper body. Moreover, The Comfy®'s primary use and purpose is materially different from the articles in Heading 6110. The Comfy® is primarily designed, marketed and used as a wearable blanket, like the Snuggie®, and is not designed, marketed or used as a sweater or

pullover. Given CBP's classification is wrong, the Court must decide the correct classification in this *de novo* proceeding. Cozy Comfort suggests that The Comfy® is appropriately classified as entered in Heading 6301 (blankets), and, if the Court determines it is not a blanket, may be appropriately classified under several other headings, including Heading 6307 (other made-up textile articles), Heading 6108 (bathrobes and similar articles), and 6114 (other knitted garments).

## DESCRIPTION OF EVIDENCE TO
## BE INTRODUCED AT TRIAL

Cozy Comfort intends to call three witnesses at trial: (1) Michael Speciale, Cozy Comfort's founder and CEO; (2) James "Jim" Crumley, Cizy Comfort's expert witness; and (3) Tatiana Matherne, the Government's Rule 30(b)(6) witness (via deposition designation).

Cozy Comfort intends to first call Michael Speciale, the inventor of The Comfy®. Mr. Speciale will authenticate the samples of The Comfy® and Cozy Comfort's business records, including the design and intellectual property records. He will testify concerning The Comfy®'s novel design, including its layered extra warm sherpa interior lining, cocooning functionality, and other purely blanket features, demonstrating that The Comfy® protects against extreme cold and is designed to function as a wearable blanket that is an outer layer, not a pullover or similar article, which do not protect against extreme cold, do not contain a sherpa or fiberfill interior lining, and are not an outer layer. He will authenticate marketing,

sales, and use documents and photographs and testify concerning The Comfy®'s marketing and use as a wearable blanket, not a pullover or similar article. He will authenticate entry and protest records and testify concerning the subject entry, Customs' reclassification, and Cozy Comfort's protests to establish Cozy Comfort timely protested Customs' decision to reclassify The Comfy® to a pullover or similar article and that Customs' protest decision was incorrect.

Next, Cozy Comfort will call Jim Crumley, its expert witness, a well-known garment and outdoor gear designer with decades of experience as an outdoorsman. Mr. Crumley invented Trebark®, the first set of camouflaged clothing for hunters and designed numerous lines of clothing and textiles for hunters and outdoorsmen as well as the general public. Mr. Crumley will demonstrate his extensive qualifications as a garment design expert by discussing his vast professional experience designing textiles to protect against extreme cold and his nearly 50 years of experience testing and using his designs in extremely cold conditions and a hunter and fisherman. Jim will present his expert opinion that The Comfy® protects against extreme cold because of its blanket functionality and its construction and materials, including layered sherpa lining and micro-fleece exterior. For these reasons, Mr. Crumley will also testify that that The Comfy® is not a typical garment like a pullover and is an improvement on a traditional cold-weather blanket because it can be worn without falling off.

Finally, Cozy Comfort will read portions of deposition testimony from Defendant's Rule 30(b)(6) witness, Tatiana Matherne, an Attorney-Advisor at Customs, who astoundingly drafted the Customs' definitive classification decision at issue in this case without ever physically examining The Comfy®. Ms. Matherne will testify that the HTSUS contains no definitions or guidance for the term wearable blanket or for what constitutes upper body in terms of garments. Ms. Matherne will also testify about Customs' Informed Compliance Publication (Apparel ICP) on wearing apparel, in which Customs takes the official position that sweaters with interior sherpa lining that provide extra warmth are excluded from classification in Heading 6110 because this added protection. Ms. Matherne will testify that there is no practical difference between sweaters and other articles of Heading 6110 in terms of the presence or absence of extra warm inner linings.

On cross examination, Cozy Comfort may first cross-examine Renee Orsat if the Government calls her on direct. The Court ruled that Ms. Orsat may testify only to: (1) Customs' general process of reviewing protests and (2) authentication of Customs' written protest decision.  Cozy Comfort objects to any questioning beyond this limited scope and may not cross-examine her on these topics because they are not probative of the *de novo* classification matter before this Court and Customs' decision speaks for itself.

Cozy Comfort will also cross-examine the Government's main expert witness, Mary Ann Ferro, an academic, concerning the Oxford English Dictionary definition of "blanket." Cozy Comfort will also cross-examine Ms. Ferro regarding the design, marketing, sales, and use of The Comfy® and her expert conclusions regarding categorization of The Comfy®.

The Court limited the testimony of the Government's other expert witness, Patricia Concannon, to the sale, marketing, merchandising of apparel. If the Government calls Ms. Concannon at trial, Plaintiff will cross-examine her regarding the very limited topics covered during her direct testimony.

## LEGAL STANDARD

Proper classification of specific imported merchandise under the HTSUS requires a two-step process. Magid Glove & Safety Mfg. Co. LLC v. United States, 87 F.4th 1352, 1357 (Fed. Cir. 2023). First, the Court must "ascertain, without deference, the meaning of the specific terms within the relevant provisions. Id.; see also, Loper Bright Enterprises v. Raimondo, 603 U.S. __ (2024) ("Loper") (overruling Chevron). Second, the Court must "determine whether the merchandise at issue falls within the description of those terms as properly interpreted." Id. The first step is a question of law, and the second step is a question of fact. Apple Inc. v. United States, 964 F.3d 1087, 1093 (Fed. Cir. 2020).

"HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same," absent contrary legislative intent. Id. at 1094. Courts may consult dictionaries, scientific authorities, and other reliable information sources and consider the relevant Explanatory Notes which are not binding but are "persuasive" and "generally indicative of the proper interpretation." Id.

Courts have also applied a rule of construction that favors importers for over a century and a half. Anhydrides & Chems. v. United States, 130 F.3d 1481, 1485 (Fed. Cir. 1997). Under this rule of construction, "unclear or ambiguous tariff classifications have been resolved in favor of the importer." Id. This rule of construction is based on the sound principle that "[r]evenue statutes are in no just sense either remedial laws or laws founded upon any permanent public policy, and, therefore, are not to be liberally construed." Id. (quoting Justice Story).

Customs' interpretation of a tariff provision is not entitled to binding deference, but it may "claim respect according to its persuasiveness." United States v. Mead, 533 U.S. 218, 221 (2001) (citing Skidmore v. Swift & Co., 323 U.S. 134 (1944) ("Skidmore")). Under Skidmore, "courts may extend respectful consideration to another branch's interpretation of the law, but the weight due those interpretations must always 'depend upon the[ir] thoroughness..., the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all

those factors which give [them] power to persuade." <u>Loper</u>, 603 U.S. __, 144 S. Ct. 2244, 2284 (2024) (Gorsuch, J., concurring) (quoting <u>Skidmore</u>, 323 U.S. at 140). Ultimately, the court "has an *independent responsibility* to decide the legal issue of the proper meaning and scope of HTSUS terms." <u>Warner-Lambert Co. v. United States</u>, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (emphasis added).

A plaintiff "is not required to establish the correct classification heading; Plaintiff only has the burden of showing the government's determined classification to be incorrect." <u>Quaker Pet Grp., LLC v. United States</u>, 287 F. Supp. 3d 1348, 1353–54 (Ct. Int'l Trade 2018) (citing *inter alia* <u>Jarvis Clark Co. v. United States</u>, 733 F.2d 873, 876 (Fed. Cir. 1984)). The Court's ultimate duty is "to find the correct result, by whatever procedure is best suited to the case at hand." <u>Wilton Indus., Inc. v. United States</u>, 741 F.3d 1263, 1265 (Fed. Cir. 2013) (quoting *inter alia* <u>Jarvis Clark</u>, 733 F.2d at 878).

## ANALYSIS

## I.   THE COMFY® IS NOT PROPERLY CLASSIFIED IN HEADING 6110.

### A.   The Comfy® Does Not Share the Essential Characteristics of Sweaters, Pullovers, and Similar Articles.

As the Court noted in its Summary Judgment Order, goods covered by Heading 6110 bear the following four essential characteristics: "[t]hey (1) cover 'the upper body,' (2) provide 'some warmth,' (3) do not 'protect against wind, rain, or extreme cold,' and (4) can be worn over 'undergarments or other clothing.'" Order

3, ECF No. 48 (quoting Rubies Costume Co. v. United States, 922 F.3d 1337, 1345–46 (Fed. Cir. 2019) ("Rubies Costume II"). The Comfy® does not share the essential characteristics of sweaters, pullovers, and similar articles because The Comfy® protects against extreme cold and covers significantly more than the user's upper body.

### 1. The Comfy® protects against extreme cold through its sherpa lining, weight, thickness, length, and cocooning functionality.

The Federal Circuit has held that goods covered by Heading 6110 do not "protect against wind, rain, and extreme cold." Rubies Costume II, 922 F.3d at 1345–46. The Federal Circuit did not define the phrase "protect against wind, rain, and extreme cold," so its meaning must be determined based on context and ordinary usage. As the Supreme Court noted in King v. Burwell, "oftentimes the meaning--or ambiguity--of certain words or phrases may only become evident when placed in context." 576 U.S. 473, 486 (2015).

In Rubies Costume II, the Federal Circuit grappled with whether a satin-lined Santa jacket was similar to sweaters, pullovers, and similar articles and could thus be classified under Heading 6110. Rubies Costume II, 922 F.3d at 1340, 1344–46. The United States had argued before this Court that the Santa jacket qualified as a Heading 6110 garment in part because it "does not protect against the elements (wind, rain or extreme cold)." Rubies Costume II, 279 F. Supp. 3d at 1167 (quoting

the United States' supplemental brief in the case). On appeal, the Federal Circuit agreed, finding the Santa jacket to be "like a sweater or sweatshirt" insofar as it "does not protect against wind, rain, and extreme cold." Rubies Costume II, 922 F.3d at 1340, 1344–46.

Rubies Costume II thus establishes a simple threshold test for classifying articles under Heading 6110. If an article provides protection from one of the elements, it cannot be classified under Heading 6110. If it does not, it can be classified in Heading 6110 if it meets other essential criteria and is designed, marketed and used as a Heading 6110 article. This test makes sense, considers that Heading 6110 is not meant to be directed at outer layers, and reflects the reality as to what people do when confronting the elements. If the weather is fair though chilly, you put on a sweater, pullover, or similar article and go on with your day. When facing one of the elements, such as when the weather turns very cold, you put on an additional protective outer layer—something on top of your clothes, including quite often on top of sweaters, pullovers, and similar articles. It is this later article—the protective outer layer—that cannot be classified under Heading 6110.

As Cozy Comfort will demonstrate at trial, with its patented design, extraordinarily thick sherpa interior lining, microfleece exterior layer, bulky materials, extra size and length, and layered construction, The Comfy® provides protection from extreme cold in a way that sweaters, pullovers, and similar articles

do not because they are only meant for "some" limited warmth. The Comfy®'s sherpa interior lining, like fiberfill interior linings on jackets and other outdoor gear, exclusively serves to keep cold air out and trap warm air in. In this manner, The Comfy® is the outermost layer and is covers all other layers. Users do not wear other articles or blankets on top of The Comfy®, unlike they do with sweaters, sweatshirts, pullovers, and similar articles, which often serve as a lower layer that provides some limited amount of warmth but not protection from the elements, such as very cold conditions. Critically, in addition, The Comfy® users can cocoon inside by pulling their arms and legs against their bodies to capture and centralize the trapped body heat, a protective feature that sweaters, pullovers, and similar articles in Heading 6110 do not have. Because The Comfy® protects against one of the elements, extreme cold, it cannot be classified in Heading 6110.

The Government takes a starkly different position than they did in <u>Rubies Costume II</u>, arguing that garments can be classified under Heading 6110 unless they fail to protect against artic conditions. ECF No. 50, at 15:17–18, 26:3–4, 26:8–11. This narrow position defies a plain reading of <u>Rubies Costume II</u>, the structure of the HTS, and Customs' own guidance in the Apparel ICP.

In <u>Rubies Costume II</u>, the Federal Circuit used the phrase "extreme cold" as part of a larger phrase, specifically "protect against wind, rain, and extreme cold." This makes the most sense given the overall context of <u>Rubies Costume II</u> where the

basic objective was to assess whether a satin-lined Santa jacket is similar to a sweater, pullover, or similar article. The Federal Circuit was assessing what is similar about sweaters, sweatshirts, pullovers, and the like. Ultimately, what is fundamentally similar about these garments, and what is consistent with the Federal Circuit's holding and phrasing, is that these articles are not an outermost layer that provides protection from the elements. As you will hear from Ms. Matherne at trial, Customs excludes from Heading 6110 outerwear garments, such as wind breakers, anoraks, coats, and sweaters with sherpa lining, that are designed to provide extra warmth or otherwise protect from the elements. See Matherne Depo. Tr. 143:6-16.

The Government's assertion that "extreme cold" means artic cold is wrong. The Federal Circuit used the phrase "extreme cold" in conjunction with the phrase "some warmth" to distinguish between articles that provide "some warmth" (Heading 6110 articles) and those that provide extra warmth (articles that are excluded from Heading 6110). Rubies Costume II, 922 F.3d at 1345–46. Used in this context, the word "extreme" served as a helpful adjective to distinguish between the level of mild cold that Heading 6110 articles protect against and a *greater level* (i.e., extreme level) of cold that Heading 6110 articles do not protect against. Thus, read in context, the meaning of "extreme cold" in Rubies Costume II is temperatures that sweaters, pullovers, or similar articles do not adequately protect against. Put

differently, in this context, "extreme cold" means very cold temperatures[3] that necessitate something warmer than sweaters, pullovers, and similar articles (i.e., something that keeps the user "extra warm" to counter the extreme cold). Id. Likewise, the presence of other basic weather elements such as rain or wind would necessitate the donning of a raincoat or windbreaker, respectively, over one's pullover, sweater, or sweatshirt.

The Federal Circuit's opinion did not in any way suggest that the phrase "extreme cold" means "artic" temperatures as the Government asserted at oral argument.[4] Nor did the Federal Circuit indicate that the relevant distinction for purposes of Heading 6110 classification is between sweaters, pullovers, etc. and gear suitable for frigid, arctic, or subzero weather. This conception of "extreme cold" lacks any foundation in caselaw or the tariff code and is entirely invented by the Government for tactical litigation purposes in this case.

Indeed, the words surrounding the phrase "extreme cold" strongly suggest otherwise. When interpreting a word or phrase in a sentence, courts must not "turn[] a blind eye" to the immediately surrounding words. Rubies Costume v. United States

---

[3] "Very cold temperatures" is the formulation adopted by the Court at the summary judgment oral argument. ECF No. 50, at 62:20–21 (describing the fourth Rubies Costume II factor as "whether the product is properly used in very cold temperatures"); 63:13–17 ("You're free, of course within the rules of evidence to bring in whatever you think may either support or refute the contention that this product, The Comfy®, is able to be used in very cold temperatures.").

[4] ECF No. 50, at 15:17–18, 26:3–4, 26:8–11.

337 F.3d 1350, 1357 (Fed. Cir. 2003); <u>see also</u> <u>Jing Mei Auto. (USA) v. United</u>
<u>States</u>, 682 F. Supp. 3d 1354, 1381 (Ct. Int'l Trade 2023) (applying *noscitur a sociis*
and using immediately surrounding words to help define unclear terms in Heading
3923). In <u>Rubies Costume II</u>, the phrase "extreme cold" is immediately preceded by
"wind" and "rain," two words that suggest far milder environs than severe or arctic
weather conditions, which would involve strong hurricane-force gusts, heavy snow,
or frigid temperatures far below freezing. <u>Rubies Costume II</u>, 922 F.3d at 1345–46.
It is also telling that the Federal Circuit did not use modifiers or surrounding terms
suggestive of harsh or artic winter conditions—like *freezing* rain, snow, or ice.

Furthermore, the Government has cited to articles, including an article from
the Mayo Clinic that discusses extreme cold in the context of humans and their
exposure to hypothermia. <u>See</u> Exhibit D37 at D37000001-000004. The very article
that the Government cites to teaches the exact opposite of what they claim in this
lawsuit. The Mayo Clinic expressly teaches that hypothermia "occurs when the core
body temperature drops below 95 degrees Fahrenheit," and refers to the "specific
condition" of "living in a house that's too cold, either from poor heating or too much
air conditioning" that gives rise to Hypothermia. Based on the Government's own
exhibit, extreme cold can occur in a person's house, and is not suggestive of harsh
or arctic conditions.

Interpreting the phrase "extreme cold" to mean temperatures that sweaters, pullovers, and similar articles do not adequately protect against is most consistent with Heading 6110's overall statutory scheme. See King, 576 U.S. at 486 (noting that words must be read "in their context and with a view to their place in the overall statutory scheme"). Several alternative headings cover articles that are excluded from Heading 6110 because they provide extra warmth and protection against the cold. For example, Headings 6101 and 6102 cover "overcoats, carcoats, capes, cloaks, anoraks (including ski-jackets), . . . and similar articles." Heading 6112 covers "ski-suits." The statutory scheme thus suggests that articles that provide "some warmth" are appropriately classified under Heading 6110, while articles that provide extra warmth or other protection from the elements are classified elsewhere.

This interpretation is in precise alignment with Customs' own Apparel ICP, which suggests classifying articles that provide "extra warmth" in headings other than 6110.[5] In discussing the meaning of the term "sweaters" as used in Heading 6110, the Apparel ICP expressly excludes garments with a sherpa interior lining from being a "sweater" under Heading 6110 because they "are used to provide *extra warmth*." See Apparel ICP at 22 (emphasis added). It continues that such garments

---

[5] An "ICP is neither binding on the Court nor entitled to deference." EOS of N. Am., Inc. v. United States, 911 F. Supp. 2d 1311, 1327 (2013). However, as the Court stated at the summary judgment oral argument, an ICP gives some insight as to what Customs' thinking is or was. ECF No. 50, at 11:19–21; see also Estee Lauder, Inc. v. United States, 815 F. Supp. 2d 1287, 1295 (2012) (considering ICP because it was "helpful").

are appropriately classified in other Chapter 61 and 62 headings. Id. In contrast to sweaters and other articles of Heading 6110, articles in Headings 6101, 6102, 6201, 6202 (overcoats, carcoats, capes, cloaks and similar garments) "are normally worn over other garments *for warmth and protection from the weather.*" Id. at 17 (emphasis added). Elsewhere, the Apparel ICP takes the position that "[g]arments similar to sweaters with full front openings, *which have a sherpa lining or a heavy weight fiberfill lining (including quilted linings), that are used to provide warmth to the wearer*" are appropriately classified under Headings 6101, 6102, 6113, 6201, 6202, 6210, or elsewhere (anoraks, windbreakers, and similar articles).[6] Id. at 11 (emphasis added). In this way, the Apparel ICP perfectly aligns with reading Rubies Costume II by placing articles that provide "some warmth" under Heading 6110 and articles that provide extra warmth (i.e., more than just some warmth) under other headings.

Finally the term sherpa originates from the term for guides traversing the harsh conditions of the Himalayas. It is undisputed that, as its name suggests, sherpa, like fiberfill, is specifically designed to keep very cold air out and trap and contain warm body heat inside. As such, sherpa's sole purpose is to provide extra warmth to protect against extreme cold. Together with The Comfy®'s other design features allowing

---

[6] The Comfy® is not properly classified in these other "jacket" or "coat" headings because the article must have a full or partial frontal opening. See Apparel ICP at 11, 17.

users to cocoon their entire bodies inside within the thick sherpa lining, The Comfy®
undoubtedly protects against extreme cold.

In summary, Rubies Costume II establishes that articles that protect against
the elements, including rain, wind, and/or extreme cold, cannot be classified under
Heading 6110. The Comfy®, with its sherpa lining, weight, thickness, length, and
cocooning functionality, is just such an article because it protects against extreme
cold and thus must be classified elsewhere.

**2.     The Comfy® covers more than the upper body.**

The Federal Circuit also held that goods covered by Heading 6110 are those
that "cover[] the upper body." Rubies Costume II, 922 F.3d at 1345–46. Cozy
Comfort argued at the summary judgment phase that this phrase imposes a length or
coverage limitation and therefore articles that extend far below the waist to cover
the lower body cannot be classified under Heading 6110. Pl.'s Opp., ECF No. 34, at
12, 14–17, 19–21. Cozy Comfort maintains that, as a matter of law, the phrase
"covers the upper body" imposes a length or coverage limitation and reiterates the
points made in its summary judgment briefing along with a few additional
considerations discussed below.

First, an enduring tenet of legal interpretation is that the expression of one
thing suggests the exclusion of another. See Jennings v. Rodriguez, 583 U.S. 281,
300 (2018) (citing A. Scalia & B. Garner, Reading Law 107 (2012), and invoking

canon of *expressio unius* to read a negative implication into an immigration detention statute); see also Best Key Textiles Co. v. United States, No. 13-00367, 37 Int'l Trade Rep. (BNA) 1590 Slip. Op. 2015-63, 2015 Ct. Intl. Trade LEXIS 65, at *5 (Ct. Int'l Trade June 18, 2015) (applying canon to interpretation of Federal Circuit mandate order). Under the canon of *expressio unius*, the Federal Circuit's reference to the "upper body" suggests the exclusion of other parts of the body, such as the thigh, knee, leg, and foot.

Second, the length issue was not before the Federal Circuit in Rubies Costume II because the importer did not raise the point. See Legal Services Corporation v. Valazquez, 531 U.S. 533, 537 (2001) (Scalia, J., dissenting) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed."). Given the Federal Circuit did not consider the length argument in Rubies Costume II, the case has no precedential value on this issue.

Third, the Apparel ICP, when read as a whole, strongly suggests that length does matter for purposes of classifying Heading 6110 articles and that Heading 6110 articles do not extend below the mid-thigh, or slightly below the mid-thigh. Notably, the ICP discusses the length of each article. The ICP says that a sweater "covers the body from the neck or shoulders to the waist or below (as far as the mid-thigh or slightly below the mid-thigh." Apparel ICP at 22. Likewise, the ICP notes that a pullover is an "upper body" garment. Id. at 18. A waistcoat, as the name implies,

extends down only to one's waist. A vest is an "upper body" garment that covers "to the waist or slightly below" with some contemporary vests being "as long as hip length." Id. at 26. "Sweatshirts" are "worn on the upper body" and reach "to the waist or below." Id. at 26. While the Apparel ICP does not state a limit to the length of a sweatshirt, the Court may read the ICP as a whole, and it stands to reason that Customs does not consider "sweatshirts" to be full-body or lower body garments because this would render the term "upper body" meaningless. Taken as a whole, the Apparel ICP suggests that Heading 6110 articles are "upper body" garments and that, to the extent these garments extend well beyond the waist, they cannot go below mid-thigh or slightly below the mid-thigh at most. Finally, the focus of the Court's inquiry should be on "typical users," in this case women, not occasional users, in this case large men (see GRK Can., Ltd. v. United States, 761 F.3d 1354, 1358 (Fed. Cir. 2014)), and any ambiguity regarding the phrase "covers the upper body" should be resolved in favor of the importer. Anhydrides, 130 F.3d at 1485.

In summary, Cozy Comfort will establish at trial that The Comfy® is not an "upper body" garment, a materially distinguishing feature from Heading 6110 articles that excludes it from this heading. The front of The Comfy® measures 36 inches by 33 inches, and the back panel is a full 8 inches longer, measuring 36 inches by 41 inches. At these dimensions, the Comfy® extends well below the mid-thigh of The Comfy®'s typical user, an adult female. The front panel reaches the knees of the

typical user and the longer, back panel goes slightly below the knees. Cozy Comfort respectfully suggests that The Comfy®'s extended length, especially on its primary uses, who are women, differentiates it from Heading 6110 articles and thus precludes classification in Heading 6110.

Accordingly, The Comfy® does not share the essential characteristics of sweaters, pullovers, and similar articles because The Comfy® protects against extreme cold and covers more than the upper body.

### B. The Comfy® Has a Primary Use or Purpose That Differs from Sweaters, Pullovers, and Similar Articles—It is Used as a Blanket.

The Court's summary judgment order also noted that "[i]n conjunction with the Rubies Costume test, the Court must also consider the following use factors: (1) physical characteristics; (2) design and intended use; and (3) marketing." Order, ECF No. 48 (citing GRK Canada, 761 F.3d at 1358; Allstar Mktg. Grp., LLC v. United States, 41 CIT __, 211 F. Supp. 3d 1319, 1332–33 (2017)). These used factors are considered as applicable to "typical users." GRK Canada, 761 F.3d at 1358 (citing CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1367–39 (Fed. Cir. 2011) and Casio, Inc. v. United States, 73 F.3d 1095, 1098 (Fed. Cir. 1996)).

It is crucial to note that the product's "primary" design and use is determinative." CamelBak Prods., 649 F.3d at 1362, 1368–69 (reversing and remanding where the CIT discounted the "primary design and use" of a backpack that served primarily to "deliver water to the user in a 'hand-free' fashion" but also

could "carry and organize a multitude of personal effects). When examining whether a use removes the article from the scope of an *eo nomine* provision, the ultimate question is whether the use "provides the articles with a unique identity and use." Id. at 1369. Accordingly, the issue is whether the primary use transforms the item from the *eo nomine* item into something different.

A separate line of Federal Circuit cases dealing with *ejusdem generis* (i.e. similar article) analysis describes the analysis in terms of comparing an article's "specific primary" or "obvious" purpose with that of the named exemplars. Otter Prods., LLC v. United States, 834 F.3d 1369, 1376, 1381 (Fed. Cir. 2016). These cases hold that it is appropriate for the Court to consider whether the "specific primary" or "obvious" purpose of the article is "inconsistent" or "differ[s]" from that of the listed exemplars. Id. If it does, classification under the HTS heading is not appropriate. Id.

For example, the Federal Circuit concluded that a durable smartphone case (the Otterbox®) was not similar to a trunk, suitcase, camera case, etc. under Heading 4202 because the Otterbox® had a primary purpose that was inconsistent or different than the exemplars, namely it allowed the enclosed electronic device to remain fully functional. In another Heading 4202 case, this Court rejected Customs' proposed classification of a pet carrying case under the heading because the primary purpose of a pet carrier was to carry living creatures and animals, not inanimate objects like

the 4202 exemplars. <u>Quaker Pet Grp., LLC v. United States</u>, 287 F. Supp. 3d 1348 (Ct. Int'l Trade 2018).

In this case, the "use factors" strongly weigh against classifying The Comfy® as a sweater, pullover, or similar article under Heading 6110. The Comfy® also has an "obvious" or "specific primary use" that is different than that of the exemplars listed under Heading 6110 (sweaters, pullovers, sweatshirts, waistcoats (vests))— The Comfy® is used as a blanket; sweaters, pullovers, and similar articles are not.

### 1.    The Comfy® is heavier, thicker, wider, and longer, has a long back panel, and cocoons the entire body.

At trial, Cozy Comfort will establish that The Comfy® does not share the unifying physical characteristics of articles classifiable under Heading 6110. Specifically, Cozy Comfort will establish that The Comfy® is heavy, made from thick, blanket materials, has a very wide circumference that allows for draping and cocooning, and, even if the user is in a standing position, goes to the knees in the front and has a back panel that is 8 inches longer than the front panel that goes below the knees. Cozy Comfort will further establish that The Comfy® enfolds the entire body and users can cocoon inside it for extra warmth. These physical characteristics distinguish The Comfy® from Heading 6110 articles, which are lighter, thinner, more fitted, shorter, do not have a longer back panel, and cannot enfold the entire body.

The limited Federal Circuit case law regarding Heading 6110 supports Cozy Comfort's position that there are significant physical differences between The

Comfy® and 6110 articles. For example, The Comfy® contains a heavy, thick sherpa lining, extends to the knees or below, and lacks a closure, whereas the Santa jacket classified in Rubies Costume II had a thin satin lining, extended only to the mid-thigh, and had full-length zipper closure. 922 F.3d at 1340. Likewise, the motorcycle jerseys at issue in Lemans were made of "mesh and ventilated…fabric," came in different sizes, and were designed for "optimal fit and comfort while participating in the sport," whereas The Comfy® is made of two separate knitted blanket fabrics, is available in a single size,[7] loosely drapes over the body, and allows for cocooning to trap extra body heat. Lemans Corp. v. United States, 660 F.3d 1311, 1317 (Fed. Cir. 2011). Additionally, The Comfy® drapes over the user and is extraordinarily loose, whereas the football jersey at issue in Riddell left "just enough extra room to accommodate shoulder pads while holding them snugly to the body." Riddell, Inc. v. United States, 754 F.3d 1375, 1377 (Fed. Cir. 2014).

At oral argument, the Court looked to the picture of the Santa jacket in Rubies Costume II to see how it compared to The Comfy®. ECF 50 at 28:19–22. As noted above, Rubies Costume II provides no precedential value on the issue of length because that was not an issue in the case. Tellingly, the Federal Circuit's opinion

---

[7] There is no dispute that The Comfy® comes in one size or is "one size fits all." Proposed Pretrial Order, Schedule C, ¶ 9, ECF No. 52 at 9. As noted in Allstar, the word "fit" in the phrase "one size fits all" is a "misnomer" and does not suggest the sort of "fit" characteristic of a garment. 211 F. Supp. 3d at 1334. Instead, it "merely conveys single size availability." Id.

does not even outline the dimensions of the Santa jacket. That said, even if the Court does consult the picture in <u>Rubies Costume II</u>, the Santa jacket is thinner, and appears far shorter than The Comfy®, even though it is designed specifically for large, wholesome men. It is also a uniform length meant for a male (Santa) user and does not have a longer back panel like The Comfy®. 922 F.3d at 1340.

The Apparel ICP further supports Cozy Comfort's position that there are notable differences between The Comfy® and Heading 6110 articles. The ICP suggests that sweaters go down only to the mid-thigh or slightly below the mid-thigh, sweatshirts have a "snug fitting bottom" and are often ribbed, pullovers are "upper body garments," and waistcoats/vests "extend to the waist or slightly below" down to "hip-length" if in the contemporary style. Apparel ICP at 18, 22, 26.

The Comfy® is heavier, thicker, wider, and longer than Heading 6110 articles. It also has a back panel longer than the front panel and enfolds the entire body. These physical design characteristics establish by a preponderance of the evidence that the Government incorrectly classified The Comfy® in Heading 6110.

### 2.     The Comfy® is primarily used as a blanket.

The Comfy® has a completely different primary use or purpose than Heading 6110 articles—namely use as a blanket. The Federal Circuit has stated that "beyond the appearance factors of size, shape, construction, and the like, use is of paramount importance" in determining the identity of an article. <u>CamelBak Prods.</u>, 649 F.3d at

1368 (quoting <u>United States v. Quon Quon</u>, 46 C.C.P.A. 70, 73 (1959)). Despite the Government's protestations, this remains true for *eo nomine* provisions. <u>Id.</u> at 1367–69. "To hold otherwise would logically require the trial court to rule out evidence of what things actually are every time the [Customs] collector thinks an article, as he sees it, is specifically named in the tariff act." <u>CamelBak Prods.</u>, 649 F.3d at 1368 (quoting <u>Quon Quon</u>). As this Court noted, this is particularly true where the heading term itself, here "pullover," connotes a certain use by the user: pulling the article on over the head.

At trial, Cozy Comfort will establish that The Comfy® is primarily used as a blanket. Cozy Comfort does not contend (nor must it to carry its burden) that The Comfy® is solely used as a blanket. Certainly, The Comfy® has other uses. For example, as a *wearable* blanket, The Comfy® protects a user's modesty, just as a robe would. But these additional uses are secondary to The Comfy®'s primary use as a blanket. In other words, use as a blanket is what gives The Comfy® its unique identity. <u>See CamelBak Prods.</u>, 649 F.3d at 1369 (holding that an article with a unique identity escapes classification under an otherwise applicable *eo nomine* provision).

In this regard, the instant case is precisely analogous to <u>CamelBak</u>. The back-mounted pack at issue in <u>CamelBak</u> had multiple uses. Although it looks like backpack, its primary use is to deliver water to the user in a hands-free fashion. <u>Id.</u>

at 1362. However, it can also be used to carry and organize personal effects. Id. at 1367. As here, the Government seized upon the secondary use and argued that the secondary use of carrying or organizing personal effects makes it a backpack. Id. But the Federal Circuit squarely rejected this argument and looked instead to the product's unique identity and use. Id. Even though the article looked at first glance like a backpack, the Federal Circuit appropriately classified it in accordance with its primary and actual use as a water delivery device.

As noted above, use is of "paramount importance" in determining the identity of an article. CamelBak Prods., 649 F.3d at 1368. While at first glance The Comfy® appears to share some features of a hooded sweatshirt, The Comfy® is primarily used as a blanket, not a pullover or other exemplar in Heading 6110. Thus, the paramount factor of use weighs strongly against classification in Heading 6110.

### 3. The Comfy® is designed and intended for use as a blanket.

Cozy Comfort will establish at trial that its extensive patent portfolio demonstrates that The Comfy® is designed and intended for use as a portable blanket and not as a sweater, pullover, or similar article. For example, Cozy Comfort's patents all describe the field of invention as relating "generally to blankets, and more particularly to large, wearable blankets."[8] The application continued to describe how

---

[8] Notably, the provisional patent application for The Comfy® was filed two and half years before Customs' March 2020 decision to classify The Comfy® as a pullover. This completely undercuts

The Comfy® was designed to serve as an alternative to extensive outer layering (i.e., using many layers on top of on another) to stay warm and to serve as a portable blanket. Id. It is true that The Comfy® was patented and trademarked initially using the terms "over-garment" and "sweatshirt" along with the term "blanket." At the time, however, term "wearable blanket" was not yet widely known in U.S. commerce and, as is the nature with any novel product category, Cozy Comfort needed a way to guide consumers to The Comfy® until such time that its "wearable blanket" marketing efforts could fully establish the category. If Cozy Comfort marketed The Comfy® as a traditional blanket, customers would be confused and have difficulty understanding the product because of its novel wearable design. Indeed, it was Cozy Comfort that created the product category, "wearable blankets," eventually succeeding in making the term ubiquitous in the marketplace in just its first few years of operation. Demonstrating the evolution of the product category, Cozy Comfort continued to add to its patent portfolio, applying for a new patent directed to "whole body blanket," and surrendered the trademark that was no longer applicable, the phrase "the blanket…that's a sweatshirt."[9] This factor also weighs against classifying the Comfy® in Heading 6110.

_____

any suggestion that Cozy somehow chose the "wearable blanket" classification to avoid customs tariffs.

[9] This trademark was surrendered in June 2021, 15 months after Customs' March 2020 decision to classify The Comfy® as a pullover. Tellingly, the category of goods for this trademark, which

**4.  The Comfy® is sold and marketed as a blanket.**

Cozy Comfort will also establish that The Comfy® is packaged in a box, not hung on a rack or folded on a shelf like a pullover, sweater, or sweatshirt, and is sold nearly exclusively in the bedding or home furnishings departments of retail stores like Costco, Target, and Walmart, and sold in the wearable blankets section in online stores like Amazon.com. It will also establish that The Comfy® is almost never sold in the wearing apparel, clothing, or garment sections of online or brick and mortar stores, or ever sold to retailers who exclusively sell clothing. Major retailers are responsible for correctly placing the product where customers will look to find it, and they place it alongside blankets, not clothing, because that is what it is. If The Comfy® is a pullover, these retailers would locate it near other pullovers so customers seeking a pullover can find it.

Cozy Comfort will further show that well-known brands and companies, such as Disney, Marvel, and the National Hockey League, describe The Comfy® as a blanket, and not as a garment, and agreed to license their valuable intellectual property on that basis only to limited use on "blankets," not pullovers, sweaters, sweatshirts or similar articles. Cozy Comfort would not act in violation of these licensing agreements by placing the licensed materials on something other than a

was applied for and granted well before the reclassification by Customs, was for "Blanket Throws, namely Whole Body Blankets." This is consistent with all the patents and further demonstrates Cozy Comfort's original and consistent position that The Comfy® is a blanket from the start.

blanket. Cozy Comfort will further demonstrate that virtually all its The Comfy®

sales are to companies that do not specialize in apparel, and that its producers

described The Comfy® as a "blanket" before Customs demanded that it be classified

as a pullover. Cozy will also establish that its marketing materials focus primarily

on The Comfy®'s use as a blanket and routinely use the terms "blanket," "giant

blanket," and "wearable blanket."

Cozy Comfort has at times used the term "sweatshirt" in its prior marketing

materials, but the term "sweatshirt" has always operated to describe certain

secondary features of The Comfy®—for example, its hood, marsupial pocket, and

sleeves—and not as a description of its primary use or design. Cozy Comfort has

never used the term without first leading with the primary blanket descriptor (e.g.,

"the blanket… that's a sweatshirt"). In other words, Cozy has never marketed or sold

sweatshirts. It has simply sold wearable blankets that include some features that may

be found on some sweatshirts, such as a hood and marsupial packet, and used well

known marketing terms relevant to these features to increase sales of its whole-body

wearable blankets. Mr. Speciale will explain that this is a common marketing tool to

attract customers unfamiliar with a novel product.

In this regard, The Comfy®'s marketing efforts are akin to Allstar Marketing

Group highlighting the Snuggie®'s sleeves. The <u>Allstar</u> court noted that the company

consistently paired the word "sleeves" with "blanket" and depicted people using the

product as a blanket. <u>Allstar</u>, 211 F. Supp. 3d at 1334–35. Cozy Comfort did the same with The Comfy®, qualifying the use of the word "sweatshirt" with the term "blanket" and consistently depicting people using The Comfy® as a blanket.

What matters in this case is the overall thrust of Cozy Comfort's marketing efforts, not the government's conveniently one-sided spin of cherry-picked bits of outdated advertising. Cozy Comfort's efforts consistently emphasized the product's unique identity as a "wearable blanket." Cozy Comfort has always understood itself, as have all its business partners, as being in the business of marketing wearable blankets, not pullovers or other garments. And it has marketed The Comfy® as such. This factor thus also weighs strongly against classifying The Comfy® under Heading 6110.

In summary, The Comfy® does not share the essential characteristics of Heading 6110 articles such as sweaters and pullovers because The Comfy® protects against extreme cold and covers much more than the upper body. In addition, The Comfy® has a design and use that materially differs from sweaters, pullovers, and similar articles—it is designed and used as a wearable blanket. For these reasons, The Comfy® does not belong in Heading 6110.

## II. THE COMFY® IS PROPERLY CLASSIFIED UNDER HEADING 6301 (BLANKETS) OR, ALTERNATIVELY, HEADINGS 6307 (MADE UP ARTICLE OF TEXTILE FABRIC), 6108 (ROBES), OR 6114 (OTHER KNITTED GARMENTS).

### A. Heading 6301 (Blankets)

The Court's ultimate duty is "to find the correct result, by whatever procedure is best suited to the case at hand." Wilton Indus., 741 F.3d at 1265 (quoting *inter alia* Jarvis Clark, 733 F.2d at 878). For the reasons stated below, The Comfy® should be classified under the original and correct classification—Heading 6301 (Blankets).

Cozy Comfort briefed the issue of classification in Heading 6301 at the summary judgment phase. Pl.'s Opp., ECF No. 34, at 39–40. Cozy Comfort understands the Court to be well versed in the arguments made there and will not repeat them here. Instead, Cozy Comfort will briefly address the points brought up by the Court at the summary judgment hearing.

As the Court correctly noted, this case presents the issue of whether The Comfy®'s additional features—a back, hood, marsupial pocket, and sleeves— "transform[] what may have been a blanket, into something that is not a blanket." Allstar, 211 F. Supp. 3d at 1336. To answer this question, the Court must assess whether The Comfy® has features "substantially in excess" of a blanket. Id. A different way to frame this question is to ask whether The Comfy® "preserves the essential characteristics of a blanket—a large piece of fabric providing a warm covering." Id.

In <u>Allstar</u>, the Court found that the addition of sleeves to a blanket "support[ed], rather than detract[ed] from, the Snuggie®'s 'primary design and use' as a blanket because they ostensibly enable the Snuggie® to remain in place and keep the user warm while allowing the user to engage in certain activities requiring the use of their hands." <u>Id.</u> (quoting <u>Casio</u>, 73 F.3d at 1098). The same can be said of The Comfy®'s sleeves and its back. These features support rather than detract from The Comfy®'s primary design and use as a wearable blanket in exactly the same way—they keep the product on and free up the user's hands.

The two other additional features—the hood and marsupial pocket—likewise support rather than detract from the blanket's primary design and use as a blanket. These two features simply amplify The Comfy®'s ability to provide extra warmth by enveloping the user and serve as an extra warm and thick covering when it is very cold. The hood eliminates the need for the user to pull other parts of the blanket over the head to keep it warm, as users commonly due in extremely cold conditions. The marsupial pocket allows the user to keep the user's hands warm without donning gloves or pulling them in the sleeves to cocoon for extra warmth, although this is also a key design feature, as evidenced by the large upper sleeves. Additionally, as discussed above, Cozy Comfort will establish at trial that The Comfy® is designed, used, and functions as a blanket and that it is regarded in commerce and described

in sales and marketing literature as a blanket. In conclusion, The Comfy® is correctly classified as a blanket under HTS 6301 (blankets).

**B.      Heading 6307 (Made Up Article of Textile Fabric).**

If the Court finds that The Comfy® has been transformed into something other than a blanket, it would then fall under the basket provision for assembled textile articles, Heading 6307. "[F]or merchandise to be classified under 6307, it must be an assembled textile article that fits under no other HTSUS heading." <u>Quaker Pet Grp.</u>, 374 F. Supp. 3d at 1382. The Comfy® is a textile fabric that is assembled by sewing. It also does not constitute apparel because it is not an identifiable clothing item,[10] and it is not designed, used, or marketed as apparel, as further discussed above.

**C.      Heading 6108 (Bathrobes and Similar Articles) or 6114 (Other Knitted Garments).**

If the Court finds that The Comfy® is a form of apparel, Cozy Comfort maintains that it should be classified under either Heading 6108, which covers leisurewear and intimate apparel, or the basket provision for garments (Heading 6114). To be classified under Heading 6108, an article's essential characteristic must be "a sense of privateness . . . or private activity." <u>Int'l Home Textile v. United</u>

---

[10] To qualify as apparel, the article must be an "identifiable clothing item[,]" <u>Allstar Mktg. Grp., LLC v. United States</u>, 211 F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2017), or what would be "considered in ordinary parlance" to be apparel, <u>Pompeo v. United States</u>, 40 Cust. Ct. 362, 366 (1958).

States, 153 F.3d 1378, 1381 (Fed. Cir. 1998). While The Comfy® can be and sometimes is worn outside of the home (e.g., as a top layer like a blanket while sitting in the stands at a frigid football game at an outdoor stadium), it is primarily used as a blanket around the house on very chilly days. In this sense, The Comfy® does seem to have as an essential characteristic "a sense of privateness . . . or private activity" like a robe, which is one of the exemplars in Heading 6108, the heading favored by the Government's expert witness, Ms. Ferro. Finally, if the Court finds that The Comfy® cannot be classified in a specific heading like Heading 6108, it should be classified under the basket provision for knitted garments, Heading 6114, because no other headings appear to apply.

## III.    <u>CONCLUSION</u>

For the reasons stated above, Cozy Comfort respectfully requests that after hearing the evidence the Court find that Customs' classification of The Comfy® is in Heading 6110 (pullovers and similar articles) is wrong and The Comfy® is properly classified in Heading 6301 (blankets), or, alternatively, in Heading 6307 (made up articles of textile fabric), HTS 6108 (robes), or Heading 6114 (other knitted garments).

Dated October 16, 2024, Los Angeles, California.

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA
Attorneys for Plaintiff
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

By      *Christopher J. Duncan*
        Christopher J. Duncan

        *Elon A. Pollack*
        Elon A. Pollack

Gregory P. Sitrick
Isaac S. Crum
Sharif S. Ahmed
MESSNER REEVES LLP
7250 N. 16th St., Suite 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059
Facsimile: (303) 623-0552

By      *Gregory P. Sitrick*
        Gregory P. Sitrick

CASTAÑEDA + HEIDELMAN LLP
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
Telephone: (214) 800-2012

By      *Robert H. Dunikoski II*
        Robert H. Dunikoski II