UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY LLC, | x | |
| | : | |
| Plaintiff, | : | Court No. 22-00173 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | x | |

## PLAINTIFF COZY COMFORT'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA LLP
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

Christopher J. Duncan
Elon A. Pollack

MESSNER REEVES LLP
7250 N. 16th St., Suite 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059

Gregory P. Sitrick
Isaac S. Crum

CASTAÑEDA + HEIDELMAN LLP
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
Telephone: (214) 800-2012

Robert H. Dunikoski II

Dated: January 10, 2025

1

# TABLE OF CONTENTS

PAGE

**TABLE OF AUTHORITIES**........................................................iii

**I.     JURISDICTION** ..............................................................3

**II.    STANDARD OF REVIEW** ...............................................3

**III.   PROCEDURAL BACKGROUND**....................................4

**IV.    PROPOSED FINDINGS OF FACT** ...............................5

    **A.** Physical Characteristics of The Comfy®........................5

    **B.** Design, Intended Use and Marketing of the Comfy® ......7

    **C.** Comparison between The Comfy® and the Snuggie®...13

    **D.** Customs Entry and Reclassification of The Comfy®.....14

**V.     PROPOSED CONCLUSIONS OF LAW** ......................17

    **A.** Legal Framework.........................................................17

    **B.** Classification of the Subject Merchandise...................19

        **1.** The Comfy® is not properly classified in heading
        6110, HTSUS, so Customs' reclassification
        decision is incorrect. ...........................................19

            **a.** The Comfy® does not meet the definition of
            "wearable apparel" of Chapter 61. .........................21

                **i.** The Comfy® is not ordinarily worn as wearing
                apparel in a common place way. ...................22

ii.     The Comfy® is designed and intended to be used as a blanket, not wearing apparel. .........................................................24

iii.    The Comfy® is marketed as a blanket. ...........28

b.  The Comfy® provides extra warmth and protects against extreme cold. ..................................................33

c.  The Comfy® covers more than the upper body. ......46

2.  The Comfy® is properly classified in heading 6301, HTSUS. ........................................................49

C. In the alternative, if The Comfy® is wearing apparel of Chapter 61, it is properly classified in heading 6114, HTSUS ...........................................................54

VI.    CONCLUSION ........................................................56

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE**

Allstar Mktg. Grp., LLC v. United States,
211 F. Supp. 3d 1319, (Ct. Int'l Trade 2017) ............................................*passim*

Anhydrides & Chems v. United States,
130 F. 3d 1481 (Fed. Cir. 1997) .......................................................................47

Baxter Healthcare Corp. v. United States,
182 F.3d 1333 (Fed. Cir. 1999) .......................................................................18

Best Key Textiles Co. v. United States,
No. 13-00367, Int'l Trade Rep. (BNA)
1590 Slip. Op. 2015-63, 2015 Ct. Int'l. Trade
Lexis 65, at *5 (Ct. Int'l Trade June 18, 2015) ..........................................20, 46

CamelBak Prods. LLC v. United States,
649 F.3d 1361 (Fed. Cir. 2011) ...........................................................17, 24, 27

Carl Zeiss, Inc. v. United States,
195 F.3d 1375 (Fed. Cir. 1999) .......................................................................18

Casio, Inc. v. United States,
73 F.3d 1095 (Fed. Cir. 1996) .........................................................................51

Degussa Corp. v. United States,
508 F.3d 1044 (Fed. Cir. 2007) .......................................................................18

E.M. Chems. v. United States,
920 F.2d 910 (Fed. Cir. 1990) .........................................................................18

GRK Canada, Ltd. v. United States,
761 F. 3d 1354 (Fed. Cir. 2014) ..................................................................21, 47

Int'l Home Textile v. United States,
153 F.3d 1378 (Fed. Cir. 1998) ........................................................55

Jarvis Clark Co. v. United States,
733 F.2d 873 (Fed. Cir. 1984) ..........................................................3

Jennings v. Rodriguez,
583 U.S. 281 (2018)...............................................................20, 46

Jing Mei Auto (USA) v. United States,
682 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ....................................35

King v. Burwell,
576 U.S. 473,
135 S. Ct. 2480, 192 L. Ed. 2d 483(2015).......................................33

La Crosse Tech., Ltd. v. United States,
723 F.3d 1353 (Fed. Cir. 2013) ........................................................17

Lemans Corp. v. United States,
660 F. 3d 1311 (Fed. Cir. 2011) ................................................48, 49

Mita Copystar Am. v. United States,
160 F.3d 710 (Fed. Cir. 1998)..........................................................17

Motorola Inc. v. United States,
436 F.3d 1357 (Fed. Cir. 2006) ........................................................18

Orlando Food Corp. v. United States,
140 F.3d 1437 (Fed. Cir. 1998).......................................................17

Otter Prods., LLC v. United States,
834 F.3d 1369 (Fed. Cir. 2016) ........................................................24

# TABLE OF AUTHORITIES (Continued)

**PAGE**

Park B. Smith v. United States,
  347 F.3d 922 (Fed. Cir. 2003) ........................................................................3

Quaker Pet Grp., LLC v. United States,
  287 F. Supp.3d 1348 (Ct. Int'l Trade 2018) .................................................25

Riddell, Inc. v. United States,
  754 F.3d 1375 (Fed. Cir. 2014) ....................................................................49

R.T. Foods, Inc. v. United States,
  757 F.3d 1349 (Fed. Cir. 2014) ....................................................................18

Rubies Costume Co. v. United States,
  337 F.3d 1350 (Fed. Cir. 2003) .......................................................19, 21, 35

Rubies Costume Co. v. United States,
  922 F. 3d 1337 (Fed. Cir. 2019) ............................................................*passim*

Shamrock Building Materials, Inc. v. United States,
  619 F. Supp. 3d 1337 (C.I.T. 2023)...............................................................19

Stewart-Warner Corp. v. United States,
  748 F.2d 663 (Fed. Cir. 1984) ......................................................................18

United States v. Wanxiang Am. Corp.,
  654 F. Supp. 3d 1279 (Ct. Int'l Trade 2023) .................................................30

Victoria Secret Direct, LLC v. United States,
  37 C.I.T. 573 (2013), Aff'd
  769 F.3d 1102 (Fed. Cir. 2014)........................................................31, 32, 56

Wilton Indus. v. United States,
  741 F.3d 1263 (Fed. Cir. 2013 ......................................................................17

# TABLE OF AUTHORITIES (Continued)

PAGE

## FEDERAL STATUTES

19 U.S.C. §1202.................................................................................3

28 U.S.C. §1581.................................................................................3

28 U.S.C. §2639.................................................................................3

28 U.S.C. §2640.................................................................................3

28 U.S.C. §2641.................................................................................3

## FEDERAL REGULATIONS

19 C.F.R. § 171................................................................................30

## HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

HTSUS General Rule of Interpretation 1 ........................................17, 18

HTSUS General Rule of Interpretation 2 ...........................................17

HTSUS General Rule of Interpretation 3 ...........................................17

HTSUS General Rule of Interpretation 4 ...........................................17

HTSUS General Rule of Interpretation 5 ...........................................17

HTSUS General Rule of Interpretation 6 ...........................................56

Chapter   39, Heading 3923 ................................................................35

Chapter   42, Heading 4202 ................................................................25

## TABLE OF AUTHORITIES (Continued)

Chapter   61, Heading 6101 ...........................................................................33, 56

Chapter   61, Heading 6102 ...........................................................................33, 56

Chapter   61, Heading 6103 ...........................................................................34, 56

Chapter   61, Heading 6104 ...........................................................................34, 56

Chapter   61, Heading 6105 ...................................................................................56

Chapter   61, Heading 6106 ...................................................................................56

Chapter   61, Heading 6107 ...................................................................................56

Chapter   61, Heading 6108 ...........................................................................55, 56

Chapter   61, Heading 6109 ...................................................................................56

Chapter   61, Heading 6110 ............................................................................*passim*

Chapter   61, Heading 6111 ...................................................................................56

Chapter   61, Heading 6112 ...........................................................................33, 56

Chapter   61, Heading 6113 ...................................................................................56

Chapter   61, Heading 6114 ............................................................................*passim*

Chapter   62, Heading 6203 ...................................................................................34

Chapter   62, Heading 6204 ...................................................................................34

Chapter   62, Heading 6211 ...................................................................................34

Chapter   63, Heading 6301 ............................................................................*passim*

Chapter   63, Heading 6302 .................................................................19

Chapter   63, Heading 6303 .................................................................19

Chapter   63, Heading 6304 .................................................................19

Chapter   63, Heading 6305 .................................................................19

Chapter   63, Heading 6306 .................................................................19

Chapter   63, Heading 6307 ..............................................................4, 19

Chapter   73, Heading 7306 .................................................................19

Chapter   85, Heading 8547 .................................................................19

**OTHER**

Federal Rule of Civil Procedure Rule 36..........................................6, 48

Webster's Third New International Dictionary(2002) ....................10, 53

Informed Compliance Publication...............................................*passim*

National Weather Service, Warmest and Coldest Days at Central Park
(1869 to the Present),
https://www.weather.gov/media/okx/Climate/CentralPark/warmcolddays............45

Oxford English Dictionary,
https://www.oed.com/search/dictionary/?scope=Entries&q=oblong (defining
"oblong" as "[e]longated (usually as a deviation from an exact square or circular
form; esp. rectangular with the adjacent sides unequal)".....................................51

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

COZY COMFORT COMPANY LLC,  x
                                          :
                Plaintiff,                :        Court No. 22-00173
                                          :
                v.                        :
                                          :
UNITED STATES,                            :
                                          :
                Defendant.                :
_____  x

## PLAINTIFF COZY COMFORT'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Cozy Comfort Company LLC ("Cozy Comfort") brings this action to contest U.S. Customs and Border Protection's ("Customs") tariff reclassification of the subject merchandise, which is a wearable blanket commercially known as The Comfy®. At a bench trial held from October 21, 2024, to October 25, 2024, Cozy Comfort presented evidence and argued that Customs' reclassification of The Comfy® in heading 6110, HTSUS, which covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles," is incorrect and that The Comfy® is properly classified in heading 6301, which covers "blankets." For the reasons stated below, the Court should enter judgment for Plaintiff Cozy Comfort and conclude The Comfy® is classified as a blanket in heading 6301, HTSUS, specifically subheading 6301.40.0020, or, alternatively, in heading 6114, HTSUS, the basket provision for other knitted garments, specifically subheading 6114.30.3070.

2

## I.   JURISDICTION

Cozy Comfort contests Customs' denial of its protest of Customs' tariff classification of its merchandise, so jurisdiction is proper pursuant to 28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part...").

## II.   STANDARD OF REVIEW

This Court reviews, *de novo*, decisions made by Customs. See Park B. Smith, Ltd. v. United States, 347 F.3d 922, 924 (Fed. Cir. 2003). Pursuant to 28 U.S.C. § 2640(a)(1), the Court is charged with rendering its determinations based on the record properly made before the Court. In general, the Federal Rules of Evidence "apply to all civil actions in the Court of International Trade." 28 U.S.C. § 2641.

Cozy Comfort has the initial burden to demonstrate through a preponderance of the evidence that Customs' classification decision is incorrect. See 28 U.S.C. § 2639(a) ("in any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct"). If Cozy Comfort overcomes Customs' initial presumption of correctness, the Court's independent "duty is to [then] find the correct result." 28 U.S.C. § 2639(a)(1); Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984) (Wisdom, J.).

### III.    PROCEDURAL BACKGROUND

This case concerns a wearable blanket called The Comfy® that Cozy Comfort imported into the United States from China classified as a blanket in heading 6301, HTSUS, starting in 2018. HTSUS. Tr. Vol. I (Speciale) at 211:24-212:18. Cozy Comfort made entry of The Comfy® at issue in this case on January 6, 2021. Summons at 1–2, ECF No. 1. At liquidation, Customs classified The Comfy® in heading 6110, HTSUS, which covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles." Heading 6110, HTSUS; P-22 at 2. Cozy Comfort timely protested on May 20, 2022, claiming that the wearable blanket should instead be classified in heading 6301, HTSUS, "blankets and traveling rugs," heading 6307, HTSUS, "other made up articles," or heading 6114, HTSUS, "other garments." Summons at 1-2, ECF No. 1.

Customs denied the protest on May 31, 2022, and Cozy Comfort filed a summons and complaint challenging Customs' classification in June 2022. Id. at 1-2; Compl., ECF No. 6. The government filed a motion for summary judgment, which the Court denied on June 12, 2024. See Def. MSJ, ECF No. 28; Minute Order, ECF No. 47; Order re Trial and Preparation, ECF No. 48. Between October 21, 2024, and October 25, 2024, the Court held a bench trial. At the conclusion of the trial, the Court ordered the parties to file proposed findings of fact and conclusions law on or before January 10, 2025.

## IV.  PROPOSED FINDINGS OF FACT

### A.  Physical Characteristics of The Comfy®

1.      The subject merchandise is a wearable blanket commercially known as The Comfy® or The Comfy® Original. RPO, Schedule C, ¶ 1.

2.      The Comfy® is knitted and made from 100% man-made polyester fibers. RPO, Schedule C, ¶ 4.

3.      The Comfy® is approximately one inch thick and weighs approximately 2.9 pounds, which is thicker and heavier than a typical garment. Tr. Vol. IV (Crumley) at 1269:7-15, 1270:8-15; Tr. Vol. I (Speciale) at 66:2-3.

4.      The Comfy® is constructed using two separate knitted fabrics: a microfiber fabric (microfleece) for the exterior and a high-quality heavy sherpa fabric for the interior that is intended to provide warmth to the user. RPO, Schedule C, ¶¶ 5, 12; Tr. Vol. I (Speciale) 124:23-125:2.

5.      The insulating sherpa interior lining layer in The Comfy® is designed to keep the user extra warm by trapping warm air within The Comfy® that is then warmed further by her own body heat. Tr. Vol. I (Speciale) 57:17-23, 125:9-20; Tr. Vol. II (Crumley) at 588:20-589:1.

6.      The front panel of The Comfy® measures approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel, and the back panel measures approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel. RPO, Schedule C, ¶ 7.

5

7.     The Comfy® extends to the knees of the typical user, an American adult female[1] with an average height of five feet four inches tall while standing. Tr. Vol. IV (Pl. Rule 36(b) Witness) at 1192:9-13; Tr. Vol. I (Speciale) at 78:9-11; P12 at 6.

8.     The Comfy® has a large, 76 inch, un-ribbed, hemmed bottom opening designed so the user can pull her knees in, pull her arms in, and get into the full cocoon position. RPO, Schedule C, ¶ 6; Tr. Vol. I (Speciale) at 57:11-12, 57:11-16.

9.     The Comfy® has elongated sleeves so the user can take it over the top of her wrist and pull her hands in very easily and has massive, 15-inch arm holes so the user can easily pull her elbows into her body. Tr. Vol. I (Speciale) at 57:5-10, 65:9-14.

10.     The Comfy® has a marsupial pocket located in an elevated position in front of the user's knees when she is sitting down in a cocooning position so the user can put her arms inside the pocket without stretching down. P6 at 24, col. 10, lns. 19-32.

11.     The Comfy® has a "huge" hood that can cover the user's entire face. Tr. Vol. I (Speciale) at 109:20-23.

12.     The Comfy® is reversible, one-size-fits-all, and unisex. RPO, Schedule C, ¶¶ 8, 9, 14.

---

[1] A 2021 market survey found that 83% of the purchasers are female. P12 at 6; Tr. Vol. I (Speciale) at 83:14-18.

**B.** **Design, Intended Use and Marketing of The Comfy®**

13.    In February 2017, Michael Speciale ("Mr. Speciale") saw his 7-year-old nephew curled up inside an extra-large hoodie belonging to the boy's six foot one, two-hundred-pound father, Mr. Speciale's brother, Brian Speciale. Tr. Vol. I (Speciale) at 62:6-63:12; RPO, Schedule C, ¶ 19.

14.    Mr. Speciale's gaze then fell on a sherpa lined throw blanket next to the boy, he "put two and two together," and the idea of The Comfy® wearable blanket was born. Tr. Vol. I (Speciale) at 62:25-63:15.

15.    Mr. Special and his brother, Brian, researched the idea of a sherpa-lined, cocooning wearable blanket for a few weeks. Tr. Vol. I (Speciale) at 64:1-8.

16.    After the Speciale brothers couldn't find anything like it on the market, they bought three sherpa blankets at a Joann fabric store and hired a local textile manufacturer to construct a prototype. Tr. Vol I (Speciale) at 64:7-64:11.

17.    The Speciale brothers received a first sample of The Comfy® that was close to what they wanted but not large enough. Tr. Vol I (Speciale) at 64:17-22.

18.    Specifically, the Speciale brothers wanted The Comfy® wider, with bigger arm holes so that a user could easily pull her arms inside, and longer to cover to the back of the knees even when a person bends over or sits down in the cocooning position. Tr. Vol I (Speciale) at 64:22-65:1.

19.     The Speciale brothers founded Cozy Comfort Company and sought to protect their invention of The Comfy® by filing a provisional patent application (Patent No. US 10,420,431) in September 2017. P6.

20.     The September 2017 patent application states that the "Field of Invention" of The Comfy® "relates generally to blankets, and more particularly to large, wearable blankets." P6 at p. 20, col. 1, lns. 14-15.

21.     The "Background of the Invention" in the September 2017 patent application describes how The Comfy® improves on a traditional blanket by being "portable" and thus solves a real consumer problem when keeping warm at home on cold nights, namely having to leave a blanket behind when getting up from the couch to "grab a hot chocolate, adjust the fire or go to bed." P6 at p. 20, col. 1, lns. 19-42; Tr. Vol. I (Speciale) at 67:20-68:5.

22.     The September 2017 patent application further emphasizes how The Comfy®'s "disproportionate sizes…allow it to be worn, placed, and draped over one's whole body…" "…like a blanket" and "can even cover the person when in the fetal position." P6 at p. 22, col. 1, lns. 62-65; P6 at 24, col. 10, lns. 13-16.

23.     The September 2017 patent application contains a diagram, Figure 10, of The Comfy® being used as a cocoon in a seated position with the user's arms and legs pulled into the article with the knees and hands pulled into the chest area. P6 at p. 11, fig. 10.

8

24.     The September 2017 patent application states that even though The Comfy® is put on like a typical article of clothing, it is designed much differently than apparel because it is approximately three-to-four times wider than conventional clothing, the length is approximately one-and-a-half times longer than conventional clothing, and the sleeves are at least twice as large as those on a typical article of clothing, all of which allow a person to cocoon inside like a blanket. P6, col. 6, lns. 4-15.

25.     The September 2017 patent application noted that The Comfy® is different from garments because these "unique features" are not available in garments. P6, col. 6, lns. 43-46.

26.     On October 12, 2017, Cozy Comfort applied for a trademark (Trademark Reg. No. 5,608,437) for the word "The Comfy" under International Class (IC) 24, the official U.S. Patent and Trademark Office (USPTO) classification for fabrics, bedding, and other textile products for household use. D14-1, p. 612.

27.     The USPTO examiner, having reviewed an image of The Comfy®, suggested that it be identified as a "blanket throw," or more descriptively, under "[b]lanket throws, namely, whole body blankets," to denote that The Comfy® is a blanket intended to cover a person's entire body. D14-1, pp. CC342–43; Tr. Vol. I (Speciale) at 87:2-16.

28.    On March 29, 2018, Cozy Comfort applied for a service mark (Trademark Reg. No. 5,678,126) under IC 24, described as "Blanket throws, namely whole body blankets," with the first use listed as December 3, 2017. P4.

29.    The USPTO approved the trademark on February 19, 2019, and granted the patent on September 24, 2019, well before the instant entry. P4, P6.

30.    The Comfy® is designed to be worn[2] over clothing. RPO, Schedule C, ¶¶ 5, 11.

31.    The Comfy® is primarily designed and intended to be used as a wearable blanket while lounging around the house, though it can be kept on for other activities. Tr. Vol. I (Speciale) at 67:16-25 (describing how The Comfy® is "mainly meant for lounging on the couch at home" though it can be used while getting a drink from the fridge or doing other daily activities like getting the mail); Tr. Vol. II (Crumley) at 580:24-25 (stating that the The Comfy®'s purpose is as a wearable blanket); P12 at CC986 (April 2021 market survey showing that the two top leading purposes for use are lounging and keeping warm during colder months); P13 (customer photographs showing them lounging around the house in The Comfy®).

---

[2] "[T]he term 'worn' is not limited to the contexts of garments and may be used to refer to a broader array of articles." Allstar Mktg. Grp., LLC v. United States, 211 F. Supp. 3d 1319, 1332 (Ct. Int'l Trade 2017) (citing inter alia Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) at 2589, 2636).

32. The Comfy® is primarily intended to be used in a cocooning position to keep body heat trapped in the core area allowing the user to stay warmer longer. Tr. Vol. II (Crumley) at 588:7-19; 590:7-19.

33. The Comfy® is primarily marketed and sold as a cocooning "wearable blanket" and Cozy Comfort's marketing strategy from the beginning was to create a brand-new market for "the world's first wearable blanket." D2, p. D2000006; Tr. Vol. I (Speciale) at 89:10-13.

34. The Comfy® is packaged for sale like a blanket; it is vacuum sealed in plastic and packaged in a cardboard box. P1; P10; Tr. Vol. I (Speciale) at 83:22-84:2.

35. Blankets are typically packaged for sale in either boxes or hard plastic bags and often are wrapped in a "belly band," which is a tight band that goes around the blanket to keep it secured. Tr. Vol. I (Speciale) at 84:22-85:8.

36. Garments, by contrast, are typically packaged for sale by being hung on hangers or folded loosely on shelves or tables. Tr. Vol. I (Speciale) at 84:13-20.

37. The Comfy® is sold in the wearable blanket, blanket and bedding, lifestyle, and "As Seen on TV" sections of its top retail customers such as Amazon.com, Bed Bath and Beyond, Target, and Big 5, and is not sold in the wearing apparel, clothing, or garment departments of these major retail stores. P10, P16; Tr. Vol. I (Speciale) at 151:18-154:13.

38.     Cozy Comfort entered into licensing agreements with major retailers allowing use their intellectual property on "wearable throw[s]/blanket[s]" and "wearable blankets," and not on any type of apparel. Tr. Vol. I (Speciale) at 164:15-20; P-11 at CC00762-763 (Disney license listing the product type as "wearable throw/blanket" and the product category as  "home furnishings"); Tr. Vol. I (Speciale) at 165:12-21; P-11 at CC00837 (Marvel license listing the product type as "wearable throw/blanket" and category as "home furnishings"); Tr. Vol. I (Speciale) at 165:22-166:5; CC00887 (National Hockey League licensing listing the product category as "wearable blanket"); Tr. Vol. I (Speciale) at 166:11-17; P-11 at CC00919 (New York State Economic Development Agency listing the licensed production as "wearable blanket"). P11.

39.     In its early days, Cozy Comfort included the marketing term "sweatshirt" after the term "blanket" to educate consumers about the wearable nature of its novel product, given "whole body" or "wearable blankets" were not yet well-known consumer terms. RPO, Schedule C, ¶ 15; Tr. Vol. I (Speciale) at 88:3-89:25; P4.

40.     After the concept of a "wearable blanket" became more widely known to the public, Cozy Comfort dropped the "sweatshirt" analogy and modified its intellectual property protections to eliminate this reference. Tr. Vol. I (Speciale) at 88:3-89:25; Tr. Vol. I (Speciale) at 92:10-18; P5, D49; RPO, Schedule C, ¶ 16.

C.    **Comparison between The Comfy® and the Snuggie®**

41.    On December 3, 2017, the Speciale brothers pitched The Comfy® on Shark Tank, a television show where inventors present novel products to a panel of potential investors called "sharks." D27-1; Tr. Vol I (Speciale) at 71:21-72:11.

42.    The Speciale brothers pitched their invention, The Comfy®, as a novel, cocooning wearable blanket to stay warm and cozy in cold weather. D27-1.

43.    During the episode, the Speciale brothers and "sharks" discussed the similarity of The Comfy® to a similar wearable blanket product new to the market, the Snuggie®. D27-1.

44.    While The Comfy® is similar to the Snuggie® in some basic respects, it is an improvement on the Snuggie® blanket because it provides all the wearable blanket benefits of a Snuggie® but also allows users to get up from the couch and move around without leaving the blanket behind. D27-1; D-9-1.

45.    One "shark" decided not to invest in The Comfy® because she felt that it was too much like the Snuggie®. D27-1.

46.    Another "shark" put on The Comfy® and after only a few minutes stated, "Ok I'm really hot now." D27-1.

47.    At the conclusion of the segment, the Speciale brothers accepted the investment of "shark" Barbara Corcoran. D27-1.

### D.     Customs Entry and Reclassification of The Comfy®

48.    After the Speciale brothers' appearance on Shark Tank, sales of The Comfy® increased rapidly, and in early 2018 Cozy Comfort began importing The Comfy® from China classified as a "blanket" in heading 6301, HTSUS. Tr. Vol. I (Speciale) at 72:12-73:13 (sales taking off and first entries in early 2018), 211:24-212:18 (first entries in 2018).

49.    In calendar year 2018, Cozy Comfort's sales of The Comfy® were more than [⬛⬛⬛⬛]. P16.

50.    In calendar year 2019, Cozy Comfort's sales of The Comfy® doubled to more than [⬛⬛⬛⬛]. P16.

51.    That same year, Amazon created a new "wearable blankets" sales category specifically for The Comfy®. Tr. Vol. I (Speciale) at 92:10-18.

52.    During this period, Cozy Comfort and its trading partners consistently referred to and declared The Comfy® as a "utility blanket" in customs entry summaries, commercial invoices, packing lists, and bills of lading. P17, p. 698-99.

53.    Through late 2019 and early 2020, Cozy Comfort continued importing The Comfy® as a "utility blanket" classified in heading 6301, HTSUS. Tr. Vol. I (Speciale) at 532:21-534:113; D9-1.

54.    This changed in March 2020 when, for the first time, a field import specialist assigned to Customs' Apparel, Footwear, and Textiles Center proposed to

reclassify The Comfy® in heading 6114, HTSUS, which covers "other garments." D9-1.

55. Given the proposed classification change, Customs' field import specialist submitted a Quality and Uniformity Information Control System (QUICS) inquiry to Customs headquarters asking for classification assistance from a national import specialist. D9-1; Tr. Vol. III (Orsat) at 750:10-16 (explaining QUICS process).

56. A Customs' national import specialist specializing in heading 6110, HTSUS, Renee Orsat, advised the field import specialist to reclassify The Comfy® not in heading 6301, HTSUS, as Cozy Comfort classified it, or in heading 6114, HTSUS, as Customs' apparel field import specialist proposed, but instead in heading 6110, HTSUS, which covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles." D9-1, p. 496; Tr. Vol. III (Orsat) at 796:12-799:7.

57. On March 9, 2020, Customs issued a Customs Form 29 Notice of Action reclassifying The Comfy® from subheading 6301.40.0020, HTSUS (blankets), 8.5% *ad valorem*, to subheading 6110.30.3059, HTSUS (pullovers), 39.50% *ad valorem*. D2-1 at D2000317.

58. The Customs Form 29 instructed Cozy Comfort to classify future entries of The Comfy® in heading 6110, HTSUS. Tr. Vol. III (Orsat) at 800:7-11.

59. Following Customs' March 9, 2020, Customs Form 29 Notice of Action, Cozy Comfort complied with Customs' written instruction but protested and

applied for further review of Customs' reclassification by Customs' Headquarters. P20.

60.     Cozy Comfort's trading partners also complied with Custom's reclassification instructions by changing the description of The Comfy® in commercial invoices, packing lists, and bills of lading from "utility blanket" to "pullover." D12; Tr. Vol. I (Speciale) at 293:11-295:16.

61.     On May 21, 2021, Customs issued a Headquarters Ruling Letter in response to Cozy Comfort's request for further review formally deciding that The Comfy® is classified in subheading 6110.30.3059, HTSUS (pullovers). P22.

62.     Customs' decision to reclassify The Comfy® had a dramatic negative impact on the Cozy Comfort because Customs applied the reclassification retroactively, resulting in additional duties being assessed on prior entries and more than [███████] in bills from Customs that was "devasting" for Cozy Comfort.[3] Tr. Vol. I (Speciale) at 168:6-8, 169:22-170:4.

63.     In addition to the more than [███████] bill for past entries, Cozy Comfort had already negotiated pricing with retailers and had to "eat" the cost increase which "wiped out [its] profitability" on current and future entries. Tr. Vol. I (Speciale) at 168:17-24.

---

[3] Mr. Speciale testified that he personally writes a [█████] check to Customs each month as part of a negotiated payment plan to satisfy the more than [██████] debt to remind himself of what he is fighting for in this lawsuit. Tr. Vol. I (Speciale) at 173:8-14.

## V. PROPOSED CONCLUSIONS OF LAW

### A. Legal Framework

The HTSUS is organized into headings, each of which contains one or more subheadings. The headings describe general categories of merchandise, and the subheadings "provide a more particularized segregation of goods within each category." Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The Court follows a strict order of operations when deciding HTSUS classification cases, which is set out in the General Rules of Interpretation (GRIs) of the HTSUS. The first task is to classify the merchandise in the correct HTSUS heading by construing the language of the headings. Id. at 1440. This is done by applying GRI 1, which provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. A product is classifiable under GRI 1 if it "is described in whole by a single classification heading" of the HTSUS. La Crosse Tech., Ltd. v. United States, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (quoting CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1364 (Fed. Cir. 2011)). If no heading describes the product in whole, the Court may proceed to GRIs 2 through 5, in order, only proceeding to the next GRI if the previous GRI cannot classify the product. See Mita Copystar Am. v. United States, 160 F.3d 710, 712 (Fed. Cir. 1998); Wilton Indus. v. United States, 741 F.3d 1263, 1266 (Fed. Cir. 2013). "[I]f the proper heading can be determined

under GRI 1, the court is not to look to the subsequent GRIs." R.T. Foods, Inc. v. United States, 757 F.3d 1349, 1353 (Fed. Cir. 2014).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). The common meaning of a tariff term is a question of law to be decided by the Court. E.M. Chems. v. United States, 920 F.2d 910, 912 (Fed. Cir. 1990) (citing Stewart-Warner Corp. v. United States, 748 F.2d 663, 664–65 (Fed. Cir. 1984)). When a tariff term is not clearly defined, the Court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used." Baxter Healthcare Corp. v. United States, 182 F.3d 1333, 1337-38 (Fed. Cir. 1999). The Court may also consult the Explanatory Notes for the Harmonized Commodity Description and Coding System, which are maintained by the World Customs Organization. Although not legally binding, the Explanatory Notes "are generally indicative of the proper interpretation of a tariff provision." Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing Motorola Inc. v. United States, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).

**B.     Classification of the Subject Merchandise**

**1.     The Comfy® is not properly classified in heading 6110, HTSUS, so Customs' reclassification decision is incorrect.**

The threshold issue is whether Customs is correct that The Comfy® is properly classified in heading 6110, HTSUS. Note 2(a) to Chapter 63 states that subchapter 1 to Chapter 63, which includes headings 6301 to 6307, does not cover "[g]oods of chapters 56-62." Thus, if an article is properly classified in heading 6110, or another heading in Chapter 61, it cannot be classified in heading 6301. See, e.g. Shamrock Building Materials, Inc. v. United States, 619 F. Supp. 3d 1337, 1343–44 (C.I.T. 2023) (first considering whether article is classifiable in heading 8547 before considering whether classifiable in heading 7306 based on note 1(f) to section XV); Allstar, 211 F. Supp. 2d at 1328 (examining whether an article is classifiable under heading 6114 before examining whether classifiable in heading 6301 based on note 2(a) to Chapter 63). Therefore, before considering classification in a Chapter 63 heading, such as heading 6301 proposed by Cozy Comfort, the Court first must address whether Customs is correct that The Comfy® is classified in heading 6110, or whether The Comfy® is properly classified in another Chapter 61 heading.

To be classified in a Chapter 61 heading, including heading 6110, HTSUS, an article must be a "garment," in other words, "wearable apparel." Rubie's Costume Co. v. United States, 337 F.3d 1350, 1357-60 (Fed. Cir. 2003) ("Rubies Costume I"); Allstar, 211 F. Supp. 2d at 1329–33 (applying Rubies Costume I). If the article

is wearing apparel of Chapter 61, to be classified in heading 6110 specifically, as Customs decided, then the article <u>must</u> also meet <u>all four</u> of the following essential characteristics of articles of heading 6110: (1) "cover[] the upper body;" (2) "provide[] some warmth to the wearer;" (3) "not protect against wind, rain, or extreme cold;" and (4) be worn "over either undergarments or other clothing." <u>Rubies Costume Co. v. United States</u>, 922 F.3d 1337, 1345–46 (Fed. Cir. 2019) ("<u>Rubies Costume II</u>"). Importantly, to be excluded from heading 6110, HTSUS, the article need only provide "extra" warmth, protect against one of the listed weather conditions (wind, rain, or extreme cold), and cover more than just the "upper body." <u>Rubies Costume II</u>, 922 F.3d at 1345–46; <u>see also</u> <u>Jennings v. Rodriguez</u>, 583 U.S. 281, 300 (2018) (citing A. Scalia & B. Garner, Reading Law 107 (2012), and invoking canon of *expressio unius* to read a negative implication into a statute); <u>see also</u> <u>Best Key Textiles Co. v. United States</u>, No. 13-00367, 37 Int'l Trade Rep. (BNA) 1590 Slip. Op. 2015-63, 2015 Ct. Intl. Trade LEXIS 65, at \*5 (Ct. Int'l Trade June 18, 2015) (applying canon to interpretation of Federal Circuit mandate order). Here, The Comfy® is not properly classified in heading 6110, HTSUS because it is not wearing apparel, it provides extra warmth and protects against extremely cold weather, and it covers much of the lower body.

### a.  The Comfy® does not meet the definition of "wearable apparel" of Chapter 61.

The Comfy® cannot be classified in heading 6110, HTSUS, or any heading in Chapter 61, because it does not meet the definition of "wearable apparel." Chapter 61, HTSUS, covers "articles of apparel and clothing accessories, knitted or crocheted." The Federal Circuit has thus determined that to be classifiable under Chapter 61 an article must qualify as "wearable apparel." Rubies Costume I, 337 F.3d at 1357-60; Allstar, 211 F. Supp. 2d at 1329–33 (applying Rubies Costume I). In determining whether an article qualifies as "wearable apparel," the Court considers whether the article is "ordinarily worn" with "ordinarily" meaning "in the ordinary course of events," "usually" or "in a commonplace way." Allstar, 211 F. Supp. 2d at 1329–33. The Court also assesses whether the article would be "considered in ordinary parlance to be wearing apparel" or in other words whether it is an "identifiable clothing item." Id. It may also look to the GRK Canada "use factors" (i.e., how it is designed, intended to be used, and marketed). Id.

In Allstar, the court applied this legal framework in determining whether a similar product to The Comfy®, the Snuggie®, qualified as a garment and could thus be classified in heading 6114, HTSUS, as the government argued in that case. The court ultimately held that the Snuggie® did not qualify as apparel of Chapter 61 primarily because it did not sufficiently resemble a "normal article of apparel" or an article "ordinarily worn" in any "commonplace way" but primarily because it was

21

designed, intended to be used, and marketed as a blanket and not as a garment. Id. at 1332-35. As discussed below, the logic that the Allstar court applied to the Snuggie® applies equally to The Comfy® and precludes classification in heading 6110, HTSUS.

### i. The Comfy® is not ordinarily worn as wearing apparel in a common place way.

The Comfy® is not ordinarily worn in a common place way like pants, a shirt, a jacket, or another article of clothing. In other words, it is not considered in ordinary parlance to be "wearing apparel" or an "identifiable clothing item." Instead, it is a brand new, novel patented product designed, marketed, and sold as an alternative to a household blanket that allows the user to cocoon inside but also bears the additional, convenient feature of portability, not as clothing for general use in public. RPO, Schedule C, ¶ 5 (uncontested fact that The Comfy® is intended to be worn over clothes or undergarments); Tr. Vol. II (Crumley) at 579:20-23 (testimony that he has not seen anything like it and that it really should have its own category because "it is nothing like anything else that was on the market"), 591:11-15 ("I just think that a wearable blanket like this sits in its own category and can't be described as a garment because it -- it is not used as a garment is normally used"); P6 at 22, col. 6, lns. 43-46 (USPTO-approved patent stating that The Comfy® is different from other garments and has "unique features" not available in garments).

The evidence at trial established that while The Comfy® bears some similarities to identifiable garments—for example, it has sleeves and a hood—it bears other non-clothing features that sharply and materially distinguish it from standard wearing apparel. For example, it is made of thick, blanket materials not normally found in apparel of Chapter 61. Tr. Vol. I (Speciale) at 69:6-11. It is "considerably wider than a conventional article of clothing." P6 at 24, col. 10, lns. 8-11. Its "sleeve openings are at least twice as large as those of a typical article of clothing." P6 at 24, col. 10, lns. 11-13. The Comfy®'s opening where the hood attaches is large enough that the user can easily pull her entire head into The Comfy®. Tr. Vol. I (Speciale) at 109:24-110:4. The Comfy®'s hood is "huge" and can cover the user's entire face. Tr. Vol. I (Speciale) at 109:20-23. The Comfy® can "drape over a person like a blanket." P6 at 24, col. 10, lns. 13-15. It "can even cover the person when in the fetal position." P6 at 24, col. 10, lns. 14-16. The user can bring her arms in and out of the sleeves easily without stretching the sleeves. P6 at 24, col. 10, lns. 15-18. The marsupial pocket is located in an elevated position so the user can put her arms in without stretching down. P6 at 24, col. 10, lns. 19-24. The marsupial pocket is placed so that it is in front of the user's knees when the user is sitting down in a cocooning position, again allowing for ease of access. P6 at 24, col. 10, lns. 24-32. The back panel of The Comfy® is longer than the front panel, so that the user's posterior is fully covered when the user is sitting down in a cocooning position. P6 at 24, col. 10, lns. 33-39. These numerous prominent blanket-like

features distinguish The Comfy® from any identifiable garments, including sweatshirts and similar articles. Tr. Vol. II (Crumley) at 598:599:4 (The Comfy® is not a sweatshirt or similar article because those articles are designed in a way that allows other garments to fit over them and The Comfy® is not); 599:5-9 (sweaters and similar articles are not designed to allow cocooning); 1269:7-15 (The Comfy® is heavier and thicker than a typical garment and sweatshirt).

## ii. The Comfy® is designed and intended to be used as a blanket, not wearing apparel.

The Comfy® is designed, intended to be used, and marketed as a blanket and not as a sweater, sweatshirt, pullover, or similar article, or any other type of wearing apparel. In considering a product's design and use, it is the "primary" design and use, not outward appearance, that is determinative. CamelBak Prods., 649 F.3d at 1362, 1368–69 (reversing and remanding where the CIT discounted the "primary design and use" of a backpack that served primarily to "deliver water to the user in a 'hand-free' fashion" but also could "carry and organize a multitude of personal effects"). A court must compare the article's "specific primary" or "obvious" purpose with that of the named exemplars. Otter Prods., LLC v. United States, 834 F.3d 1369, 1376, 1381 (Fed. Cir. 2016). If the article's "specific primary" or "obvious" purpose is "inconsistent" or "differ[s]" from that of the listed exemplars, classification under the HTS heading is not appropriate. Id.

For example, the Federal Circuit concluded that a durable smartphone case (the Otterbox®) was not similar to a trunk, suitcase, camera case, etc. under heading 4202, HTSUS because the Otterbox® had a primary purpose that was inconsistent with or different than the exemplars, namely it allowed the enclosed electronic device to remain fully functional. Id. In another heading 4202, HTSUS case, the court rejected Customs' proposed classification of a pet carrying case under the heading because the primary purpose of a pet carrier was to carry living creatures and animals, not inanimate objects like the heading 4202 exemplars. Quaker Pet Grp., LLC v. United States, 287 F. Supp. 3d 1348 (Ct. Int'l Trade 2018).

Here, The Comfy® has an "obvious" or "specific primary use" that is different than that of the exemplars listed in heading 6110, HTSUS (sweaters, pullovers, sweatshirts, waistcoats (vests)), or in any Chapter 61 heading – The Comfy® is used as a cozy, cocooning blanket; sweaters, pullovers, similar articles, and other types of wearing apparel, are not. The evidence at trial established that Cozy Comfort referred to the product as a "wearable blanket" from its earliest days and as a "blanket," "wearable blanket," "blanket throw," and "whole body blanket" in trademark and patent applications. P6 at 20, col. 1, lns. 14-15; Tr. Vol. I (Speciale) at 89:10-13. It further established that the company's business partners also independently referred to it as a "utility blanket" in entry records until Customs instructed that they stop doing so in March 2020. P17 at 698-99. Cozy Comfort's first patent filing shows how the company designed The Comfy® to be materially

25

different from clothing and used exclusively as a wearable blanket. P6 at 22, col. 6., lns. 4-15 (patent describing how The Comfy® differs from clothing); Tr. Vol. II (Crumley) at 589:16-18 (testifying that Fig. 10 shows design and intended use solely as a blanket). Testimony from Cozy Comfort's CEO, Mr. Speciale, and its expert witness, Mr. Crumley, a 2021 market survey, and ample customer photos demonstrate that the primary intended use of The Comfy® is additional warmth while lounging around the house—just like a blanket. Tr. Vol. I (Speciale) at 67:16-25; Tr. Vol. II (Crumley) at 580:24-25; P12 at CC986; P13.

It is critical to note that Cozy Comfort's evidence regarding primary design and use was left unrebutted by the government. The government failed to produce any evidence establishing that The Comfy® has some other *primary* design and *intended* use than as a blanket. More specifically, the government offered no evidence that The Comfy® is designed or intended to be used as a pullover or similar article of heading 6110, HTSUS, or that any type of wearing apparel is used to cocoon for warmth like The Comfy® is. Instead, relying on a single marketing statement, which occurred years before the entry in this litigation was filed, the government broadly and generally argued that The Comfy® can be used during other activities like dancing, sitting at a sporting event, or taking a walk. Tr. Vol. I (Customs' opening) at 49:19-23. But even if this is true, and not mere marketing puffery, this merely establishes that The Comfy® can be used in multiple ways in addition to warmth, just like a typical blanket, so it is not determinative for

classification purposes. It also does not establish that The Comfy® is *primarily* intended to be used for these other activities or rebut Cozy Comfort's ample evidence that The Comfy®, like the Snuggie®, is designed and *primarily* used as a blanket.

The government essentially makes the same argument that the Federal Circuit expressly rejected in <u>CamelBak</u>. The back-mounted pack at issue there appeared to be a backpack and had multiple uses. It could be used to deliver water to the user in a hands-free fashion. <u>CamelBak</u>, 649 F.3d at 1362. But it could also be used to carry and organize personal effects. <u>Id.</u> at 1367. As here, Customs seized upon its superficial appearance and the latter use and argued that this made it a backpack. <u>Id.</u> But the Federal Circuit squarely rejected this argument and looked instead to the product's design, unique identity, and intended use, even though that identity and use differed from its outward appearance. <u>Id.</u> Even though the Camelbak® article looked at first glance like a backpack, the Federal Circuit directed it be classified it in accordance with its *primary* and *actual* use as a water delivery device. <u>Id</u>.

In this case, The Comfy® does share some similar superficial features and secondary uses to apparel—it has a hood and marsupial pocket and can be placed on the body as an article that provides additional warmth while doing activities such as taking a walk, grabbing a drink from the fridge, or checking the mail. But, as with a traditional blanket's common use to be wrapped around the body in this manner during such activities, any such uses are secondary to The Comfy®'s *primary* use as covering for warmth while lounging in or around the house (i.e., use as a blanket).

27

### iii.    **The Comfy® is marketed as a blanket.**

The trial record also established that Cozy Comfort has consistently marketed The Comfy® as a wearable blanket, not as wearing apparel. Mr. Speciale credibly testified that from the beginning the company sought to create and dominate the wearable blanket market, and had no interest, or expertise, in clothing. D2, p. D2000006; Tr. Vol. I (Speciale) at 89:10-13. Cozy Comfort sells The Comfy® in packaging prominently marked "wearable blanket." Tr. Vol. III (Concannon) at 903:24-904:3. The Comfy® is vacuum sealed in plastic and packaged in a cardboard box. P1; P10; Tr. Vol. I (Speciale) at 83:22-84:2. Blankets are typically sold in packaged in this manner. Tr. Vol. I (Speciale) at 84:22-85:8. Clothing, on the other hand, is typically hung on a hanger or folded loosely on shelves or tables, not vacuum-sealed in a box, so it can be examined and tried on for fashion, appearance, and fit. Tr. Vol. I (Speciale) at 84:13-20. The Comfy® is not intended to be used as clothing so potential purchasers cannot and do not try it on like clothing. Cozy Comfort's website states that "[w]e created the world's first wearable blanket" and that the "blanket's huge, one-size fits all design combines an ultrasoft microfiber exterior with a luxurious, sherpa-lined interior to make you think you're being hugged by a cloud." P35 at 1. Cozy Comfort nearly exclusively sells The Comfy® in online and brick-and-mortar store sections dedicated to blankets, bedding, and lifestyle good and not in sections dedicated to clothing. P10 (photos from retail sales locations), P16 (accounting records); Tr. Vol. I (Speciale) at 151:18-154:13.

28

Amazon.com markets and sells The Comfy® in the "wearable blanket" sales category, a category it created specifically for The Comfy®, not in an apparel category where pullovers and similar articles are sold. Tr. Vol. I (Speciale) at 145:21-24. QVC sells it in the "bedding and blanket" section, not the apparel section. Tr. Vol. I (Speciale) at 152:12-16. Costco sells it in the "bedding or lifestyle" section, not the apparel section. Tr. Vol. I (Speciale) at 152:17-19.

Cozy Comfort has also entered into licensing agreements with major retailers and a New York state agency allowing use their intellectual property on "wearable throw[s]/blanket[s]" and "wearable blankets," not on apparel. Tr. Vol. I (Speciale) at 164:15-20; P-11 at CC00762-763 (Disney); Tr. Vol. I (Speciale) at 165:12-21; P-11 at CC00837 (Marvel); Tr. Vol. I (Speciale) at 165:22-166:5; CC00887 (National Hockey League); Tr. Vol. I (Speciale) at 166:11-17; P-11 at CC00919 (New York State Economic Development Agency).[4] The fact that these large, well-known third parties all independently agreed The Comfy® is a type of blanket, not clothing, is compelling evidence The Comfy® is not wearing apparel.

At trial, the government attempted to show that The Comfy® has been marketed as apparel but failed to produce convincing evidence in support of this

---

[4] It is true that these licensing agreements were entered into after Customs demanded reclassification of The Comfy® in March 2020. Customs insinuated that Cozy Comfort somehow played a role in including this description in the license agreement. However, Customs offered no evidentiary support for this claim, and the Court should decline to draw any sort of negative inference from the timing of this licensing agreements. Instead, the Court should find it more likely than not that market dynamics—and not a customs dispute—dictated the terms of these licensing agreements.

claim. For example, the government pointed out that The Comfy® has been sold by companies whose name included the word "apparel." Tr. Vol. I (Speciale) at 431:3-432:3. As shown at trial, however, none of the top retailers of The Comfy® are primarily apparel sellers and the few companies the government cherry-picked account for a miniscule amount of its global sales; [          ] dollars out of [              ] dollars in global sales between 2018 and 2022. P16.

The government also presented evidence that certain business partners changed their reference to The Comfy® from "utility blanket" to "pullover" in an invoice, packing list, and freight bill. D12; Tr. Vol. I (Speciale) at 293:11-295:16. However, this argument is disingenuous as well because the descriptions in these records all came after Customs' March 2020 Notice of Action in which Customs ordered Cozy Comfort to reclassify The Comfy® as a pullover. Once Customs issued its Notice of Action, Cozy Comfort and its manufacturing partners had little choice but to comply by preparing entry records consistent with Customs' instructions. To do otherwise could make them subject to liability under 19 C.F.R. Part 171, Appendix B(C)(2). United States v. Wanxiang Am. Corp., 654 F. Supp. 3d 1279, 1295–96 (Ct. Int'l Trade 2023) ("The allegation that Wanxiang continued to misclassify entries after receiving a Notice of Action regarding universal joints and parts of universal joints gives rise to a plausible conclusion that Wanxiang's subsequent misclassifications 'result[ed] from an act or acts ... done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or

disregard for the offender's obligations under the statute.'"). The timing of these records coming after Customs' reclassification instruction is critical to understand what they mean for the dispute at bar. The government's insinuation attempts to give credence to the well-known logical fallacy *post hoc ergo propter hoc.*

The government also claimed in its opening argument that Walmart sold The Comfy® on its website under the women's clothing section. However, at trial, the government failed to produce evidence to support this claim. The sole evidence offered on the issue was a dubious screenshot from Walmart's marketplace related to an offering by a third-party seller called "Mega Maxi" characterizing the product as women's clothing. Tr. Vol. I (Speciale) at 331:3-346:19; D-15. However, the way a single questionable third-party seller referenced The Comfy® on Walmart's marketplace bears little probative value in this classification matter, and the Court ruled this evidence cannot be used to establish how The Comfy® is marketed.

Lastly, contrary to the government's assertions, Cozy Comfort never really marketed The Comfy® as a sweatshirt. The great weight of the evidence—discussed in detail above—indicates that the company went to market as a "wearable blanket" and that when the company used the term "sweatshirt" in its early days it always did so after and in conjunction with the primary descriptive term "blanket" to educate new consumers about the wearable features of its novel blanket product. Tr. Vol. I (Speciale) at 302:22-310:7. For example, in <u>Victoria's Secret</u>, the court held that sellers sometimes attach familiar or distinctive names to new or novel products to

expand consumer appeal. <u>See</u> <u>Victoria's Secret Direct, LLC v. United States</u>, 37 C.I.T. 573, 594 (2013), aff'd, 769 F.3d 1102 (Fed. Cir. 2014). Notably, the government offered no evidence that consumers or retailers considered The Comfy® a sweatshirt or any other type of wearing apparel.

It is true that Cozy Comfort did at times refer to The Comfy® as an "overgarment" or "garment" in some of its early patent filings. The term "overgarment" is innocuous as many things ostensibly go over a garment and are not themselves garments. This descriptor does not advance the government's position that The Comfy® is a pullover or similar article, which the government did not assert or prove are "overgarments." The record supports Cozy Comfort's position the term simply means The Comfy® is designed to go over clothing for extra warmth. Tr. Vol. I (Speciale) at 115:8-15; Tr. Vol. II (Crumley) at 591:2-7.

Although Cozy Comfort repeatedly use of the familiar term "garment" in patent filings, which are intended to broadly protect an invention against counterfeit knockoffs, the USPTO-granted patent filings make it clear The Comfy® is a novel product that is not apparel and not a traditional blanket, despite having some features of both. P6, Col. 6., Lines 4-46. Bearing this in mind, while relevant to the Court's analysis, the Court should not read too much into the use of the word "garment" in context of Cozy Comfort's patent filings, particularly given Cozy Comfort listed the field of invention as "blankets," not wearing apparel, and described its background and intended purpose solely as a blanket in all of its patent and trademark filings.

In summary, the record at trial establishes that The Comfy® is not ordinarily worn in a common place way and is not considered in ordinary parlance to be "wearable apparel" or an "identifiable clothing item." The record further establishes that The Comfy® is designed, primarily intended for use, and marketed as a blanket, and not as a pullover or similar article of heading 6110, HTSUS, or apparel of any kind for that matter. For these reasons, The Comfy® does not meet the definition of wearable apparel, and is therefore not properly classified in heading 6110, HTSUS, or any other Chapter 61 heading.

## b. The Comfy® provides extra warmth and protects against extreme cold.

Even if The Comfy® is a type of wearing apparel of Chapter 61, however, it is excluded from classification in heading 6110, HTSUS because it provides extra warmth and protects against extreme cold. In Rubies Costume, the Federal Circuit held that heading 6110, HTSUS, covers articles that provide "some warmth" but excludes articles that provide extra warmth such that they protect against extreme cold. This is consistent with the overall statutory scheme, which contains several alternative headings for garments that provide greater warmth and protection from the cold than sweaters, pullovers, and similar articles. See King v. Burwell, 576 U.S. 473, 486, 135 S. Ct. 2480, 2489, 192 L. Ed. 2d 483 (2015) (noting that words must be read "in their context and with a view to their place in the overall statutory scheme"). For example, headings 6101 and 6102 cover "overcoats, carcoats, capes,

cloaks, anoraks (including ski-jackets)…and similar articles" that provide protection from weather elements. Heading 6112 covers "ski-suits." Headings 6103, 6104, 6114, 6203, 6204, and 6211 cover garments that are "insulated, for cold weather protection." The statutory scheme thus suggests that garments that provide some standard level of warmth are appropriately classified in heading 6110, HTSUS, while garments that provide extra warmth or other insulation from cold weather such that they protect against extreme cold are classified elsewhere in the tariff code.

The Explanatory Notes to heading 6110, HTSUS, reinforce this point because they specifically exclude vests with insulating padding for protection against cold weather from heading 6110, HTSUS. Ex. P43; Tr. Vol. III (Orsat) at 810:22-811:11. Customs' official policy position in its Informed Compliance Publication (ICP) on the classification of apparel ("Apparel ICP") reflects the same distinction, as does Customs' policy and practice of excluding garments with a sherpa interior lining that provides extra warmth to the user from heading 6110, HTSUS.[5] P21, p. 22; Tr. Vol. III (Orsat) at 809:810:18; 828:20-829:11; Tr. Vol. III (Matherne 30(b)(6)) at 739:5-9.

---

[5] At trial, Customs' national import specialist Renee Orsat first accepted Customs' policy that articles with a sherpa lining are excluded from heading 6110, HTSUS, then attempted to disavow this official policy position and practice, stating that "we have a statute that gets us around that." Tr. Vol. III (Orsat) at 833:2-15. But the statute is silent on the issue of whether sherpa lined garments can be included in section 6110. It is thus unclear how Customs "gets around" the written classification guidance it issued to the trade community but it seemingly attempts to do so in this case.

The government departs from this accepted distinction for purposes of this litigation and now argues that "extreme cold" means "arctic cold." In other words, the government now claims that articles do not protect against extreme cold such that they are excluded from heading 6110, HTSUS unless they provide enough warmth to protect against arctic temperatures such as "minus 15 or below." Tr. Vol. III (Ferro) at 1120:16-22. The government's new argument in this litigation is not persuasive.

The government's proposed interpretation of extreme cold as arctic cold is inconsistent with the statutory framework discussed above, which places articles that provide some warmth in heading 6110, HTSUS and those that provide additional warmth and protection elsewhere. It is also inconsistent with the words immediately surrounding the Federal Circuit's phrase "extreme cold," a term that does not appear in the tariff code. When interpreting a word or phrase in a sentence, courts must not "turn[] a blind eye" to the immediately surrounding words. Rubies Costume I, 337 F.3d at 1357; see also Jing Mei Auto. (USA) v. United States, 682 F. Supp. 3d 1354, 1381 (Ct. Int'l Trade 2023) (applying *noscitur a sociis* and using immediately surrounding words to help define unclear terms in heading 3923). In Rubies Costume II, the phrase "extreme cold" is immediately preceded by "wind" and "rain," two words that suggest far milder environs than arctic weather conditions, which would involve strong gusts, heavy snow, or frigid temperatures far below freezing. Rubies Costume II, 922 F.3d at 1345–46. It is also telling that the Federal Circuit did not

use modifiers or surrounding terms suggestive of arctic winter conditions—like freezing rain, snow, or ice. Further, as set forth above, other references in the tariff code, Explanatory Notes, and Apparel ICP describe warming insulation to protect against mere "cold weather," not arctic or freezing weather conditions, as the type of feature that excludes an article from classification in heading 6110, HTSUS.

Additionally, the government's proposed interpretation fails to account for the inherent subjectivity in the concept of "extreme cold." Witnesses from both parties testified at trial that the concept is subjective and that people have different levels of cold tolerance. Mr. Speciale testified that he is from Phoenix and that he considers it extremely cold when it is fifty degrees. Tr. Vol. I (Speciale) at 122:2-7. He further testified that his wife gets cold at sixty-five degrees. Tr. Vol. I (Speciale) at 122:8-14. Mr. Crumley testified that he considers it extremely cold when it hits twenty or below. Tr. Vol. II (Crumley) at 602:3-7. Ms. Ferro agreed that the concept is subjective, stating that someone from Phoenix gets "very cold" when the weather is near freezing while someone from Wisconsin would be fine. Tr. Vol. III (Ferro) at 955:14-24. She also testified that to be extremely cold it must be "minus 15 or below." Tr. Vol. III (Ferro) at 1120:16-22. The government also offered evidence from the National Weather Service to this same effect. D30 (stating that "[w]hat constitutes extreme cold varies in different parts of the country" and that in the southern U.S. "near freezing temperatures are considered extreme cold" where in the north "extreme cold means well below zero."). The government's proposed

interpretation ignores this reality and arbitrarily adopts "arctic cold" as the requisite threshold for extremely cold weather when in fact most people are extremely cold at much higher temperatures.

Here, the record establishes by a preponderance of the evidence that The Comfy®, particularly its insulating sherpa interior lining, provides a greater level of warmth than a sweater, sweatshirt, pullover or similar article, and protects against extreme cold. Specifically, The Comfy® provides a greater level of cold weather protection than sweaters, pullovers, and similar articles of heading 6110, HTSUS, especially when properly used as the final, outermost layer with proper layering underneath, which is its intended use. When used as designed, The Comfy® protects the user from freezing temperatures due to the fabrics used, its construction, and the way it can be worn, including its cocooning functionality. At a minimum, its thick sherpa interior lining indisputably insulates for extra warmth and protection from extreme cold.

The Comfy® is made of heavy, thick, oversized materials. Specifically, it weighs around 2.9 pounds, is a little over one inch thick, has large arm holes, elongated sleeves, goes to around the knees of the typical user, and loosely drapes over the user. Tr. Vol. I (Speciale) at 66:2-3 (weighs 2.9 pounds); 69:6-11 (thick sherpa layer); 57:1-2 (oversized hood); 57:2-3, 65:10 (very large arm holes); 57:6 (elongated sleeves); 57:11 (huge bottom); Tr. Vol. II (Crumley) at 588:24 (thick sherpa lining); Tr. Vol. IV (Crumley) at 1270:8-12 (over one inch thick);  Tr. Vol.

IV (Crumley) at 588:2-8 (oversized). The Comfy®'s thick sherpa interior serves as insulation by trapping air and increasing warmth. Tr. Vol. I (Speciale) 57:17-23; Tr. Vol. I (Speciale) at 125:9-20; Tr. Vol. II (Crumley) at 588:20-589:1 (sherpa lining is the key to trapping heat); Tr. Vol. II (Crumley) at 595:4-9 (sherpa is an insulating fabric); 598:1-5 (adding sherpa to a fleece outer layer increases warmth).

These heavy, thick, oversized materials are sewn together to create an article that traps a large amount of air that can be warmed by body heat, especially in the cocooning position. Tr. Vol. I (Speciale) at 57:17-23; Tr. Vol. II (Crumley) 588:2-8; Tr. Vol. II (Crumley) at 595:4-9. The combination of these materials results in an article that can serve as an appropriate outermost layer when dressing to protect against extreme cold, as explained in detail by Cozy Comfort's expert witness, Jim Crumley.

Mr. Crumley is a well-known figure in the hunting world, having invented Trebark®, a product that brought nature-based camouflage patterns to the hunting industry.[6] Tr. Vol. II (Crumley) at 568:6-5-575:17; 616:22-617:3 (noting that outdoor industry writers have referred to him as "The Godfather of Camouflage," "The Grandfather of Hunting Camouflage," and "the Godfather of Modern Camouflage"). Mr. Crumley went on to design hunting garments, blankets, and other

---

[6] Mr. Crumley brought this style of camouflage to the Third Branch of Government as well, having designed and presented a judicial robe with camouflage to U.S. Supreme Court Justice Antonin Scalia. Tr. Vol. II (Crumley) at 575:3-14.

items intended to protect against extreme cold for some of the nation's largest retailers, including Cabela's, Bass Pro, Orvis, and Walmart. Tr. Vol. II (Crumley) at 573:4-17; 578:10-21 (noting that he and his team designed garments that would allow hunters to stay in a hunting stand for at least two hours in extreme cold); 681:24-682:4 (noting experience designing jackets, pants, bib overalls, and coveralls to protect against extreme cold). He has also written books and given seminars on keeping warm in cold environments. Tr. Vol. II (Crumley) at 602:8-603:16.

Plaintiff's expert, Mr. Crumley, credibly testified that layering is the key to protect against extreme cold. Tr. Vol. II (Crumley) at 604:24-605:7; see also Tr. Vol. I (Speciale) at 132:4-23 (discussing the importance of layering). Layering involves dressing in at least three different layers. The first layer, or the one closest to the body, should be a manmade wicking garment that wicks moisture away from the skin so that moisture cannot be cooled against the skin. Tr. Vol. II (Crumley) at 608:10-19. The second layer can be goose down, wool, or a fiber fill garment of some sort. Tr. Vol. II (Crumley) at 608:20-25. The third layer is the outermost layer. Tr. Vol. II (Crumley) at 609:1-3.

Mr. Crumley's expert opinion is that The Comfy® serves as the outermost layer and when used in this way with appropriate layering underneath it protects against extreme cold. Tr. Vol. II (Crumley) at 599:10-13 (The Comfy® is designed to be the outermost layer); 607:20-608:9 (The Comfy® can protect against extreme cold if used with proper layering underneath); 610:12-21 (same). The government's

own expert, Ms. Ferro, also testified on cross that someone would be protected from the extreme cold by wearing an additional layer below The Comfy®, as it is designed to be used. Tr. Vol. IV (Ferro) at 1103:1-18.

The government's argument that an article must by itself protect against extreme cold to fall outside heading 6110, HTSUS is unpersuasive. As Mr. Crumley credibly testified, layering is the key to cold weather protection and one garment generally does not suffice. Tr. Vol. II (Crumley) at 603:17-604:23. Indeed, the government's own expert witness, Ms. Ferro, similarly testified about the importance of layering. Tr. Vol. III (Ferro) 944:10-16, 978:11-15. The government also offered into evidence a diagram from the National Weather Service showing the importance of wearing three plus layers to protect against extreme cold, which corroborates Mr. Crumley's testimony. D30.

Beyond the heavy, thick, oversized fabrics used and the way these fabrics are combined, The Comfy® is also designed to be worn in a way that protects against extreme cold. Specifically, as the Court itself observed, it is designed to allow a user to "cocoon" inside. Cocooning entails sitting down, pulling one's knees and arms fully inside the garment, and keeping the knees and arms close to the core. Cocooning in this way keeps heat in the core area and allows a user to stay warmer longer. Tr. Vol. II (Crumley) at 588:7-19; 590:7-19. The Comfy® has a large, 76 inch, un-ribbed, hemmed bottom opening that is primarily designed to allow users to pull their arms and knees in and get into the full cocoon position. RPO, Schedule

C, ¶ 6; Tr. Vol. I (Speciale) at 57:11-12; Tr. Vol. I (Speciale) at 57:11-16. It also has elongated sleeves and large, 15-inch arm holes that allow users to easily pull their elbows close to the body. Tr. Vol. I (Speciale) at 57:5-10; Tr. Vol. I (Speciale) at 65:9-14.[7] It is worth noting again that none of the record evidence establishes that any of these extra warming features are found in standard wearing apparel, much less articles of heading 6110, HTSUS, which, by definition, cannot be designed to provide extra warmth or protection from extreme cold.

The trial record also contains evidence that The Comfy® is used by consumers in weather that they consider extremely cold. Mr. Speciale testified about two specific times he used The Comfy® this way, once in December at Niagara Falls and another time inside an ice rink. Tr. Vol. I (Speciale) at 122:4-5; Tr. Vol. I (Speciale) at 118:25-120:4; Tr. Vol. I (Speciale) at 120:5-121:21. He further described how he has heard from numerous people how The Comfy® keeps cancer patients warm while receiving chemotherapy in cold hospitals. Tr. Vol. I (Speciale) at 123:17-124:18. Mr. Speciale further testified that he knows customers use The Comfy® in extremely cold weather from customer reviews and photos that have been submitted to the company. Tr. Vol. I (Speciale) at 134:12-18. Photographs from the company's Instagram account showing people using The Comfy® in snowy conditions

---

[7] Following the Court's inspection and use of The Comfy® in the cocooning position in the courtroom, the Court likewise noted that The Comfy® is warm and made the Court perspire. Ex. P1; Tr. Vol. V (Vaden) at 1401:1-6.

corroborate this testimony. P13 at CC 01086, 1096, 1098, and 1101. The record also indicates that according to a marketing survey conducted in 2021, more than half of The Comfy®'s sales were in the Northeast and Midwest United States regions of the United States, regions where it regularly gets extremely cold (by anyone's definition). Tr. Vol. I (Speciale) at 427:13-22. The government failed to offer any evidence rebutting this evidence or even purporting to demonstrate that The Comfy® does not keep a person extra warm in these very cold conditions.

The Comfy® is distinguished from heading 6110, HTSUS articles by the fabrics used, its construction, and the way it can be worn (including its cocooning functionality). Mr. Crumley, an experienced wearing apparel designer, credibly testified that pullovers do not typically have sherpa lining and would not provide nearly as much warmth as The Comfy® even if they did. Tr. Vol. II (Crumley) at 601:13-24. He also pointed out that, unlike The Comfy®, pullovers and similar articles are not designed or intended to be used for cocooning inside. Tr. Vol. II (Crumley) at 601:18-24.

The government, in turn, offered only limited evidence consistent with its argument that extreme cold means arctic cold. Specifically, the government pointed to garments like a down jacket from Columbia and a "very high end" expedition parka from Canada Goose and argued that The Comfy® must possess similar features to protect against extreme cold. D42; D42-1 (noting that the Columbia jacket is among the warmest that Columbia sells); D43; Tr. Vol. III (Concannon) at 851:6-

13. But as discussed above, the government's interpretation of "extreme cold" as arctic cold misses the mark and it failed to establish that even articles with these exclusive features protects against extreme cold. The relevant question is whether The Comfy® provides a greater level of warmth than a standard pullover or similar article and/or protects against extremely cold weather, not whether The Comfy® provides the same level of protection as a "very high end" expedition parka and protects against arctic cold. These are overly exacting and virtually impossible standards to meet. As a result, the government's evidence is of negligible value to the Court's inquiry.

The testimony from the government's experts suffers from a similar defect insofar as they analyze The Comfy®'s cold protection properties against an overly high bar. For example, the government's marketing expert, Ms. Concannon, testified that The Comfy® is being marketed "more" as loungewear than as an article that protects against extreme cold. Tr. Vol. III (Concannon) at 870:13-871:3. But by "extreme cold," Ms. Concannon meant temperatures like "negative 22 degrees Fahrenheit." Tr. Vol. III (Concannon) at 847:11-19, 848:16-24; Tr. Vol. III (Concannon) at 847:11-19, 851:1-5. Applying this arctic cold standard, Ms. Concannon testified that the "very high end" Canada Goose expedition parka could be considered as marketed for extreme cold but almost nothing else would meet this standard. Tr. Vol. III (Concannon) at 851:6-13. She distinguished such articles from "mid-level moderately priced jackets that will protect you if you live in a very cold

43

climate and you're going from your car to the grocery store and so forth." Tr. Vol. III (Concannon) at 852:5-12. Again, this is not the standard that the Federal Circuit adopted in <u>Rubies Costume II</u>. The question is not whether The Comfy® is comparable to "very high end" Canada Goose expedition parkas supposedly (but not proven to be) suitable for exploratory missions to Antarctica or other subzero destinations. Under this standard, very little on the market would be excluded from heading 6110, HTSUS. The question is whether The Comfy®, with its insulating sherpa lining and patented cocooning functionality, provides a greater level of warmth and protection from the cold than ordinary pullovers and similar articles. The evidence at trial conclusively establishes it does.

The reliability of Ms. Concannon's testimony was also undermined by the customer reviews that she used to formulate her opinion. These reviews indicate that many customers see The Comfy® as a product that protects against extreme cold. For example, one review described how The Comfy® helped keep the user warm along with a sleeping bag while car camping in "15 degree weather" and while "shovel[ing] snow." Tr. Vol. III (Concannon) at 896:6-12; <u>see</u>, e.g., P37, Sophia (2/3/21) ("[I]t's keeping me really nice and warm on these wicked cold days."); Lori (3/25/24) ("I recommend these to anyone living in a very cold climate."); Heather (2/11/24) ("The best product out there for cold winter days and nights."); Chelie (12/23/23) ("I live in the northern U.S., and let me tell you, when I say it gets cold in the winter, its an understatement!...[The Comfy] was warmer than my coat."). It

should also be noted that Ms. Concannon did not visit any retail stores to formulate her opinion and admitted that she has not seen The Comfy® marketed in apparel sections of stores. Tr. Vol. III (Concannon) at 903:5-23.

Ms. Ferro applied an even more demanding standard for extreme cold, casting serious doubt on the overall reliability of her testimony. She testified that extreme cold means "minus 15 or below." Tr. Vol. III (Ferro) at 1120:16-22. But, if that is right, as Cozy Comfort noted in its closing, this means that the <u>only</u> time it was extremely cold in New York was February 9, 1934, the coldest day on record.[8] This simply cannot be the standard of "extreme cold" that the Federal Circuit intended to adopt in establishing a way to distinguish between sweaters, pullovers, and the like from other articles that provide greater warmth. Ms. Ferro also expressly pointed out that in formulating her opinion she was considering only the outermost layer and not the overall effect that a garment has in a series of layers. Tr. Vol. IV (Ferro) 1158:10-19. As Mr. Crumley credibly noted, having spent hours on end in hunting blinds across the country, cold weather protection is all about the layers and thus it makes little sense to assess an article's cold weather protection properties in isolation. Instead, it is most reasonable to assess how an article fits in with a standard series of standard layers. Additionally, it should be noted that in formulating her opinion, Ms. Ferro did not perform experiments or tests on cold protection, but instead simply

---

[8] National Weather Service, Warmest and Coldest Days at Central Park (1869 to the Present), https://www.weather.gov/media/okx/Climate/CentralPark/warmcolddays.pdf.

reviewed marketing materials and conducted an irrelevant, undefined, and unscientific water test. Tr. Vol. IV (Ferro) at 1117:8-19.

For all these reasons, The Comfy® provides extra warmth and protects against extreme cold and is thereby excluded from classification in heading 6110, HTSUS.

### c.    The Comfy® covers more than the upper body.

The Comfy® also cannot be classified in heading 6110, HTSUS, because it extends to the knees or below of a typical user whereas heading 6110 only applies to upper body garments. The Federal Circuit has held that goods covered by heading 6110, HTSUS are those that "cover[] the upper body." Rubies Costume II, 922 F.3d at 1345–46. The Federal Circuit's use of the phrase "covers the upper body" imposes a length or coverage limitation and thus means that articles that cover much of the lower body cannot be classified in heading 6110, HTSUS and must be classified elsewhere. See Jennings, 583 U.S. at 300 (citing A. Scalia & B. Garner, Reading Law 107 (2012), and invoking canon of *expressio unius* to read a negative implication into an immigration detention statute); see also Best Key Textiles, 2015 Ct. Intl. Trade LEXIS at *5 (applying canon to interpretation of Federal Circuit mandate order). Under the canon of *expressio unius*, the Federal Circuit's reference to the "upper body" suggests the exclusion of the lower parts of the body, such as the knee, leg, and foot.

This is consistent with Customs' Apparel ICP, which when read as a whole, strongly suggests that length does matter for purposes of classifying heading 6110,

HTSUS, articles and that heading 6110 articles do not extend below the mid-thigh area. P21. Notably, the ICP discusses the length of each article. The ICP says that a sweater "covers the body from the neck or shoulders to the waist or below (as far as the mid-thigh or slightly below the mid-thigh)." Id. at 22. Likewise, the ICP notes that a pullover is an "upper body" garment. Id. at 18. A waistcoat, as the name implies, extends down only to one's waist. A vest is an "upper body" garment that covers "to the waist or slightly below" with some contemporary vests being "as long as hip length" but no longer. Id. at 26. "Sweatshirts" are "worn on the upper body" and reach "to the waist or below." Id. at 26. When read a whole, the Apparel ICP strongly suggests that heading 6110, HTSUS articles are "upper body" garments and that, to the extent these garments extend well beyond the waist, they cannot go below mid-thigh or slightly below the mid-thigh at most. Finally, the focus of the Court's inquiry should be on "typical users," in this case women, not occasional users, in this case large men (see GRK Can., Ltd. v. United States, 761 F.3d 1354, 1358 (Fed. Cir. 2014)), and any ambiguity regarding the phrase "covers the upper body" should be resolved in favor of the importer. Anhydrides, 130 F.3d at 1485.

Here, Cozy Comfort established at trial that The Comfy® was designed to cover not just the upper body but most of the lower body as well, and the entire body in the cocooning position, which is not permitted for heading 6110, HTSUS articles. The front of The Comfy® measures 36 inches by 33 inches, and the back panel is a full 8 inches longer, measuring 36 inches by 41 inches. At these dimensions, The

Comfy® extends well below the mid-thigh of The Comfy®'s typical user, an adult female when standing. Tr. Pro. Vol. IV (Pl. Rule 36(b) Witness) at 1192:9-13; Ex. P1.[9] Given The Comfy® covers much of the lower body when the typical user is standing, and the entire body in the cocooning position, it cannot be classified as an upper body garment in heading 6110, HTSUS.

In conclusion, The Comfy® cannot be classified under heading 6110, HTSUS because it is not wearable apparel, and even if The Comfy® is wearing apparel, it is not properly classified in heading 6110 because it provides more than just some (i.e., extra) warmth, protects against extreme cold, and covers much of the lower body. This conclusion is well supported by the limited Federal Circuit case law regarding heading 6110, HTSUS. These cases indicate that there are significant physical differences between The Comfy® and heading 6110, HTSUS articles. For example, The Comfy® contains a heavy, thick sherpa lining, extends to the knees or below, and lacks a closure, whereas the Santa jacket classified in Rubies Costume II had a thin satin lining, extended only to the mid-thigh, and had full-length zipper closure. 922 F.3d at 1340. Likewise, the motorcycle jerseys at issue in Lemans were made of "mesh and ventilated…fabric," came in different sizes, and were designed for "optimal fit and comfort while participating in the sport," whereas The Comfy® is

---

[9] During the Court's wearing of The Comfy® before both parties following the conclusion of the trial, the Court observed that The Comfy® extends to the knees of the Court. Tr. Pro. Vol. V (Vaden) at 1395:17-21.

made of two separate knitted blanket fabrics, is available in a single size,[10] loosely drapes over the body, and is designed as a wearable blanket to allow for cocooning to trap extra body heat and protect from extreme cold. Lemans Corp. v. United States, 660 F.3d 1311, 1317 (Fed. Cir. 2011). Additionally, The Comfy® drapes over the user and is extraordinarily loose, whereas the football jersey at issue in Riddell left "just enough extra room to accommodate shoulder pads while holding them snugly to the body." Riddell, Inc. v. United States, 754 F.3d 1375, 1377 (Fed. Cir. 2014).

For these and the other reasons discussed above, even if The Comfy® is considered wearing apparel, it is not properly classified in heading 6110, HTSUS. For its part, the government failed to offer contrary evidence disputing that Comfy® is a not pullover or similar article. Cozy Comfort has met its initial burden of establishing that Customs' classification of The Comfy® in heading 6110, HTSUS is incorrect. Given Cozy Comfort has overcome Customs' presumption of correctness, the Court's duty in this case is to then find the correct classification.

## 2. The Comfy® is properly classified in heading 6301, HTSUS.

Having determined that The Comfy® is not classified in heading 6110, HTSUS (pullovers and similar articles), or any heading in Chapter 61, the Court

_____

[10] There is no dispute that The Comfy® comes in one size or is "one size fits all." Proposed PTO, Schedule C, ¶ 9, ECF No. 52 at 9. As noted in Allstar, the word "fit" in the phrase "one size fits all" is a "misnomer" and does not suggest the sort of "fit" characteristic of a garment. 211 F. Supp. 3d at 1334. Instead, it "merely conveys single size availability." Id.

should first consider the classification initially declared by Cozy Comfort at entry, heading 6301, HTSUS (blankets). For the reasons stated below, The Comfy® is properly classified as a blanket in heading 6301.

The <u>Allstar</u> court correctly defined a blanket as a large (possibly oblong) piece of fabric that is used as a covering for warmth (often but not always on a bed). <u>Allstar Mktg. Group, LLC v. United States</u>, 211 F. Supp. 3d 1319, 1336 (Ct. Int'l Trade 2017). The <u>Allstar</u> court further held that the Snuggie®, a non-traditional blanket with sleeves, was properly classified in heading 6301, HTSUS, even though it is not designed like a traditional blanket. 211 F. Supp. 3d 1319. The court rejected the government's position that adding sleeves to a blanket made it something that is not a blanket. <u>Id.</u> at 1335-37. The court noted that the Snuggie® was patented, trademarked, and marketed as a blanket and that retail packaging labeled it a as a blanket and showed people using the product as a blanket. <u>Id.</u> Ultimately, the court concluded that the addition of the sleeves was incidental and did not transform the Snuggie® from a blanket into something else. <u>Id.</u>

Here, The Comfy® meets the <u>Allstar</u> definition of a "blanket." The Comfy® is large piece of fabric. The front panel measures approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel. The back panel measures approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel. RPO, Schedule C, ¶ 7. The Comfy® is oblong, meaning that it is elongated and departs from an exact square with its

rectangular shape. Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=oblong (defining "oblong" as "[e]longated (usually as a deviation from an exact square or circular form; esp. rectangular with the adjacent sides unequal)"). As discussed above, the Comfy® is designed and *primarily* used as a covering for warmth and protection from the cold like a blanket. Tr. Vol. II (Crumley) at 582:5-8. Even the government's own textile design expert, Ms. Ferro, agrees that The Comfy® meets the Oxford English Dictionary definition of a blanket. Tr. Vol. IV (Ferro) at 1109:7-14.

The question then becomes whether The Comfy®'s additional features—a back, hood, marsupial pocket, and sleeves—"transform[] what may have been a blanket, into something that is not a blanket." Allstar, 211 F. Supp. 3d at 1336. To answer this question, the Court must assess whether The Comfy® has features "substantially in excess" of a blanket. Id. A different way to frame this question is to ask whether The Comfy® "preserves the essential characteristics of a blanket—a large piece of fabric providing a warm covering." Id.

In Allstar, the Court found that the addition of sleeves to a blanket "support[ed], rather than detract[ed] from, the Snuggie®'s 'primary design and use' as a blanket because they ostensibly enable the Snuggie® to remain in place and keep the user warm while allowing the user to engage in certain activities requiring the use of their hands." Id. (quoting Casio, 73 F.3d at 1098). The same is true of The Comfy®'s sleeves and back. These features support rather than detract from The

51

Comfy®'s primary design and use as a wearable blanket in exactly the same way—they keep the product on and free up the user's hands, enhancing, not diminishing, its primary function as a warming blanket.

The two other additional features—the hood and marsupial pocket—likewise support rather than detract from the blanket's primary design and use as a blanket. These two features simply amplify The Comfy®'s ability to provide extra warmth by enveloping the user and serve as an extra warm and thick covering when it is very cold. The hood eliminates the need for the user to pull other parts of the blanket over the head to keep it warm, as users commonly due in extremely cold conditions. The marsupial pocket allows the user to keep the user's hands warm without donning gloves or pulling them in the sleeves to cocoon for extra warmth, although this is also a key design feature, as evidenced by the large upper sleeves. Additionally, Cozy Comfort established at trial that The Comfy®, like the Snuggie® in Allstar, is designed, used, and functions as a wearable blanket and that it is regarded in commerce and described in sales and marketing literature as a wearable blanket.

The Court should not be persuaded by Ms. Ferro's testimony that The Comfy® is not a blanket because it can be "worn." Tr. Vol III (Ferro) at 945:22-24. As an initial matter, Ms. Ferro herself testified that she has no specific training in blanket design. Tr. Vol IV (Ferro) at 1081:7-17. Moreover, as the Allstar court correctly noted, "the term 'worn' is not limited to the contexts of garments and may be used to refer to a broader array of articles." Allstar, 211 F. Supp. 3d at 1332 (citing *inter*

*alia* Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) at 2589, 2636). The key inquiry, as the <u>Allstar</u> court noted, is whether the article's additional features support rather than detract from the article's primary design and use. Here, as noted above, The Comfy®'s additional features—a back, hood, marsupial pocket, and sleeves—support rather than detract from its design and primary use as a portable cocooning blanket by providing full coverage while at the same time keeping it on the user when the user moves around.

The court's decision in <u>Allstar</u> supports classifying The Comfy® as a blanket in heading 6301, HTSUS. Though The Comfy® and the Snuggie® are certainly not identical products, they bear many more similarities than differences. Mr. Speciale articulated both how the products are remarkably similar and how The Comfy® merely improves upon the Snuggie® by adding portability. Tr. Vol. I (Speciale) at 66:12-20, 69:21-70:5 (both products have a final outer layer, sleeves, large arm holes, and can be wrapped up in), 66:15-18 (sleeves), 66:18-20 (can wrap up in both), (large arm holes); Tr. Vol. I (Speciale) at 67:8-17, 69:1-11 (The Comfy® has cocooning functionality, a hood, elastic cuffs, a marsupial pocket, and warmer materials including sherpa lining). Indeed, the similarities between these products played a substantial part in both the product's appearance on Shark Tank and the original Customs field import specialist's QUICS classification inquiry to Customs Headquarters based on her belief The Comfy® is substantially similar to the

Snuggie®. D27-1; D-9-1 (QUICS message noting that The Comfy® is "substantially significant or substantially similar" to the Snuggie); Tr. Vol. III (Orsat) at 767:6-15.

The Comfy® is made from blanket materials, such as sherpa, not from clothing material. The Comfy® is designed to be a portable blanket to solve the "left behind blanket" problem, not to be a garment. The Comfy® is primarily intended to be used, and customer photographs show it is actually used, to cocoon a user inside for extra warmth and protection from the cold, not to be worn as clothing. The Comfy® is licensed, marketed, and sold as a blanket, not as wearing apparel. Accordingly, The Comfy®, which is made from synthetic materials, is properly classified as a blanket in heading 6301, HTSUS, specifically subheading 6301.40.0020 ("Blankets and traveling rugs; Blankets (other than electric blankets) and traveling rugs, of synthetic fibers; Other").

### C. In the alternative, if The Comfy® is wearing apparel of Chapter 61, it is properly classified in heading 6114, HTSUS.

In the alternative, if The Comfy® is considered wearable apparel of Chapter 61, it is properly classified in heading 6114, HTSUS, where Customs' apparel import specialist initially suggested it be classified, because The Comfy® is not classified in any specific Chapter 61 heading. Despite the field import specialist's inclination to classify The Comfy® in heading 6114, the government does not propose classification in any Chapter 61 heading other than heading 6110, HTSUS. In fact, even though the government failed to prove The Comfy® is a pullover or similar

article, or even offer evidence about what these terms mean, the government affirmatively argues against classification outside of heading 6110, HTSUS.

Nevertheless, heading 6108, HTSUS bears consideration because both government expert witnesses testified that they considered The Comfy® to be "loungewear" and "intimate apparel" like pajamas or a robe, which are listed exemplars in heading 6108. Tr. Vol. (Concannon) at 870:7-15 ("marketed as more of a loungewear product"); Tr. Vol. IV (Ferro) at 1075:25-1077:13 ("intimate apparel"). To be classified in heading 6108, HTSUS, however, an article's essential character must be "a sense of privateness . . . or private activity." Int'l Home Textile v. United States, 153 F.3d 1378, 1381 (Fed. Cir. 1998). While The Comfy® is primarily used as a blanket around the house on very chilly days, given The Comfy® is designed to be worn over clothing, can be worn outside, and is not designed to be worn directly over undergarments or the naked body as sleepwear, pajamas, or a robe, it does not have as an essential characteristic "a sense of privateness . . . or private activity." In short, The Comfy® is designed to be worn and used both inside around the house and outside in cold weather like a blanket. These qualities disqualify it from classification in heading 6108, HTSUS. Accordingly, The Comfy® is not properly classified in heading 6108, HTSUS.

The record is devoid of evidence concerning any other specific headings in Chapter 61.[11] Under these circumstances, if The Comfy® is considered wearing apparel, the Court may consider Heading 6114, HTSUS, which is the residual or basket provision for wearing apparel of Chapter 61. If The Comfy® is not described by the terms of any heading in the group 6101–6113, HTSUS, it is properly classified in heading 6114. See Victoria's Secret, 37 C.I.T. at 602–03. Pursuant to GRI 6, given The Comfy® is knitted, 100 percent polyester, unisex, and not described by a specific term in heading 6114, HTSUS, the appropriate subheading is 6114.30.3070 ("Other garments, knitted or crocheted; Of man-made fibers; Other; Women's or girls").

## VI.  **CONCLUSION**

Customs' decision that The Comfy® is classified in heading 6110, HTSUS is incorrect because The Comfy® is not wearing apparel of Chapter 61, protects against extreme cold, and/or covers more than the upper body. Given The Comfy® has the physical properties of a blanket, and is designed, intended to be used, and marketed

---

[11] For instance, neither party submitted evidence concerning headings 6101 or 6102, HTSUS, which cover coats, anoraks and similar articles for men and women, respectively. However, these headings are mentioned in Customs' Apparel ICP as an alternative classification for articles excluded from heading 6110 by virtue of having a sherpa lining. P21, p. 22. Chapter 61, Chapter Note 9 provides, "Garments which cannot be identified as men's or boy's garments or as women's or girl's garments are to be classified in the headings covering women's or girl's garments." The Comfy® is unisex so only heading 6102, which covers women's anoraks and similar articles, potentially applies. According to Customs' Apparel ICP, however, The Comfy® cannot be classified in heading 6102 because The Comfy® lacks a full or partial frontal opening, an essential characteristic for articles of this heading. P21, p. 11. In addition, articles of heading 6102, HTSUS, are primarily intended to be worn outside, whereas The Comfy® is primarily intended to be worn inside. These facts and the absence of any reference to the exemplars in heading 6102 in The Comfy®'s patents, trademarks, or marketing, effectively ends the inquiry.

as a blanket, The Comfy® is properly classified as a blanket in heading 6301 HTSUS, specifically subheading 6301.40.0020. Alternatively, if the Court concludes The Comfy® is wearing apparel of Chapter 61, The Comfy® is properly classified in heading 6114, HTSUS, the residual provision for other knitted garments, specifically subheading 6114.30.3070.

Dated: January 10, 2025

Respectfully submitted,

STEIN SHOSTAK SHOSTAK POLLACK & O'HARA LLP
865 S. Figueroa Street, Suite 1388
Los Angeles, California 90017
Telephone: (213) 630-8888

By    <u>Christopher J. Duncan</u>
       Christopher J. Duncan

       <u>Elon A. Pollack</u>
       Elon A. Pollack

MESSNER REEVES LLP
7250 N. 16th St., Suite 410
Phoenix, Arizona 85020
Telephone: (602) 457-5059

By    <u>Gregory P. Sitrick</u>
       Gregory P. Sitrick

CASTAÑEDA + HEIDELMAN LLP
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
Telephone: (214) 800-2012

By    <u>Robert H. Dunikoski II</u>
       Robert H. Dunikoski II