## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| COZY COMFORT COMPANY, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

Court No. 22-00173

### DEFENDANT'S PROPOSED JUDGMENT ORDER

Upon the evidence elicited during the trial in this action, and upon other papers and proceedings had herein, it is hereby

**ORDERED** that the imported subject merchandise is properly classified under subheading 6110.30.30 of the Harmonized Tariff Schedule of the United States; and it is further

**ORDERED** that judgment is entered for defendant and this action be, and hereby is, dismissed.

_____
Stephen Alexander Vaden, Judge

Dated: _____
        New York, New York

# TABLE OF CONTENTS

I.    PROCEDURAL BACKGROUND ............................................................... 1

II.    JURISDICTION AND STANDARD OF REVIEW ..................................... 3

III.    LEGAL FRAMEWORK FOR CLASSIFICATION ...................................... 4

    A.  Factors From *Rubies* ....................................................................... 5

    B.  "Protection Against Extreme Cold" Means Protection For A Substantial Period Of time From Cold That Is Intense, Frigid, Bitter, Or Arctic, Which Is Well Below Zero Degrees Fahrenheit ................................................................... 6

    C.  Use Factors From *GRK Canada* And Comparison To The Snuggie® ........................... 10

IV.    UNDISPUTED FACTS STIPULATED BY THE PARTIES ....................... 10

V.    ADDITIONAL FINDINGS OF FACT ..................................................... 11

VI.    CONCLUSIONS OF LAW ...................................................................... 31

    A.  The Law, As Applied To The Facts Elicited At Trial, Shows That The Comfy® Is Properly Classified As A Pullover Or Similar Article Of Heading 6110, HTSUS ......... 31

        1.  The Comfy® Is A Pullover Of Heading 6110, And Is Not Designed, Intended, Or Marketed, Nor Possesses The Physical Characteristics, For Protection From Extreme Cold .................................................................................. 31

        2.  In The Alternative, The Comfy® Is A Similar Article Of Heading 6110 .................. 37

    B.  Plaintiff Failed To Show, Through Admissible And Probative Evidence, That The Comfy® Is Not Properly Classified As A "Pullover" Or "Similar Article" Under Subheading 6110.30.30, HTSUS ................................................................ 37

        1.  Mr. Speciale's Testimony ....................................................................... 38

        2.  Mr. Crumley's Testimony ...................................................................... 47

        3.  Deficient Documentation ........................................................................ 53

        4.  Plaintiff's Failure To Establish Numerous Material Facts ........................................ 56

CONCLUSION .......................................................................................... 58

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Allstar Mktg. Grp., LLC v. United States*,
41 CIT __, 211 F.Supp.3d 1319 (2017) ................................................................ 10, 44, 45

*Bibbs v. Early*,
541 F.3d 267 (5th Cir. 2008) ................................................................................ 7

*Casio, Inc. v. United States*,
73 F.3d 1095 (Fed. Cir. 1996) .............................................................................. 44

*Chrysler Corp. v. United States*,
601 F.Supp.2d 1347 (Ct. Int'l Trade 2009) .......................................................... 3

*Darter v. Greenville Cmty. Hotel Corp.*,
301 F.2d 70 (4th Cir. 1962) .................................................................................. 4

*Del Raine v. Williford*,
32 F.3d 1024 (7th Cir. 1994) ................................................................................ 8, 9

*Ford Motor Co. v. United States*,
992 F.Supp.2d 1346 (Ct. Int'l Trade 2014) .......................................................... 4, 5

*GRK Canada, Ltd. v. United States*,
761 F.3d 1354 (Fed. Cir. 2014) ............................................................................ 5, 10

*Henderson v. DeRobertis*,
940 F.2d 1055 (7th Cir. 1991) .............................................................................. 7, 8

*Jarvis Clark Co. v. United States*,
733 F.2d 873 (Fed. Cir. 1984) .............................................................................. 3, 4, 38

*Melco Clothing Co., Inc. v. United States*,
804 F.Supp. 369 (Ct. Int'l Trade 1992) ................................................................ 4

*ME Global, Inc. v. United States*,
633 F.Supp.3d 1349 (Ct. Int'l Trade 2023) .......................................................... 5

*Park B. Smith, Ltd. v. United States*,
347 F.3d 922 (Fed. Cir. 2003) .............................................................................. 3

*Penn-Texas Corp. v. Morse*,
  242 F.2d 243 (7th Cir. 1957) ................................................................ 4

*Rubies Costume Co. v. United States*,
  922 F.3d 1337 (Fed. Cir. 2019) ...................................... 5, 6, 37, 50

*Tomoegawa (U.S.A.), Inc. v. United States*,
  763 F.Supp. 614 (Ct. Int'l Trade 1991) ........................................... 4

*Top Brand v. Cozy Comfort Co., LLC*,
  Case No. 21-cv-00597-PHX-SPL (D. Ariz) ............................... 28, 52

*United States v. Lopez*,
  2002 WL 1446678 (E.D. Va. May 6, 2022) ..................................... 4

*United States v. White*,
  846 F.2d 678 (11th Cir. 1988) ........................................................ 4

*Vienna Metro LLC v. Pulte Home Corp.*,
  786 F.Supp.2d 1090 (E.D. Va. 2011) .............................................. 4

*Well Luck Co. v. United States*,
  887 F.3d 1106 (Fed. Cir. 2018) ...................................................... 5

*Wright v. McMann*,
  387 F.2d 519 (2d Cir. 1967) ....................................................... 8, 9

*Zenith Radio Corp. v. United States*,
  823 F.2d 518 (Fed. Cir. 1987) ........................................................ 4

## Harmonized Tariff Schedule of The United States (HTSUS)

Chapter 61

Heading 6108

Subheading 6108.92.00 ................................................................. 1

Heading 6110

Subheading 6110.30.30 ........................................................ *passim*

Subheading 6110.30.3059 ............................................................ 11

Chapter 63

Heading 6301

Subheading 6301.40.00 ........................................................................................... 1

Heading 6307

Subheading 6307.90.9891 ....................................................................................... 1

**Statutes**

19 U.S.C. § 1581(a) ................................................................................................. 3

28 U.S.C. § 2639(a) ................................................................................................. 3

28 U.S.C. § 2640(a)(1) ............................................................................................. 3

28 U.S.C. § 2641 ..................................................................................................... 3

Section 515 of the Tariff Act of 1930 ...................................................................... 3

Section 516A of the Tariff Act of 1930 .................................................................... 3

**Rules**

FRE 106 ................................................................................................................ 43

FRE 602 .......................................................................................................... 42, 43

FRE 703 ................................................................................................................ 43

USCIT Rule 52(a)(1) ................................................................................................ 4

**Other Authorities**

HQ H313594 ........................................................................................................ 14

*Extreme*, MERRIAM-WEBSTER.COM,
https://www.merriam-webster.com/dictionary/extreme (last visited Dec. 11, 2024) ................... 6

*Intense*, MERRIAM-WEBSTER.COM,
https://www.merriam-webster.com/dictionary/intense (last visited Dec. 11, 2024) ................... 6

*Frigid*, MERRIAM-WEBSTER.COM,
https://www.merriam-webster.com/dictionary/frigid (last visited Dec. 11, 2024) ....................... 7

*Arctic*, MERRIAM-WEBSTER.COM,
https://www.merriam-webster.com/dictionary/arctic (last visited Dec. 11, 2024)....................... 7

Tyndale Enterprises, *What is the Clo Value of FR Clothing?*, TYNDALEUSA.COM,
https://tyndaleusa.com/blog/2015/01/16/what-is-the-clo-value-of-fr-clothing/
(last visited Jan. 7, 2025)....................................................................................................... 27

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: HON. STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| COZY COMFORT COMPANY, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 22-00173 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with the Court's October 25, 2024 Minute Order, Docket No. 96, defendant, United States (the Government), respectfully submits its Proposed Findings of Fact and Conclusions of Law.

## I.    PROCEDURAL BACKGROUND

Plaintiff Cozy Comfort Company, LLC (Cozy Comfort) claims that the imported merchandise in this action, The Comfy® (also known as The Comfy® Original), is properly classified under subheading 6301.40.0020 of the HTSUS (as a "blanket"), subheading 6307.90.9891 (as an "other made up article, including dress patterns"), subheading 6114.30.3070 (as an "other garment"), or subheading 6108.92.00 (as a "robe," even though that is not a tariff term under that heading).  ECF No. 89, at 43.  However, as we will show below, based on the applicable law and the facts adduced at trial, the imported merchandise is properly classified as a "pullover" or "similar article" under heading 6110, HTSUS, and more specifically under subheading 6110.30.30 ("Of man-made fibers: Other: Other: Other.").  *See* Answer, ECF No. 9.; ECF No. 89, at 44-46; *see also* P22 (Ruling HQ H313594).

The Court conducted a trial in this action from October 21, 2024 to October 25, 2024. Plaintiff presented direct testimony from two witnesses: (i) Michael Speciale, President and Chief Executive Officer of Cozy Comfort; and (ii) James Crumley, plaintiff's expert witness who has primarily designed certain types of garments for hunting, as well as insulated camping blankets (Trial Tr. vol. II, 572:12-573:1). The Government cross-examined each of Cozy Comfort's witnesses, and presented testimony from three witnesses: (i) Renee Orsat, a U.S. Customs and Border Protection (CBP or Customs) National Import Specialist for headings 6104 and 6110 of the HTSUS (Trial Tr. vol. III, 747:20-749:21); (ii) Patricia Concannon, defendant's expert witness in the sales, marketing, and merchandising of apparel, including how products that protect against extreme cold are typically sold, marketed, and merchandised (Trial Tr. vol. III, 841:8-18, 844:11-846:7); and (iii) Mary Ann Ferro, defendant's expert witness in the design of outerwear, including garments that protect from extreme cold, and who has been a professor at the Fashion Institute of Technology (FIT) for approximately 50 years (Trial Tr. vol. III, 914:7-23, 923:21-924:10, 966:23-967:2).

As we demonstrate below, the subject merchandise, The Comfy®, is properly classified as a pullover under subheading 6110.30.30, HTSUS, because the evidence elicited at trial shows that it meets the common meaning of the tariff term "pullover." Alternatively, The Comfy® is properly classified under heading 6110, HTSUS, because the evidence elicited at trial shows that it shares the common characteristics of the *eo nomine* terms in heading 6110 and is therefore a "similar article" under that heading. Finally, Cozy Comfort failed to provide sufficient probative evidence at trial to meet its burden of showing that The Comfy® is not an article of heading 6110 and that its proper classification falls under a heading other than 6110.

2

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court possesses jurisdiction under 19 U.S.C. § 1581(a) to hear this action, which arises from plaintiff's timely challenge to CBP's denial of Protest No. 2704-22-160430. ECF No. 10.

This Court reviews, *de novo*, decisions made by Customs. *See Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 924 (Fed. Cir. 2003). Pursuant to 28 U.S.C. § 2640(a)(1), the Court is charged with rendering its determinations based on the record properly made before it. The Federal Rules of Evidence (FRE) applies to this civil action. 28 U.S.C. § 2641.

At trial, the burden is on the plaintiff to demonstrate through a preponderance of the evidence that CBP's decision—which is presumed correct—is erroneous. *See* 28 U.S.C. § 2639(a) ("in any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision."); *Jarvis Clark Co. v. United States*, 739 F.2d 628, 630 (Fed. Cir. 1984) ("The burden is still on the plaintiff to prove the government's classification to be incorrect, and the court still decides this question on the basis of the evidence presented."); *Chrysler Corp. v. United States*, 601 F.Supp.2d 1347, 1353 (Ct. Int'l Trade 2009) (section 2639(a) "allocates to plaintiff the burden of proof on contested factual issues that arise from the protest decision."). The Court also has a duty to "consider whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

In a bench trial, "the court must find the facts specially and state its conclusions of law separately." USCIT Rule 52(a)(1).[1] In so doing, "a court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable." *United States v. Lopez*, 2022 WL 1446678, *6 (E.D. Va. May 6, 2022) (citing *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957)). As the trier of fact, a trial court may "disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias." *Vienna Metro LLC v. Pulte Home Corp.*, 786 F.Supp.2d 1090, 1092 (E.D. Va. 2011) (citing *Penn-Texas Corp.,* 242 F.2d at 247 and omitting quotation marks and citations). Consistent with Rule 52, a court need not make findings in negatively responding to every issue of fact raised. *Vienna Metro*, 786 F. Supp. 2d at 1093 (quoting *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962)). Instead, the "test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Id.*

## III. LEGAL FRAMEWORK FOR CLASSIFICATION

Prior to trial, this Court issued a decision in this action in response to the Government's motion for summary judgment. ECF No. 48. Law of the case encompasses issues expressly decided or "decided by necessary implication." *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F.Supp.2d 1346, 1355 (Ct. Int'l Trade

---

[1] The Court may rely on judicial authority construing a Federal Rule of Civil Procedure when that rule, here Rule 52(a)(1), mirrors this Court's rule. *Melco Clothing Co., Inc. v. United States*, 804 F.Supp. 369, 371 (Ct. Int'l Trade 1992) (citing *Tomoegawa (U.S.A.), Inc. v. United States*, 763 F.Supp. 614, 617 (Ct. Int'l Trade 1991), which cited *Zenith Radio Corp. v. United States*, 823 F.2d 518, 521 (Fed. Cir. 1987)).

2014).  Moreover, the Government hereby incorporates all its legal arguments previously made in its pretrial memorandum of law.  *See* Def. Pretrial Summ. Mem. (ECF No. 84).

### A.  Factors From *Rubies*

In its decision denying the Government's motion for summary judgment, the Court determined that four "essential characteristics" applied to all goods of heading 6110, including pullovers.  ECF No. 48, at 3; *see also Rubies Costume Co. v. United States*, 922 F.3d 1337, 1345-46 (Fed. Cir. 2019).  Specifically, those characteristics are that these goods (1) cover "the upper body," (2) provide "some warmth," (3) do not "protect against wind, rain, or extreme cold," and (4) can be worn over "undergarments or other clothing."  *Rubies*, 922 F.3d at 1345-46.

The Government continues to maintain that The Comfy® is first and foremost described *eo nomine* by the term "pullover" provided in heading 6110, and that the *Rubies* factors provide guidance as to what constitutes "similar articles" of heading 6110, but are not strict requirements for the named articles of the heading.  "An *eo nomine* tariff provision 'is one which describes a commodity by a specific name, rather than by use, and absent limitation or contrary legislative intent . . . includes all forms of the named article, even improved forms.'"  *ME Global, Inc. v. United States*, 633 F.Supp.3d 1349, 1360 (Ct. Int'l Trade 2023) (quoting *Well Luck Co. v. United States*, 887 F.3d 1106, 1111 n.4 (Fed. Cir. 2018) (cleaned up)).  Unlike the "other wood screws" of *GRK Canada, LTD. v. United States*, 761 F.3d 1354, 1359 (Fed. Cir. 2014) or the "[m]otor cars and other motor vehicles principally designed for the transport of persons" of *Ford Motor Co. v. United States*, 926 F.3d 741, 750 (Fed. Cir. 2019), a "pullover" does not lend itself to a use limitation.  Therefore, any improvements to the form of a pullover, such as including a man-

made sherpa lining or designing it to be oversized will not remove it from being an *eo nomine* pullover.  *See also* Def. Pretrial Summ. Mem. (ECF No. 84).

In its decision establishing the need to conduct a trial, the Court further specified that the parties disagreed on one of the four *Rubies* factors: whether The Comfy® protects from extreme cold.  ECF No. 48, at 3.  However, neither this Court nor the *Rubies* court have defined what constitutes "protect[ion] against . . . extreme cold."  *Rubies*, 922 F.3d at 1346.

## B. "Protection Against Extreme Cold" Means Protection For A Substantial Period Of Time From Cold That Is Intense, Frigid, Bitter, Or Arctic, Which Is Well Below Zero Degrees Fahrenheit

The Federal Circuit did not expound on the meaning of "protection against extreme cold" in *Rubies*.  922 F.3d at 1346.  Nor has it directly interpreted that phrase in other cases.  However, other federal courts of appeals have discussed and interpreted the meaning of "extreme cold." As we show below, various dictionary definitions, the National Weather Service's (NWS) description, and several other courts' interpretations of "extreme cold" support a determination that "extreme cold" is maximum, intense, frigid, bitter, or arctic cold, *i.e.*, well below zero degrees Fahrenheit.  Further, other cases, as well as the evidence elicited by the parties' expert witnesses in this case, suggest that protection against extreme cold means protection for a substantial period of time.

"Extreme," as relevant here, is defined as "existing in a very high degree," "exceeding the ordinary, usual, or expected," and "maximum."  *Extreme*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/extreme (last visited Dec. 11, 2024).  "Intense" is defined as "existing in an extreme degree."  *Intense*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/intense (last visited Dec. 11, 2024).  "Frigid" is

defined as "intensely cold." *Frigid*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/frigid (last visited Dec. 11, 2024). "Arctic" is defined as "bitter cold: frigid." *Arctic*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/arctic (last visited Dec. 11, 2024). Taken together, these definitions suggest that "extreme cold" can be defined as maximum, intense, frigid, bitter, or arctic cold.

The NWS describes extreme cold as follows: "in the southern U.S., near freezing temperatures are considered extreme cold," and in the northern states, "extreme cold means temperatures well below zero." D30, at 2. As relevant here, the evidence elicited at trial shows that The Comfy® is predominantly sold in northern states, which suggests that using the definition for northern states is most reasonable.[2]

Various courts have also provided definitions for extreme cold. In one case, extreme cold has not been found when temperatures were around 20 degrees Fahrenheit in Texas. In *Bibbs v. Early*, 541 F.3d 267, 272-275 (5th Cir. 2008), the Fifth Circuit held that the cold alleged by a prisoner in Texas who was subjected to four hours of 20-degree temperatures, when the prisoner had two blankets and all his clothes to partially abate the alleged harsh temperature, did not rise to the level of "extreme cold" from which prisoners are protected under the Eighth Amendment.

Conversely, in *Henderson v. DeRobertis*, 940 F.2d 1055, 1057-58 (7th Cir. 1991), the Seventh Circuit found that temperatures in Illinois of 22 degrees Fahrenheit below zero with a

---

[2] According to Cozy Comfort, 55 percent of Comfy® sales occur in the Midwest and Northeast regions, in addition to those sold in other northern states in the West region, where 22 percent are sold; therefore, more than 55 percent of sales of The Comfy® occur in northern states. Trial Tr. vol. II, 426:22-429:21; P12, at CC00944.

wind chill factor of 80 degrees below zero did constitute "extreme cold." The Seventh Circuit

specifically described the facts of the case as follows:

> Frigid weather descended upon northern Illinois from January 8th through January 11th of 1982. The sub-zero temperatures recorded dropped to twenty-two degrees below zero with a corresponding wind chill factor of eighty degrees below zero. During these abnormally cold days, many areas in the Stateville Correctional Center experienced colder than usual temperatures. But in Cellhouse B–West, the heating system malfunctioned and the inside temperatures there fell and remained below freezing.

*Id.* at 1057-1058. The Seventh Circuit referenced this weather as "extreme cold," and more

specifically described it as "extremely cold weather." *Id.* at 1059.

In *Wright v. McMann*, 387 F.2d 519, 526 (2d Cir. 1967), the Second Circuit found a

violation of the Eighth Amendment when a prisoner was denuded and "exposed to the bitter cold

of winter in northern New York State" "for a substantial period of time." Subsequently, in *Del

Raine v. Williford*, 32 F.3d 1024, 1033 (7th Cir. 1994), the Seventh Circuit cited the Second

Circuit's decision in *Wright*, noting, "As far back as 1967, the Second Circuit reversed dismissal

of a prisoner's complaint of exposure to extreme cold." The Seventh Circuit then proceeded to

cite to its earlier decision in *Henderson*, which held that "there was no question that in 1982 a

reasonable prison official would have known of a prisoner's constitutional right to adequate

protection from extreme cold." *Del Raine*, 32 F.3d at 1035 (citing to *Henderson*, 940 F.2d at

1059). Immediately after this citation, the Seventh Circuit in *Del Raine* wrote as follows

regarding an inmate in southern Illinois:

> The appellant alleges that he made numerous requests to various prison officials to fix the broken windows. He further alleges that the temperature in his cell was not much higher than the temperature outside and the temperature outside was, according to the appellant, forty or fifty degrees below zero with the wind chill. This supports

8

> an inference that prison officials failed to provide adequate heat and
> shelter.

*Id.* at 1035 (internal footnote omitted).  This case law shows that the Seventh Circuit also considers temperatures of 40 to 50 degrees Fahrenheit below zero (including the wind chill) to constitute extreme cold in southern Illinois.

Taken together, the above definitions and cases support the interpretation that "extreme cold"—for purposes of an imported garment that is sold and worn by individuals throughout the United States, but predominantly in northern states—constitutes cold that is intense, frigid, bitter, or arctic and consists of temperatures well below zero degrees Fahrenheit.

The above cases also suggest that an analysis of adequate protection from extreme cold must consider the individual being exposed to such cold for a "substantial period of time."  *See Wright*, 387 F.2d at 526.  Accordingly, for purposes of this case, protection from extreme cold contemplates that the wearer of The Comfy® will be exposed to extreme cold for a substantially long enough period of time in order to assess whether it can actually provide protection from extreme cold.  This standard also comports with the evidence elicited at trial from both plaintiff's and defendant's expert witnesses, whose testimony indicated that garments designed to protect from extreme cold should provide protection for at least several hours, *i.e.*, a substantial period of time.[3]

---

[3] Ms. Ferro testified that garments designed to protect from extreme cold should provide protection for the entirety of the extreme cold, *i.e.*, for many hours.  Trial Tr. vol. IV, 1132:2-11.  Mr. Crumley's testimony also suggested that garments designed to protect from extreme cold in the context of hunting should provide protection from extreme cold for several hours, *i.e.*, a minimum of two to three hours.  Trial Tr. vol. II, 606:14-22, 631:12-20.

### C.  Use Factors From *GRK Canada* And Comparison To The Snuggie®

In its decision denying the Government's motion for summary judgment, the Court also indicated that it must consider the following use factors identified in *GRK Canada, Ltd. v. United States*, 761 F.3d 1354, 1358 (Fed. Cir. 2014): (1) physical characteristics, (2) design and intended use, and (3) marketing.  ECF No. 48, at 4.  The Court further indicated that it wished to learn of any similarities or differences between The Comfy® and the Snuggie® that bear on classification.  ECF No. 48, at 4-5; *see also Allstar Mktg. Grp., LLC v. United States*, 41 CIT __, 211 F.Supp.3d 1319, 1332–33 (2017) (citing *GRK Canada*, 761 F.3d at 1358).

### IV.    UNDISPUTED FACTS STIPULATED BY THE PARTIES

As reflected in the November 13, 2024 Revised Pretrial Order, the parties agreed to a set of uncontested facts.  *See* Schedule C at ECF No. 107, at 7-10.  The most salient of these provide that:

1. The subject merchandise is commercially known as The Comfy® or The Comfy® Original.  ¶ 1.

2. The Comfy® is knitted and made from 100% man-made fibers, specifically polyester.  ¶ 4.

3. The Comfy® has an opening for the head, a hood, long sleeves, ribbed wrist cuffs, a wide, un-ribbed, hemmed bottom opening, and a frontal marsupial or kangaroo pocket. ¶ 6.

4. The front panel of The Comfy® measures approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel.  The back panel measures approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel.  ¶ 7.
5. The Comfy® is one-size-fits-all.  ¶ 9.

6. To wear The Comfy®, users pull it over their heads, extend their arms through the sleeves, and have the option of placing the hood over their heads.  ¶ 10.

7. The Comfy® is intended to be worn over clothes or undergarments.  ¶ 11.

10

8. The Comfy® is intended to provide warmth to its users.  ¶ 12.

9. The Comfy® does not provide protection against rain or wind.  ¶ 13.

10.  The Comfy® has been marketed as a "blanket that's a sweatshirt"; "a giant blanket that's a giant sweatshirt"; "a giant blanket that's really a giant sweatshirt"; "The Blanket . . . That's A Sweatshirt"; and as "The Original Blanket/Sweatshirt."  ¶ 15.

11.  Cozy Comfort's marketing includes that The Comfy® allows users who wear The Comfy® to perform activities that are not feasible with an ordinary blanket.  ¶ 17.

12.  The Comfy® is intended and marketed for use both while relaxing and while doing activities such as: ice skating; holiday activities at the park; tailgating; dinner party hosting; outside chores, like raking leaves; outside play, like jumping in the freshly raked leaves; pumpkin picking; pumpkin carving; hayrides; corn mazes; dancing; walking the dog; getting the mail; cheering on the sidelines; and raiding the fridge for snacks.  ¶ 18.

13.  Cozy Comfort describes The Comfy® as a garment or overgarment in two if its patents, which were issued by the United States Patent and Trademark Office (USPTO): Patent Nos. D859,788 and 10,420,431.  ¶ 25.

14.  On September 19, 2019, the USPTO issued Design Patent No. D859,788 to Cozy Comfort for an "ENLARGED OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET."  ¶ 26.

15.  The covered product in U.S. Patent No. D859,788 is referred to as an "enlarged over-garment" throughout the patent and it is not referred to as a blanket in the patent.  ¶ 27.

16.  On September 24, 2019, the USPTO issued Patent No. 10,420,431 to Cozy Comfort for an "OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET."  ¶ 28.

17.  All the claims of U.S. Patent No. 10,420,431 are directed to overgarments.  ¶ 30.

18.  No patents for The Comfy® include a description that it is for "protection against extreme cold."  ¶ 31.

19.  On or about March 9, 2020, U.S. Customs and Border Protection (CBP) issued Notices of Action reclassifying several entries of The Comfy® original from HTSUS subheading 6301.40.0020 (blankets) to HTSUS subheading 6110.30.3059 (pullovers).  ¶ 32.

## V.    ADDITIONAL FINDINGS OF FACT

1.  At trial, defendant's expert witness Mary Ann Ferro, who is an outerwear designer and has been a professor at the Fashion Institute of Technology for over 50 years, testified that The

Comfy® is an oversized pullover with a hood that was designed primarily for indoor use and does not have the materials and characteristics to protect against extreme cold. Trial Tr. vol. III, 914:7-915:14, 923:22-924:11, 943:8-944:6, 966:23-967:2, 979:8-981:11; *see also* ECF No. 107, 60-63; P1; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . . It is designed almost exclusively for use inside a home or other living quarters.").

2. At trial, plaintiff's witness Michael Speciale, CEO for Cozy Comfort Company, testified that on December 3, 2017, he appeared with his brother Brian on the television show Shark Tank and pitched The Comfy® to potential investors. Trial Tr. vol. I, 71:21-24, 180:24-181:7.

3. There is no testimony or evidence that Mr. Speciale and his brother described The Comfy® as having the ability to protect from extreme cold when pitching The Comfy® on Shark Tank. *See* Trial Transcripts and Exhibits.

4. Defendant's exhibit D27-1, a video of the Speciale brothers pitching The Comfy® on Shark Tank, shows that at no point during their pitch did they state or suggest that The Comfy® was designed or intended to protect from extreme cold.

5. Mr. Speciale testified that he does not know how long The Comfy® will protect somebody from extreme cold. Trial Tr. vol. I, 129:10-12.

6. Mr. Speciale testified that in plaintiff's response to defendant's interrogatory no. 9, which asked to describe in detail all the uses of The Comfy®, there is no mention that The Comfy® can be used for protection against extreme cold. Trial Tr. vol. I, 300:6-302:16; D13, at 5-6.

7. Mr. Speciale's testimony confirmed that in a document entitled "The Comfy Marketing Strategy and Approach," there was no mention of a targeted audience specifically involved in extreme cold activities. Trial Tr. vol. I, 311:20-314:5; *see also* D14-2, CC000262-266.

8. Mr. Speciale's testimony confirmed that defendant's Request for Production (RFP) no. 17 requested that plaintiff "identify and produce all documents and materials that describe and/or relate to the purpose and function of the imported merchandise." Trial Tr. vol. I, 357:24-358:12; *see also* D17, at 1-2.

9. Mr. Speciale's testimony confirmed that he signed for the response to defendant's RFP No. 17. Trial Tr. vol. I, 357:6-16; *see also* D17, at 2.

10. Mr. Speciale's testimony confirmed that he "ha[d] no idea" if anywhere in plaintiff's response to defendant's RFP no. 17, which states "See sales/marketing records Bates Numbers 00239-268, 00337-639," there was any description of the purpose and function of The Comfy® as being for protection against extreme cold. Trial Tr. vol. I, 363:6-16; *see also* D17, at 1-2.

11. The Bates Number ranges cited by plaintiff in D17, and found in P10 (CC000240-261), D14-2 (CC00262-266), D14-3 (CC00267-268), and D14-1 (CC00337-629), contain no descriptions or statements that one of the purposes or functions of The Comfy® is to protect from extreme cold.  *See also* Trial Tr. vol. I, 364:11-15.

12. Mr. Speciale's testimony confirmed that the first time that Cozy Comfort claimed specifically that The Comfy® protected against extreme cold was in an affidavit signed by him and submitted in 2023 in opposition to defendant's motion for summary judgment.  Trial Tr. vol. I, 364:22-365:5.

13. The merchandise at issue in the present action, The Comfy®, is the same merchandise at issue in Court No. 21-00404 (The Comfy®).  *Compare* P1 *with* D51; P20.

14. The merchandise in Court No. 21-00404 (The Comfy®) was imported into the United States on July 10, 2019, under cover of Entry No. 9HX-5585266-6.  D2-1, at ECF 320; P22, at 1; Summons, Court No. 21-404, ECF No. 1.

15. The merchandise at issue in Court No. 21-00404 and covered by Entry No. 9HX-5585266-6, The Comfy®, was protested under Protest No. 2704-20-141606 on August 26, 2020.  D2-1, at ECF 319-332.

16. The commercial invoice, packing list, and freight bill for The Comfy® at issue in the present action describe it as a "knit pullover."  Trial Tr. vol. I, 294:8-195:16; D12-1, at ECF 500-502.

17. Customers of The Comfy® wear it in the typical fashion of or similar to an article of clothing.  Trial Tr. vol. IV, 1246:9-12; D14-1 at CC00356 (U.S. Provisional App. No. 62/558,136) ("In operation, the garment 10 is worn on the body of the person 11 like an article of clothing"); *see also* P1.

18. The Comfy® is a pullover and is typically worn like an article of clothing—specifically a pullover—and it is not draped over the body.  *See* Trial Tr. vol. II, 673:16-25; Trial Tr. vol. III, 915:9-14, 1034:4-20; Trial Tr. vol. IV, 1185:14-22, 1204:15-22, 1246:9-12; D14-1 at CC00356 (U.S. Provisional App. No. 62/558,136) ("In operation, the garment 10 is worn on the body of the person 11 like an article of clothing"); *see also* P1.

19. Mr. Speciale's testimony confirmed that on the 2017 Shark Tank episode in which he pitched The Comfy®, he and his brother stated that The Comfy® would retail for $39.99 and it cost $13 dollars to make.  Trial Tr. vol. I, 181:8-14; *see also* D27-1, at 4:23-4:28.

20. Mr. Speciale's testimony confirmed that on the 2017 Shark Tank episode in which he pitched The Comfy®, he said that The Comfy® "is absolutely not the Snuggie."  Trial Tr. vol. I, 190:23-191:3; *see also* D27-1, at 6:09-11.

13

21. The Comfy® covers the user's upper body (arms and torso, and optionally, the head).  P1; Trial Tr. vol. IV, at 1185:14-22, 1216:8-25.

22. The length of The Comfy® below the waist will depend on the user's body size.  *See* P1; Trial Tr. vol. IV, 1185:23-1186:19.

23. For some users, The Comfy® will fall mid-thigh or above the knees.  *See id.*

24. For other users, The Comfy® will fall at or below the knees.  *See id.*

25. Plaintiff previously admitted that The Comfy® is a knit garment designed for warmth but with no protection from the weather.  Trial Tr. vol. I, 262:2-16; D8 at 6 ("In HQ H313594, Customs acknowledges that The Comfy® is a knit garment designed for warmth with no protection from the weather.").

26. The Comfy® cannot provide, nor is it designed nor intended to be worn for, protection against extreme cold.  *See id.*; Trial Tr. vol. III, 914:24-915:8; *see also* P1; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

27. Although The Comfy® is designed primarily for indoor use, it can also be used outdoors in mild, dry weather.  Trial Tr. vol. III, 914:24-915:8, 943:7-944:5, 979:8-981:11.

28. The Comfy® is sold online, including on Cozy Comfort's website and on Amazon, in retail brick and mortar stores, through social media, and by live stream.  Trial Tr. vol. IV, 1246:13-1248:3; D13, at 5.

29. Cozy Comfort's marketing distinguishes The Comfy® from blankets based on its functions and features, including that The Comfy® allows users who wear The Comfy® to perform activities that are not feasible with blankets.  D21, at 2 ("You can't dance in a blanket.  You can't hug in a blanket.  You can't flip pages of your novel in a blanket without your arms being exposed."), 3 ("pumpkin picking, pumpkin carving, hayrides, and corn mazes;" "The Comfy is perfect for outside yard chores like raking leaves, or outside play, like jumping in freshly raked leaf piles"); Trial Tr. vol. IV, 1244:12-1245:19.

30. Cozy Comfort has at times marketed The Comfy® as a sweatshirt or a garment.  Trial Tr. vol. IV, 1209:1-1210:15, 1246:9-1247:10; P4, at 2 ("The mark consists of an image of a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET…THAT'S A SWEATSHIRT!'"); P10, at CC00254 (showing The Comfy® displayed at a store on a form or mannequin as a pullover, sweatshirt, or similar garment might be); D27-1.

31. Cozy Comfort marketed The Comfy® as "The Original Blanket/Sweatshirt" on its product packaging.  P10, at CC00240 (beneath "the Comfy" trademark).

32. Cozy Comfort markets The Comfy® as a substitute for an oversized sweatshirt.  D20, at 2 ("It's no secret that there is something sensational about throwing on a sweatshirt that's 3 sizes too big for you.  That's literally why we invented The Comfy, a giant wearable blanket that feels even better than an oversized sweatshirt!  Whether you're tired of your favorite sweatshirt going missing, or you're tired of them complaining about you wearing their sweatshirt, it no longer has to be a problem!  Trade out their oversized sweatshirt for a wearable blanket, and it'll be smooth snuggling from here on out.").

33. Cozy Comfort obtained a federal trademark registration, Reg. No. 5,678,126, for the following trademark:



P4.

34. Mr. Speciale's testimony confirmed that Cozy Comfort's patent attorney, Mr. Thomas W. Galvani, stated  in a letter dated July 24, 2020 and addressed to CBP that "[a]ll trademark applications, when filed, identify a class of goods or services with which the subject trademark application is or will be used," and further added that "[c]lass 25 is for all apparel and clothing, and any trademark application for a sweatshirt or an oversized pullover would be classified there."  Trial Tr. vol. I, 316:19-318:18; D14-1, at CC00342-343.

35. Defendant's exhibits D47, D48, and D49 are trademarks for The Comfy® which identify Class 25 as the class of goods for which these trademarks are to be used, thereby showing that these trademarks for The Comfy® are to be used with apparel and clothing.  Trial Tr. vol. I, 352:16-354:22, 356:13-357:3; D47, D48, D49.

36. Cozy Comfort used trademark No. 5,678,126 on its website and during its co-founders' pitch of The Comfy® on Shark Tank.  Trial Tr. vol. IV, 1208:5-21; D27-1.

37. On September 13, 2017, Cozy Comfort filed an application for U.S. Design Patent No. D859,788, entitled "Enlarged over-garment with an elevated marsupial pocket."  P7, at 2.

38. The sole claim of U.S. Design Patent No. D859,788 is directed to the ornamental design for an enlarged over-garment with an elevated marsupial pocket, as shown and described in the patent. P7, at 2; *see also* P7, at 3-11.

39. On September 13, 2018, Cozy Comfort filed an application for U.S. Patent No. 10,420,431, entitled "Overgarment with an elevated marsupial pocket." P6, at 2.

40. The Comfy® has measured 41 inches long from the bottom of the hood to the bottom of the center back since 2018. Trial Tr. vol. IV, 1232:5-10; P6, at 21.

41. The Comfy®'s physical dimensions and features have not changed since 2018. *See* Trial Tr. vol. IV, 1232:5-10; P6; *see also* P1 (samples are the same).

42. Although in U.S. Patent No. 10,420,431 the applicant described the field of the invention as relating to blankets or large, wearable blankets, the covered product is referred to as a "garment" or an "overgarment" throughout the patent. P6, at 1 (Abstract) and 19-25, showing the first paragraph under the heading titled "Summary of the Invention" providing as follows:

> An overgarment includes a single body constructed from two soft, woven fabric plies and a torso in the body. Opposed sleeves are attached to the torso at sleeve openings, and the sleeves each have a top, an opposed bottom, and a length. A marsupial pocket on a front of the torso has a top and opposed bottom, the top of the marsupial pocket is above the bottom of each sleeve, and the bottom of the marsupial pocket is below the bottom of each sleeve.

43. On July 20, 2019, Cozy Comfort imported The Comfy® under cover of Entry No. 9HX-5585266-6 through the Port of Los Angeles. *See* Trial Tr. vol. I, 478:13-16; D2-1, at ECF 320; P22, at 1; Summons, Court No. 21-404, ECF No. 1.

44. In Entry No. 9HX-5585266-6, Cozy Comfort described The Comfy® as a "utility blanket," and Cozy Comfort claimed that it was classified under subheading 6301.40.00, HTSUS. Trial Tr. vol. II, 532:21-533:14; D2-1, at ECF 319-322.

45. A few months later in 2019, Cozy Comfort tried to enter The Comfy® (in Entry No. 9HX-5590259-4) as a "blanket" under subheading 6301.40.00, HTSUS, and on October 30, 2019, CBP sent Cozy Comfort a Request for Information (CBP Form 28). *See* Trial Tr. vol. III, 799:17-800:11; *see also* P18, at 2 ("Unlike the Snuggie, cited in your reply to the CBP 28 dated 10/30/2019 for entry 9HX-55902594").

46. In November 2019 (prior to remarks by CBP's Joy Davies on Dec. 2, 2019 in QUICS Message 45675), Cozy Comfort responded to CBP's Form 28, asserting that The Comfy® was a blanket like the Snuggie®. *See id.*; D9-1.

47. On March 9, 2020, after reviewing plaintiff's reply to the Form 28, CBP issued a Notice of Action Taken (CBP Form 29) to Cozy Comfort, informing Cozy Comfort that The Comfy® was considered an oversized pullover properly classified under subheading 6110.30.30, HTSUS ("Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: Of man-made fibers: Other: Other: Other."). D2-1, at ECF 317.

48. Defendant's witness Renee Orsat, a National Import Specialist at CBP, testified that CBP's Informed Compliance Publication (ICP), at P21, is only a helpful guide, and that CBP classifies imports according to the statutory terms of the tariff headings, and not according to the ICP. Trial Tr. vol. III, 803:20-804:5, 804:14-24, 833:19-24, 834:20-835:9.

49. On April 10, 2020, CBP liquidated Entry No. 9HX-5585266-6 under subheading 6110.30.30. *See* Summons, Court No. 21-404, ECF No. 1; D2-1, at ECF 324-333; P22, at 1; *see also* Trial Tr. vol. III, 778:25-780:22.

50. On April 11, 2020, Cozy Comfort filed applications for U.S. Design Patent Nos. D969,458 and D905,380, both entitled "Whole body blanket." P8, at 1; P9, at 2.

51. The sole claim of both U.S. Design Patent No. D969,458 and No. D905,380 is directed to "[t]he ornamental design for a whole body blanket, as shown and described" in the patent. P8, at 1-12; P9, at 2-17.

52. In reference to patents covering The Comfy®, Mr. James Crumley, plaintiff's expert witness, testified that patent D905,380, issued on December 20, 2020, had already been fully disclosed in patent D859,788, issued on September 19, 2019. Trial Tr. vol. II, 663:20-664:14; *see also* 661:12-663:13; P7; P8.

53. The Comfy® has been manufactured by Xiamen Fitex Garment Company, Zhangzhou Luckytex Garment Company, Mace Quanzhou Clothing Company, and Quanzhou Shengliren Garments and Weaving Company. Trial Tr. vol. IV, 1229:2-1229:23; 1236:11-1240:5.

54. Mr. Speciale's testimony confirmed that Xiamen Fitex Garment Company, Mace Quanzhou Clothing Company, and Quanzhou Shengliren Garments and Weaving Company are companies that produce apparel. Trial Tr. vol. IV, 1237:8-1240:5.

55. Between 2018 and 2022, The Comfy® was sold at various apparel-specific stores as well as stores that sell apparel. *See, e.g.*, P16, at 1175 (Advantage Apparel and Graphics; Amazon), 1176 (Costco; Elite Custom Apparel), 1177 (Kohl's; Lazydog Apparel and IMprints), 1178 (Macy's, Nordstrom, Target, Walmart); D15.

56. All the licensing agreements submitted by Cozy Comfort in P11 post-date (1) the July 10, 2019 date of Entry No. 9HX-5585266-6 (which gave rise to the legal dispute in this case); (2) the issuance of CBP's Notice of Action Taken (Form 29) on March 9, 2020 notifying

plaintiff that The Comfy® was considered a pullover properly classified under subheading 6110.30.30; and (3) the date of the entry at issue in this case (January 6, 2021). Trial Tr. vol. II, 477:20-478:19; Summons, ECF No. 1; P11 (showing all the licensing agreements contain dates after January 2021, with some dating to 2022).

57. Mr. Speciale's testimony regarding the licensing agreements at P11 was inconsistent, and revealed that he does not know who specifically negotiated these licensing agreements, how they were negotiated, or how the terms in the contracts were chosen. Trial Tr. vol. II, 479:11-480:18, 481:10-483:7; Trial Tr. vol. IV, 1256:20-1257:18, 1258:11-19, 1259:10-16.

58. The Comfy® was primarily designed to be worn in the home for relaxing. Trial Tr. vol. III, 955:4-9; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . . It is designed almost exclusively for use inside a home or other living quarters.").

59. The Comfy®'s sherpa lining is not thick like most sherpa blankets which have a very thick sherpa. Trial Tr. vol. III, 929:7-14.

60. The Comfy®'s sherpa lining is knitted on a very porous open weave background or base. Trial Tr. vol. III, 929:15-930:2.

61. Ms. Ferro's water test on The Comfy® showed that the microfleece was not water repellent, it absorbed the water and stayed wet for a long time (approximately an hour or two), and it did not wick or spread out the water. Trial Tr. vol. III, 935:9-937:12.

62. Ms. Ferro's water test on The Comfy®'s interior sherpa lining showed that it got soaking wet and stayed wet a lot longer than the microfleece, thereby causing a person wearing The Comfy® to lose heat from the body a lot faster. Trial Tr. vol. III, 937:13-938:8.

63. The Comfy® is not water repellent, waterproof, or windproof. Trial Tr. vol. III, 944:2-5, 979:18-23.

64. Ms. Ferro testified that if a person wears The Comfy® in the cold and the person perspires, the person can get hypothermia because the moisture from perspiration is going to move heat out of the body and because The Comfy® will absorb water and stay wet. Trial Tr. vol. III, 944:24-945:21.

65. Ms. Ferro testified that when she designed outerwear garments, such as coats, all three factors—protection from wind, rain, and extreme cold—would be considered together, so the garments would have to include protection against water and wind to also protect against extreme cold. *See* Trial Tr. vol. III, 980:4-981:11.

66. Ms. Ferro testified that she would never wear The Comfy® for protection against extreme cold because it is not meant to be worn for extreme cold. Trial Tr. vol. III, 1004:17-20; D2-1

at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

67. Ms. Ferro testified that one can wear The Comfy® outdoors in mild climate, but cannot wear it in the freezing cold because, among other things, it is too open, it is not protective enough, and the fabrics are not quite strong enough to keep anybody warm in extreme cold.  Trial Tr. vol. III, 943:19-944:1; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

68. The Comfy® is not a blanket, because you can wear it both indoors and outdoors, and it is not designed just to be worn on a couch like the Snuggie®; rather, it is an oversized pullover with a hood.  Trial Tr. vol. III, 915:9-14, 945:21-946:2; P1; P6; P7; D21, at 2 ("You can't dance in a blanket.  You can't hug in a blanket.  You can't flip pages of your novel in a blanket without your arms being exposed.").

69. Cozy Comfort sells a product called The Comfy Dream Big Blanket.  D44-25, at 2.

70. Cozy Comfort uses the word "blanket" in the name of The Comfy Dream Big Blanket, unlike with The Comfy®, and The Comfy Dream Big Blanket has different dimensions than The Comfy®.  D44-25, at 2.

71. The Snuggie® is like a blanket, but The Comfy® is a garment because it has seams that pull it all together just like any garment, and it is sewn together.  Trial Tr. vol. III, 946:3-6.

72. Sherpa and fleece are not fabrics used exclusively in blankets, as they are also used in outerwear garments.  Trial Tr. vol. III, 951:8-953:14.

73. Ms. Ferro testified that she has a throw with sherpa and microfleece but the sherpa in her throw was of a different quality and much thicker than the sherpa in The Comfy® (which she had earlier testified is knitted on a very porous open weave background or base (Trial Tr. vol. III, 929:15-930:2), and that one cannot see the background in the throw.  Trial Tr. vol. III, 951:8-14.

74. People can perspire in the cold.  Trial Tr. vol. III, 982:4-5.

75. Ms. Ferro's testimony indicated that even if one is outside and it is dry and not raining, perspiration is going to be considered in terms of designing a garment to keep warm, because if a person perspires while wearing a garment, the person's heat will leave with the perspiration.  Trial Tr. vol. III, 981:17-982:3.

76. Wicking is an essential feature for the inside of a garment designed for extreme cold.  Trial Tr. vol. III, 982:15-19.

19

77. If a garment lacks wicking ability and a person is outside perspiring, that will make the person colder. Trial Tr. vol. III, 982:20-23.

78. If a person perspires while wearing a garment and the garment does not wick, he or she will be wet inside the garment and the perspiration will stay there. Trial Tr. vol. III, 982:15-19.

79. The term "wearable blanket" is not found in the HTSUS. Trial Tr. vol. III, 733:3-5.

80. The term "wearable blanket" is a marketing term. Trial Tr. vol. III, 904:4-8.

81. The terms "blanket" and "wearable blanket" are different. Trial Tr. vol. IV, 1201:6-8.

82. The most common way to wear The Comfy® is by pulling it over one's head with the head sticking out and the hood behind the head. Trial Tr. vol. IV, 1192:23-1193:3.

83. There is no testimony or evidence that The Comfy® is typically placed flat on a bed or laid over a person to keep the person warm, as a blanket is typically used. *See* Trial Transcripts and Exhibits.

84. Exposure to cold can cause frostbite or hypothermia and become life-threatening. Trial Tr. vol. III, 957:12-14; D30, at 2; *see also* D31; D34; D37.

85. Extreme cold creates a very dangerous environment for people. Trial Tr. vol. III, 1007:8-12; D30; D31; D34; D37.

86. In the southern U.S., near freezing temperatures are considered extreme cold, while in the northern states, extreme cold means temperatures well below zero. Trial Tr. vol. III, 957:18-958:1; D30, at 2.

87. According to Cozy Comfort, 55 percent of sales of The Comfy® occur in the Midwest and Northeast regions, in addition to those sold in other northern states in the West region, where 22 percent are sold; therefore, more than 55 percent of sales of The Comfy® occur in northern states. Trial Tr. vol. II, 426:22-429:21; P12, at CC00944.

88. Most sales of The Comfy® occur in states where extreme cold means temperatures well below zero. Trial Tr. vol. II, 426:22-429:21; P12, at CC00944; Trial Tr. vol. III, 957:18-958:1; D30, at 2.

89. The NWS describes wind chill as the rate of heat loss on the human body resulting from the combined effect of low temperature and wind. As winds increase, heat is carried away from the body at a faster rate, driving down both the skin temperature and eventually the internal body temperature. D30, at 2.

90. The NWS makes the following recommendations for dressing for the cold:

20

    a. Wear layers of loose-fitting and lightweight clothing. Trapped air between the layers will insulate you.

    b. If doing strenuous outdoor activities, avoid wearing cotton. Once wet, cotton takes a long time to dry and will sap your heat. Use synthetic fabrics that wick moisture from your skin and dry quickly.

    c. Outer garments should be tightly woven, water repellent, and hooded.

    d. Wear a hat, because 40 percent of your body heat can be lost from your head.

    e. Cover your mouth to protect your lungs from extreme cold.

    f. Mittens, snug at the wrist, are better than gloves.

    g. Try to stay dry and out of the wind.

D30, at 3.

91. If The Comfy® is worn in extreme cold, it can neither keep a person dry or out of the wind. Trial Tr. vol. IV, 1137:9-12.

92. The Comfy® can only safely be worn outdoors in mild, dry weather, and it is dangerous for a person to wear it in windy, wet, cold, very cold, or extreme cold weather without additional protection. Trial Tr. vol. III, 941:24-942:25, 979:8-14, 1019:16-18; Trial Tr. vol. IV, 1142:7-1144:12; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . . It is designed almost exclusively for use inside a home or other living quarters."); *see also* D30, at 2-3; D31; D34; D37.

93. At trial, defendant's expert witness Patricia Concannon, who is an expert in the sales, marketing, and merchandising of apparel, testified that she has worked with a lot of different brands that sell apparel for extreme cold, including Columbia Sportswear and UGG. Trial Tr. vol. III, 837:21-842:6; 844:11-856:4; *see also* ECF No. 107, 58-59.

94. Ms. Concannon testified that The Comfy®'s website, marketing, and imagery show that it is advertised as a very comfortable product to be worn mostly indoors for activities such as watching Netflix or reading a book. Trial Tr. vol. III, 856:11-20.

95. Ms. Concannon testified that although The Comfy®'s website, marketing, and imagery also showed certain activities outdoors like walking the dog and going to a sporting event, the primary use advertised was as an indoor, comfortable garment to keep a person warm while doing activities around the house. Trial Tr. vol. III, 856:21-857:2.

96. In respect to the The Comfy®'s marketing, Ms. Concannon testified that she did not see any specific technical features advertised when reviewing the packaging as one might see in a garment that holds itself out to protect from the elements—such as a Gore-Tex outer shell or Thinsulate lining—and instead, the features advertised were that it was The Original, ginormous, and soft, as well as a 100-day promise. Trial Tr. vol. III, 857:5-858:2; *see also* P1.

97. The Comfy®'s packaging box does not show any specifications indicating protection from weather or extreme cold.  Trial Tr. vol. III, 858:22-859:6; P1.

98. Canada Goose is an example of a brand that makes garments meant for varying types of weather and temperature ranges, including extreme cold weather.  Trial Tr. vol. III, 850:11-851:13, 975:5-13, 977:16-24.

99. Canada Goose lists the temperature ranges when they claim that a product will protect from the elements and from a certain level of cold.  Trial Tr. vol. III, 850:11-851:13; 975:5-13, 977:11-24.

100.    Canada Goose's jackets are tested for the type of weather and temperature ranges for which they are suitable.  Trial Tr. vol. III, 975:5-13.

101.    A Canada Goose jacket can presumably protect a person from extreme cold if he or she is wearing a long-sleeve T-shirt underneath.  Trial Tr. vol. IV, 1145:2-5.

102.    A Canada Goose jacket will have two or three layers and, compared to The Comfy®, will have different, warmer, more protective material, including an outer water repellent layer and an inner layer filled with a sort of batting like down or fiberfill, which are superior to sherpa. Trial Tr. vol. IV, 1147:20-1148:19.

103.    Ms. Ferro designed jackets and pullovers with thicker sherpa than The Comfy®'s, but they did not protect from extreme cold because they lacked the necessary extra layers.  Trial Tr. vol. IV, 1153:21-1155:3.

104.    Ms. Ferro's testimony indicated that if a person wears a sweatshirt underneath a Canada Goose jacket in extreme cold, the jacket is the garment that is offering the protection.  Trial Tr. vol. IV, 1156:9-1156:20.

105.    When asked if a person is appropriately layered, would the person sitting in the cocooning position in a Comfy® outside be protected from extreme cold, Ms. Ferro responded that she could not give credit to The Comfy® keeping the person warm because he or she is wearing layers of other things that keep him or her warm.  Trial Tr. vol. IV, 1098:19-1099:12.

106.    Companies that sell garments that protect from extreme cold typically advertise the uses of their products because they go through the lengths to develop them, which includes a lot of science that goes into technical fabrics as well as a lot of costs.  Trial Tr. vol. III, 850:11-24.

107.    Companies that sell garments that protect from extreme cold typically want to portray that their products have been tested and will provide temperature ranges reflecting the

protection offered, for example, up to negative 22 degrees Fahrenheit.  Trial Tr. vol. III, 850:25-851:5.

108.    There is no evidence in the record that The Comfy® has ever undergone testing for protection against extreme cold or that Cozy Comfort provides temperature ranges at which The Comfy® can safely be worn.  *See* Trial Transcripts and Exhibits; *see also* Trial Tr. vol. III, 976:1-8.

109.    Whereas there is a lot of marketing showing The Comfy® being worn in the home or indoors as more of a loungewear product, products that are marketed for protection from extreme cold would not be worn at home, such as while the wearer is watching TV, unless that person was in arctic cold with no heat or fireplace perhaps.  Trial Tr. vol. III, 870:7-871:3.

110.    Ms. Ferro testified that she reviewed jackets on Canada Goose's website and noted that their jackets, such as the Paradigm Expedition Parka, highlight the following features that are useful to protect against extreme cold:

    a.  a placket covering the zipper on the front to protect from wind and rain
    b.  a very high collar going up past the chin to protect the neck and part of the face, which is very vulnerable to frostbite
    c.  a hood with a drawstring to pull the hood around the face so as to not have air going into the garment from around the face
    d.  knit cuffs inside the sleeves to prevent cold air from getting in the sleeves
    e.  a puffy fiberfill or down insulated layer
    f.  an outer shell layer
    g.  varying sizing that forms to the body so that the fabrics can be close to the skin to keep heat from escaping the body
    h.  double-entry pockets with entry for storing things in and another entry to keep the hands warm
    i.  sealed seams with Gore-Tex

Trial Tr. vol. III, 968:3-974:12; *see also* D43.

111.    The Comfy® has none of the above features described by Ms. Ferro that are found in Canada Goose jackets and which help protect against extreme cold.  *See* Trial Transcripts; P1.

112.    The Comfy®'s marketing does not suggest that it can be worn in extreme cold weather, including for extreme cold activities such as skiing, snow sports, hiking, mountaineering, or snowmobiling, as apparel for extreme cold weather is typically marketed.  *See* Trial Tr. vol. III, 846:25-848:24, 850:11-852:22; P1; D18-20.

23

113.    The Comfy® has a big and low neckline so that it can be pulled over the head, which means it is low on the body and is not protecting the neck.  Trial Tr. vol. III, 941:23-942:9.

114.    The Comfy®'s bottom is very open and loose, which allows cold air to get inside it very easily.  Trial Tr. vol. III, 930:11-20.

115.    The Comfy® lacks drawstrings in the hood or at the bottom, so cold air gets into the garment from both the hood and the bottom.  Trial Tr. vol. III, 931:10-16.

116.    In contrast to The Comfy®'s design being too open and loose, Canada Goose's garments are snugly fit, which keeps them close to the body to trap heat better.  Trial Tr. vol. III, 930:12-21, 1016:24-1018:12; *see also* D36, at 2.

117.    Most outerwear that is made for extreme cold weather has to be more or less snugly fit. Trial Tr. vol. III, 934:16-18.

118.    The Comfy® lacks smart fabrics, which include thermal fabrics, such as phase change materials, that react and change according to the temperature around them to make the wearer of the garment more comfortable.  Trial Tr. vol. III, 984:19-986:5.

119.    Even when The Comfy® is worn in the cocooning position, it cannot protect against extreme cold, because the rest of the fabrics are not touching the body, the hood is still open, the sherpa is porous, and it is not water repellent.  Trial Tr. vol. III, 986:6-987:25.

120.    Canada Goose's Paradigm Expedition Parka is an example of a garment marketed for protection from extreme cold: it lists several technical features, it indicates that it provides optimal protection on extreme days, and it includes a temperature range for wearing it, *i.e.*, negative 22 Fahrenheit and below, which comports with the NWS's description of extreme cold weather.  Trial Tr. vol. III, 865:5-9, 868:2-870:6; D30, at 2.

121.    The Comfy® cannot protect from extreme cold, whether that be near freezing temperatures in southern states, or well below zero temperatures in northern states.  Trial Tr. vol. III, 943:19-944:1; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

122.    The following are some of the features of the Snuggie® which differ from The Comfy®:
    a.  It is open, almost like a flat piece.
    b.  It does not have side seams.
    c.  It is totally open in the back.
    d.  Its sleeves are open at the bottom, in a bell shape, so the bottom is wider.
    e.  It is made of one single fabric.
    f.  It is worn at home or while sitting down, but not while walking around in it.
    g.  It is a blanket.

24

Trial Tr. vol. III, 988:1-989:2; D50, at 4.

123.    Ms. Ferro testified that the NWS's graphic clearly shows how to dress in extreme cold (the coldest of the three ranges shown), and demonstrates that a person should wear three or more layers—a wicking layer, an insulation layer, and an outer shell—which are more technical layers than are afforded by The Comfy®.  Trial Tr. vol. III, 996:4-1000:3; D31, at 2; *see also* D35 and D36.

124.    The small sample of photographs of customers selected by Cozy Comfort in P13 does not show how cold it was, what time of year it was, where they were taken, what the temperature was outside, how long the individuals in the photographs were standing outside, or what other layers the individuals were wearing underneath; as such, these photographs cannot establish that it was extremely cold in any of those photographs, or that The Comfy® can protect the wearer in extreme cold for any amount of time.  Trial Tr. vol. II, 802:13-803:1; Trial Tr. vol. III, 1003:15-1004:12; P13.

125.    Mr. Speciale testified that he did not take any of the photographs in P13, and he does not know any of the subjects.  Trial Tr. vol. II, 801:19-802:3; P13.

126.    Mr. Speciale could not explain how the 100 photographs in P13 were selected from among the thousands of photographs that Cozy Comfort keeps.  Trial Tr. vol. II, 803:2-804:6; P13.

127.    The photographs in P13 were taken after the legal dispute with Customs arose in 2019, which eventually led to the present court action.  Court No. 21-404, ECF Nos. 1, 6; Court No. 22-173, ECF No. 8; P13.

128.    Designers of outerwear seriously consider the health risks associated with being in extreme cold without proper protection, such as hypothermia and frostbite, which is very dangerous and can lead to death.  Trial Tr. vol. III, 1004:21-1005:16, 1006:8-12, 1018:18-1019:18; D34; D37.

129.    Garments designed for protection from extreme cold typically indicate that they test their products in those conditions and provide temperature ranges reflecting such protection.  Trial Tr. vol. III, 899:8-24.

130.    Companies that make products designed to protect from extreme cold and indicate that their products are tested for protection and provide temperature ranges are in some cases providing a guarantee that their products can protect from extreme cold, including from frostbite and hypothermia.  Trial Tr. vol. III, 899:19-900:5.

131.    Columbia is an example of a company that makes products that protect from extreme cold.  Trial Tr. vol. III, 900:6-11; *see also* D42.

132.    Columbia provides a warmth rating for its Icelandite TurboDown Jacket of 3 out of 3. Trial Tr. vol. III, 900:17-902:9; *see also* D42.

133.    Outerwear for extreme cold is made using down insulation, PrimaLoft, and other materials that are costly and bring the price of these garments up.  Trial Tr. vol. III, 1005:4-16.

134.    There are mid-level moderately-priced jackets that will protect a person from the cold if he or she lives in a very cold climate and is going from the car to the grocery store and so forth, but most of these mid-level products do not make the claim that they protect from extreme cold or from a certain temperature range.  Trial Tr. vol. III, 852:3-12.

135.    The products that do claim they protect from extreme cold will most likely list all those specifications on their website and many times on hang tags on the product, in addition to their marketing through imagery of someone utilizing that product in an extreme cold environment.  Trial Tr. vol. III, 852:13-22.

136.    Neither the price of The Comfy® nor its marketing are indicative of a product containing the types of quality materials (*e.g.*, weatherproof) and required details and accessories (*e.g.*, hood with drawstring, fur trim, etc.) geared towards protecting a person from extreme cold. Trial Tr. vol. III, 844:20-853:16, 1005:4-16.

137.    Mr. Speciale testified that he could not think of a single instance in which The Comfy® has been displayed next to products that protect from extreme cold.  Trial Tr. vol. II, 433:25-434:6.

138.    Cozy Comfort has never tested The Comfy® to establish that it protects from extreme cold.  Trial Tr. vol. II, 434:7-10.

139.    Mr. Speciale testified that to his knowledge, no one has tested The Comfy® to determine its ability to protect from extreme cold.  Trial Tr. vol. II, 434:11-14.

140.    The Comfy® was subjected to "apparel testing" by Costco.  D-26, CC01197-01213; *see also* Trial Tr. vol. II, 497:10-498:7; D26-1, CC01214-01279.

141.    The Comfy® has never been marketed for protection from extreme cold.  Trial Tr. vol. II, 434:11-14.

142.    Ms. Ferro testified that she did not see any temperature ranges for using The Comfy® in any information that she reviewed.  Trial Tr. vol. III, 976:1-4; *see also* P1.

143.    In contrast to The Comfy® which is one-size-fits-all, Canada Goose does not make jackets in one-size-fits-all, and instead their jackets form to the body, so they need to be in different sizes.  Trial Tr. vol. III, 930:22-24, 971:18-22.

144.    There is no evidence in the record of documents, such as product manuals, product development files, marketing materials, website pages, patents, or test results, showing that The Comfy® protects from extreme cold.  *See* Trial Transcripts and Exhibits.

145.    Ms. Ferro testified that in one of the courses she teaches, a student took a comforter and converted it into a garment, specifically a down coat, and that it can no longer be called a comforter because once a fabric undergoes processes like sewing it together and then being worn on a person indoors, the comforter is no longer being used on a bed as a blanket, but is instead being worn like clothing.  Trial Tr. vol. III, 946:23-951:7.

146.    Ms. Ferro testified that the thickness of the fabric does not always comport with how warm it keeps a person.  Trial Tr. vol. III, 978:24-979:2; *see also* 1016:3-11.

147.    Garments do not necessarily need to be thick to keep a person warm, due to different types of thermal fabrics being developed, such as Thinsulate, down, PrimaLoft, which are thinner and lighter.  Trial Tr. vol. III, 1023:24-1024:15.

148.    CLO is a way to measure the warmth inside a garment that a person is wearing.  Trial Tr. vol. III, 1024:16-1025:18; D45-1.[4]

149.    Pullovers have the following features: they have an opening for the head; they pull over the head; they are knitted; they come down at least to the waist but can be longer; they may have a hood; they have a bottom opening; they usually have some kind of rib at the wrist, like ribbed cuffs; they have sleeves; they have front and back panels sewn together; they can have a kangaroo pocket; and they can have other types of pockets.  Trial Tr. vol. III, 1034:4-1036:2.

150.    A sweatshirt is a classic, and classics in the design industry are used often to inspire other garments, and liberty is taken to make changes for the better or for a different purpose.  Trial Tr. vol. III, 1036:2-9; *see also* 1034:4-1036:2.

151.    Sweatshirts often inspire the production of other garments.  Trial Tr. vol. III, 1036:11-14.

152.    The inspiration for The Comfy® was a child wearing a XL hoodie.  Trial Tr. vol. III, 1036:15-25; D18, at 2-3.

---

[4] "**Clo Value** is used to measure clothing's thermal properties – how warm a garment will keep you.  If you look up 'clo,' you will find it defined as 'the amount of insulation that allows a person at rest to maintain thermal equilibrium (1).'  A clo value indicates how resistant a garment is to thermal loss.  For example, a clo value of zero would mean a person is not wearing anything.  Therefore, the higher the clo value, the warmer a person will be and the colder the environment, the higher clo value needed."  Tyndale Enterprises, *What is the Clo Value of FR Clothing?*, TYNDALEUSA.COM, https://tyndaleusa.com/blog/2015/01/16/what-is-the-clo-value-of-fr-clothing/ (last visited Jan. 7, 2025).

27

153.    When asked if he had "experienced what [he] would consider extreme cold," Mr.
        Crumley testified that "that was usually going out West . . . high in the mountains out West,
        Wyoming, Utah . . . Kansas in November at times would be 5 to 10 degrees air temperature
        and blowing 25 to 30 miles an hour."  Trial Tr. vol. II, 576:20-577:5.

154.    Mr. Crumley's testimony particularly emphasized that wind was part of the extreme cold
        that he experienced, ending a minutes-long description of his experience with extreme cold
        with "But that wind—wind was something."  Trial Tr. vol. II, 578:2-3; *see also* Trial Tr. vol.
        II, 577:17-19 ("And it was, like, 5 degrees air temperature blowing 25 miles an hour and
        gusting to 50.").

155.    Mr. Crumley testified that he went online and found that there are actually several
        companies that offer sherpa-lined pullovers.  Trial Tr. vol. II, 601:7-10.

156.    Mr. Crumley testified that he field tests garments that he manufactures, which involves
        using them while hunting or in cold weather.  Trial Tr. vol. II, 629:7-630:5.

157.    Mr. Crumley further testified that he was usually asked by companies he worked with to
        field test products to make sure that customers would like them.  Trial Tr. vol. II, 634:3-
        635:20.

158.    Mr. Crumley testified that he was never asked by anyone to field test The Comfy®.  Trial
        Tr. vol. II, 635:21-636:2.

159.    Mr. Crumley testified that he never wore The Comfy® in extreme cold.  Trial Tr. vol. II,
        678:14-16.

160.    Mr. Crumley testified that he never tested The Comfy®.  Trial Tr. vol. II, 678:17-19.

161.    Mr. Crumley testified that he has never seen anyone wearing The Comfy® outdoors, and
        that the only person he has seen wearing it in fetal position is his wife, and she did so
        indoors.  Trial Tr. vol. II, 636:9-638:6.

162.    Mr. Crumley's opinion in this case is that The Comfy® is a wearable blanket, but not a
        blanket.  Trial Tr. vol. II, 642:14-21.

163.    Mr. Crumley testified that in his report in the *Top Brand* case, his opinion referred to The
        Comfy® as a garment.  Trial Tr. vol. II, 653:4-654:23.

164.    In reference to patents covering The Comfy®, Mr. Crumley's testimony stated that patent
        D905,380, issued on Dec. 20, 2020, had already been fully disclosed in patent D859,788,
        issued on Sept. 19, 2019.  Trial Tr. vol. II, 663:20-664:14; *see also* 661:12-663:13; P7; P8.

165.    Mr. Crumley's testimony confirmed that he agreed that the definition of a blanket is a large usually oblong piece of woven fabric used as a bed cover.  Trial Tr. vol. II, 674:1-10.

166.    Mr. Crumley differentiated The Comfy® from a blanket because The Comfy® will not fall off the body like a blanket will.  Trial Tr. vol. II, 674:11-24.

167.    Mr. Crumley's testimony confirmed that The Comfy® shares many of the same features of a hooded pullover.  Trial Tr. vol. II, 674:25-675:22.

168.    Mr. Crumley testified that he has never gone to The Comfy®'s website to look at it there.  Trial Tr. vol. II, 680:14-20.

169.    Mr. Crumley testified that he did not remember any ads for The Comfy® that he had seen.  Trial Tr. vol. II, 680:21-681:3.

170.    When asked if he had ever designed an oversized garment for protection against extreme cold, Mr. Crumley replied, "We did the standard sizes."  Trial Tr. vol. II, 681:17-20.

171.    Mr. Crumley testified that when he designed garments for protection against extreme cold, they all employed "just Thinsulate."  Trial Tr. vol. II, 681:21-682:8.

172.    Mr. Crumley testified that he never went to the website to look at photographs of The Comfy® and people actually using it.  Trial Tr. vol. II, 683:24-684:2.

173.    When asked to explain why he testified that The Comfy® is not used like a garment is usually used, Mr. Crumley stated that a garment can be worn in a lot of different situations, *e.g.*, that a sweater, sweatshirt, or pullover could be worn in the house, outside, or to the grocery store, but that he would not expect a Comfy® to be worn in all those situations.  Trial Tr. vol. II, 682:18-683:20.

174.    Mr. Crumley testified that he never researched how anyone is using The Comfy®.  Trial Tr. vol. II, 683:21-23.

175.    There is no evidence in the record establishing that The Comfy® is a robe.  *See* Trial Transcripts and Exhibits.

176.    Pullovers, sweatshirts, sweatpants, tracksuits, and sweatsuits are all types of loungewear.  Trial Tr. vol. IV, 1127:21-1128:2.

177.    Intimate apparel is a range of products that is meant for private use in the house, and includes products such as nightgowns, slippers, underwear, sleepwear, robes.  Trial Tr. vol. IV, 1128:5-25.

178.    The Comfy® can be considered a type of loungewear.  Trial Tr. vol. IV, 1129:1-3.

29

179.    Intimate apparel is a separate category from loungewear.  Trial Tr. vol. IV, 1129:4-8.

180.    Pullovers and sweatshirts can move from category to category because they could be used for sportswear, like a tracksuit could be activewear or sportswear, and a sweatshirt could be used to relax in the house as loungewear, or it could be used for running outside and therefore be part of activewear.  Trial Tr. vol. IV, 1129:10-21; 1130:8-18.

181.    Ms. Ferro testified that garments designed to protect from extreme cold should provide protection for the entirety of the extreme cold, *i.e.*, for many hours.  Trial Tr. vol. IV, 1132:2-11; *see also* D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

182.    Ms. Ferro testified that when she worked at Woolrich, garments designed for protection from extreme cold were field tested.  Trial Tr. vol. IV, 1144:13-16.

183.    Mr. Crumley's testimony also suggested that garments designed to protect from extreme cold while hunting should provide protection from extreme cold for several hours, *i.e.*, a minimum of two to three hours.  Trial Tr. vol. II, 606:14-22, 631:12-20.

184.    Ms. Ferro testified that she has never designed a garment to protect from extreme cold for just a few minutes, and that she is unaware of any companies or products that claim to protect from extreme cold but would only do so for a few minutes.  Trial Tr. vol. IV, 1132:17-20; 1132:21-1133:3; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters.").

185.    Garments may be displayed in stores in various ways: hung on racks, folded, shown on dress forms or mannequins, or packaged.  Trial Tr. vol. IV, 1138:20-1140:21.

186.    Mr. Speciale's testimony was inconsistent with regards to whether he considers The Comfy® to be a blanket, a wearable blanket, a garment, or a sweatshirt.  *See, e.g.*, Trial Tr. vol. I, 56:24-57:1 ("The Comfy is a one-size-fits-all wearable blanket."), 304:17-305:9 ("The Comfy is a blanket first, a wearable blanket, and it's described as a sweatshirt."; "Q. The statement that says, 'The blanket that's a sweatshirt,' means the blanket that is a sweatshirt, correct?  A. You could interpret it that way, yes."); Trial Tr. vol. II, 437:3-6, 438:10-22, 439:8-14 (in prior sworn testimony he confirmed that he referred to The Comfy® as an "actual garment" in comparison to the Snuggie®, which he stated in contrast was a wearable blanket); Trial Tr. vol. IV, 1205:8-15 ("Q. Has Cozy Comfort ever referred to The Comfy as a garment in any way? A. Using the word 'garment,' not that I'm aware of. Q. Has it ever referred to The Comfy as an over-garment? A. Not that I'm aware of."), 1206:1-25 ("Q. And at the top of the page, does it say, 'Enlarged over-garment with an elevated marsupial pocket'? A. Yes, it does."; "Q. So if I asked you going back has Cozy Comfort ever referred to The Comfy as a garment or as an over-garment, what is the answer? A. Yes."), 1215:7-

1218:10 (confirming that the patent application refers to The Comfy® as a garment), 1240:17-1241:15 ("It's meant to be used as a wearable blanket as any standard blanket would be used.").

## VI.    CONCLUSIONS OF LAW

### A.    The Law, As Applied To The Facts Elicited At Trial, Shows That The Comfy® Is Properly Classified As A Pullover Or Similar Article Of Heading 6110, HTSUS

1. The Comfy® Is A Pullover Of Heading 6110, And Is Not Designed, Intended, Or Marketed, Nor Possesses The Physical Characteristics, For Protection From Extreme Cold

Ms. Ferro provided consistent, probative, and reliable testimony throughout the trial.  Her opinion that The Comfy® is an oversized pullover with a hood that was designed primarily for indoor use and does not have the materials and characteristics to protect against extreme cold, is supported by her experience designing outerwear garments and qualifications as a professor at FIT for over 50 years; by the documentary evidence in the record; by her detailed inspection and explanation of the construction, design, and materials of The Comfy®; and by the testimony of other witnesses such as Ms. Concannon, and at times even Mr. Crumley's.  Trial Tr. vol. III, 914:7-915:14, 923:22-924:11, 943:8-944:6, 966:23-967:2, 979:8-981:11; *see also* ECF No. 107, 60-63; P1.  As such, it is not surprising that her opinion significantly tracks plaintiff's own prior statements about The Comfy®, such as that it is absolutely not like the Snuggie® (Trial Tr. vol. I, 190:23-191:3; D27-1, at 6:09-11.), "it could only reasonably be utilized to cover the body for warmth for a short period of time" and that "[i]t is designed almost exclusively for use inside" or indoors.  D2-1 at ECF 328.

Ms. Ferro testified consistently and in detail regarding the physical characteristics, design, and intended use of The Comfy®.  She testified that The Comfy®'s sherpa lining is not

thick like most sherpa blankets which have a very thick sherpa, Trial Tr. vol. III, 929:7-14, and that The Comfy®'s sherpa lining is knitted on a very porous open weave background or base. Trial Tr. vol. III, 929:15-930:2. The very porous sherpa base can easily be seen and felt by inspecting the sample. P1. This is one of the many features that prevents The Comfy® from being able to provide protection from extreme cold, even in the cocooning position. Trial Tr. vol. III, 986:6-987:25. Ms. Ferro also testified that other reasons why The Comfy® cannot protect from extreme cold are that the rest of the fabrics are not touching the body, the hood is still open, and it is not water repellent. *Id.* Ms. Ferro's testimony that The Comfy® is not water repellent, waterproof, or windproof also comports with the uncontested facts at Schedule C. *Compare* Trial Tr. vol. III, 944:2-5, 979:18-23 *with* Schedule C, ¶ 13. Notably, Ms. Ferro explained that when she designed outerwear garments, such as coats, all three factors— protection from wind, rain, and extreme cold—would be considered together, so the garments would have to include protection against water and wind in order to also provide protection against extreme cold. *See* Trial Tr. vol. III, 980:4-981:11. This testimony alone is sufficient to establish that The Comfy® lacks the physical characteristics to protect from extreme cold.

But Ms. Ferro provided additional testimony to further support her opinion that The Comfy® cannot protect from extreme cold. For example, she explained that she conducted a water test on The Comfy®, which showed that the microfleece was not water repellent, that it absorbed the water and stayed wet for a long time (approximately an hour or two), and that it did not wick or spread out the water. Trial Tr. vol. III, 935:9-937:12. Ms. Ferro also conducted a water test on The Comfy®'s interior sherpa lining, which showed that it got soaking wet and stayed wet a lot longer than the microfleece, thereby causing a person wearing The Comfy® to

32

lose heat from the body a lot faster.  Trial Tr. vol. III, 937:13-938:8.  This is because, as Ms. Ferro testified, if a person wears The Comfy® in the cold and the person perspires (as they also do in the cold), the person can get hypothermia because the moisture from perspiration is going to move heat out of the body while The Comfy® will absorb water and stay wet.  Trial Tr. vol. III, 944:24-945:21, 982:4-5.  And even if one is outside and it is dry and not raining, perspiration is going to be considered in terms of designing a garment to keep warm.  Trial Tr. vol. III, 981:17-982:3.

Ms. Ferro explained that although one can wear The Comfy® outdoors in mild climate, one cannot (safely) wear it in the freezing cold because, among other things, it is too open, it is not protective enough, and the fabrics are not quite strong enough to keep anybody warm in extreme cold.  Based on these reasons, she testified that she would never wear The Comfy® for protection against extreme cold.  Trial Tr. vol. III, 1004:17-20.  Ms. Ferro further explained that exposure to cold can cause frostbite or hypothermia and become life-threatening, and the evidence in the record supports her testimony.  Trial Tr. vol. III, 957:12-14; D30, at 2; *see also* D31; D34; D37.  She also emphasized that extreme cold is very dangerous, and the record evidence also indicates that extreme cold creates a dangerous environment for people.  Trial Tr. vol. III, 1007:8-12; D30; D31; D34; D37.  The National Weather Service (NWS) stresses the importance of dressing appropriately in extreme cold because lacking the proper protection can be dangerous to people's health.  *See* D30; D31.  Therefore, the NWS makes the following recommendations for dressing for the cold: wear layers of loose-fitting and lightweight clothing; if doing strenuous outdoor activities, avoid wearing cotton; *use synthetic fabrics that wick moisture from your skin and dry quickly*; *outer garments should be tightly woven, water*

33

*repellent,* and hooded; wear a hat, because 40 percent of your body heat can be lost from your head; cover your mouth to protect your lungs from extreme cold; mittens, snug at the wrist, are better than gloves; *try to stay dry and out of the wind*. *See* D30, at 3 (emphasis added).

Taking Ms. Ferro's testimony together with the NWS's recommendations, the italicized recommendations noted above in particular reflect features that The Comfy® lacks but which are necessary for protection from the cold, especially extreme cold. And as explained above, The Comfy® cannot properly wick moisture, is not water repellent, cannot protect from the wind, and cannot keep the wearer dry. This contrasts with garments that are designed to protect from extreme cold, such as Canada Goose's garments which are snugly fit, thereby keeping them close to the body to trap heat better. Trial Tr. vol. III, 930:12-21, 1016:24-1018:12; *see also* D36, at 2. But The Comfy®'s design is too open and loose (Trial Tr. vol. III, 930:12-21, 1016:24-1018:12), and if The Comfy® is worn in extreme cold, it can neither keep a person dry or out of the wind. Trial Tr. vol. IV, 1137:9-12.

Ms. Ferro also testified that she designed jackets and pullovers with thicker sherpa than The Comfy®'s, but they did not protect from extreme cold because they lacked the necessary extra layers. Trial Tr. vol. IV, 1153:21-1155:3. She also explained that if a person wears a sweatshirt underneath a Canada Goose jacket in extreme cold, the jacket is the garment that is offering the protection. Trial Tr. vol. IV, 1156:9-1156:20. And when she was asked if a person is appropriately layered, would the person sitting in the cocooning position in a Comfy® outside be protected from extreme cold, Ms. Ferro responded that she could not give credit to The Comfy® keeping the person warm because he or she is wearing layers of other things that keep him or her warm. Trial Tr. vol. IV, 1098:19-1099:12.

34

Ms. Ferro further explained that The Comfy® is not a blanket, because you can wear it both indoors and outdoors, and it is not designed to just be worn on a couch like the Snuggie®; rather, The Comfy® is an oversized pullover with a hood. Trial Tr. vol. III, 915:9-14, 945:21-946:2; P1; P6; P7; D21, at 2 ("You can't dance in a blanket. You can't hug in a blanket. You can't flip pages of your novel in a blanket without your arms being exposed."). She added that although The Snuggie® is like a blanket, The Comfy® is a garment also because it has seams that pull it all together just like any garment, and it is sewn together. Trial Tr. vol. III, 946:3-6. She also refuted plaintiff's contention that The Comfy® is a blanket because it uses fabrics found in blankets, explaining that sherpa and fleece are not fabrics used exclusively in blankets and that they are also used in outerwear garments. Trial Tr. vol. III, 951:8-953:14. The record evidence further supports Ms. Ferro's testimony that The Comfy® is a pullover and not a blanket because it shows that the most common way to wear The Comfy® is by pulling it over one's head with the head sticking out and the hood behind the head. Trial Tr. vol. IV, 1192:23-1193:3. Further, there is no testimony or evidence that The Comfy® is typically placed flat on a bed or laid over a person to keep the person warm, as a blanket is typically used. *See* Trial Transcripts and Exhibits.[5]

Ms. Concannon's testimony was also consistent, probative, and reliable, and further comports with Ms. Ferro's testimony and the documentary evidence. As explained *supra*, Ms. Concannon's testimony established that The Comfy®'s marketing is not typical of products

---

[5] Notably, *Cozy Comfort*, apparently recognizing that The Comfy® is not intended for use by consumers as a blanket, sells a product that it advertises by name as a blanket: The Comfy Dream Big Blanket. D44-25, at 2. The Comfy Dream Big Blanket has different dimensions and features than The Comfy®. *See id.* As such, Cozy Comfort uses the word "blanket" in the name of that product, unlike with The Comfy®; but The Comfy Dream Big Blanket has different dimensions and features than The Comfy®. *Id.*

designed for protection from extreme cold, and her testimony reflected her experience working

with many different brands that sell apparel for extreme cold, like Columbia Sportswear and

UGG.  Trial Tr. vol. III, 837:21-842:6; 844:11-856:4; *see also* ECF No. 107, 58-59.  She also

testified that The Comfy®'s website, marketing, and imagery show that it is advertised as a very

comfortable product to be worn mostly indoors for activities such as watching Netflix or reading

a book.  Trial Tr. vol. III, 856:11-20.  Ms. Concannon testified that although The Comfy®'s

website, marketing, and imagery also showed certain activities outdoors like walking the dog and

attending a sporting event, the primary use advertised was as an indoor, comfortable garment to

keep a person warm while doing activities around the house.  Trial Tr. vol. III, 856:21-857:2.

Ms. Concannon also testified that she did not see any specific technical features advertised on the

packaging as one might see for a garment that claims to protect from the elements or extreme

cold, such as a Gore-Tex shell or Thinsulate lining.  Trial Tr. vol. III, 857:5-858:2, 858:22-859:6;

*see also* P1.  All this testimony comports both with Ms. Ferro's testimony and the record

evidence that The Comfy® is designed and marketed to be primarily worn indoors, or outdoors

only in mild weather.

In sum, The Comfy® can only safely be worn outdoors in mild, dry weather, and it is

dangerous for a person to wear it in windy, wet, cold, very cold, or extreme cold weather without

additional protection.  Trial Tr. vol. III, 941:24-942:25, 979:8-14, 1019:16-18; Trial Tr. vol. IV,

1142:7-1144:12; D2-1 at ECF 328; *see also* D30, at 2-3; D31; D34; D37.  For all the above

reasons, The Comfy® cannot protect from extreme cold and has the physical characteristics,

design and intended use, and marketing of an oversized hooded pullover.  Therefore, it is

properly classified in heading 6110.

2. <u>In The Alternative, The Comfy® Is A Similar Article Of Heading 6110</u>

Although the evidence in the record establishes that The Comfy® is a pullover, it also supports a determination that were it not to be considered a pullover, it nevertheless constitutes a similar article of heading 6110 because it shares the essential, *ejusdem generis* characteristics of such articles and remains properly classified in heading 6110. Those characteristics are that these goods (1) cover "the upper body," (2) provide "some warmth," (3) do not "protect against wind, rain, or extreme cold," and (4) can be worn over "undergarments or other clothing." *Rubies*, 922 F.3d at 1345-46. Prior to trial, the Court specified that the parties disagreed on one of these factors: whether The Comfy® protects from extreme cold. ECF No. 48, at 3.

Indeed, there is no dispute that The Comfy® covers the upper body (P1; Trial Tr. vol. IV, at 1185:14-22, 1216:8-25), provides some warmth (Schedule C, ¶ 12), can be worn over undergarments or other clothing (Schedule C, ¶ 11), and cannot protect against wind or rain (Schedule C, ¶ 13). But as explained *supra* in Section VI.A.1, the evidence adduced at trial shows that The Comfy® also cannot protect against extreme cold. As such, The Comfy® shares the essential, *ejusdem generis* characteristics of the articles of heading 6110, such that even if the Court were to find that it does not meet the *eo nomine* definition of "pullover"—which it should—it nevertheless would still constitute a "similar article" of heading 6110 and be properly classified in that heading.

**B. Plaintiff Failed To Show, Through Admissible And Probative Evidence, That The Comfy® Is Not Properly Classified As A "Pullover" Or "Similar Article" Under Subheading 6110.30.30, HTSUS**

As discussed above, "[t]he burden is still on the plaintiff to prove the government's classification to be incorrect, and the court still decides this question on the basis of the evidence

presented." *Jarvis Clark*, 739 F.2d at 630. The evidence presented by plaintiff at trial fell far short of satisfying its burden of proof to show that The Comfy® is not properly classified as a pullover or similar article of heading 6110, and specifically subheading 6110.30.30. As we show below, the evidence propounded by plaintiff is at turns improbable, inconsistent, inaccurate, and incomplete or served to show that the Government's classification of the imported merchandise is correct.

1. Mr. Speciale's Testimony

Significant portions of Mr. Speciale's testimony, the only witness proffered by plaintiff to explain the initial design, use, and marketing of The Comfy®, lacked credibility because it was often questionable, improbable, incomplete, and/or contradicted by admissible documentary evidence, other witnesses' testimony, and his prior sworn testimony.

For example, Mr. Speciale claimed, without documentary support such as marketing or advertising materials or test results, that The Comfy® protects from extreme cold. However, his testimony is contradicted by other witnesses' testimony—as well as by his own prior sworn statements—and the documentary evidence, all of which demonstrate that The Comfy® was not designed, intended, or marketed for that purpose. The evidence at trial showed that from the very beginning of The Comfy®'s development and subsequent marketing on Shark Tank in 2017, neither Mr. Speciale nor his brother described The Comfy® as having the ability to protect from extreme cold when they pitched it on Shark Tank. Indeed, the Shark Tank video reveals that at no point during their eleven-minute pitch did they state or suggest that it was designed for, intended for, or capable of protecting from extreme cold. D27-1. In fact, Mr. Speciale testified that The Comfy® has never been marketed for protection from extreme cold. Trial Tr. vol. II,

38

434:11-14. This is particularly notable because, as Ms. Concannon's testimony showed, companies that sell garments that protect from extreme cold typically advertise the uses of their products given that they go through the lengths to develop them, including a lot of science that goes into technical fabrics as well as a lot of costs. Trial Tr. vol. III, 850:11-24. As such, it would be expected in a pitch to potential investors, as well as in the product's advertising, that if The Comfy® could protect from extreme cold, that capability would be extolled. The absence of such information in the pitch and marketing of The Comfy® is just one element of proof that it does not protect from extreme cold.

Mr. Speciale's testimony is further undermined by Ms. Concannon's testimony that she did not see any specific technical features advertised when reviewing The Comfy®'s packaging as one might see in a garment that holds itself out to protect from the elements—such as a Gore-Tex outer shell or Thinsulate lining—and thus, the packaging lacks any specifications indicating protection from extreme cold. Trial Tr. vol. III, 857:5-858:2, 858:22-859:6; P1.

Further, despite claiming that The Comfy® can protect from extreme cold, Mr. Speciale could not provide such crucial information as to how long it can allegedly protect someone from extreme cold. Trial Tr. vol. I, 129:10-12. This stands in stark contrast to both Ms. Ferro's and Mr. Crumley's testimony that garments designed to protect from extreme cold should provide protection for at least several hours. Trial Tr. vol. II, 606:14-22, 631:12-20; Trial Tr. vol. IV, 1132:2-11. Therefore, knowing how long The Comfy® can safely be worn in extreme cold is essential to establishing the claim that it can protect from extreme cold according to the standards outlined by the expert witnesses in this case, as well as by the information provided by the NWS and the standards described by courts that have addressed the issue of protection from

extreme cold.  But Mr. Speciale testified that Cozy Comfort has never tested The Comfy® to establish that it protects from extreme cold (Trial Tr. vol. II, 434:7-10), and he added that to his knowledge, *no one* has tested The Comfy® to determine its ability to protect from extreme cold. Trial Tr. vol. II, 434:11-14.  In contrast, both Ms. Ferro and Mr. Crumley testified that garments that they designed for protection from cold or extreme cold were field tested.  Trial Tr. vol. IV, 1144:13-16; Trial Tr. vol. II, 629:7-630:5.  Moreover, Mr. Crumley testified that he was usually asked by companies he worked with to field test products to make sure that customers would like them, yet Mr. Crumley testified that he was never asked by anyone to field test The Comfy®. Trial Tr. vol. II, 634:3-636:2.  Mr. Speciale's testimony that The Comfy® can protect from extreme cold is further refuted by Ms. Concannon's testimony that companies that sell garments that protect from extreme cold typically want to portray that their products have been tested and will provide temperature ranges reflecting the protection offered, for example, up to negative 22 degrees Fahrenheit.  Trial Tr. vol. III, 850:25-851:5.  And Ms. Ferro testified that she did not see any temperature ranges for using The Comfy® in any information that she reviewed.  Trial Tr. vol. III, 976:1-4; *see also* P1.  Thus, Mr. Speciale's claim that The Comfy® can protect from extreme cold should be afforded little to no weight, given the voluminous evidence showing otherwise.

Moreover, Mr. Speciale's extreme cold claim is further rebutted by his testimony confirming that plaintiff's response to defendant's interrogatory no. 9, (describe in detail *all* the uses of The Comfy®), does not even mention that The Comfy® can be used for protection against extreme cold.  Trial Tr. vol. I, 300:6-302:16; D13, at 5-6.  Mr. Speciale further conceded that in a document entitled "The Comfy Marketing Strategy and Approach," there is no mention

of a targeted audience specifically involved in extreme cold activities.  Trial Tr. vol. I, 311:20-314:5; *see also* D14-2, CC000262-266.  Mr. Speciale's testimony acknowledged that receipt and response to defendant's RFP no. 17 ("identify and produce all documents and materials that describe and/or relate to the purpose and function of the imported merchandise."  Trial Tr. vol. I, 357:24-358:12; D17, at 1-2.  Yet, although reviewing and signing the response, Trial Tr. vol. I at 357:6-16 and D17 at 2, Mr. Speciale testified that he "ha[d] no idea" if plaintiff's response to RFP no. 17, which referred to "sales/marketing records Bates Numbers 00239-268, 00337-639," contained any description or statement that The Comfy®'s purpose or function included protection against extreme cold.  Trial Tr. vol. I, 363:6-16; *see also* D17, at 1-2.  A review of the Bates ranges cited by plaintiff in D17, and found in P10 (CC000240-261), D14-2 (CC00262-266), D14-3 (CC00267-268), and D14-1 (CC00337-629), reveals that they contain no descriptions that one of the purposes or functions of The Comfy® is to protect from extreme cold.  *See also* Trial Tr. vol. I, 364:11-15.

Notably, Mr. Speciale's claim that The Comfy® was designed to and actually can protect from extreme cold is further marred by his testimony that the first time that Cozy Comfort claimed specifically that The Comfy® protected against extreme cold was in Mr. Speciale's 2023 affidavit in opposition to the Government's motion for summary judgment.  Trial Tr. vol. I, 364:22-365:5.  Yet the overwhelming, probative evidence in the record—including plaintiff's prior statements—establishes that The Comfy® was primarily designed to be worn in the home for relaxing and can only be used outdoors in mild, dry weather.  Trial Tr. vol. III, 914:24-915:8, 943:7-944:5, 955:4-9, 979:8-981:11.  Significantly, plaintiff's own representatives stated to Customs that "[i]f used outside, [The Comfy®] could only reasonably be utilized to cover the

body for warmth for a short period of time" and that The Comfy® "[wa]s designed almost exclusively for use inside a home or other living quarters." D2-1, at ECF 328.

Moreover, Mr. Speciale stated in his sworn affidavit opposing summary judgment that his knowledge that The Comfy® can protect from extreme cold was "based on feedback that the company has received from its users, including many pictures of actual users using The Comfy®, and common sense." ECF No. 34-1, Ex. 12, at 4 (ECF page 711). Yet at trial, the cherry-picked "feedback" and photographs from users that Cozy Comfort introduced as evidence failed to establish that The Comfy® provides protection from extreme cold because both lack indicia of reliability and/or sufficient information to support his extreme cold claim. For example, the relatively small sample of photographs of customers selected by Cozy Comfort in P13 (less than ten of the 100 selected from thousands contain snow) does not show how cold it was, what time of year it was, where they were taken, what the temperature was outside, how long the individuals in the photographs were standing outside, or what other layers the individuals were wearing underneath. As such, these photographs cannot establish that it was extremely cold in any of those photographs, or that The Comfy® can protect the wearer in extreme cold for any period of time, let alone a substantial period of time. Trial Tr. vol. II, 802:13-803:1; Trial Tr. vol. III, 1003:15-1004:12; P13.

Mr. Speciale further testified that he did not take any of the photographs in P13, and he does not know any of the subjects. Trial Tr. vol. II, 801:19-802:3; P13. Therefore, he lacks sufficient personal knowledge to provide testimony regarding these photographs. *See* FRE 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). And none of the subjects depicted in

the photographs testified as witnesses at trial.  Nor could Mr. Speciale explain how the 100

photographs in P13 were selected from among the thousands of photographs that Cozy Comfort

keeps.  Trial Tr. vol. II, 803:2-804:6; P13.  As such, this exhibit is incomplete and unreliable for

this additional reason.  *See* FRE 106.  As to the customer feedback (available at P34, P36, and

P37), this evidence is also insufficient to corroborate Mr. Speciale's testimony, as it consists of

incomplete or illegible reviews (P34), thus violating FRE 602, as well as cherry-picked search

terms ("extreme" for P36; "cold" for P37), thus violating FRE 106, and it was only admitted

under FRE 703 and not for the truth of the matter asserted.  Accordingly, the customer feedback

and photographs are unable to establish any relevant facts, and fail to support Mr. Speciale's

prior sworn testimony that these bases provided him sufficient knowledge to testify that The

Comfy® provides protection from extreme cold.

Accordingly, given all the above, Mr. Speciale's claim that The Comfy® protects from

extreme cold, first asserted during summary judgment briefing in this action, is contradicted by

the testimony and evidence described above, including plaintiff's own prior inconsistent

statements about The Comfy®, and should be rejected.

Mr. Speciale has also made inconsistent statements regarding whether The Comfy® is

like the Snuggie®.  He testified that on the 2017 Shark Tank episode in which he pitched The

Comfy®, he said that The Comfy® "is absolutely not the Snuggie."  Trial Tr. vol. I, 190:23-

191:3; *see also* D27-1, at 6:09-11.  And Mr. Speciale's knowledge of the Snuggie® is also

questionable, as evidenced by him initially erroneously testifying that the original Snuggie® had

a hood, which it did not.  Trial Tr. vol. I, 68:6-17.  And although the evidence in the record

shows that The Comfy® was inspired by a XL hoodie (Trial Tr. vol. III, 1036:15-25; D18, at 2-

3) and not the Snuggie®, Mr. Speciale's testimony seems to improbably suggest at times that The Comfy® "made improvements" on the Snuggie®. Trial Tr. vol. I, 66:22-24. But even if that were the case, the *Allstar* court's decision can be read as determining that the Snuggie®—which lacked a backside (*i.e.*, was open in the back), a hood, ribbed cuffs, a kangaroo pocket, and the ability to be worn while doing any non-sedentary activities without it falling off—was already an "improved blanket," and as such, was already at the limit of what would still be considered a blanket because, as the images at D50 show (particularly at page 4), it was essentially a rectangular piece of fabric with two armholes cut in for the unconventional "sleeves." *See* 211 F.Supp.3d at 1335 ("Plaintiff contends the Snuggie® is classifiable under heading 6301 as an 'enhanced or improved blanket with sleeves.'") (internal citation omitted). Indeed, the *Allstar* court found that the Snuggie®'s sleeves were "incidental to the Snuggie®'s use as a blanket; the sleeves are not so substantial as to transform the Snuggie® into something other than a blanket." *Id.* at 1337. But any further improvements—such as The Comfy®'s back panel, hood, narrowing sleeves ending in ribbed cuffs, kangaroo pocket, and ability to wear it outdoors during various activities—would remove it from the "blanket" heading because they would constitute "features *substantially in excess* of those within the common meaning of the term"—here, "blanket." *Id.* at 1336 (quoting *Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996)) (emphasis in original).

Mr. Speciale's testimony regarding the licensing agreements at P11 was also inconsistent and improbable, and revealed that he does not know who specifically negotiated these licensing agreements, how they were negotiated, or how the terms in the contracts were chosen. Trial Tr. vol. II, 479:11-480:18, 481:10-483:7; Trial Tr. vol. IV, 1256:20-1257:18, 1258:11-19, 1259:10-

16.  As such, plaintiff's claim that the companies chose the terms of the contracts, including the term "wearable blanket," is implausible, inconsistent, and uncorroborated by any other testimony.

Lastly but no less important, Mr. Speciale's testimony was significantly inconsistent as to whether he considers The Comfy® to be a blanket, a wearable blanket, a garment, or a sweatshirt.  Mr. Speciale's testimony is replete with inconsistent and contradictory statements in this regard.  *See, e.g.*, Trial Tr. vol. I, 56:24-57:1 ("The Comfy is a one-size-fits-all wearable blanket."), 304:17-305:9 ("The Comfy is a blanket first, a wearable blanket, and it's described as a sweatshirt."; "Q. The statement that says, 'The blanket that's a sweatshirt,' means the blanket that is a sweatshirt, correct?  A. You could interpret it that way, yes."); Trial Tr. vol. II, 437:3-6, 438:10-22, 439:8-14 (in prior sworn testimony, Mr. Speciale confirmed that he referred to The Comfy® as an "actual garment" in comparison to the Snuggie®, which he stated in contrast was a wearable blanket); Trial Tr. vol. IV, 1205:8-15 ("Q. Has Cozy Comfort ever referred to The Comfy as a garment in any way? A. Using the word 'garment,' not that I'm aware of. Q. Has it ever referred to The Comfy as an over-garment? A. Not that I'm aware of."), 1206:1-25 ("Q. And at the top of the page, does it say, 'Enlarged over-garment with an elevated marsupial pocket'? A. Yes, it does."; "Q. So if I asked you going back has Cozy Comfort ever referred to The Comfy as a garment or as an over-garment, what is the answer? A. Yes."), 1215:7-1218:10 (confirming that the patent application refers to The Comfy® as a garment), 1240:17-1241:15 ("It's meant to be used as a wearable blanket as any standard blanket would be used.").

Given Mr. Speciale's vacillating and inconsistent testimony on what The Comfy® is and how it has been marketed, as well numerous times at trial during which he claimed to not know

or be able to recall information about the company which he founded and for which he is the CEO or regarding his involvement in this case,[6] his testimony should not be found as probative. Further, the logical inference that can be drawn is that, when it has been convenient for Mr. Speciale to refer to The Comfy® in one way he has done so, *e.g.*, the Snuggie® is not like The Comfy® on Shark Tank (Trial Tr. vol. I, 190:23-191:3; D27-1, at 6:09-11); The Comfy® is like a giant sweatshirt or garment (Schedule C, ¶ 15; Trial Tr. vol. I, 304:17-305:9 ("The Comfy is a blanket first, a wearable blanket, and it's described as a sweatshirt."; "Q. The statement that says, 'The blanket that's a sweatshirt,' means the blanket that is a sweatshirt, correct?  A. You could interpret it that way, yes."); Trial Tr. vol. IV, 1246:9-1247:10; P4, at 2, indicating, "The mark consists of an image of a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET…THAT'S A SWEATSHIRT!'"; D27-1), only to change his testimony when it is inconvenient to maintain a prior position—now, saying that the Snuggie® is similar to The Comfy® (Trial Tr. vol. I, 66:9-21, 67:10-12), and that The Comfy® is not a garment (Trial Tr. vol. I, 56:24-57:1, 115:8-15).

Tellingly, Mr. Speciale previously testified that The Comfy® "[is] meant to be used as a wearable blanket as any *standard* blanket would be used."  Trial Tr. vol. IV, 1240:17-1241:15 (emphasis added).  The definition of "standard," as relevant here, is "sound and usable but not of top quality," and synonyms for "standard" include "normal," "average," "usual," "typical," and

---

[6] *See, e.g.*, Trial Tr. vol. 1, 193:11-16, 203:18-22, 204:10-12, 214:5-9, 216:10-17, 219:3-11, 221:5-6, 221:21-222:9, 225:18-22, 262:18-23, 267:22-24, 268:13-16, 278:21-279:5, 313:5-18, 349:21-25, 361:4-10, 363:8-15, 364:11-15, 365:6-20, 366:8-12; Trial Tr. vol. II, 425:5-7, 432:25-433:13, 433:15-17, 433:21-24, 435:3-14, 437:3-6, 484:19-24, 486:4-8, 503:2-5, 507:24-508:1; *see also* Trial Tr. vol. 1, 283:13-17 (the Court correctly observing, "[W]e've got a problem here, because we've got a witness who is CEO of the company who claims not to remember anything.").

46

"ordinary." *Standard*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/standard (last visited Dec. 17, 2024); *Standard*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/thesaurus/standard (last visited Dec. 17, 2024). Given the above definitions and synonyms, common sense dictates that standard blankets—*i.e.*, those which are not of top quality but are normal, average, or typical—provide protection from standard—*i.e.*, normal, average, or typical—cold, and plaintiff has not provided evidence to the contrary. Consequently, *standard* blankets do not provide protection from *extreme* cold, which as explained *supra*, is not normal, average, or typical cold. As such, this testimony is also inconsistent and undermines Mr. Speciale's claim that The Comfy® provides protection from extreme cold.

The above examples of implausible, inconsistent, incomplete, and contradicted testimony reveal a witness whose testimony should largely be seen as untrustworthy and, thus, not credited unless corroborated by other, unimpeachable evidence. However, given that, as discussed below, plaintiff provided deficient documentation at trial, such corroborative information is unavailable to rehabilitate this witness. Accordingly, Mr. Speciale's testimony should be given little to no weight.

2. Mr. Crumley's Testimony

Nor can Mr. Speciale's testimony be rehabilitated by Mr. Crumley, who testified as plaintiff's expert witness. Despite having designed a number of garments for cold weather in the past, Mr. Crumley's testimony was at times implausible, questionable, and even inconsistent as regards The Comfy®'s ability to protect from extreme cold, physical characteristics, design and intended use, and marketing.

Mr. Crumley testified that The Comfy® can provide protection from extreme cold, but neither his own testimony nor the documentary evidence corroborate his claim, and other witnesses' consistent testimony further undermines his claim. For example, despite Mr. Crumley testifying that he field tests garments that he manufactures, which involves using them while hunting or in cold weather (Trial Tr. vol. II, 629:7-630:5), and that he was usually asked by companies he worked with to field test products to make sure that customers would like them (Trial Tr. vol. II, 634:3-635:20), surprisingly he was never asked by anyone to field test The Comfy®. Trial Tr. vol. II, 635:21-636:2. In fact, despite having been retained by Cozy Comfort as far back as 2021 (Trial Tr. vol II, 646:1-7), in all these years he not only never tested The Comfy® (Trial Tr. vol. II, 678:17-19), he never even wore it in extreme cold (Trial Tr. vol. II, 678:14-16).

Just as surprising was his testimony that he has never even seen anyone wearing The Comfy® outdoors, and that the only person he has ever seen wearing it in the fetal position is his wife, who did so indoors. Trial Tr. vol. II, 636:9-638:6. And he did not testify that it was extremely cold indoors when he saw his wife wearing it. *See id.* In addition, when asked if he had ever designed an oversized garment for protection against extreme cold, Mr. Crumley replied, "We did the standard sizes." Trial Tr. vol. II, 681:17-20. This actually comports with Ms. Ferro's testimony that most outerwear that is made for extreme cold weather has to be more or less snugly fit, Trial Tr. vol. III, 934:16-18, an example being Canada Goose which does not make jackets in one-size-fits-all, and instead their jackets form to the body, so they need to be in different sizes. Trial Tr. vol. III, 971:18-22. Furthermore, Mr. Crumley testified that when he designed garments for protection against extreme cold, they all employed "just Thinsulate."

48

Trial Tr. vol. II, 681:21-682:8.  All this contrasts significantly with The Comfy®, which is oversized, one-size-fits-all, and employs only sherpa and microfleece, and not any of the specialized insulating fabrics, such as Thinsulate, employed by Mr. Crumley or Ms. Ferro in the garments they designed for protection from extreme cold, nor discussed by Ms. Concannon as being featured in the marketing that is typical of garments holding themselves out to protect from extreme cold.  For all these reasons, Mr. Crumley's claim that The Comfy® can protect from extreme cold is unsupported by the evidence adduced at trial.

But even if Mr. Crumley's testimony were to be fully credited, his opinion was only that The Comfy® could provide protection from extreme cold "in the cocooning position" if "the temperature is freezing and [the user] has layered."  Trial Tr. vol. II, 610:12-21.  Even without considering the contradictory testimony offered by both Ms. Concannon and Ms. Ferro—that The Comfy®'s physical characteristics, design and intended use, and marketing establish that it is meant to be worn indoors and only outdoors in mild, dry weather—this testimony is insufficient to establish that The Comfy® can protect from extreme cold for several reasons.

First, Mr. Crumley's testimony does not take into account the definition of extreme cold that we discussed *supra*—drawn from dictionary definitions, case law, and the fact that most Comfy®s are sold in northern states—that the cold must be extreme, frigid, bitter, arctic, and well below zero, not just freezing.  Notably, Mr. Crumley's own prior testimony comports with this definition because he indicated that the extreme cold that he had experienced had been in Western states, in the mountains in places such as Wyoming and Utah, and that even in places like Kansas, it had been at temperatures of 5 to 10 degrees with the wind blowing 25 to 30 miles per hour.  Trial Tr. vol. II, 576:20-577:5.  And his testimony particularly emphasized that wind

49

was part of the extreme cold that he experienced, Trial Tr. vol. II, 578:2-3, which comports with Ms. Ferro's testimony that garments designed for the extreme cold consider all three factors—protection from wind, rain, and extreme cold. *See* Trial Tr. vol. III, 980:4-981:11. And given that it is uncontested that The Comfy® lacks protection from rain or wind (Schedule C, ¶ 13), it does not follow logically that The Comfy® can protect from extreme cold.

Second, Mr. Crumley's testimony that The Comfy® protects from extreme cold makes the erroneous assumption that the individual wearing The Comfy® has layered. As indicated by Ms. Ferro's testimony, a garment designed for protection from extreme cold must be able to provide such protection by itself, not with other layers. *See* Trial Tr. vol. IV, 1098:19-1099:12. This also comports with the rationale of *Rubies* and heading 6110, for if layering were allowed to establish that an article can protect from extreme cold, any article in heading 6110 could be layered with other articles sufficiently so that it could be deemed to provide such protection. The result would be the nullification of the rationale of *Rubies* that heading 6110 is for articles that do not provide protection from the elements, in contrast to other headings that do. *See* 922 F.3d at 1345-46. In other words, a pullover or similar article that is layered over several garments to provide overall, layered protection from extreme cold would fail the *Rubies* test for inclusion in heading 6110, which would render absurd results. But even assuming that layering were to be allowed when considering whether a garment protects from extreme cold, Mr. Crumley failed to specify just how many and what types of layers underneath The Comfy® are necessary for it to protect from extreme cold.

Third, Mr. Crumley failed to explain how long a Comfy® with an unknown number and types of layers could protect from extreme cold—would it be a few minutes, an hour, three

hours?  Although he did not provide that information, as shown above, the protection from extreme cold must last for a substantial period of time for a garment to be considered capable of protecting from extreme cold.

Fourth, neither Mr. Crumley's testimony nor other testimony or evidence in the record have established that cocooning outdoors in The Comfy® is a typical or intended use of it.[7] Indeed, the cocooning position appears only as the last figure in two of The Comfy®'s patents, and not at all in the other two patents, which suggests that it is not a typical intended use, and further, there is no description that it is meant to be worn in the cocooning position *outdoors*, not to mention in extreme cold.  *See* P6, Fig. 20; P7, Fig. 10; P8 (absent); P9 (absent).

Mr. Crumley's testimony was also inconsistent regarding his opinions on whether The Comfy® is a blanket, a wearable blanket, or a garment.  Mr. Crumley's opinion in this case is that The Comfy® is a wearable blanket, but not a blanket.  Trial Tr. vol. II, 642:14-21.  Yet Mr. Crumley did not provide a definition of what exactly a "wearable blanket" is.  Further, his testimony undermines plaintiff's cherry-picked definition of a blanket, *see* P23, because Mr. Crumley testified that at his deposition, he agreed that the common definition of a blanket is a large usually oblong piece of woven fabric used as a bed cover.  Trial Tr. vol. II, 674:1-10.  Mr. Crumley further differentiated The Comfy® from a blanket because The Comfy® will not fall off the body like a blanket will, Trial Tr. vol. II, 674:11-24, and his testimony also confirmed

---

[7] Similarly, plaintiff failed to establish that The Comfy® is typically used indoors in extreme cold conditions, or that in the United States, extreme cold conditions are typically found indoors. On the contrary, the evidence in the record, as well as common sense, confirm that in the United States extreme cold conditions indoors are extremely atypical.  *See* Trial Tr. vol. III, 870:7-871:3 ("products that are marketed for protection from extreme cold would not be worn at home, such as while the wearer is watching TV, unless that person was in arctic cold with no heat or fireplace perhaps").

51

that The Comfy® shares many of the same features of a hooded pullover.  Trial Tr. vol. II,

674:25-675:22.  Moreover, Mr. Crumley testified that in his report in the *Top Brand* case,[8] his

opinion in that case referred to The Comfy® as a garment.  Trial Tr. vol. II, 653:4-654:23.

Furthermore, when asked to explain why he had earlier testified that The Comfy® is not used

like a garment—in support of his opinion that The Comfy® is a wearable blanket and not a

garment—Mr. Crumley stated that a garment can be worn in a lot of different situations, *e.g.*, a

sweater, sweatshirt, or pullover could be worn in the house, outside, or to the grocery store, but

that he would not expect a Comfy® to be worn in all those situations.  Trial Tr. vol. II, 682:18-

683:20.  Yet the record is replete with examples of individuals wearing The Comfy® in all those

situations, and even more.  *See, e.g.*, Schedule C, ¶ 18; Trial Tr. vol. III, 915:9-14, 945:21-946:2;

P1; P6; P7; D21, at 2.  And further undermining this testimony that The Comfy® is not used like

a garment is the plain fact that Mr. Crumley never researched how people actually use The

Comfy®.  Trial Tr. vol. II, 683:21-23.  Accordingly, Mr. Crumley's testimony is inconsistent as

to what he considers The Comfy® to be and is, therefore, should be afforded no probative

weight.

Finally, Mr. Crumley did not offer any expert testimony regarding the use or marketing

of The Comfy®, neither of which he considered in forming his opinion.  He testified that he has

never visited The Comfy®'s website to look at it there, Trial Tr. vol. II, 680:14-20, that he did

not remember any ads for The Comfy® (Trial Tr. vol. II, 680:21-681:3), and that he never

consulted the website to look at photographs of The Comfy® and people actually using it.  Trial

---

[8] The Comfy® was the subject of a patent litigation during which Mr. Crumley testified as an expert in the area of design patent infringement.  *See Top Brand v. Cozy Comfort Company, LLC*, Case No. 21-cv-00597-PHX-SPL (D. Ariz.).

Tr. vol. II, 683:24-684:2.  And as noted above, Mr. Crumley testified that he never researched how customers use The Comfy®.  Trial Tr. vol. II, 683:21-23.  As such, Mr. Crumley's testimony cannot serve to corroborate Mr. Speciale's testimony as it concerns the use and marketing of The Comfy®, which is contradicted by the testimony of Ms. Ferro and Ms. Concannon.

In sum, Mr. Crumley failed to follow reliable methods that other experts in his field follow to reach his opinion.  What is most striking is that Mr. Crumley failed to follow his *own* prior methods of testing and assessing the quality and durability of garments designed for cold, as he never tested or even wore The Comfy® in extreme cold in the several years during which he was retained by plaintiff as an expert.  And unlike Ms. Concannon and Ms. Ferro, both of whom consulted all the discovery documents produced in this case, including the parties' responses to interrogatories and document requests, patents, marketing materials, and the website, Mr. Crumley failed to consider any of this information, some of which contradicts his opinion.  For all these reasons, the Court should afford little to no probative weight to Mr. Crumley's testimony.

### 3.  Deficient Documentation

In addition to the non-probative testimony of Mr. Speciale and Mr. Crumley, plaintiff failed to provide sufficient reliable corroborating documentation to rehabilitate the testimony regarding The Comfy®.

For example, Ms. Concannon testified that companies that sell garments that protect from extreme cold typically want to portray that their products have been tested and will provide temperature ranges reflecting the protection offered, for example, up to negative 22 degrees

Fahrenheit.  Trial Tr. vol. III, 850:25-851:5.  Nevertheless, there is no documentation in the record that The Comfy® had ever been tested for protection from extreme cold, indeed, Mr. Speciale admitted that he was unaware of any such testing, or that it can offer protection at particular temperature ranges, including those considered extreme cold.

Notably, it is uncontested that no patents for The Comfy® describe it as being able to provide "protection against extreme cold."  Schedule C, ¶ 31.  And nothing in the patents suggests that The Comfy® has the physical ability to protect from cold considered extreme.  *See* P6-P9.  In fact, there is no documentation whatsoever, such as product manuals, product development files, marketing materials, website pages, or test results, showing that The Comfy® can protect from extreme cold.  *See* Trial Transcripts and Exhibits.  Ms. Concannon's testimony that outerwear companies go to significant lengths and costs to design and develop products that protect from extreme cold, *see* Trial Tr. vol. III at 850:11-24, establishes a reasonable expectation that such a typically noteworthy and costly feature as protection from extreme cold would not only be mentioned, but would actually be described in significant detail in a patent for such a product.  *See also* Trial Tr. vol. III, 852:13-22.  Moreover, Ms. Concannon's testimony indicated that products that do claim to protect from extreme cold will most likely list technical specifications on their website and on the products' hang tags, in addition to featuring marketing using imagery of people using their products in an extreme cold environment.  Trial Tr. vol. III, 852:13-22.  Yet any such documentation regarding The Comfy®'s ability to provide extreme cold protection is oddly absent from the record.  *See also* P1 (no technical specifications related to extreme cold protection on The Comfy®'s tags).

Plaintiff also failed to admit at trial corroborating documentation as to The Comfy®'s marketing. Indeed, Ms. Concannon testified that she did not see any specific technical features advertised when reviewing the packaging for The Comfy® as one might except to see in a garment that holds itself out to protect from the elements—such as a Gore-Tex outer shell or Thinsulate lining—and instead, the features advertised on packaging were simply that it was The Original, ginormous, and soft, as well as including a 100-day promise. Trial Tr. vol. III, 857:5-858:2; *see also* P1. This stands in stark contrast to technical features often included in garments designed and intended to protect from extreme cold, such as Canada Goose's jackets and parkas, which include many of the following features that are specifically developed to protect against extreme cold: a placket covering the zipper on the front to protect from wind and rain; a very high collar going up past the chin to protect the neck and part of the face, which is very vulnerable to frostbite; a hood with a drawstring to pull the hood around the face so as to not have air going into the garment from around the face; knit cuffs inside the sleeves to prevent cold air from getting in the sleeves; a puffy fiberfill or down insulated layer; an outer shell layer; varying sizing that forms to the body so that the fabrics can be close to the skin to keep heat from escaping the body; double-entry pockets with entry for storing things in and another entry to keep the hands warm; and sealed seams with Gore-Tex. Trial Tr. vol. III, 968:3-974:12; *see also* D43. But The Comfy®'s packaging and marketing include none of these features to protect against extreme cold. *See* Trial Transcripts; P1. The inescapable conclusion is that the absence of such evidence is proof that The Comfy® is not designed nor intended to protect from extreme cold.

4.  <u>Plaintiff's Failure To Establish Numerous Material Facts</u>

Given all the above, plaintiff failed to establish many of the material facts that it included in Schedule C-1 of the pretrial order due to contradictory testimony, deficient documentation, or both.  *See* Schedule C-1.  Most significantly, plaintiff did not establish that The Comfy® can protect a wearer in very cold weather; consequently, it also failed to establish that it can protect a wearer in extreme cold weather.  *See, e.g.*, Trial Tr. vol. I, 262:2-16; Trial Tr. vol. III, 914:24-915:8; D2-1 at ECF 328 ("If used outside, [The Comfy®] could only reasonably be utilized to cover the body for warmth for a short period of time . . . .  It is designed almost exclusively for use inside a home or other living quarters."); D8 at 6; *see also* P1.

Plaintiff did not establish that The Comfy® is, was designed to be, or is used as a blanket.  *See, e.g.*, Schedule C, ¶¶ 17-18; Trial Tr. vol. II, 674:11-24, 684:21-23; Trial Tr. vol. III, 856:21-857:2, 915:9-14; 945:21-946:2, 988:1-989:2; P1; P6 (consistently referring to it as a garment); P7; D14-1 at CC00356 (U.S. Provisional App. No. 62/558,136) ("In operation, the garment 10 is worn on the body of the person 11 like an article of clothing"); D21, at 2 ("You can't dance in a blanket.  You can't hug in a blanket.  You can't flip pages of your novel in a blanket without your arms being exposed.").  Plaintiff also did not establish that The Comfy is a "wearable blanket."  *See, e.g.*, Trial Tr. vol. III, 915:9-14; P1; P6; P7.

Plaintiff did not establish that The Comfy® extends to the knees or below on the average user.  *See, e.g.*, P1; Trial Tr. vol. IV, 1185:23-1186:19.  Nor did plaintiff establish that The Comfy® loosely drapes over the user.  *See, e.g.*, Trial Tr. vol. II, 673:16-25; Trial Tr. vol. III, 856:11-20, 915:9-14, 955:4-9, 1034:4-20; Trial Tr. vol. IV, 1185:14-22, 1204:15-22, 1246:9-12;

D14-1 at CC00356 (U.S. Provisional App. No. 62/558,136) ("In operation, the garment 10 is worn on the body of the person 11 like an article of clothing"); *see also* P1.

Plaintiff also failed to establish that The Comfy® is marketed as a blanket. *See, e.g.*, Schedule C, ¶¶ 17-18; Trial Tr. vol. III, 856:11-857:4. Nor did plaintiff establish that The Comfy® is sold "nearly exclusively" (Schedule C-1, ¶ 23) in the home furnishings and/or bedding departments of online and brick and mortar stores and is typically not sold in the apparel, clothing, or garment departments. *See, e.g.*, Trial Tr. vol. I, 152:17-19, 153:17-18, 153:23-154:1, 154:8-9 (showing different areas of stores where it is sold); P16, at 1175 (Advantage Apparel and Graphics; Amazon), 1176 (Costco; Elite Custom Apparel), 1177 (Kohl's; Lazydog Apparel and IMprints), 1178 (Macy's, Nordstrom, Target, Walmart); D-26, CC01197-01213; *see also* Trial Tr. vol. II, 497:10-498:7; D15; D26-1, CC01214-01279.

Plaintiff also failed to establish that FIT "classifies The Comfy® in the intimate apparel specialty class, which includes robes" (Schedule C-1, ¶ 27). *See* Trial Tr. vol. IV, 1129:1-8 (indicating that The Comfy® can be considered a type of loungewear and that intimate apparel is a separate category from loungewear); 1129:10-21, 1130:8-18 (showing that pullovers and sweatshirts can move from category to category because they could have different uses at different times).

For all the reasons above, plaintiff also failed to show that The Comfy® is not a pullover. *See, e.g.*, Trial Tr. vol. III, 799:17-800:6, 915:13-14, 1034:14-20. Nor did plaintiff establish that The Comfy® is not similar to a hooded pullover. *See, e.g.*, Schedule C, ¶ 6; Trial Tr. vol. II, 674:25-675:22; Trial Tr. vol. III, 1034:4-1036:2; P1; P4, at 2 ("The mark consists of an image of

a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET…THAT'S A SWEATSHIRT!'").

Finally, plaintiff failed to establish that The Comfy® is not a typical garment, because there is no evidence in the record of what qualifies as a "typical" garment. *See* Trial Transcripts and Exhibits. On the contrary, the evidence adduced at trial showed that The Comfy® is worn just like a pullover is and can be worn in the same places and situations as a pullover. *See, e.g.*, Schedule C, ¶ 18; Trial Tr. vol. III, 915:9-14, 945:21-946:2; P1; P6; P7; D21, at 2.

For all the above reasons, plaintiff failed to meet its burden of demonstrating that The Comfy® is not properly classified as a pullover or similar article of heading 6110, and specifically under subheading 6110.30.30.

## <u>CONCLUSION</u>

The law, as applied to the facts elicited at trial, shows that The Comfy® is properly classified as a "pullover" under heading 6110, HTSUS, and specifically under subheading 6110.30.30 ("Of man-made fibers: Other: Other: Other."). Therefore, we respectfully request that judgment be entered for the Government and that this action be dismissed.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Beverly A. Farrell
BEVERLY A. FARRELL
Senior Trial Attorney

*Of Counsel*:                                        /s/ Brandon A. Kennedy
Michael Anderson                              BRANDON A. KENNEDY
General Attorney                                 Trial Attorney
Office of the Assistant Chief Counsel    Department of Justice, Civil Division
International Trade Litigation              Commercial Litigation Branch
U.S. Customs and Border Protection     26 Federal Plaza, Room 346
New York, New York 10278                New York, New York 10278
                                                         Tel.: (212) 264-9237 or 9230
                                                         *Attorneys for Defendant*

Dated: January 10, 2025

59