Slip Op. No. 25-75

## UNITED STATES COURT OF INTERNATIONAL TRADE

COZY COMFORT COMPANY, LLC,

          *Plaintiff*,

v.

UNITED STATES,

          *Defendant.*

Before: Stephen Alexander Vaden, Judge

Court No. 1:22-cv-00173 (SAV)

## <u>FINDINGS OF FACT & CONCLUSIONS OF LAW</u>

[Resolving disputed facts about the subject merchandise, called The Comfy®, and concluding that The Comfy® is a pullover classifiable under Heading 6110 and Subheading 6110.30.30]

Dated: June 16, 2025

*Christopher J. Duncan* and *Elon A. Pollack* of Stein Shostak Shostak Pollack & O'Hara, of Los Angeles, CA, for Plaintiff Cozy Comfort Company, LLC. With them on the brief were *Gregory P. Sitrick*, *Isaac S. Crum*, and *Sharif S. Ahmed* of Messner Reeves LLP, of Phoenix, AZ, and *Robert H. Dunikoski II* of Castenda and Heidelman LLP, of Dallas, TX.

*Brandon A. Kennedy*, Trial Attorney, and *Beverly A. Farrell*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. With them on the brief were *Justin R. Miller*, Attorney-In-Charge, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Michael A. Anderson*, General Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection.

    **Vaden, Judge**:    Cozy Comfort Company, LLC (Cozy Comfort) created a

novel product called The Comfy®, which combines the features of an ordinary throw

blanket with those of an oversized pullover.  The Comfy® is made abroad so that it must be imported into the United States before it is sold to American consumers. Importing The Comfy® presented Cozy Comfort and the United States Government with a problem.  All goods entering the United States must be classified according to the Harmonized Tariff Schedule of the United States (HTSUS) before import duties can be assessed.  The HTSUS is not updated to account for every novel product on the market; it speaks in more general terms about broader categories of products. Importing The Comfy® thus demanded an answer to a classification question:  Is The Comfy® a blanket, a pullover, or something else?

Cozy Comfort brought this lawsuit because it believes U.S. Customs and Border Protection (Customs) answered that question incorrectly.  Customs classified The Comfy® under Subheading 6110.30.30, HTSUS, which covers sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles.  Cozy Comfort contends The Comfy® should be classified under a tariff heading for blankets instead, or in the alternative, under one of two other tariff headings.  The Court conducted a five-day bench trial to resolve lingering factual disputes about The Comfy®.  Based on the following findings of fact, the Court concludes that the Government is correct.  The Comfy® is a pullover classifiable under 6110.30.30, HTSUS.

## BACKGROUND

### I.    Procedural History

Cozy Comfort first imported The Comfy® in January 2018.  *See* Trial Tr. vol. I at 72:17–20, ECF No. 108 (direct testimony of Mr. Speciale).  The company listed the

product as a blanket under Subheading 6301.40.00, HTSUS, on its customs forms and paid the associated duties.  *See* Pre-Trial Order, Schedule C ¶ 32 (Jt. Uncontested Facts), ECF No. 107.  On March 9, 2020, however, Customs reclassified The Comfy® as a pullover under Subheading 6110.30.30, HTSUS.  *See id.*  Cozy Comfort responded by filing its first protest with Customs on August 26, 2020.  *See id.* ¶ 33.  Customs issued Ruling H313594 on May 21, 2021, to resolve the protest.  *See id.* ¶ 35.  That ruling continued to find The Comfy® should be classified as a pullover under Subheading 6110.30.30, HTSUS.  *See id.*

While Customs reviewed Cozy Comfort's first protest, Cozy Comfort imported a new shipment of The Comfy® under Entry No. 442-9233932-0 on January 6, 2021. *See id.* ¶ 34.  Cozy Comfort classified the products in that entry as pullovers under Subheading 6110.30.30, HTSUS, as Customs directed.  *See id.*  This January 2021 shipment is the shipment at issue in this case.  *See id.* ¶¶ 34–35.  On May 20, 2022, Cozy Comfort timely filed another protest contesting Custom's liquidation of the January 2021 shipment at the higher tariff rate for pullovers.  *See id.* ¶ 38.  Customs denied that protest on May 31, 2022.  *See* Compl. ¶ 24, ECF No. 6.

Cozy Comfort filed the present lawsuit challenging both the May 31, 2022 protest denial and the underlying Customs Ruling supporting it.[1]  *See id.* ¶¶ 22–27. The Government moved for summary judgment after discovery concluded.  *See* Def.'s Mot. for Summ. J., ECF No. 28.  The Court denied the Motion, finding issues of

---

[1] Before this litigation, Cozy Comfort filed an earlier lawsuit in the Court of International Trade challenging Customs' denial of its first protest; but it voluntarily dismissed that lawsuit without prejudice.  *See Cozy Comfort Co. v. United States*, Ct. No. 1:21-cv-00404, ECF Nos. 17–18.

material fact remained.  *See* Order, ECF No. 47.  The Court ordered a trial to
determine the proper classification of The Comfy® and expressed it was "particularly
interested in hearing evidence about three matters:  (1) whether The Comfy® protects
against extreme cold, (2) how The Comfy® compares to [a similar product,] the
Snuggie®, and (3) the use factors identified in [the Federal Circuit's] *GRK Canada*
[customs classification opinion] and applied [by the Court of International Trade] in
*Allstar Marketing*."  *See* Order at 5, ECF No. 48.

The Court's trial order noted that classifying The Comfy® would require
applying the Federal Circuit's legal framework from *Rubies Costume Co. v. United
States* (*Rubies Costume II*), 922 F.3d 1337 (Fed. Cir. 2019).  *See* Order at 3–4, ECF
No. 48.  *Rubies Costume II* addressed whether a Santa Suit jacket fell under Heading
6110 and Subheading 6110.30.30, HTSUS.  922 F.3d at 1345–46.  The Federal Circuit
explained that items in Heading 6110 share certain characteristics:  They "cover[] the
upper body[,]" are worn "over either undergarments or other clothing[,]" "provide[]
some warmth to the wearer[,]" but "do[] not protect against wind, rain, or extreme
cold."  *Id.*  These characteristics govern whether The Comfy® can be classified as a
pullover under Heading 6110, as the Government requests.  *See* Order at 3–4, ECF
No. 48.

The parties filed a proposed pre-trial order listing key information, including
uncontested facts, claims and defenses, damages and other relief requested, triable
issues, proposed witnesses, and proposed exhibits.  *See* Proposed Pre-Trial Order at
1–3, ECF No. 52.  The Court then held a pre-trial conference to discuss this filing.

*See* Tr. of Pre-Trial Conf., ECF No. 64. Both parties indicated that they had objections to the other side's proposed exhibits and witnesses. *See id.* at 67:16–68:4. The Court set a schedule to hear motions *in limine* on those objections. *See* Order, ECF No. 58.

The parties filed four Motions. Cozy Comfort filed a motion *in limine* to exclude the testimony of Patricia Concannon, the Government's fashion marketing expert. *See* Pl.'s First Mot. in Lim., ECF No. 54. It also filed a motion *in limine* to exclude the testimony of Renee Orsat, a national import specialist at Customs who helped classify The Comfy®. *See* Pl.'s Second Mot. in Lim., ECF No. 60. Cozy Comfort did not move to exclude testimony from Professor Mary Ann Ferro, the Government's garment design expert. The Government filed a motion *in limine* to exclude the testimony of James Crumley, Plaintiff's garment design expert. *See* Def.'s Second Mot. in Lim., ECF No. 62. It also filed a motion to exclude certain proposed exhibits. *See* Def.'s First Mot. in Lim., ECF No. 61. The Court held a hearing on these Motions on October 11, 2024. *See* ECF No. 80. It then issued an Order that granted in part Cozy Comfort's two motions *in limine*, denied the Government's motion *in limine* regarding Mr. James Crumley, and reserved ruling on the Government's exhibit-based motion until trial. *See Cozy Comfort Co., LLC v. United States*, 48 CIT __, Court No. 1:22-cv-00173, 2024 Ct. Intl. Trade LEXIS 115 (Oct. 15, 2024).

The Court held a bench trial from October 21 to October 25, 2024, to decide whether Customs properly classified The Comfy®. *See* Trial Tr. vols. I–V, ECF Nos. 108–112. The Court heard testimony from witnesses and considered objections from the parties. In some instances, the Court struck legally impermissible testimony and

evidence from the record.[2]   The parties submitted proposed findings of fact and conclusions of law after the trial ended.   *See* Pl.'s Proposed Findings of Fact and Conclusions of Law (Pl.'s Br.), ECF No. 114; Def.'s Proposed Findings of Fact and Conclusions of Law (Def.'s Br.), ECF No. 116.

## II.    Stipulated Facts

The Court outlined the uncontested facts in its Pretrial Order.   *See* Jt. Uncontested Facts, ECF No. 107.   The parties stipulated to these facts in their pretrial filings.   *See id*.  These facts establish basic details about The Comfy®'s design, physical characteristics, use, and marketing.   The following stipulated facts are relevant to the issues in this case.

In February 2017, two brothers, Michael Speciale and Brian Speciale, invented The Comfy®.   *See id*. ¶ 19.   A picture of The Comfy® from the box in which it is sold is depicted below.   The product was "inspired by a men's [extra-large] hooded sweatshirt and a sherpa blanket."   *Id.* ¶ 3.  To produce, market, and sell The Comfy®, the two brothers founded Cozy Comfort in April 2017.   *See id.* ¶ 20.  Cozy Comfort manufactures The Comfy®, also known as "The Comfy® Original," in the People's Republic of China.   *Id.* ¶¶ 1–2.

---

[2] In formulating this opinion, the Court gave no consideration to any testimony it struck from the record at trial because of that testimony's legally impermissibility.  This included stricken testimony that (1) the Government erroneously introduced about settlement discussions and (2) the Government erroneously elicited from an expert witness that went beyond the scope of the witness's expert report.  Even if the Court had not stricken and ignored this testimony on the specific evidentiary grounds noted, it would have disregarded the testimony as unduly prejudicial under Federal Rule of Evidence 403.



*See* Ex. P-1 (The Comfy® and its accompanying box).

The Comfy® is made "using two separate knitted fabrics:  a microfiber fabric (microfleece) for the exterior and a sherpa fabric for the interior that provides extra warmth to the user." Jt. Uncontested Facts ¶ 5, ECF No. 107; *see also id.* ¶ 4.  These fabrics are "100% man-made fibers, specifically polyester." *Id.* ¶ 4.  The Comfy® has an "opening for the head, a hood, long sleeves, ribbed wrist cuffs, a wide, un-ribbed, hemmed bottom opening, and a frontal marsupial or kangaroo pocket." *Id.* ¶ 6.  It is intended to be worn over clothes or undergarments.  *See id.* ¶ 11.  It does not protect users from rain or wind.  *See id.* ¶ 13.

The Comfy® is reversible and comes in one-size regardless of gender.  *See id.* ¶¶ 8, 9, 14.  The front panel of The Comfy® measures "approximately 36 inches wide and 33 inches long from the bottom of the neck hole to the bottom of the panel."  *Id.*

¶ 7.  The back panel of The Comfy® measures "approximately 36 inches wide and 41 inches long from the bottom of the neck hole to the bottom of the panel." *Id.*

Cozy Comfort has numerous design patents for The Comfy®.  On September 19, 2019, the U.S. Patent and Trademark Office (USPTO) issued Design Patent No. D859,788 to Cozy Comfort for an "ENLARGED OVER-GARMENT WITH AN ELEVATED MARSUPIAL POCKET." *Id.* ¶ 26.  That patent refers to the product as an "enlarged over-garment" and does not describe the product as a blanket. *Id.* ¶ 27. On September 24, 2019, USPTO issued Patent No. 10,420,431 to Cozy Comfort for an "OVERGARMENT WITH AN ELEVATED MARSUPIAL POCKET." *Id.* ¶ 28.  In that patent, Cozy Comfort described the invention as relating to blankets or large, wearable blankets, and the product was referred to as a "garment" or an "overgarment" throughout the patent. *Id.* ¶ 29.  No patents for The Comfy® "include a description that it is for 'protection against extreme cold.'" *Id.* ¶ 31.  On November 15, 2022, after the start of the present tariff classification dispute, USPTO issued Design Patent No. D969,458 to Cozy Comfort for a "WHOLE BODY BLANKET." *Id.* ¶ 40.

Cozy Comfort has marketed The Comfy® in different ways.  It has been described as a "blanket that's a sweatshirt," "a giant blanket that's really a giant sweatshirt," and "The Blanket … That's A Sweatshirt." *Id.* ¶ 15.  Cozy Comfort has also marketed the product as a "wearable blanket," noting that The Comfy® allows users who wear it to perform activities that an ordinary blanket would not allow. *Id.* ¶¶ 16–17.

Cozy Comfort designed a logo to help market the product. *See id.* ¶ 22. The logo featured "an image of a standing panda bear wearing a hooded sweatshirt to the left of the words 'THE COMFY' all of which is above the words 'THE BLANKET … THAT'S A SWEATSHIRT!'" *Id.* On February 19, 2019, USPTO registered Trademark No. 5,678,126 to Cozy Comfort for that logo, noting that it fell under "Class 24, 'Blanket throws, namely whole body blankets,'" and "Class 35, 'On-line retail store services featuring blanket throws, namely whole body blankets[.]'" *Id.* ¶ 24. The logo is depicted below.



*See* Ex. P-4.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) because Cozy Comfort contests Customs' denial of its protest against the tariff classification of its merchandise.  28 U.S.C. § 1581(a) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part …."). The Court reviews Customs' denial of Cozy Comfort's protest *de novo.  See Rheem Metalurgica S/A v. United States*, 20 CIT 1450, 1456 (1996), *aff'd*, 160 F.3d 1357, 1358 (Fed. Cir. 1998). Although Customs' decision is presumed

correct and "[t]he burden of proving otherwise shall rest upon the party challenging

such decision," 28 U.S.C. § 2639(a)(1), the Court's "duty is to find the *correct* result."

*Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (Wisdom, J.). In

a bench trial, the Court acts as the fact finder and weighs the evidence to reach a

determination. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833

(Fed. Cir. 2010) ("As the fact finder in the bench trial, the judge is responsible for

deciding what evidence to credit or reject and what result to reach.").

## FINDINGS OF FACT

The Court makes the following findings of fact based on non-stricken testimony

given during a five-day bench trial, a review of all the evidence entered pursuant to

the Federal Rules of Evidence during that trial, and the Court's own *in camera* review

of The Comfy®.

### I.    Overview of Witnesses and Their Testimony

Cozy Comfort presented the testimony of three people at trial. First, the Court

heard testimony from Mr. Michael Speciale, the co-founder of Cozy Comfort and co-

creator of The Comfy®. *See* Trial Tr. vol. I at 61:20–64:2, ECF No. 108. Second, the

Court heard from Mr. James Crumley, an outdoorsman and garment designer who

served as Cozy Comfort's expert witness. *See* Trial Tr. vol. II at 559:17–22, ECF No.

109; *id.* at 562:10–579:7. Third, the Court heard testimony from Customs employee

Ms. Tatiana Matherne's Rule 30(b)(6) deposition on behalf of the United States, which

Cozy Comfort read into the record. *See* Trial Tr. vol. III at 717:20–25, 724:11–725:25,

ECF No. 110. A Rule 30(b)(6) witness offers testimony "on behalf" of a non-human

party to the case. Fed. R. Civ. P. 30(b)(6) (Notes of Advisory Committee on Rules –
1970 Amendment).

The Government presented the testimony of four people at trial. First, the
Court heard live testimony from Ms. Renee Orsat, a national import specialist at
Customs who helped classify The Comfy®. *See* Trial Tr. vol. III at 747:18–749:9, ECF
No. 110. Second, the Court heard live testimony from Ms. Patricia Concannon, an
expert witness and experienced clothing marketing professional. *See id.* at 837:21–
843:3. Third, the Court heard live testimony from Professor Mary Ann Ferro, an
expert witness and an experienced garment designer. *See id.* at 914:7–925:2. Fourth,
the Court heard testimony from Mr. Speciale's Rule 30(b)(6) deposition on behalf of
Cozy Comfort, which the Government read into the record. *See* Trial Tr. vol. IV at
1164:20–1165:18, 1169:6–16, ECF No. 111.

Cozy Comfort's principal witness, Mr. Speciale, provided a detailed
explanation of how he and his brother invented The Comfy®. *See* Trial Tr. vol. I at
61:20–65:6, ECF No. 108. Mr. Speciale testified that he invented The Comfy® while
living with his brother Brian Speciale. *See id.* at 61:20–63:15. Mr. Speciale conceived
of The Comfy® one morning when he saw his young "[seven]-year-old" nephew
"wearing one of [Brian Speciale's] old hoodies" while lying next to a sherpa-lined,
microfleece throw blanket. *Id.* at 62:8–11; *see id* at 61:20–63:15. Brian Speciale was
"six [foot] one" and "about 200 pounds," so that his sweatshirt was oversized on
Michael Speciale's nephew. *Id.* at 62:11–13. Inspired by this scene, Mr. Speciale
decided to combine an oversized sweatshirt and a throw blanket to create a new

product for adults.  *Id.* at 63:21–22.  To make the first prototype, he bought blankets and took them to a prototype design company to put together the first sample, which "was fairly close to what [they] wanted."  *Id.* at 64:7–22.  Mr. Speciale also discussed various patent and trademark exhibits that the Court accepted into evidence.  *See, e.g.*, *id.* at 85:10–88:1 (describing Ex. P-4); Exs. P-3, P-4, P-5, P-6, P-8, P-9.  These aspects of Mr. Speciale's testimony were credible, persuasive, and undisputed by the Government.

Other aspects of Mr. Speciale's testimony spoke to factual issues disputed by the parties.  Mr. Speciale explained how he and his brother sought to market the product to consumers and how they sold The Comfy® in various stores and online retail sites.  *See* Trial Tr. vol. I at 88:7–89:25, 151:18–166:17, ECF No. 108.  This explanation sought to portray The Comfy® as being sold like a blanket.  *See, e.g.*, *id.* at 88:12–16 (MR. SPECIALE:  "[I]t is always a blanket first[.]").  Mr. Speciale also testified about how Cozy Comfort launched The Comfy® on the TV show *Shark Tank*, and the Court accepted a video of that appearance into evidence.  *See id.* at 71:21–72:20, 73:14–24; Ex. D-27.  That video showed Cozy Comfort's initial marketing strategy, which described The Comfy® as "the blanket that's a sweatshirt" and sought to distinguish it from a well-known existing product, The Snuggie®.  *See* Ex. D-27 at 0:43–46, 1:30–33, 6:32–49.  The Court finds that Mr. Speciale's characterization of The Comfy®'s marketing was undermined by other evidence in the record and was less persuasive than related testimony from Professor Ferro and Patricia Concannon.

Mr. Speciale also spoke about physical characteristics that he believed The Comfy® possessed. *See, e.g.*, Trial Tr. vol. I at 94:5–96:6, ECF No. 108; *id.* at 57:12–15. He repeatedly referred to The Comfy® as a "wearable blanket." *See, e.g.*, *id.* at 132:18. Mr. Speciale claimed the product was "designed ... so you can pull your knees in, pull your arms in and get into the full cocoon position[,]" which he demonstrated in Court. *Id.* at 57:13–15, 94:5–96:6. Mr. Speciale and other witnesses referred to this position as "The Comfy® cocoon." *Id.* at 57:15–16. Mr. Speciale also asserted that The Comfy® "will protect [a user] from extreme cold," especially when used in the cocooning position. *Id.* at 130:6–12; *see id.* at 132:12–133:4. Mr. Speciale testified that Cozy Comfort's customers used the product in the extreme cold, and the Court accepted various photographs of customers using The Comfy® into evidence. *See id.* at 134:8–145:17; Ex. P-13. The Court, however, found that these portions of Mr. Speciale's testimony were contradicted by other evidence in the record and were less persuasive than testimony from Professor Mary Ann Ferro and Patricia Concannon.

Cozy Comfort's expert witness, Mr. James Crumley, is an avid, lifelong outdoorsman who uses this expertise to help companies design hunting garments. *See* Trial Tr. vol. II at 559:20–22, 572:12–23, ECF No. 109. Mr. Crumley testified that he grew up "outdoors ... fishing, hunting[,] and [playing] sports" from a young age and that he began working as a hunting guide after college. *Id.* at 563:10–11, 565:3–25; *see also id.* at 563:14–20, 566:1–11. During his work as a hunting guide, Mr. Crumley decided to invent new "camo[uflage] patterns that blend in with the surroundings in the United States[.]" *Id.* at 568:11–13. The pattern he invented,

Trebark®, became a commercial success; and Mr. Crumley started helping companies design garments that used this pattern. *See id.* at 572:12–23. Mr. Crumley's garment design work involved applying his "experience of being in the woods" to ensure products were suitable for hunters. *Id.* at 578:12.

Mr. Crumley's testimony primarily focused on The Comfy®'s ability to protect against the extreme cold. *See, e.g.*, *id.* at 582:24–583:2. His expert opinion on this topic was informed both by his experience hunting in extreme cold conditions and by his work designing and testing hunting garments. *See, e.g.*, *id.* at 575:19–578:3 (describing his experience hunting in conditions as cold as "5 degrees air temperature blowing 25 miles an hour and gusting to 50"); *id.* at 578:6–579:7 (describing his professional experience designing and evaluating products that protect against the extreme cold). Mr. Crumley believes The Comfy® can protect against the extreme cold because of "the construction and the fabrics used in the construction and the way the patents show that it should be worn to maximize warmth." *Id.* at 582:24–583:2. This testimony was disputed by later witnesses, and the Court found Mr. Crumley's expert opinion to be less persuasive than the opinion of the other two expert witnesses, Professor Mary Ann Ferro and Patricia Concannon.

Professor Ferro was the Government's principal expert witness. She is a garment design expert who has spent her career designing outerwear for various major clothing companies including London Fog. *See* Trial Tr. vol. III at 914:7–925:2, ECF No. 110 (direct testimony of Prof. Ferro). Currently, she is an assistant professor at the Fashion Institute of Technology. *See id.* at 925:8–19. Professor Ferro's

testimony primarily focused on the physical characteristics and design of The Comfy®. She testified that The Comfy® could not protect against the extreme cold because it cannot insulate the user and trap body heat. Her experience designing garments for cold weather informed her opinion. *See, e.g.*, *id.* at 977:25–979:7. Professor Ferro supported her opinion with a detailed explanation about how The Comfy®'s interior fabric was "very porous" and allowed air to flow into and out of the item. *See id.* at 928:11–929:18. She explained how The Comfy®'s open bottom and open hood also allowed airflow into and out of it. *See id.* at 930:12–931:20. Professor Ferro's testimony about The Comfy®'s inability to protect against the extreme cold aligned with aspects of Ms. Concannon's testimony but differed from Mr. Speciale's and Mr. Crumley's testimonies. The Court found Professor Ferro's detailed analysis of the product to be more persuasive than the testimonies of Mr. Speciale and Mr. Crumley.

Professor Ferro also testified about the differences between a pullover and a blanket, and she detailed how those differences impacted her assessment of The Comfy®. *See id.* at 915:13–14, 1034:4–1036:2 (direct testimony of Prof. Ferro). She explained that, in the fashion industry, pullovers are defined by certain common features: (1) they have an opening for the head, (2) they "pull[] over the head[,]" (3) they are "knitted[,]" (4) they "may … have a hood[,]" (5) they usually have "some kind of rib at the wrist … like ribbed cuffs," (6) they "have sleeves[,]" (7) they have "[f]ront and back panels … sewn together[,]" and (8) they can have a kangaroo pocket. *See id.* at 1034:4–1036:2. Based on her experience as a garment designer, she believed

that The Comfy® is an "oversized garment," *id.* at 928:16–17, and more specifically is "an oversized pullover with a hood." *Id.* at 915:13–14.  Professor Ferro's definition of the term pullover provided helpful context to determine the "common and commercial meaning[]" of the term pullover, a customs term at issue in this case. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).  Her opinion that The Comfy® was a pullover — while informative — spoke to the ultimate issue in this case, which involves mixed questions of fact and law that the Court must assess on its own.  *See Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1265–66 (Fed. Cir. 2013) (noting that properly classifying an item is a "two-step process" involving questions of law and fact).

The Government's other expert witness, Patricia Concannon, is a fashion marketing professional.  She has spent her career helping companies sell clothing to retailers and advising these companies on how to "bring [clothing] product[s] to market." Trial Tr. vol. III at 840:8, ECF No. 110 (direct testimony of Ms. Concannon); *see also id.* at 837:21–843:3.  Ms. Concannon's testimony focused on how The Comfy® was marketed and sold to consumers.  She explained how products that protect against the extreme cold are typically marketed in ways that detail "the technical features that go into producing" the product and provide "a temperature range of what level [of cold] protection" the product affords.  *Id.* at 845:1–3, 851:2–5.  Ms. Concannon noted The Comfy® was not marketed in that manner.  *See id.* at 856:14–858:2.  It instead was marketed as a wearable indoor garment with some mention of outdoor activities like "walking the dog" and "going to a sporting event[.]"  *See id.* at

856:14–857:2, 870:8–15.  She based her opinion on her professional knowledge about how products "that protect[] against the extreme cold … [are] marketed and sold." *Id.* at 844:17–19.  The Court found Ms. Concannon's testimony on these topics to align with the testimony of Professor Ferro and to be more persuasive than the testimony of Mr. Speciale and Mr. Crumley.

The remaining witnesses and testimonies that the Court heard were less relevant for resolving factual issues in this case.  The Government called Renee Orsat as a fact witness.  *See id.* at 747:7–10.  Ms. Orsat is a national import specialist who works for Customs and who helped classify The Comfy®.  *See id.* at 747:18–749:9 (direct testimony of Ms. Orsat).  Ms. Orsat's testimony provided helpful context about the general Customs classification process and the agency's interpretation of the relevant tariff headings, but it did not speak to any of the disputed facts at issue in the trial.  *See, e.g.*, *id.* at 777:2–6.  Similarly, each party read deposition testimony from a Rule 30(b)(6) witness into the record.  Mr. Speciale was deposed as the Rule 30(b)(6) witness representing Cozy Comfort, and the Government introduced portions of his testimony into evidence.  *See* Trial Tr. vol. IV at 1164:20–1165:18, 1169:6–16, ECF No. 111.  The Court found Mr. Speciale's deposition testimony on behalf of Cozy Comfort generally duplicative of the live testimony Mr. Speciale offered as a fact witness.  *See, e.g.*, *id.* at 1173:15–1174:15.  Tatiana Matherne was deposed as the Rule 30(b)(6) witness for the Government.  *See* Trial Tr. vol. III at 717:20–25, 724:11–725:25, ECF No. 110.  Cozy Comfort read portions of her testimony into the record. *See id.*  This testimony — much like Ms. Orsat's testimony — provided helpful context

about the Customs classification process and Customs' interpretation of the relevant tariff provisions, but it did not speak to the facts in dispute in the trial.  *See, e.g.*, *id.* at 726:3–20.

## II.    The Comfy®'s Design, Intended Use, and Physical Characteristics

Cozy Comfort designed The Comfy® to combine the features of an oversized sweatshirt and a throw blanket, creating a new product for adults.  *See* Trial Tr. vol. I at 62:6–65:6, ECF No. 108 (direct testimony of Mr. Speciale).  To make the first prototype, Mr. Speciale bought blankets and took them to a prototype design company to put together the first sample, which "was fairly close to what [they] wanted."  *Id.* at 64:7–22 (direct testimony of Mr. Speciale).  The design process eventually produced the product depicted below.



*See* Ex. P-6, fig. 1.

The Comfy® solved what Cozy Comfort's lawyers call the "left behind blanket problem." *See* Trial Tr. vol. I at 28:4–7, ECF No. 108 (opening statement of Cozy Comfort). Pre-importation patents Cozy Comfort filed note that, although traditional "[t]hrow blankets are great at keeping a person warm and comfortable on the couch, … sadly, eventually, one must get up from the couch … [and] must leave the warm blanket behind …." Ex. P-6, col. 1, lines 19–27. The Comfy® aimed to be "[a]n improved, cozy, comfortable blanket" that was "practically portable" because it could be worn. *Id.*

The Comfy® was "mainly meant for lounging … at home." Trial Tr. vol. I at 67:18–19, ECF No. 108 (direct testimony of Mr. Speciale). The "background of the invention" section of Cozy Comfort's patent describes indoor activities such as "get[ing] up from the couch … to grab a hot chocolate, adjust the fire, or go to bed" as the context for why Cozy Comfort created The Comfy®. *See* Ex. P-6, col. 1, lines 23–25. Professor Ferro agreed The Comfy® was "designed primarily for indoors" in her expert opinion. *Compare* Trial Tr. vol. III at 915:4–8, ECF No. 110 (direct testimony of Prof. Ferro), *with* Trial Tr. vol. I at 67:16–25, ECF No. 108 (direct testimony of Mr. Speciale).

The Comfy® is designed so that users put it on by pulling it over their heads. Mr. Speciale demonstrated this process in Court during his testimony. He described the process of donning the product:

> I'm holding The Original Comfy. I'm opening it up now
> from the very large bottom opening. I'm going to slide my
> arms into each of the two sleeves and pull the rib cuff to my

> wrists.  I am now going to put my head through the hole for
> the — where the hood is.  I now have The Comfy on.

Trial Tr. vol. I at 108:23–109:6, ECF No. 108.

Once on, The Comfy® may be worn whether the wearer is standing or seated. The product's patent begins its "DETAILED DESCRIPTION" of The Comfy® by explaining how The Comfy® is used "as worn by a person … in a standing position." Ex. P-6, col. 2, lines 43–46.  Photographs of users wearing The Comfy® show customers wearing the product while standing.  *See* Ex. P-13.  When they are not standing in these photographs, users are typically wearing The Comfy® in a seated position.  *See id.*

The Comfy® was designed to be oversized.  Mr. Speciale's first conception of The Comfy® was for it to be a "big oversized" item for adults.  Trial Tr. vol. I at 63:21–22, ECF No. 108 (direct testimony of Mr. Speciale).  The Comfy® extends to between the mid-thigh and knees of a wearer, depending on that wearer's height.  *See* Ex. P-13.  Product patents predating The Comfy®'s first importation into the United States corroborate Mr. Speciale's testimony regarding The Comfy®'s oversized design.  *See, e.g.*, Ex. P-6, col. 6, lines 6–8 (describing the product as "approximately three to four times wider and approximately one-and-a-half times longer" than "a conventional item of clothing").  The Court confirmed The Comfy® was oversized when it donned The Comfy® in open court and allowed the parties to point out aspects of the product they felt were relevant.  *See* Trial Tr. vol. V. at 1389:11–1391:16, ECF No. 112 (THE COURT:  "I was going to come down and put The Comfy on here in the courtroom … and allow you to point out anything that you might want to point out….").  The in-

court review demonstrated that the product fell to about the undersigned's knees. *See id.* at 1396:17–21 (MR. SITRICK: "Your Honor, where does The Comfy come down to on your body while you're standing?" THE COURT: "It looks like about my knees.").

The Comfy® was not "primarily intended to be used in a cocooning position," despite its size and Cozy Comfort's arguments before the Court. Pl.'s Br. at 11, ECF No. 114. Mr. Speciale testified at trial that the product was "designed … so you can pull your knees in, pull your arms in and get into the full cocoon position." Trial Tr. vol. I at 57:12–15, ECF No. 108. Mr. Speciale and other witnesses at the trial referred to this position as "The Comfy cocoon." *See, e.g.*, *id.* at 57:15–16 (direct testimony of Mr. Speciale). Cozy Comfort and its patents describe the cocooning position as "a seated position with the user's arms and legs pulled into the article with the knees and hands pulled into the chest area." Pl.'s Br. at 8, ECF No. 114; *see also* Ex. P-6, fig. 10. That position is depicted below.



*See* Ex. P-6, fig. 10.

Persuasive evidence demonstrates that the cocooning position was not the product's primary use.  First, the Court's *in camera* and in court review found that the cocooning position, as depicted above, was uncomfortable, constricting, and immobilizing.  The Court had difficulty rising from the floor when assuming the cocoon position.  The immobilizing nature of the cocooning position is in tension with how Cozy Comfort's patents describe the product's intended uses.  Those patents detail how The Comfy® is portable and suitable for indoor activities and primarily focus on how the product is used "as worn by a person … in a standing position."  Ex. P-6, col. 2, lines 43–46; *see also id.*, col. 1.  Although a user might partially cocoon in The Comfy® by pulling his legs into the item while lying on his side in a fetal position, Cozy Comfort describes the "The Comfy® cocoon" as something different.  *See* Pl.'s Br. at 8–9, ECF No. 114; Ex. P-6, fig. 10 (figure depicted above).

Second, customer photographs show only a handful of customers in a position resembling "The Comfy® cocoon." *See* Ex. P-13. Third, the box in which The Comfy® is sold does not mention or show the cocooning position. *See* Ex. P-1. All the pictures on the box instead show users wearing The Comfy® in a variety of standing positions. *See id.* For these reasons, the Court finds that the cocooning position is not the product's primary intended use. The cocooning position is a possible but uncomfortable and infrequent use of the product. It is not a position from which one can hunt or perform any other outdoor activity requiring movement. *See* Trial Tr. vol. II at 629:16–630:5, ECF No. 109 (cross-examination of Mr. Crumley) (describing the process for field testing hunting garments).

The Comfy® provides users with some warmth. That is primarily because The Comfy®'s interior is lined with a "sherpa-type … curly pile fabric" modeled after "real … shearling." Trial Tr. vol. III at 932:3–11, ECF No. 110 (direct testimony of Prof. Ferro). The Comfy®'s sherpa is an insulating fabric "made of … synthetic fabric[.]" *Id.* at 933:7–12 (direct testimony of Prof. Ferro). Its addition helps trap some body heat in the product, keeping the user's body temperature higher in indoor environments. *See* Trial Tr. vol. II at 597:21–598:5, ECF No. 109 (direct testimony of Mr. Crumley). The Comfy®'s interior sherpa lining was created by threading synthetic sherpa fiber through a mesh fabric. *See* Trial Tr. vol. III at 928:19–929:18, ECF No. 110 (direct testimony of Prof. Ferro); *see also id.* at 933:2–18 (direct testimony of Prof. Ferro). Because of the visible holes in this mesh fabric, The Comfy®'s sherpa lining is "porous" and allows for some airflow into and out of the

product. *Id.* at 929:16–930:3 (direct testimony of Prof. Ferro). Because of this open design, The Comfy® only keeps users warm in indoor or mild outdoor conditions, as detailed later in this opinion. *See id.* at 979:8–14 (MR. KENNEDY: "[W]ould you be able to estimate where you could wear The Comfy outdoors, at what temperature ranges?" PROF. FERRO: "I would say mild temperatures because of its open — especially because of its open design.").

Eighty-three percent of The Comfy®'s purchasers are females. *See* Ex. P-12 at 6; Trial Tr. vol. I at 83:14–18, ECF No. 108 (direct testimony of Mr. Speciale). Twenty-seven percent reside in the Midwest, twenty-eight percent in the Northeast, twenty-three percent in the South, and twenty-two percent in the West. *See* Ex. P-12 at 6. No testimony directly addressed whether The Comfy® is worn primarily during particular seasons, but testimony suggests the product is worn indoors year-round. *See* Trial Tr. vol. I at 120:8–121:21, ECF No. 108 (direct testimony of Mr. Speciale) (explaining how he wore The Comfy® indoors at a hockey rink "in the summer"). It can be worn outdoors in cool and mild conditions. *See* Trial Tr. vol. III at 979:8–14, ECF No. 110 (direct testimony of Prof. Ferro).

### III.    Marketing & Sales of The Comfy®

Cozy Comfort "knew from the beginning" that The Comfy® would "get compared with the Snuggie" by consumers. Trial Tr. vol. I at 66:24–67:1, ECF No. 108 (direct testimony of Mr. Speciale). The Snuggie® is a large, modified blanket "with two sleeves you put your arms through." Trial Tr. vol. IV at 1193:16–18, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale); *see also Allstar Mktg. Grp., LLC v.*

*United States*, 41 CIT __, 211 F. Supp. 3d 1319, 1324–26 (2017) (describing The Snuggie®).  These sleeves allow a user to wear the Snuggie "on the front" of their body.  Trial Tr. vol. IV at 1193:19–20, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort).  The Snuggie®'s box and a Snuggie® laid on a table are depicted below.




*See* Ex. D-50.

Mr. Speciale explained that comparisons between The Comfy® and The Snuggie® were "not necessarily a bad thing, especially in marketing …" because The Snuggie® is a well-known item.  Trial Tr. vol. I at 67:1–3, ECF No. 108.  Two major aspects of Cozy Comfort's marketing relied on public knowledge of The Snuggie.  First, Cozy Comfort sold The Comfy® exactly how The Snuggie® is sold:  in a box.  *Compare* Ex. P-1, *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 (noting The Snuggie® is sold in "boxes").  Second, Cozy Comfort sold The Comfy® in the same store sections as The Snuggie®.  *Compare* Trial Tr. vol. I at 152:12–154:13, ECF No.

108 (direct testimony of Mr. Speciale) (detailing how The Comfy® has been sold in the "bedding and blanket section," the "bedding or lifestyle section," and the "As Seen on TV section"), *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1326 ("The Snuggie® is sold in the bedding, housewares, general merchandise, impulse buy, or as-seen-on-TV departments of retail stores, never in the wearing apparel department.") (internal quotation marks and citations omitted).

Cozy Comfort still needed to distinguish The Comfy® from The Snuggie® to generate consumer interest, and it did so by emphasizing how The Comfy® was fully wearable and portable unlike The Snuggie®. *See* Trial Tr. vol. I at 67:8–25, ECF No. 108 (direct testimony of Mr. Speciale) (MR. SPECIALE: "But what's great about [The Comfy®] is that you can get up and take your warmth with you. If you're going to get something to drink, just day-to-day activities or going out to get the mail[.]"); Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE: "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around."). Expert testimony confirmed that clothing-like wearability was the key difference between The Comfy® and The Snuggie®. Professor Ferro testified that, unlike The Snuggie®, "The Comfy is not a blanket, because you wear it. You wear it … indoors. You wear it outdoors. It's not just … for the couch like the Snuggie …." Trial Tr. vol. III at 945:23–946:2, ECF No. 110. She summarized the difference between the products by stating that "The Snuggie is like a blanket. But [The Comfy®] is a garment." *Id.* at 946:4–5.

Focusing on The Comfy®'s distinct clothing-like wearability was an essential part of Cozy Comfort's marketing strategy. This focus began from the moment Cozy Comfort launched The Comfy® on the TV show *Shark Tank* in December 2017. *See* Trial Tr. vol. I at 71:21–72:20, 73:14–24, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort introduced its product on *Shark Tank* as "the blanket that's a sweatshirt" and explained that "it goes with you and keeps you warm wherever you are." Ex. D-21 at 0:43–46, 1:30–33. One of the *Shark Tank* hosts, Lori Greiner, noted The Comfy® is "just like" The Snuggie®. *Id.* at 6:03–05. Mr. Speciale responded that The Comfy® "is absolutely not The Snuggie®." *Id.* at 6:09–10. Another *Shark Tank* host, Barbara Corcoran, then asked Mr. Speciale to "explain to me what the difference between your product is and The Snuggie®." *Id.* at 6:32–37. Mr. Speciale explained, "If you're on the couch with The Snuggie® and you wanted to get up to go do something, you have to take it off every time." *Id.* at 6:37–43. His brother then emphasized that, unlike The Comfy®, The Snuggie® is "open in the back, it's like having a robe on backwards." *Id.* at 6:43–46. These differences made The Comfy® a "significant improvement" on The Snuggie® that customers would appreciate. *Id.* at 6:47–49 (according to Brian Speciale).

Early post-*Shark Tank* marketing played up this wearability while referencing known terms in the consumer goods market. *See* Trial Tr. vol. I at 88:5–16, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort identified the product as a hybrid of a blanket and a sweatshirt with slogans like "The Comfy, the Blanket… That's A Sweatshirt!" Ex. P-4. Cozy Comfort also adopted a trademark for The

Comfy®'s marketing logo, which depicts "a standing panda bear wearing a hooded sweatshirt …." Ex. P-4. This slogan and logo emphasize to observers how The Comfy® can be worn like an article of clothing, unlike The Snuggie®.



*See* Ex. P-4.

Cozy Comfort changed this trademark in June 2021, but that change occurred after the present dispute with the Government began. *See* Trial Tr. vol. I at 91:23–92:1, ECF No. 108 (direct testimony of Mr. Speciale) (noting Cozy Comfort cancelled its original trademark on "June 17 of 2021"). Mr. Speciale admitted that the tariff dispute "may have accelerated" this marketing change. *Id.* at 93:19; *see also id.* at 93:14–23. That makes Cozy Comfort's later trademarks and slogans less reliable evidence for the Court's assessment of The Comfy®'s intended use and how it was marketed.

Cozy Comfort also switched to calling the product a "wearable blanket" alongside this marketing change. *See id.* at 89:6–25 (direct testimony of Mr. Speciale); Ex. P-1. Though it dropped the word "sweatshirt" from its slogan, the key marketing emphasis for The Comfy® remained its clothing-like wearability. *See* Ex. P-1 (The Comfy® and its accompanying box). To that end, the pictures of The Comfy®

on the box in which it is sold still depict people wearing The Comfy® while standing, emphasizing its clothing-like wearability and portability. *See id.* Those pictures continued to contrast The Comfy® with the Snuggie®. *Compare Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 ("The retail packaging shows users wearing the Snuggie® on their front with their arms through the sleeves while reclining or seated on an airplane, couch, bed, and floor[.]"), *and* Ex. D-50 (pictures of The Snuggie®), *with* Ex. P-1 (The Comfy® and its accompanying box).

Cozy Comfort makes a plurality of its sales on Amazon.com. *See* Trial Tr. vol. I at 151:18–152:11, ECF No. 108 (direct testimony of Mr. Speciale); Ex. P-16. Mr. Speciale testified that, early on, Amazon sold the product as a blanket. *See* Trial Tr. vol. I at 145:18–147:3, ECF No. 108. Today, Amazon sells The Comfy® in the "wearable blankets" category, which Amazon created for the product sometime in 2019. *See id.* at 145:18–146:23 (direct testimony of Mr. Speciale).

Other retailers sell The Comfy® in similar sections and categories as The Snuggie®. *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1326 ("The Snuggie® is sold in the bedding, housewares, general merchandise, impulse buy, or as-seen-on-TV departments of retail stores, never in the wearing apparel department.") (internal quotation marks omitted). QVC sells The Comfy® in the "bedding and blanket section." *See* Trial Tr. vol. I at 152:12–16, ECF No. 108 (direct testimony of Mr. Speciale). Costco sells it in the "bedding or lifestyle section." *Id.* at 152:17–19 (direct testimony of Mr. Speciale). Target sells the product in the "As Seen on TV section," because the product was featured on the TV show *Shark Tank*. *Id.* at 152:24–153:2

(direct testimony of Mr. Speciale).  Bed Bath & Beyond sold the product in the "blanket and bedding section."  *Id.* at 153:3–5 (direct testimony of Mr. Speciale). Other stores sell the product in similar areas.  *See id.* at 153:6–154:13 (direct testimony of Mr. Speciale).  Exhibit P-10, a series of photographs that shows The Comfy® displayed for sale in retail locations, confirms Mr. Speciale's testimony.  *See* Ex. P-10; Trial Tr. vol. I at 154:21–155:2, ECF No. 108 (direct testimony of Mr. Speciale).

Licensing agreements with different major companies refer to The Comfy® in a variety of ways.  *See* Trial Tr. vol. I at 165:12–166:17, ECF No. 108 (direct testimony of Mr. Speciale).  Agreements with companies like Disney categorize the product as a "wearable throw[]… [or] blanket."  *Id.* at 165:12–17 (direct testimony of Mr. Speciale); *see also id.* at 165:22–166:17; Ex. P-11.  Other agreements with companies such as Marvel call the product a "home furnishing[.]"  Trial Tr. vol. I at 166:4–5, ECF No. 108 (direct testimony of Mr. Speciale); *see also* Ex. P-11 at 1.

The Comfy® was primarily marketed as a comfortable, wearable product to be used indoors.  Ms. Concannon testified, "A lot of the imagery and a lot of the marketing looked like it was worn mostly indoors[.]"  Trial Tr. vol. III at 856:16–18, ECF No. 110.  The outdoor activities displayed in marketing materials focused on activities "like walking the dog" and "going to a sporting event."  *Id.* at 856:21–857:2 (direct testimony of Ms. Concannon); *see also* Jt. Uncontested Facts ¶ 18, ECF No. 107.  All these activities are incompatible with the blanket-like Snuggie®.  *See* Ex. D-

21 at 6:37–43 (MR. SPECIALE: "If you're on the couch with The Snuggie® and you wanted to get up to go do something, you have to take it off every time.").

## IV.    Whether The Comfy® Protects Against the Extreme Cold

The remainder of the trial centered on whether The Comfy® protects against the extreme cold. Sweaters, pullovers, vests, and other similar articles do not provide protection against the "extreme cold." *Rubies Costume II*, 922 F.3d at 1345–46. Customs' classification of the product as a pullover would be incorrect if The Comfy® did provide such protection. *See id.*

### A.

Various witnesses offered competing ideas about what "extreme cold" means. Mr. Speciale testified that what constitutes extreme cold "depends on the person and the individual." Trial Tr. vol. I at 133:5–14, ECF No. 108. He believes, "Somebody that's on the equator may consider 68 degrees extremely cold." *Id.* at 133:15–16. Mr. Crumley, an experienced outdoorsman, noted that he "usually" had experienced extreme cold temperatures out West with "5 to 10 degrees air temperature and [wind] blowing 25 to 30 miles an hour." *See* Trial Tr. vol. II at 576:20–577:5, ECF No. 109. *But see id.* at 593:13–16 (direct testimony of Mr. Crumley) (describing the extreme cold as a subjective term). Professor Ferro believed "extreme cold" constituted a range of temperatures that reasonable people consider to be extremely cold. *See* Trial Tr. vol. III at 955:12–24, ECF No. 110. The parties continued to dispute the meaning of "extreme cold" in their post-trial briefs. Cozy Comfort argues that extreme cold has "inherent subjectivity" and varies based on the user. Pl.'s Br. at 36, ECF No. 114.

The Government argues that extreme cold "is maximum, intense, frigid, bitter, or arctic cold, *i.e.*, well below zero degrees Fahrenheit." Def.'s Br. at 6, ECF No. 116.

"Extreme cold" is relevant to this case because of the Federal Circuit's opinion in *Rubies Costume II*. 922 F.3d at 1345–46. The meaning of the phrase is a question of law for this Court to assess on its own. *See YBM Magnex, Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317, 1320 (Fed. Cir. 1998) ("The meaning or interpretation of precedent is a question of law[.]") (citing *S. Park Indep. Sch. Dist. v. United States*, 453 U.S. 1301, 1304–05 (1981)), *rev'd on other grounds*, 285 F.3d 1046 (Fed. Cir. 2002). "[T]he language of [a judicial] opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Courts interpreting the language of precedential opinions must remain cognizant that the words of a judicial opinion "appeared in a particular context and did particular work." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023).

The Court declines to adopt the Government's interpretation of "extreme cold." The Government's interpretation rests on a literalistic analysis of the word "extreme" and citations to general explanations about "extreme cold." *See* Def.'s Br. at 6–7, ECF No. 116 (citing to dictionary definitions of "extreme"); *id.* at 7 (citing to National Weather Service definitions of "extreme cold"). That interpretation makes no sense in the context the Federal Circuit's *Rubies Costume II* opinion. The Federal Circuit compared the jacket of a Santa Suit to a common sweater or sweatshirt when it wrote about the "extreme cold." *See Rubies Costume II*, 922 F.3d at 1345–46. It said that "[l]ike a sweater or sweatshirt, the [Santa Suit] jacket covers the upper body and

provides some warmth to the wearer but does not protect against wind, rain, or extreme cold." *Id.* "Extreme cold" follows the terms "wind" and "rain," two standard weather conditions. *Id.* This context implies that the "extreme cold" the Federal Circuit had in mind was a more common, serious but not severe, cold. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated.") (internal citations and quotation marks omitted); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("We rely upon [*noscitur a sociis*] to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]").

The Court also declines to accept Cozy Comfort's subjective definition of the extreme cold. Nothing in the Federal Circuit's opinion implies it was adopting a purely subjective, user-based standard for "some warmth," "rain," "wind," or "extreme cold." One cannot read the Federal Circuit as saying that the jacket in *Rubies Costume II* provides some warmth to the wearer but does not protect against wind, rain, or 68-degree weather. *Compare* Trial Tr. vol. I at 133:15–16, ECF No. 108 (direct testimony of Mr. Speciale) (suggesting someone at the equator "may consider 68 degrees extremely cold"), *with Rubies Costume II*, 922 F.3d at 1345–36.

The term "extreme cold" in *Rubies Costume II* instead refers to a range of temperatures at, near, or below freezing. No bright line separates the ordinary cold from the extreme cold, because, as the National Weather Service recognizes, "[w]hat constitutes extreme cold varies in different parts of the country." Ex. D-30. Still, there are limits to what temperatures are extremely cold. The National Weather

Service's definition of "extreme cold" goes no higher than "near freezing temperatures" when experienced in the "southern U.S." *Id.* Elsewhere, such as in the northern states, "extreme cold [only] means temperatures well below zero." *Id.* The National Weather Service's range — from "near freezing" down to "well below zero" — aligns with both common sense and the context of *Rubies Costume II.* 922 F.3d at 1345–46 ("Like a sweater or sweatshirt, the jacket … provides some warmth to the wearer but does not protect against wind, rain, or extreme cold."). Temperatures in this range present a similar degree of inclement weather as "wind" and "rain." *Id.* They also involve the kind of weather against which an ordinary sweater, sweatshirt, or pullover cannot protect — the precise inquiry that motivated the Federal Circuit to write the phrase in question. *See id.* at 1345 ("Although the precise term for the type of jacket included with the Santa Suit does not appear in the list of items in heading 6110, the jacket shares the characteristics of the named articles in the heading.").

Persuasive expert testimony at trial demonstrated that no single product protects against the extreme cold. The key to protecting against the extreme cold is proper layering, which, as Professor Ferro explained, "keep[s] in the [body's] heat." Trial Tr. vol. III at 934:13–14, ECF No. 110; *see also id.* at 944:11–17 (direct testimony of Prof. Ferro); Trial Tr. vol. II at 603:17–604:23, ECF No. 109 (direct testimony of Mr. Crumley). For an outer layer like The Comfy® to protect against the extreme cold, it must insulate, or trap, air within the garment and "prevent[] the outside … cold from getting into the garment." Trial Tr. vol. III at 935:24–936:1, ECF No. 110

(direct testimony of Prof. Ferro); *see also* Trial Tr. vol. II at 657:21–25, ECF No. 109 (direct testimony of Mr. Crumley) (noting a garment protecting against "colder weather" needs material "to trap air, [and] body heat").  As Professor Ferro elaborated, "What the [outer] garment does is keep in the heat…. Most outerwear that's made for extreme cold weather has to be more or less snugly fit."  Trial Tr. vol. III at 934:13–18, ECF No. 110.  This insulating function keeps cold air out and body heat in, allowing the body to maintain its temperature.  *See id.* at 983:1–984:18 (direct testimony of Prof. Ferro) (detailing the importance of trapping heat "at least around the body"); *see also id.* at 1018:4–12 (direct testimony of Prof. Ferro).  Outer garments that protect against the extreme cold have certain common characteristics, according to the National Weather Service.  *See* Ex. D-30.  They are typically tightly woven to keep body heat in the garment.  *See id.*  They also often are water repellent and have a hood with a drawstring to pull the hood snug against the face.  *See id.*; *see also* Trial Tr. vol. III at 997:5–1000:3, ECF No. 110 (direct testimony of Prof. Ferro).

## B.

The Comfy® does not protect against the extreme cold.[3]  Aspects of The Comfy®'s physical design make it unsuited for extreme cold conditions, as Professor Ferro persuasively explained and the evidence confirmed.  Three facts lead to this

---

[3] The Government's post-trial brief suggests that the relevant inquiry should be whether The Comfy® protects against the rain, wind, and extreme cold, not simply whether The Comfy® protects against the extreme cold.  *See* Def.'s Br. at 32, ECF No. 116.  The parties stipulated that The Comfy® does not protect against the rain or wind.  *See* Jt. Uncontested Facts ¶ 13, ECF No. 107.  Because The Comfy® does not protect against the extreme cold, the Court finds it unnecessary to address the Government's suggestion that all three conditions should be evaluated together.

finding.  First, The Comfy® lacks several important features products designed for the extreme cold typically possess.  Second, The Comfy® is not marketed like products that protect against the extreme cold.  Third, The Comfy® was designed primarily for indoor use.

The Comfy®'s porous interior fabric design renders it unable to protect users against the extreme cold.  Professor Ferro credibly and persuasively testified that The Comfy®'s interior synthetic sherpa lining "wasn't thick" because "it was knitted on" to a background material that was "very porous."  Trial Tr. vol. III at 928:19–929:18, ECF No. 110; *see also id.* at 933:2–18.  That background material is mesh-like.  *See id.* at 929:21–23 (direct testimony of Prof. Ferro).  The Court confirmed these facts *in camera*.  Cozy Comfort manufactures The Comfy®'s interior lining by looping sherpa fabric in and out of the mesh holes in the background material.  *See id.* at 929:24–930:3 (direct testimony of Prof. Ferro).  This leaves gaps in the lining where there is no sherpa material to block air from entering.  *See id.* at 929:16–930:3 (direct testimony of Prof. Ferro); *see also* Trial Tr. vol. II at 436:23–467:2, ECF No. 109 (cross examination of Mr. Speciale) (MR. KENNEDY:  "[The Comfy®] has hundreds of holes throughout the inside of the sherpa lining, correct?"  MR. SPECIALE:  "That's how it's manufactured, correct.").

Similarly, The Comfy®'s open bottom and open hood make it unsuitable for the extreme cold.  The Comfy® has an oversized bottom opening that allows cold air to enter the product, as Professor Ferro testified and the Court's review confirmed.  *See* Trial Tr. vol. III at 930:12–21, ECF No. 110.  The product's oversize hood also allows

cold air to enter.  *See id.* at 931:11–20 (direct testimony of Prof. Ferro).  Indeed, The

Comfy® lacks a drawstring that would permit the wearer to ensure a tight fit around

the head to retain heat.  *See id.* at 930:12–21, 931:11–20 (direct testimony of Prof.

Ferro).  The Comfy®'s porous material, open bottom, and open hood permit easy

airflow into and out of the product.  Summarizing her views, Professor Ferro

persuasively testified, "You're not going to be able to wear [The Comfy®] in the

freezing cold because … [i]t's too open[.]"  *Id.* at 943:22–24; *see also id.* at 1018:5–7

(PROF: FERRO:  "The Comfy was too open to really — for the fabric to really do [its]

job to keep the heat in.").

Garments keep users warm in the extreme cold by insulating them with air

trapped between layers.  *See* Ex. D-30; Trial Tr. vol. III at 934:15–18, ECF No. 110

(PROF. FERRO:  "What the garment does is keep in the heat…. Most outerwear that's

made for extreme cold weather has to be more or less snugly fit.").  The Comfy®'s

oversized design and porous lining prevent it from effectively trapping air so that it

cannot adequately insulate users.  *Compare* Trial Tr. vol. III at 928:19–929:18,

930:12–931:21, ECF No. 110 (direct testimony of Prof. Ferro) (detailing how The

Comfy® is porous and open), *with id.* at 930:15–21 (PROF. FERRO:  "[I]f I'm thinking

about … staying warm, cold air can get into the garment very easily…. [i]t really

needs to be cinched in, in order to keep the cold air from getting into the garment."),

*and* Trial Tr. vol. II at 657:21–25, ECF No. 109 (direct testimony of Mr. Crumley)

(noting a garment protecting against "colder weather" needs material "to trap air,

[and] body heat").  The Comfy® therefore is unsuitable for the extreme cold, and the

Court finds that it does not protect from the extreme cold.  *See* Trial Tr. vol. III at 935:24–936:1, ECF No. 110 (direct testimony of Prof. Ferro) (explaining for an outer layer to protect against the extreme cold it must "prevent[] the outside … cold from getting into the garment").

Cozy Comfort's post-trial brief attempts to discredit Professor Ferro's expert testimony.[4]  It argues Professor Ferro's opinion that The Comfy® did not protect against the extreme cold hinges on her belief that "extreme cold" only encompasses arctic-like temperatures.  Pl.'s Br. at 45, ECF No. 114.  Cozy Comfort claims that "Ms. Ferro applied an even more demanding standard for extreme cold … [and] testified that extreme cold means 'minus 15 or below.'"  *Id.*  The Court disagrees.

Cozy Comfort's characterization of Professor Ferro's testimony hinges on a line from her cross examination.  In that portion of her testimony, counsel for Cozy Comfort asked her about a time when she wore a down coat to protect against temperatures that she considered extremely cold.  *See* Trial Tr. vol. IV at 1118:3–5, ECF No. 111 (cross examination of Prof. Ferro).  Only once amid this line of questioning did Professor Ferro say, "According to the [National Weather Service], [extreme cold is] minus 15 and below."  *Id.* at 1119:20–23.  This was a brief statement

---

[4] Cozy Comfort also argues that "Ms. Ferro … was considering only the outermost layer and not the overall effect that a garment has in a series of layers."  *See* Pl.'s Br. at 45, ECF No. 114.  This too mischaracterizes Professor Ferro's testimony.  Professor Ferro explained that no single garment protects against the extreme cold, and layering is essential.  *See, e.g.*, Trial Tr. vol. IV at 1101:19–1102:1, ECF No. 111 (cross examination of Prof. Ferro) (explaining Prof. Ferro's belief that the Canada Goose protects against the extreme cold only when properly layered).  The Court understands Professor Ferro's opinion on The Comfy® to be rooted in her analysis of The Comfy® as the outermost of multiple layers, not only as an analysis of The Comfy®'s ability to protect against the cold in isolation.

where Professor Ferro, under cross-examination, quickly summarized how she believed the National Weather Service defined extreme cold.  In contrast, Professor Ferro gave an extensive, detailed explanation of her view that the term "extreme cold" embodied a range of temperatures that a reasonable person may find "extremely cold."  She explained that she believed the meaning of extreme cold:

> [D]epends on — for a person, it depends on where they come from, what their constitution is, what their build is, what their health is like, what [their] age is.  If you live in Arizona and it comes near freezing, you're very cold.  But the person that lives in Wisconsin is fine.

Trial Tr. vol. III at 955:12–24, ECF No. 110 (direct testimony of Prof. Ferro).  She based her opinion on outside sources like a National Weather Service webpage on the extreme cold.  *See, e.g.*, *id.* at 955:12–956:24, 957:12–958:4 (direct testimony of Prof. Ferro).  When allowed to fully explain the National Weather Service's definition of extreme cold, Professor Ferro provided testimony demonstrating the National Weather Service adopted a similar standard.  *See, e.g.*, *id.* at 957:18–958:1 (direct testimony of Prof. Ferro) (reading the National Weather Service webpage) (PROF. FERRO:  "In the Southern United States, near freezing temperatures are considered extreme — extremely cold."); *see also* Ex. D-30.  Thus, when Professor Ferro said she believed The Comfy® could not protect against the extreme cold, the totality of her testimony clarifies that she meant The Comfy® could not protect against any temperature in the range considered to be extremely cold.  This range included "near freezing" temperatures, *see* Trial Tr. vol. III at 955:20–21, ECF No. 110 (direct

testimony of Prof. Ferro), of the type the Federal Circuit meant when it wrote "extreme cold" in *Rubies Costume II*. 922 F.3d at 1345–46.

That The Comfy® lacks the common characteristics of clothing that does protect against the extreme cold further supports the Court's determination. Unlike most overgarments designed for the extreme cold, The Comfy® does not possess an elastic band or drawstring to keep its open bottom tight to the body and its hood close to the face. *See* Trial Tr. vol. III at 930:12–21, 931:11–20, ECF No. 110 (direct testimony of Prof. Ferro). It also does not use common insulating fabrics like Gore-Tex, Thinsulate, Primaloft, down, or fiber fill. *See* Trial Tr. vol. II at 435:21–436:10, ECF No. 109 (cross-examination of Mr. Speciale).

The Comfy® also lacks water resistance. The parties stipulated that The Comfy® does not protect against the rain. *See* Jt. Uncontested Facts at ¶ 13, ECF No. 107. But this understates The Comfy®'s deficiencies. As Professor Ferro testified, The Comfy® absorbs water on contact and stays wet for hours.[5] *See* Trial

---

[5] In its post-trial brief, Cozy Comfort makes a conclusory argument that Professor Ferro's water test was "irrelevant, undefined, and unscientific ...." Pl.'s Br. at 45–46, ECF No. 114. The Court disagrees. Expert witnesses must provide testimony that "is the product of reliable principles and methods[,]" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (c)–(d). Courts reviewing the reliability of an expert's methodology focus on whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed." *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). Here, Professor Ferro first assessed whether The Comfy® is water resistant. To do that, she poured "a couple of tablespoons of water on the fabric that comes in the box with The Comfy®." *See* Trial Tr. vol. III at 936:5–8, ECF No. 110 (direct testimony of Prof. Ferro). Pouring a small quantity of water on an item is an appropriate method for determining if it is water resistant. After pouring this water on the material, Professor Ferro observed what happened to the material and waited to see how quickly the sample fabric dried. *See id.* at 936:18–937:22 (direct testimony of Prof. Ferro). That is an appropriate way to determine if a garment is capable of wicking water. The Court struggles to imagine another method to make that determination, and Cozy

Tr. vol. III at 935:10–938:9, ECF No. 110.   Water resistance is not technically

essential for a product to protect against the extreme cold, but products that do

usually have this feature.  *See id.* at 980:4–981:11 (direct testimony of Prof. Ferro).

That is because water resistance prevents the wearer's perspiration from soaking the

garment and causing heat to leave the body.  *See id.* at 934:4–8 (direct testimony of

Prof. Ferro).  Moisture is the enemy of heat preservation, and The Comfy® lacks any

ability to wick moisture away from the body.  *See id.* at 982:15–19 (MR. KENNEDY:

"So then is [water] wicking important for the inside of the garment?"  PROF. FERRO:

"Yeah.  That's … essential … for [the] extreme cold[.]").

The Comfy® is not marketed or sold like products that protect against the

extreme cold.  Ms. Concannon credibly explained that products which protect against

the extreme cold are typically marketed with certain features.[6]  These products' tags

---

Comfort's briefing provides no alternative test it considers more appropriate.  *See* Pl.'s Br. at
46, ECF No. 114.

[6] Cozy Comfort attempts to discredit Ms. Concannon's testimony by arguing that she too
relied on an incorrect definition of the term "extreme cold."  It claims that Ms. Concannon
interpreted "extreme cold" to mean "temperatures like 'negative 22 degrees Fahrenheit.'"
Pl.'s Br. at 43, ECF No. 114 (citing Trial Tr. vol. III 847:11–19, 851:1–5, ECF No. 110 (direct
testimony of Prof. Concannon)).   Cozy Comfort's characterization of Ms. Concannon's
testimony is inaccurate.  When Ms. Concannon was discussing negative 22-degree weather,
she was not explaining her definition of extreme cold.  Instead, she was providing an example
of the temperatures against which some products claim to protect.  That is clear from the full
context of her statement.  She said, "A lot of times, some of the goods will give you a
temperature range of what level you'll be protected up to, say for example, negative 22
degrees Fahrenheit.  You know, they'll put these specs on there.  Canada Goose is one
example of that."  Trial Tr. vol. III at 851:2–8, ECF No. 110 (direct testimony of Ms.
Concannon).  The Court understands Ms. Concannon's definition of extreme cold to embody
a range of temperatures up to and including freezing cold.  When discussing the concept of
"extreme cold" in depth, Ms. Concannon cited to outdoor sports that typically take place in
temperatures at, near, or slightly below freezing such as skiing and hiking.  *See* Trial Tr. vol.
II at 847:15–19 (direct testimony of Ms. Concannon); *see also id.* at 851:20–852:2 (direct
testimony of Ms. Concannon).  She did not discuss extreme arctic sports that typically take
place at temperatures well below zero degrees Fahrenheit.

or websites tend to detail "the technical features that go into producing that garment" to demonstrate to consumers how and why the product can protect against the extreme cold. *Id.* at 845:1–3 (direct testimony of Ms. Concannon); *see also id.* at 844:20–846:24 (direct testimony of Ms. Concannon). This information often provides buyers with "a temperature range of what level [of cold] you'll be protected up to[.]" *See id.* at 851:2–5 (direct testimony of Ms. Concannon). Garments that protect against the extreme cold are also typically advertised in ways that show the garment being worn in extremely cold conditions. *See id.* at 850:11–851:13 (direct testimony of Ms. Concannon).

By contrast, Cozy Comfort marketed The Comfy® primarily as an indoor product, with some mention of outdoor activities like "walking the dog" and "going to a sporting event." *Id.* at 856:21–23 (direct testimony of Ms. Concannon); *see also id.* at 856:14–857:2 (direct testimony of Ms. Concannon). The box in which The Comfy® comes does not contain any indication the product offers protection from the extreme cold. *See* Ex. P-1; Trial Tr. vol. III at 857:5–858:2, ECF No. 110 (direct testimony of Ms. Concannon). The Comfy® was marketed "as more of a loungewear product" rather than a product that protects against the elements. Trial Tr. vol. III at 870:13–14, ECF No. 110 (direct testimony of Ms. Concannon); *see also id.* at 870:8–15 (direct testimony of Ms. Concannon). Mr. Speciale confirmed this portion of Ms. Concannon's testimony. He admitted Cozy Comfort had never marketed The Comfy® as protecting against the extreme cold. *See* Trial Tr. vol. II at 434:15–17, ECF No. 109 (cross

examination of Mr. Speciale) (MR. KENNEDY: "The Comfy has never been marketed for protection from extreme cold, correct?"  MR. SPECIALE: "Correct.").

Finally, Cozy Comfort's admission that it designed The Comfy® primarily for indoor use reinforces the Court's finding.  *See* Pl.'s Br. at 10, ECF No. 114.  As The Comfy®'s co-creator Mr. Speciale testified on direct examination, The Comfy® is "mainly meant for lounging on the couch at home."  Trial Tr. vol. I at 67:16–19, ECF No. 108.  Given the stark temperature differences between the typical indoor environment and any fair definition of extreme cold, it would be unlikely that the same product could be comfortably worn in both environments.  *See* Ex. P-6, col. 1 (describing the indoor environment as the background for invention of The Comfy®).  A product that protects against the extreme cold would keep in too much body heat, causing the user to become too hot for room temperature conditions.  The opposite is true for a product designed for indoor use, like The Comfy®, which would be too loose and non-insulating to protect users from the extreme cold.

## C.

Cozy Comfort makes four main arguments for why The Comfy® protects against the extreme cold.  First, it offers expert opinion testimony from Mr. Crumley, an avid hunter and outdoorsman who believes the product protects against the extreme cold.  Second, it argues that the product was designed to protect against the extreme cold.  Third, it contends that customers use the product in the extreme cold.  Fourth, it insists that customer reviews confirm the product is used in the extreme

cold. The Court finds each of these arguments unsupported by the evidence admitted at trial.

Mr. Crumley's opinion that The Comfy® protects against the extreme cold was unpersuasive. Mr. Crumley believes that The Comfy® protects against the extreme cold because of "the construction and the fabrics used in the construction and the way the patents show that it should be worn to maximize warmth." *See* Trial Tr. vol. II at 582:24–583:2, ECF No. 109. His opinion focused on the cocooning position as an aspect of The Comfy®'s protection against the extreme cold. *See id.* at 588:3–589:1. The cocooning position, in his view, allows users to protect their extremities from the cold. *See id.* at 588:3–19. Mr. Crumley stated he believes the The Comfy®'s sherpa lining traps body air to maximize warmth in the cocooning position. *See id.* at 588:20–589:1. Mr. Speciale advanced the same theory in his testimony. *See, e.g.*, Trial Tr. vol. I at 71:7–14, ECF No. 108; *id.* at 132:24–133:4.

Both Mr. Crumley and Professor Ferro agree that a garment cannot protect against the extreme cold unless it traps air inside the garment to help the body retain heat. *Compare* Trial Tr. vol. III at 935:20–23, ECF No. 110 (direct testimony of Prof. Ferro), *with* Trial Tr. vol. II at 588:20–589:8, ECF No. 109 (direct testimony of Mr. Crumley), *and id.* at 597:21–25 (direct testimony of Mr. Crumley). Mr. Crumley rested his analysis on conclusory assertions that "the construction and the fabrics" of The Comfy® enable it to protect against the extreme cold. Trial Tr. vol. II at 582:24–583:2, ECF No. 109. He also suggested that, if users properly layer items beneath

The Comfy®, then it would protect against the extreme cold. *See id.* at 603:17–605:7;
Pl.'s Br. at 39, ECF No. 114.

But Professor Ferro undermined Mr. Crumley's opinion. Unlike Mr. Crumley's
conclusory assertions, Professor Ferro's testimony provided a detailed analysis of The
Comfy®'s porous, open design and physical characteristics. *See* Trial Tr. vol. III at
928:19–931:20, ECF No. 110 (direct testimony of Prof. Ferro). An outer layer like The
Comfy® must trap air to protect against the extreme cold. *See* Ex. D-30; Trial Tr. vol.
III at 935:20–23, ECF No. 110 (direct testimony of Prof. Ferro); Trial Tr. vol. II at
588:20–589:8, ECF No. 109 (direct testimony of Mr. Crumley). Professor Ferro
persuasively demonstrated how The Comfy®'s design made it unable to effectively
trap air and keep the user warm in the extreme cold. *See, e.g.*, Trial Tr. vol. III at
928:19–929:18, ECF No. 110 (PROF. FERRO: "[The background the sherpa was
knitted on is] very porous…. The background is all … it's like a mesh type …."); *id.*
at 987:13–17 (MR. KENNEDY: "And what is the effect of the sherpa being porous?"
PROF. FERRO: "Again, you know, it's not doing its … full job. The air is escaping.
The air can get in even."). As she testified, "[The Comfy® is] a very open, loose
garment…. [I]f I'm thinking about it staying warm, cold air can get into the garment
very easily." *Id.* at 930:14–18. The Court finds Professor Ferro's detailed analysis
more persuasive and credible than that of Mr. Crumley.

The Court is also unpersuaded by Mr. Crumley's testimony about the
protection provided by The Comfy® in the cocooning position. To be sure, Professor
Ferro credibly testified that the cocooning position keeps the user warmer than when

standing, because the bottom is no longer open.  *See id.* at 986:19–22.  However, she explained that, even as a cocoon, The Comfy® does not have the characteristics "that it needs to protect against the extreme cold."  *Id.* at 986:25–987:3.  That is because "the fabrics … are still not touching the body[;] … [t]he hood is still open[;] … the sherpa is porous[;] … it's not water repellent[;] … [and] [i]t doesn't have a finish."  *Id.* at 987:5–12 (direct testimony of Prof. Ferro).  These features make it difficult for The Comfy® to trap air even when users cocoon.  Cocooning also involves crouching down to the ground, which — in extreme cold conditions — may involve putting the non-water resistant Comfy® in contact with the wet ground or snow.  In that case, The Comfy® would absorb rather than repel the moisture, ending its ability to provide warmth to the user.  *See id.* at 937:23–938:9 (MR. KENNEDY: "Okay.  And can you just explain why … is it a good thing or bad thing that [The Comfy®] stays wet?" PROF. FERRO: "No.  It's a bad thing."  MR. KENNEDY: "And why is that?"  PROF. FERRO:  "Heat moves very quickly through water.  So you lose the heat from your body a lot faster.  The whole idea of putting all these things on is to keep the heat in.").  Thus, even in the position most likely to provide protection, The Comfy®'s flaws prevent it from being able to protect in extreme cold conditions.

Cozy Comfort argues that The Comfy®'s ribbed knit and thick sherpa lining provide protection from the extreme cold, but the evidence does not support this contention.  The Comfy® protects against mild to cool temperatures, like a sweater, pullover, or other similar article.  *See id.* at 979:8–14 (MR. KENNEDY: "[W]ould you be able to estimate where you could wear The Comfy outdoors, at what temperature

ranges?"  PROF. FERRO:  "I would say mild temperatures because of its open —
especially because of its open design.").  As Professor Ferro testified, the ribbed knit
at the bottom of the sleeves "keep[s] out the wind" and outside cold air.  *Id.* at 929:7.
The sherpa lining also traps some body heat in the product to "keep … warmth in."
*Id.* at 1023:3–9 (direct testimony of Prof. Ferro).  These are important features for
providing warmth to users.  But other deficiencies with the product make it unable
to protect against the extreme cold, including the porous nature of the sherpa, the
open hood, and the open bottom.  *See id.* at 928:19–931:20 (direct testimony of Prof.
Ferro).  Thus, The Comfy® only provides warmth indoors at room temperature or
outdoors in mild weather.  *See id.* at 979:8–14 (MR. KENNEDY: "[W]ould you be able
to estimate where you could wear The Comfy outdoors, at what temperature ranges?"
PROF. FERRO:  "I would say mild temperatures because of its open — especially
because of its open design.")

     Cozy Comfort also contends that the product was designed to protect from the
extreme cold.  *See* Trial Tr. vol. I at 94:5–8, ECF No. 108 (direct testimony of Mr.
Speciale).  The evidence did not support these assertions.  Mr. Speciale testified that
he drew inspiration from his nephew cocooned in a sweatshirt lying next to a blanket.
*See id.* at 61:20–63:15.  This occurred indoors.  *See id.*  When making the prototype,
Mr. Speciale took basic throw blankets — like those he saw next to his nephew — and
paid a company to turn them into "wearable blanket" that was almost identical to
final version of The Comfy®.  *See id.* at 64:7–22.  No extra steps were taken to ensure
The Comfy® could protect against the extreme cold.  *See* Trial Tr. vol. II at 434:7–10,

ECF No. 109 (cross-examination of Mr. Speciale) (MR. KENNEDY: "No testing has been performed by Cozy Comfort that shows The Comfy protects from extreme cold, correct?" MR. SPECIALE: "I believe that is correct, yes.").

On direct examination, when asked to point to patent documents showing that The Comfy® could protect from the extreme cold, Mr. Speciale could only identify language that details how The Comfy® protects one indoors. *See* Trial Tr. vol. I at 95:4–96:6, 100:1–101:17, ECF No. 108 (citing Ex. P-6, col. 1). The cited patent describes how The Comfy® allows someone to "stay warm inside a cool building." Ex. P-6, col. 1, line 29. The patent contains no mention of how The Comfy® is, can be, or should be used outdoors. *See id.* The cool room temperatures described in the patent do not approach near freezing. A product designed for these conditions is ill suited for any credible definition of extreme cold.

Cozy Comfort also entered photographs into evidence that purport to show customers using the product in the extreme cold. *See* Ex. P-13; Trial Tr. vol. I at 134:8–18, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort identified five photographs in Exhibit P-13. *See* Trial Tr. vol. I at 142:12–14, ECF No. 108. Through its witnesses, it argued these photographs showed customers wearing The Comfy® "in extremely cold conditions" based on the fact there was "snow on the ground." *Id.* at 145:15–17 (direct testimony of Mr. Speciale). The Court has reviewed all the photographs admitted in Exhibit P-13. The Court finds that these photographs have little evidentiary value on whether The Comfy® can protect one in extreme cold conditions. The photographs provide little evidence of the weather

conditions at the time they were taken. None of the photographs depict the temperature or wind speed. Snow can remain for a time once the temperature rises above levels that could be described as extremely cold. The Court is cognizant of the Government's objection that the photographs could easily be cherrypicked by the Plaintiff. *See* Trial Tr. vol. I at 141:4–14, ECF No. 108 (raising objections to the admission of Ex. P-13); *cf.* Fed. R. Evid. 403 ("The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice[.]"); Fed. R. Evid. 1006(a) ("The court may admit as evidence a summary … offered to prove the content of voluminous admissible … photographs that cannot be conveniently examined in court[.]"). Mr. Speciale could not provide a precise estimate of the total number of customer photographs Cozy Comfort possesses, but he guessed that the number "would be in the thousands." Trial Tr. vol. II at 504:6, ECF No. 109 (cross-examination of Mr. Speciale). Exhibit P-13, however, only contains around one hundred of these photographs; and Mr. Speciale "[didn't] know exactly how they were selected." *Id.* at 503:4–5 (cross-examination of Mr. Speciale); s*ee id.* at 502:13–16 (cross-examination of Mr. Speciale). It is impossible to gauge how frequently customers may wear the product outside as opposed to inside from Exhibit P-13. The customer reviews referenced by some witnesses in their testimony suffer from the same defects. *See, e.g.*, Trial Tr. vol. III at 885:3–25, ECF No. 110 (cross-examination of Ms. Concannon). When the photographs and reviews are compared with objective evidence such as the design of the product as well as Cozy Comfort's representations in its patent applications that the product is designed for use "inside a cool building,"

the objective evidence bears greater weight.  *See* Ex. P-6.  For these reasons, the Court

finds that The Comfy® does not protect against the extreme cold.

## CONCLUSIONS OF LAW

The question of law in this case is under which HTSUS heading The Comfy®

belongs.   The parties propose Heading 6110 (sweaters, pullovers, sweatshirts,

waistcoats (vests), and similar articles); Heading 6301 (blankets and traveling rugs);

Heading 6114 (other garments, knitted or crocheted); or Heading 6307 (other made-

up articles, including dress patterns).  For the following reasons, the Court finds that

The Comfy® is properly classified as a pullover under Heading 6110, and — within

that Heading — under Subheading 6110.30.30, HTSUS.

### I.    The Legal Framework for Tariff Classification

The Harmonized Tariff Schedule of the United States is organized into

headings,  each  of  which  contains  one  or  more  subheadings.   Headings  describe

"general  categories  of  merchandise."  *Wilton  Indus.*,  741  F.3d  at  1266.   Subheadings

"provide a more particularized segregation of the goods within each category."  *Id.*

The General Rules of Interpretation (GRIs) of the HTSUS set out a strict order

of operations for courts to follow.  First, "[a] classification analysis begins, as it must,

with the language of the headings."  *Orlando Food Corp. v. United States*, 140 F.3d

1437, 1440 (Fed. Cir. 1998) (citing GRI 1, HTSUS).  Then, "[h]aving classified the

product  under  the  appropriate  heading,"  the  Court  "turn[s]  to  the  subheadings"

within the heading.  *Id.* at 1442 (citing GRI 6, HTSUS).

Heading classification follows a two-step process whenever — as is the case here — litigants dispute material facts related to "the nature of the merchandise[.]"[7] *Wilton Indus.*, 741 F.3d at 1266. First, courts interpret the language of the tariff headings at issue. *See Orlando Food*, 140 F.3d at 1439; *see also Wilton Indus.*, 741 F.3d at 1266. "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss*, 195 F.3d at 1379. The Court decides the common meaning of a tariff term as a question of law. *E.M. Chems. v. United States*, 920 F.2d 910, 912 (Fed. Cir. 1990) (citing *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 664–65 (Fed. Cir. 1984)). The Court "may consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used" when the tariff term lacks a clear definition. *Baxter Healthcare Corp. v. United States*, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999). It may also consult the Explanatory Notes for the Harmonized Commodity Description and Coding System, which the World Customs Organization maintains. Although not legally binding, the Explanatory Notes "are generally indicative of the proper interpretation of a tariff provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing *Motorola Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)).

Some HTSUS headings are *eo nomine* provisions, which "describe[] an article by a specific name." *CamelBak Prods.*, 649 F.3d at 1364–65 (citing *Carl Zeiss*, 195

---

[7] This two-step process "collapses entirely into a question of law" whenever there is "no dispute as to the nature of the merchandise[.]" *Wilton Indus.*, 741 F.3d at 1266 (citing *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).

F.3d at 1379). *Eo nomine* provisions differ from use provisions, which describe merchandise by its use. *See Carl Zeiss*, 195 F.3d at 1379. An *eo nomine* provision "include[s] all forms of the named article[,]" *id.*, even improved forms, "as long as the improved article performs the same essential function as the named exemplar." *Deckers Corp. v. United States*, 752 F.3d 949, 957 (Fed. Cir. 2014). An improved article stops performing the same essential function of a named exemplar when its improvements cause it to "possess[] features *substantially in excess* of those within the common meaning of the [named] term." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (internal quotation marks omitted) (emphasis in original).

Second, after interpreting the tariff headings, courts apply the General Rules of Interpretation, starting with GRI 1, to determine the product's proper heading. *See Orlando Food*, 140 F.3d at 1439. GRI 1 provides that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. The Federal Circuit has explained that GRI 1 determines a product's classification if it "is described *in whole* by a single classification heading" of the HTSUS. *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (emphasis added). If no heading describes the product in whole, the Court then uses GRIs 2 through 5, in order — only using the next GRI if the previous GRI cannot classify the product. *See Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998); *Wilton Indus.*, 741 F.3d at 1266. But, "if the proper heading can be

Court No. 1:22-cv-00173 (SAV)                                          Page 53

determined under GRI 1, the court is not to look to the subsequent GRIs." *R.T. Foods*, 757 F.3d at 1353.

Once the Court determines the correct heading for the merchandise, it then analyzes the relevant subheadings. *See Orlando Food*, 140 F.3d at 1440. The Court uses the same process to determine the proper HTSUS subheading as it did the heading: first construing the subheadings' meanings and then applying the General Rules of Interpretation in order. *See* GRI 6, HTSUS; *Orlando Food*, 140 F.3d at 1442.

## II.    Construction of the Relevant HTSUS Headings

The parties suggest four possible headings for The Comfy®. The Government maintains that the The Comfy® belongs in Heading 6110, as Customs originally determined. *See* Def.'s Br. at 31, ECF No. 116. Cozy Comfort suggests three alternative Headings — 6114, 6301, and 6307. *See* Pl.'s Br. at 2, 4, ECF No. 114. "All of the asserted classifications fall within Section XI of the HTSUS, which covers 'textiles and textile articles' and includes Chapters 50 to 63 of the HTSUS." *Allstar Mktg.*, 41 CIT ___, 211 F. Supp. 3d at 1328. Chapter 61 and Chapter 63 apply only to "made up articles." Note 1 to Ch. 61, HTSUS; Note 1 to Ch. 63, HTSUS. Note 7(e) to Section XI defines "made up" as an item "assembled by sewing, gumming or otherwise." Note 7(e) to Section XI, HTSUS. Neither party disputes that The Comfy® is "made up" within the meaning of the section. *See* Pl.'s Br., ECF No. 114; Def.'s Br., ECF No. 116. It is therefore appropriate to turn to these chapters to classify The Comfy®.

## A.

Heading 6110 falls under Chapter 61 of the HTSUS. That chapter encompasses "articles of apparel and clothing accessories, knitted or crocheted." Ch. 61, HTSUS. Headings 6101 to 6114 of Chapter 61 encompass various articles of apparel. For an item to be classifiable under these headings, it first must be "wearing apparel." *Rubies Costume Co. v. United States* (*Rubies Costume I*), 337 F.3d 1350, 1357 (Fed. Cir. 2003); *see* Statistical Note 2, Ch. 61, HTSUS (all items in Heading 6110 are "garments"); *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1329–30 (deciding if an item is a "garment" by first considering if it is "wearing apparel"). The Federal Circuit clarified the meaning of "wearing apparel" in *Rubies Costume I*, where it determined that various Halloween costumes were not wearing apparel because they were "of a flimsy nature and construction" and were not "normal articles of apparel." *Rubies Costume I*, 337 F.3d at 1358, 1360. As the Court explained, "Wearing apparel" is defined as "all articles which are ordinarily worn—dress in general." *Id.* at 1357 (emphasis removed) (quoting *Arnold v. United States*, 147 U.S. 494, 496 (1893)).

Heading 6110 covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted[.]" 6110, HTSUS. The Federal Circuit elaborated on the meaning of this heading in *Rubies Costume II*, where it determined a "well-made" and "durable" Santa Suit jacket was a "similar article" classifiable under Heading 6110. *Rubies Costume II*, 922 F.3d at 1345–46. The Federal Circuit explained that items under this heading share a few common traits: (1) they cover the upper body; (2) they provide "some warmth"; (3) they do not "protect against wind,

rain, or extreme cold"; and (4) they can be worn over "undergarments or other clothing." *Rubies Costume II*, 922 F.3d at 1345–46.  Goods of Heading 6110 also have openings for the waist, head, and arms.  *See BASF Corp. v. United States*, 35 CIT 1478, 1481 (2011) ("To assist it in ascertaining the common meaning of a tariff term, the court may rely on its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources.") (citing *Baxter Healthcare*, 182 F.3d at 1337–38).

Heading 6110 is an *eo nomine* provision because the terms in Heading 6110 "describe[] … article[s] by [their] specific name."  *R.T. Foods*, 757 F.3d at 1354; *see Rubies Costume II*, 922 F.3d at 1345–46 (treating Heading 6110 as an *eo nomine* provision).  "[A] sweater describes 'a knitted or sometimes crocheted elastic jacket or pullover made in various styles and of various materials and usu[ally] having ribbing around the neck, cuffs, and lower edge[.]'"  *LeMans Corp. v. United States*, 34 CIT 156, 162–63 (2010) (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2308 (2002)); *see also Carl Zeiss, Inc.*, 195 F.3d at 1379.  "[A] pullover comprises 'a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening.'"  *LeMans Corp.*, 34 CIT at 162–63 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2309 (2002)).  A placket is "a finished slit" that provides an opening in the front of a garment.  *Id.* at 163 n.11 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1728 (2002)).  A sweatshirt is "a collarless long-sleeved pullover made of cotton jersey with a smooth-

finished face and a heavily napped back." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2308 (1968). A waistcoat or vest is "an item of wearing apparel extending to the waist or below that is similar to a sleeveless jacket … [u]sually worn over a blouse or shirt …." *Victoria's Secret Direct, LLC v. United States*, 37 CIT 573, 588– 89 (2013) (citing THE FAIRCHILD DICTIONARY OF FASHION 477 (3rd ed. 2003)).

Though Heading 6110 is an *eo nomine* provision, the Court must still consider use when classifying goods under this heading. In general, courts "should not read a use limitation into an *eo nomine* provision." *Kahrs Int'l v. United States*, 713 F.3d 640, 646 (Fed. Cir. 2013) (citing *Carl Zeiss*, 195 F.3d at 1379). But in certain "very limited circumstances," the terms of an *eo nomine* provision "inherently suggest[] looking to intended use" and require a court to "consider use." *Ford Motor Co. v. United States*, 926 F.3d 741, 753 (Fed. Cir. 2019); *see also Carl Zeiss*, 195 F.3d at 1375, 1379. To determine if these circumstances exist, courts look to "the language of the particular headings" to see whether it "impl[ies] that use or design is a defining characteristic." *Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1361 (Fed. Cir. 2019).

Use is a relevant consideration when classifying an item under Heading 6110. In *Rubies Costume II*, the Federal Circuit's classification of a Santa Suit jacket under Heading 6110 rested on its assessment that users can "wear the jacket over either undergarments or other clothing" and that the jacket "provides some warmth to the wearer but does not protect against the wind, rain, or extreme cold." *Rubies Costume II*, 922 F.3d at 1346. These considerations relate to how the Santa Suit jacket is used.

*See id.*  The term pullover in Heading 6110 also "suggests a type of use," *Carl Zeiss*, 195 F.3d at 1379, because a pullover must be "put on by being pulled over the head[.]" *LeMans Corp.*, 34 CIT at 162–63 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2309 (2002)).  The Court accordingly must consider use when classifying goods under Heading 6110.  Doing so requires the Court to consider not only an article's physical characteristics but also its design, intended use, and marketing.  *See GRK Canada, Ltd. v. United States*, 761 F.3d 1354, 1358 (Fed. Cir. 2014).

## B.

Heading 6301 covers "blankets and travelling rugs."[8]  6301, HTSUS.  Note 2(a) to Chapter 63 states that Headings 6301 to 6307 do not cover the "[g]oods of chapters 56-62."  If an article is properly classified under Heading 6110, it cannot be classified in Heading 6301.  *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1328 (first examining if an article is classifiable under Heading 6114 before examining if it can be classified in Heading 6301 based on note 2(a) to Chapter 63).

The Court of International Trade analyzed the meaning of the term blanket in Heading 6301 in *Allstar Marketing*.  *See* 41 CIT __, 211 F. Supp. 3d at 1335–36.  The Court explained, "Blanket is not defined in the statute or legislative history; thus, the court considers its common commercial meaning."  *Id.* at 1335 (internal quotation marks omitted).  The Court's review of dictionary entries revealed that "first … a

---

[8] Neither party suggests that The Comfy® is a travelling rug.  A travelling rug is an article commonly used to cover the lower half of a person's body while travelling by carriage, car, rail, ship, or other means of motorized transportation.  *See Riley & Co. v. United States*, 8 Ct. Cust. 116, 117–18 (1917).

blanket is a large (possibly oblong) piece of fabric, and second, that a blanket is used as a covering for warmth, often, but not always, as common knowledge dictates, on a bed." *Id.* at 1336. The Court summarized its understanding of the term blanket by saying, "[T]he essential characteristics of a blanket … [are] a large piece of fabric providing a warm covering." *Id.* at 1337 (internal quotation marks omitted).

Heading 6301 is an *eo nomine* provision because it "describes an article by a specific name." *R.T. Foods*, 757 F.3d at 1354. The term "traveling rug" in Heading 6301 "impl[ies] that use or design is a defining characteristic" for at least some items classifiable under the heading, *Irwin Indus. Tool Co.*, 920 F.3d at 1361, because "traveling rug[s]" are rugs used as a covering for passengers traveling in "automobiles … [and] carriages" or other means of motorized transportation. *Riley & Co. v. United States*, 8 Ct. Cust. 116, 117–18 (1917).

## C.

Cozy Comfort offers two alternative headings, both basket provisions. Heading 6114 covers "Other garments, knitted or crocheted." Heading 6307 covers "Other made up articles, including dress patterns[.]" "A basket provision is not a specific provision." *R.T. Foods*, 757 F.3d at 1354 (quoting *Int'l Bus. Machs. Corp. v. United States*, 152 F.3d 1332, 1338 (Fed. Cir. 1998)). Imported merchandise only belongs in a basket provision "if there is no tariff category that covers the merchandise more specifically." *Id.* (quoting *Rollerblade, Inc. v. United States*, 24 CIT 812, 815 (2000), *aff'd*, 282 F.3d 1349 (Fed. Cir. 2002)). The two basket headings do not apply if the Court finds that either of the more specific provisions covers The Comfy®. *Id.*

### III.    The Comfy® Is Classifiable Under Heading 6110

The Government correctly classified The Comfy® under Heading 6110 because The Comfy® is a pullover.  Heading 6110 covers "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted."  6110, HTSUS.  The parties agree that The Comfy® is "knitted," so that it is classifiable under Heading 6110 if it (1) is wearing apparel; (2) shares the common characteristics of goods in Heading 6110; and (3) is a sweater, a pullover, a sweatshirt, a waistcoat, or a similar article.  *See Rubies Costume II*, 922 F.3d at 1344–46 (determining if a Santa Suit jacket falls under Heading 6110); Jt. Uncontested Facts ¶ 4, ECF No. 107 ("The Comfy® is knitted.").    As the foregoing analysis shows, The Comfy® is wearing apparel.    It shares the key characteristics common to "[s]weaters, pullovers, sweatshirts, waistcoats (vests) and similar articles" and is a "pullover[.]"  6110, HTSUS.

### A.

The Comfy® must be a "garment," or "wearing apparel," to be classified in Heading 6110.  *See Rubies Costume I*, 337 F.3d at 1357; *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1330.  Cozy Comfort argues that The Comfy® is not wearing apparel because it "is not ordinarily worn in a common place way like pants, a shirt, a jacket, or another article of clothing."  Pl.'s Br. at 21–22, ECF No. 114.  Instead, "it is a brand new, novel patented product designed, marketed, and sold as an alternative to a household blanket … not as clothing for general use in public."  *Id.* at 22.  The Comfy® — in Cozy Comfort's telling — possesses "non-clothing features that sharply and

materially distinguish it from standard wearing apparel." *Id.* at 23.  The Court disagrees.

Federal courts have analyzed the meaning of the term "wearing apparel" for over a century.  *See, e.g.*, *Arnold v. United States*, 147 U.S. 494 (1893).  Summarizing that case law, the Federal Circuit has explained:

> An understanding of what is an article of [wearing] apparel begins with the Supreme Court's decision in *Arnold v. United States* … where the Court stated:   "The term 'wearing apparel' is not an uncommon one in statutes, and is used in an inclusive sense as embracing all articles which are *ordinarily* worn" ….   The Customs Court in *Antonio Pompeo v. United States*, 40 Cust. Ct. 362 (1958), further developed this definition [saying that]:   "Wearing apparel refers to clothes or coverings for the human body worn for decency or comfort and common knowledge indicates that adornment is also an element of many articles of wearing apparel."

*Rubies Costume I*, 337 F.3d at 1357 (emphasis in original) (indentations omitted). Certain features may indicate an item is wearing apparel "such as the extent of styling features, including 'zippers, inset panels, darts or hoops, and whether the edges of the materials [are] left raw or finished.'"  *Rubies Costume II*, 922 F.3d at 1343 (citing *Rubies Costume I*, 337 F.3d at 1357).

Whether merchandise is wearing apparel hinges on if it is "ordinarily worn." *Rubies Costume I*, 337 F.3d at 1358 (citing *Arnold*, 147 U.S. at 496).  The parties have stipulated that The Comfy® is "intended to be worn …."  Jt. Uncontested Facts ¶ 11, ECF No. 107.  The remaining question is whether the merchandise is *ordinarily* worn. An item is "ordinarily" worn if it is worn like wearing apparel "in the ordinary course of events: usually" or "in a commonplace … way[.]"  WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 1589 (1968); *see also Allstar Mktg.*, 41 CIT __, 211 F.

Supp. 3d at 1332.

No brightline rule governs when merchandise moves from being merely worn

to being ordinarily worn.  Courts examining the question conduct a fact intensive

inquiry.  In *Rubies Costume I*, the Federal Circuit held that a variety of Halloween

costumes were not "ordinarily worn" because they were (1) worn once a year "for

Halloween fun," (2) "lacked cognitive association as wearing apparel," and (3) were

"of a flimsy nature" and not generally recognized as "normal articles of apparel."  337

F.3d at 1358.  In *Allstar Marketing*, the Court of International Trade applied *Rubies*

*Costume I* and found that The Snuggie® was not ordinarily worn because (1) The

Snuggie® lacked cognitive association as wearing apparel because of its long

"dimensions and lack of [a] rear closure" and (2) The Snuggie® was used like a

blanket and thus was not "ordinarily worn in any commonplace way."  41 CIT __, 211

F. Supp. 3d at 1333–34.  By contrast, in *Rubies Costume II*, the Federal Circuit found

that a Santa Suit jacket was classifiable as "wearing apparel under HTSUS chapter

61" because the jacket's "styling, construction, and finishing touch[es]" showed it was

"well-made" and "of durable and nonflimsy construction…."  922 F.3d at 1345.

Extensive evidence shows that The Comfy® is ordinarily worn because users

wear it in a variety of everyday, commonplace situations.  These situations primarily

include indoor activities like lounging on the couch, grabbing a drink, and adjusting

the fire.  *See* Jt. Uncontested Facts ¶ 18, ECF No. 107; Ex. P-6, col. 1.  They also

include outdoor activities like "walking the dog," "getting the mail," and "outside

chores[.]"  Jt. Uncontested Facts ¶ 18, ECF No. 107.  When users don and wear The Comfy® in these situations, they do so by pulling it over their head in a manner identical to how users don and wear an ordinary pullover.  *Cf.* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale) (describing how to put on The Comfy®).  The Comfy®'s patents further explain that The Comfy® "is worn on the body of the person like an article of clothing[.]"  Ex. P-6, col. 5, lines 65–66. The Comfy® is "made from a fleece outer-fabric and … a thick, luxurious sherpa lining."  Trial Tr. vol. II at 595:4–6, ECF No. 109 (direct testimony of Mr. Crumley); s*ee also* Trial Tr. vol. I at 125:15–16, ECF No. 108 (direct testimony of Mr. Speciale) (noting The Comfy® has a "thick sherpa layer").  These materials impart The Comfy® with a "durable and nonflimsy construction."  *Rubies Costume II*, 922 F.3d at 1345.

The Comfy® is not worn once or twice during a specific week of the year, like the Halloween costumes in *Rubies Costume I*.  Nor is its use limited by season. Testimony and evidence established that The Comfy® can keep users warm indoors and in cool or mild outdoor conditions.  It is worn indoors year-round, even during the summer.  *See* Trial Tr. vol. I at 120:8–121:16, ECF No. 108 (direct testimony of Mr. Speciale) (describing how he wore The Comfy® indoors at a hockey rink "in the summer" when "it was 110 [degrees] outside").  The Comfy® also is used for outdoor activities during cool and mild temperatures, which may occur during all four seasons depending on where a user lives.  *See* Trial Tr. vol. III at 979:8–14, ECF No. 110 (MR. KENNEDY:  "[W]ould you be able to estimate where you could wear The Comfy outdoors, at what temperature ranges?"  PROF. FERRO:  "I would say mild

temperatures because of its open — especially because of its open design."); Ex. P-12
at 6 (detailing the distribution of Comfy® customers in different regions of the United
States).

      The Comfy® also retains a cognitive association with wearing apparel, unlike
a Halloween costume and The Snuggie®. The Federal Circuit in *Rubie's Costume I*
explained that Halloween costumes "lacked cognitive association as wearing apparel"
because they "promote[] festive value rather than cognitive association as wearing
apparel." 337 F.3d at 1358. In other words, the costumes did not resemble items that
people wear in ordinary circumstances. *See id.* That is not a concern here, as users
wear The Comfy® in ordinary situations. *See* Jt. Uncontested Facts ¶ 18, ECF No.
107 (noting users wear The Comfy® while performing activities like "walking the
dog," "getting the mail," and performing "outside chores"). In *Allstar Marketing*, The
Snuggie®'s lack of cognitive association as wearing apparel hinged on the product's
long "dimensions and lack of [a] rear closure." 211 F. Supp. 3d at 1333–34. Unlike
The Snuggie® depicted below, The Comfy® has a closed back like typical wearing
apparel. And it is not as long as The Snuggie®. *Compare id.* at 1333 ("[T]he Snuggie®
consists of a 71-by-54 inch rectangular piece of … fabric[.]"), *with* Jt. Uncontested
Facts ¶ 7, ECF No. 107 (stipulating that The Comfy® is, at its longest, 36-by-41
inches). The Comfy® also has a "hood[,]" a "marsupial … pocket[,]" and "ribbed wrist
cuffs," unlike The Snuggie®. *See* Jt. Uncontested Facts ¶ 6, ECF No. 107. These
differences give The Comfy® a cognitive association as wearing apparel and make the
item appear to be an oversized pullover.

 

*See* Ex. D-50.

The Comfy® is also used like commonplace apparel unlike The Snuggie®. Courts considering an item's use give great weight to its "primary design and use," *CamelBak Prods.*, 649 F.3d at 1362, 1368–69, and assess if that "specific primary" or "obvious" purpose aligns with the purposes of items in the HTSUS headings at issue. *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1376, 1381 (Fed. Cir. 2016). In *Allstar Marketing*, the Court focused on how "the Snuggie® was designed (and, thus, intended) to be loosely worn as an outer layer roughly covering the front of the user to provide warmth." *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1334. Additionally, evidence "showed people wearing [T]he Snuggie® in the types of situations one might use a blanket; for example, while seated or reclining on a couch or bed, or outside cheering a sports team." *Id.* at 1337.

Cozy Comfort relies on *Allstar Marketing* and argues that The Comfy®'s "primary design and use" is as a "as a cozy, cocooning blanket[,]" not as wearing

apparel. Pl.'s Br. at 24–25, ECF No. 114. But The Comfy® and The Snuggie® are different products with different physical characteristics. Unlike The Snuggie®, The Comfy® covers both sides of a user's body, not just the wearer's front; and users put on The Comfy® exactly like an ordinary pullover. *See* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort called these differences a "significant improvement" on The Snuggie® when its founders tried persuading *Shark Tank*'s investors of The Comfy®'s viability, and Cozy Comfort's marketing of The Comfy® emphasized these unique aspects of the product. *See* Ex. D-21 at 6:43– 49 (according to Brian Speciale); Ex. P-1. Users do not primarily cocoon in The Comfy®, as Cozy Comfort argues. *See* Pl.'s Br. at 24–25, ECF No. 114; *supra* at 21– 23. Instead, they primarily wear The Comfy® during indoor lounging activities like sitting or lying on the couch while watching television. True, these are "the types of situations one might use a blanket," but they also are situations where one might use wearing apparel like a sweatshirt or pullover. *Cf. Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1337. And unlike blankets and The Snuggie®, users also wear The Comfy® during a variety of active tasks. Cozy Comfort stipulated that users wear the product during activities such as "ice skating; holiday activities at the park; tailgating; dinner party hosting; outside chores, like raking leaves; outside play, like jumping in the freshly raked leaves; pumpkin picking; pumpkin carving; hayrides; corn mazes; dancing; walking the dog; getting the mail; [and] cheering on the sidelines[.]" Jt. Uncontested Facts ¶ 18, ECF No. 107. The Comfy®'s co-creator, Mr. Speciale, testified that he wore The Comfy® in public at a hockey rink and while

"explor[ing]" the area near Niagara Falls.  *See* Trial Tr. vol. I at 118:25–121:21, ECF No. 108.  These activities are not possible while using a blanket.

The Court does not find Cozy Comfort's remaining argument — that The Comfy® has "non-clothing features" that make it different from wearing apparel — persuasive.  Pl.'s Br. at 23, ECF No. 114.  Several features Cozy Comfort points to are simply features of oversized clothing.  These include The Comfy®'s large hood opening, that its hood is "huge" and "can cover the user's entire face," the merchandise's ability to "drape over a person," its ability to "cover the [wearer] when in the fetal position," and its ability to permit a user to "bring [his or her] arms in and out of the sleeves …."  *Id.*  Cozy Comfort claims that The Comfy®'s "thick, blanket materials," microfleece and sherpa, distinguish the item from clothing.  *Id.*; *see also* Jt. Uncontested Facts ¶ 5, ECF No. 107.  But these are fabrics that are in clothing as well.  *See* Trial Tr. vol. III at 952:2–6, ECF No. 110 (MR. KENNEDY: "What types of fabrics can be used to make garments?"  PROF. FERRO:  "You can use … anything to make a garment."); *id.* at 952:17–21 ("MR. KENNEDY:  [H]ave you ever designed garments using sherpa?"  PROF. FERRO:  "Yes, I did."); *see also* Pl.'s Br. at 23, ECF No. 114.  For these reasons, the Court finds that The Comfy® is wearing apparel.

## B.

The next question is whether The Comfy® shares the common characteristics of goods in Heading 6110.  "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles" all (1) cover the upper body, (2) provide "some warmth," (3) do not "protect against wind, rain, or extreme cold," and (4) can be worn over

"undergarments or other clothing." *Rubies Costume II*, 922 F.3d at 1345–46. The Comfy® possesses all four characteristics. The parties agree that The Comfy® does not provide protection against rain or wind. *See* Jt. Uncontested Facts ¶ 13, ECF No. 107. And they agree, "The Comfy® is intended to be worn over clothes or undergarments." *Id* ¶ 11. The Court resolved the parties' remaining factual arguments over this issue in its findings of fact. The Comfy® covers the upper body of the user, *see supra* at 20–21, provides some warmth, *see supra* at 23–24, but does not protect against the extreme cold. *See supra* at 31–50.

Cozy Comfort's remaining argument is that "The Comfy® ... cannot be classified in Heading 6110, HTSUS, because it extends to the knees or below of a typical user whereas Heading 6110 only applies to upper body garments." Pl.'s Br. at 46, ECF No. 114. The Court found that The Comfy® falls between the thigh and the knees of a user, depending on the user's height. Because the typical user is an adult female and the typical adult female is 5 feet 4 inches tall, The Comfy® falls around a typical user's knees. *See* Trial Tr. vol. I at 77:23–78:11, ECF No. 108 (direct testimony of Mr. Speciale). Cozy Comfort designed the product to be oversized. *See id.* at 63:21–22 (direct testimony of Mr. Speciale); Ex. P-6, col. 6, lines 4–15. This gives rise to a colorable argument that The Comfy®'s oversized design takes it out of Heading 6110. Pl.'s Br. at 46, ECF No. 114.

Cozy Comfort, however, incorrectly assumes that "[H]eading 6110 *only* applies to upper body garments." *Id.* (emphasis added). *But see Victoria's Secret Direct*, 37 CIT at 589 (noting that a waistcoat or vest is "an item of wearing apparel *extending*

*to the waist or below*") (emphasis added).  To be sure, in *Rubies Costume II*, the Federal Circuit noted that the typical sweater, sweatshirt, or pullover "covers the upper body."  922 F.3d at 1345–46.  To Cozy Comfort, this implies that these goods may cover no more than the upper body.  Modifications from a typical item, however, do not remove a product from an *eo nomine* heading unless the "difference" is "significant."  *R.T. Foods*, 757 F.3d at 1354 (citing *CamelBak Prods.*, 649 F.3d at 1365); s*ee also Deckers Corp.*, 752 F.3d at 957.

When determining if a "significant enough" difference exists, "[t]he criterion is whether the item possesses features *substantially in excess* of those within the common meaning of the [heading] term."  *Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996) (internal quotation marks omitted) (emphasis in original).  An article that "has been improved or amplified but whose essential characteristic is preserved or only incidentally altered is not excluded from an unlimited *eo nomine* statutory designation."  *Id.*  But an item does not belong in an *eo nomine* provision if it "is in character or function something other than as described … and the difference is significant."  *Id.* at 1097 (citation omitted).

Courts apply this "substantial excess" test in a fact-specific inquiry.  *See, e.g.*, *id.* at 1098 (an electronic synthesizer does not possess characteristics in substantial excess of ordinary musical instruments because its "additional features are designed primarily to make it easier for a musician to create music or embellish the sound he or she would normally be able to produce"); *CamelBak Prods.*, 649 F.3d at 1368–69 (a bag with hydration and cargo components possessed features substantially in excess

of a backpack because it was principally designed to afford "hands-free" hydration, not storage); *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336–37 (the addition of wearable sleeves to an ordinary blanket did not introduce features in substantial excess of a blanket because the sleeves amplified the product's ability serve as a covering). "Relevant factors include the subject import's design, use, or function, how the article is regarded in commerce and described in sales and marketing literature, and whether the addition 'is a substantial or incidental part of the whole product.'" *Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336–37 (quoting *CamelBak Prods.*, 649 F.3d at 1368).

Oversized sweaters, sweatshirts, and pullovers may be somewhat atypical, but they are still familiar items in the apparel market. Indeed, Mr. Speciale modeled The Comfy® off of a scene he witnessed where he saw his "[seven]-year-old" nephew cocooned in Mr. Speciale's "six [foot] one … 200 pound" brother's "hood[y]" sweatshirt. Trial Tr. vol. I at 62:6–13, ECF No. 108 (direct testimony of Mr. Speciale). That sweatshirt was oversized on his nephew, but it was still a sweatshirt. *See id.* (describing what his nephew was wearing as "one of my brother's old hoodies"). Its oversized nature did not transform it into something new.

Like the size of the sweatshirt his nephew wore, The Comfy®'s oversized nature is an "incidental part of the whole product." *CamelBak Prods.*, 649 F.3d at 1368. Despite its size, the product is principally donned and worn like an ordinary pullover. *See* Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale). The Comfy® possesses all the essential characteristics of a sweater,

sweatshirt, or pullover:  It covers the user's upper body; it provides for some warmth without protecting from inclement weather; and users can wear it over other garments.  *See supra* at 67.  The Comfy®'s oversized features do not negate these essential characteristics.  If anything, they amplify The Comfy®'s ability to be worn over other garments and provide for some warmth.

The Comfy's marketing also leans in favor of concluding The Comfy®'s oversized nature does not remove it from Heading 6110.  Marketing is relevant when deciding if a product's improved features — here, being oversized — are in substantial excess of a heading term.  *See GRK Canada*, 761 F.3d at 1358.  It is true that The Comfy® was sold in a box and often was sold in stores' bedding or blanket sections, but that reflects Cozy Comfort's desire to take advantage of the public's familiarity with The Snuggie® rather than The Comfy®'s true nature.  *Compare* Ex. P-1 (showing The Comfy®'s box), *and* Trial Tr. vol. I at 152:12–154:13, ECF No. 108 (direct testimony of Mr. Speciale) (detailing where The Comfy® has been sold), *with Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1325 (stating The Snuggie® is sold in a "box"), *and id.* at 1326 (detailing where The Snuggie® is sold).  The Comfy®'s marketing strategy focused on how The Comfy® differs from The Snuggie® by emphasizing its sweatshirt-like wearability.  *See, e.g.*, Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE:  "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around.");  Trial Tr. vol. III at 945:23–946:5, ECF No. 110 (PROF. FERRO:  "The Snuggie is like a blanket.  But [The Comfy®] is a

garment."); Ex. D-21 at 6:03–47 (Mr. Speciale describing the differences between The Snuggie® and The Comfy® on *Shark Tank*). This difference was the centerpiece of Cozy Comfort's marketing strategy. *See* Trial Tr. vol. I at 67:1–7, ECF No. 108 (direct testimony of Mr. Speciale); Ex. P-4; Ex. D-21. That strategy involved calling the product "The Blanket … *That's A Sweatshirt*" and advertising the product using a trademark of a panda "wearing a hooded sweatshirt." Ex. P-4 (emphasis added). The Comfy® is oversized, but that did not stop Cozy Comfort from emphasizing its sweatshirt-like characteristics when selling consumers on the product. In the words of the patent, The Comfy® solved the left-behind blanket problem by giving users something that was "practically portable when worn on the body," Ex. P-6, col. 1., lines 40–41, and The Comfy® is "worn on the body of the person like an article of clothing[.]" *Id.* at col. 5, lines 65–66. The Comfy® thus meets the essential characteristics associated with items of Heading 6110.

## C.

Finally, the Court assesses if The Comfy® falls under a particular term in Heading 6110. 6110, HTSUS. No party argues that The Comfy® is a waistcoat or vest, and the Court finds The Comfy® is not classifiable as such a garment. *Compare Victoria's Secret Direct*, 37 CIT at 588 (defining vest as "[a]n item of wearing apparel … that is similar to a sleeveless jacket") (citing THE FAIRCHILD DICTIONARY OF FASHION 477 (3rd ed. 2003)), *with* Jt. Uncontested Facts ¶ 6, ECF No. 107 (noting The Comfy® has "long sleeves"). No party argues that The Comfy® is a sweater or a sweatshirt. Instead, they debate whether The Comfy® falls under the term

"pullovers" or under the catch-all term "similar articles." *See* Pl.'s Br. at 19–49, ECF No. 114; Def.'s Br. at 31–37, ECF No 116.

"[A] pullover comprises 'a garment (as a sweater, shirt, or blouse) that is put on by being pulled over the head and is usu[ally] made without a placket or similar opening.'" *LeMans Corp.*, 34 CIT at 162–63 (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1840, 2308 (2002)). Professor Ferro testified that, in the garment industry, pullovers share key features: (1) they have an opening for the head; (2) they pull over the head; (3) they are knitted; (4) they have a hood; (5) they usually have some kind of rib at the wrist like ribbed cuffs; (6) they have sleeves; (7) they have front and back panels sewn together; and (8) they can have a kangaroo pocket. *See* Trial Tr. vol. III at 1034:4–1036:2, ECF No. 110.

Users put on The Comfy® by pulling it "over the head," in the same manner as users don an ordinary pullover. *Id.*; *see also* Jt. Uncontested Facts ¶ 10, ECF No. 107. The Comfy® also has all the other key features of a pullover: It has an opening for the head; it is knitted; it has a hood; it has ribbed cuffs; it has sleeves; its front and back panels are sewn together; and it has a kangaroo pocket. *See* Trial Tr. vol. III at 1034:4–1036:2, ECF No. 110 (direct testimony of Prof. Ferro); Jt. Uncontested Facts ¶¶ 4–6, ECF No. 107. It lacks a "placket or similar opening" in the front panel of the garment. *LeMans Corp.*, 34 CIT at 162–63. Its design was inspired in part by a pullover. *See* Trial Tr. vol. I at 61:20–63:15, ECF No. 108 (direct testimony of Mr. Speciale). And users wear it in the same situations they might wear a pullover. *See* Jt. Uncontested Facts ¶ 18, ECF No. 107 (list of activities during which The Comfy®

can be worn).  Cozy Comfort's marketing of The Comfy® as an improvement on The Snuggie® that offers clothing-like wearability also leans in favor of this conclusion. *See* Ex. P-4 (depicting a "standing panda bear wearing a hooded sweatshirt" as a logo for The Comfy®); Ex. D-21 at 6:03–49; Trial Tr. vol. IV at 1193:23–25, ECF No. 111 (Rule 30(b)(6) deposition of Mr. Speciale on behalf of Cozy Comfort) (MR. SPECIALE: "So [The Snuggie®] does have an opening, as opposed to The Comfy, where[as] The Comfy is closed around.").  Indeed, the first association a consumer is likely to have on viewing the product for the first time is that it is an oversized pullover.  It is an inescapable association.

## IV.    The Comfy® Cannot Be Classified Under Any Other Heading

Cozy Comfort makes three arguments for why The Comfy® should be classified as a blanket under Heading 6301.  First, it argues that The Comfy® "is a large piece of fabric" like a blanket.  *See* Pl.'s Br. at 50–51, ECF No. 114.  Second, it asserts The Comfy® is "oblong, meaning that it is elongated and departs from an exact square with its rectangular shape."  *See id.*  Third, it contends "the Comfy® is designed and primarily used as a covering for warmth and protection from the cold like a blanket." *See id.* at 51 (emphasis removed).  The Court is unpersuaded.

That The Comfy® is made of fabric does not render the product a blanket. Many items are made of fabric, including sweaters, sweatshirts, pullovers, blankets, tee shirts, pants, suit jackets, dresses, skirts, scarves, gloves, and ties.  The HTSUS does not contain a general "fabric" classification.  Instead, it creates a system where fabric-made items are classified based on the physical characteristics that the

manufacturing process imparts on them, *e.g.*, by sewing. *See, e.g.*, 6110, HTSUS ("Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted[.]"); 6301, HTSUS ("Blankets and traveling rugs[.]").

The Comfy® is oblong, but — as with being made of fabric — that characteristic is not unique to blankets. Many items also have an elongated, non-square shape. These items include ties, dresses, and shirts. Oblongness, while perhaps a feature of blankets, is not sufficient to make an item a blanket.

The Comfy® is designed to provide for some warmth and protection from the cold, but it is not a "covering … like a blanket." Pl.'s Br. at 51, ECF No. 114. As *Allstar Marketing* noted, the "essential characteristic" of a blanket is that a blanket is "a large piece of fabric providing a warm covering." 41 CIT __, 211 F. Supp. 3d at 1337. *Allstar Marketing*'s reference to the term "covering" is linked to the fact that people drape a blanket over their front. *See id.* at 1333–34 (discussing how The Snuggie® is designed "to be loosely worn as an outer layer roughly covering the front of the user"). The Comfy® does not cover a person like a blanket. Rather than being draped over their front, users wear The Comfy® by pulling it over their head, sliding their arms into the item, and then pulling it down. The Comfy® not only covers a user's front but also covers his back, arms, and — if he uses the hood — his head. This is not the kind of "covering" that the *Allstar Marketing* Court viewed as quintessentially blanket-like. 41 CIT __, 211 F. Supp. 3d at 1337. That The Comfy® is sewn shut with a back panel undermines Cozy Comfort's argument that the product is a blanket. Both the typical blanket and The Snuggie® are not sewn shut and do

not have a back panel. *See Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1333 (discussing how The Snuggie® is "open in the back"). This difference is not esoteric; being sewn shut with a back panel is not an "incident[al] alter[ation]" to the ordinary blanket. *Cf. Casio*, 73 F.3d at 1098.

Sewing the panels together makes The Comfy® into something "in character [and] function" significantly different from a blanket in three important ways. *Id.* at 1097; *see also* Trial Tr. vol. III at 946:4–7, ECF No. 110 (PROF. FERRO: "The Snuggie is like a blanket. But [The Comfy®] is a garment. It has seams that pull it all together just like any garment. It's sewn together."). First, The Comfy® — by being sewn shut with a back panel — provides a 360-degree covering that, while oversized, tracks the shape of the human upper body. A blanket does not have this kind of human-body-based design and instead is a flat piece of fabric. *See Allstar Mktg.*, 41 CIT __, 211 F. Supp. 3d at 1336 ("Plaintiff offers as a common meaning that a blanket is a flat, rectangular textile covering …. Defendant contends the dictionary definitions suggest that a blanket is a single, continuous uninterrupted piece of fabric ….") (internal quotation marks and modifications omitted). Second, customers don The Comfy® differently from how they use a blanket because The Comfy® is sewn shut with a back panel. Users do not wrap a blanket around their body by "opening it up … from the very large bottom opening … slid[ing] [their] arms into each of the two sleeves … pull[ing] the rib cuff to [their wrists] … [and] put[ing] [their] head through the hole for … where the hood is." Trial Tr. vol. I at 108:23–109:6, ECF No. 108 (direct testimony of Mr. Speciale). Third, because of its back panel, The Comfy®

is designed to be worn like an article of clothing — including when the user is active. Those activities can include "ice skating; holiday activities at the park; tailgating; dinner party hosting; outside chores, like raking leaves; outside play, like jumping in the freshly raked leaves; pumpkin picking; pumpkin carving; hayrides; corn mazes; dancing; walking the dog; getting the mail; [and] cheering on the sidelines[.]" Jt. Uncontested Facts ¶ 18, ECF No. 107.

These three differences all touch on the core characteristics that define The Comfy®. They also make The Comfy® "in character [and] function something other than as described" by the term blanket. *Casio*, 73 F.3d at 1097. Fundamental differences like these mean that The Comfy® cannot be classified under Heading 6301. *See id.* (holding that an item cannot be classified in an *eo nomine* provision if it "is in character or function something other than as described … and the difference is significant"). The Comfy® also cannot fit under the two other basket headings proffered by Cozy Comfort. Merchandise can only fit into a basket provision "if there is no tariff category that covers the merchandise more specifically." *R.T. Foods*, 757 F.3d at 1354 (quoting *Rollerblade*, 24 CIT at 815). As Heading 6110 covers The Comfy®, the product cannot fit into a basket provision. *Id.*

## V. The Comfy®'s Proper Subheading

Customs believes that, if The Comfy® is classifiable in Heading 6110, it belongs in Subheading 6110.30.30. Def.'s Br. at 58, ECF No. 116. Cozy Comfort argues over The Comfy®'s proper heading classification but does not address which

subheading The Comfy® should fall under if the Court finds the good classifiable under Heading 6110. Pl.'s Br. at 56–57, ECF No. 114.

The subheadings under Heading 6110 classify products based on the kind of fabric used in the production process. *See, e.g.*, 6110.30.15, HTSUS (items "[c]ontaining 23 percent or more by weight of wool or fine animal hair"); 6110.10.10, HTSUS (items "[o]f wool or fine animal hair" that are "[w]holly of cashmere"); 6110.20.10, HTSUS (items "[o]f cotton" that contain "36 percent or more by weight of flax fibers."). Subheading 6110.30.30 applies to items that are "[o]f man-made fibers" other than "23 percent or more ... of wool or fine animal hair," "30 percent or more ... of silk or silk waste," and "25 percent or more ... of leather." *Compare* 6110.30.30, HTSUS, *with* 6110.30.10, 6110.30.15, *and* 6110.30.20, HTSUS. The parties agree that The Comfy® is "knitted and made from 100% man-made fibers, specifically polyester." *See* Jt. Uncontested Facts ¶ 4, ECF No. 107. Therefore, The Comfy® is a pullover classifiable under Subheading 6110.30.30.

## CONCLUSION

A wearable, oversized item covering the front and back with a hood, sleeves, ribbed cuffs, and a marsupial pocket is not a blanket. It is a pullover. Judgment must enter accordingly.

**SO ORDERED**.

Stephen Alexander Vaden, Judge

Dated: June 16 2025
       New York, New York